UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE NO. 23-CR-14013-AMC

UNITED STATES OF AMERICA,

            Plaintiff,              FORT PIERCE, FLORIDA

    vs.

                                  MAY 9TH, 2023

RAYMOND SAUNDERS,

                                PAGES 1 - 267

            Defendant.
_____/

DAY II OF III

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
FOR THE GOVERNMENT:    JOHN C. McMILLAN, AUSA
                       U.S. Attorney's Office
                       500 S. Australian Ave., Suite 400
                       West Palm Beach, Florida  33401

FOR THE DEFENDANT:     MARTIN L. ROTH, ESQ.
                       Martin L. Roth, P.A.
                       1700 East Las Olas Blvd., Suite 307
                       Fort Lauderdale, Florida  33301

REPORTED BY:           DIANE M. MILLER, RMR, CRR, CRC
                       Official Court Reporter
                       United States District Court
                       Fort Pierce, FL  34950
                       (772)467-2337

```
 1                      INDEX OF WITNESSES

 2   WITNESSES:                                        PAGE

 3   CARLOS RODRIGUEZ-RODRIGUEZ

 4        Cross-Examination by Mr. Roth                 17

 5        Redirect Examination by Mr. McMillan          55

 6   CLAYTON KIMBALL

 7        Direct Examination by Mr. McMillan            68

 8        Cross-Examination by Mr. Roth                102

 9        Redirect Examination by Mr. McMillan         107

10   JASON DIMART

11        Direct Examination by Mr. McMillan           109

12        Cross-Examination by Mr. Roth                124

13   JAMES HOLLORAN

14        Direct Examination by Mr. McMillan           127

15        Cross-Examination by Mr. Roth                141

16        Redirect Examination by Mr. McMillan         149

17   RONALD ANDERSON

18        Direct Examination by Mr. McMillan           156

19        Cross-Examination by Mr. Roth                175

20        Redirect Examination by Mr. McMillan         176

21   JOSHUA WOODBURY

22        Direct Examination by Mr. McMillan           179

23

24

25
```

Tuesday, May 9th, 2023

1                   P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Good morning, you may be seated.

3          All right.  I hope you had a pleasant evening.  This

4    is day two of trial in this case, 23-14013, criminal, United

5    States of America versus Raymond Saunders.

6          Mr. McMillan, any updates to start out with?

7          MR. McMILLAN:  Well, Your Honor, we still have the

8    issue of the NCIC printouts in Mr. Rodriguez's file, and if the

9    Court is asking if there are any updates regarding the timing

10   of the trial or any other issues, I think we are still on

11   track.

12         THE COURT:  In terms of the NCIC issue, after we left

13   things off, Mr. Roth explained that he received the certified

14   A file in discovery and I think; therefore, appropriately

15   determined that the contents of the A file he received

16   certified, in fact, were associated with

17   Mr. Rodriguez-Rodriguez, so do you have a legal objection at

18   this point, or do you have an actual request of the Court?

19         MR. McMILLAN:  Well, I have a legal objection in that

20   the records to which he is referring do not belong to this

21   individual.

22         THE COURT:  But the certification says otherwise?

23         MR. McMILLAN:  No, Your Honor.  The certification

24   says this is the A file of the person; however, if an

25   individual exercises due diligence in looking at the NCIC

1    records, one can see that there are a total of 15 different

2    individuals that were conducted in a warrant search in what is

3    called the temporary file.

4         Now, we had to go and give the Defense the entire

5    A file because the CIS, Citizenship and Immigration Services

6    will not certify individual documents; you get the whole thing

7    or nothing at all.

8         THE COURT:  Why can't you have a witness that

9    explains the ins and outs of how this works and how NCIC

10   information about other people somehow ended up in the A file

11   of this individual, Mr. Rodriguez?

12        MR. McMILLAN:  We absolutely can, and are happy to do

13   so.  The only reason I brought it up was I didn't want to

14   sandbag Defense Counsel if he honestly believed that these 15

15   other individuals are related to Mr. Rodriguez, I didn't want

16   him going down the path of cross-examining the Defendant -- or

17   the Codefendant.

18        THE COURT:  Okay.  No, I appreciate that you gave him

19   that heads up, and that's all fine.  At this point, though, I

20   need to decide whether there is a legal issue or factual issue

21   to adjudicate.

22        It sounds like there isn't and that you have a

23   witness prepared to explain away any potential inconsistencies

24   in the A file, is that correct?

25        MR. McMILLAN:  Yes, Your Honor.

 1              THE COURT:  Okay.  So is there any issue to resolve,

 2    Mr. Roth, on this subject?

 3              MR. ROTH:  Well, the only issue that I'm aware of,

 4    the A file is in evidence, and so is or will be Mr. Saunders' A

 5    file in evidence and the Government and I discussed removing

 6    the NCIC printouts from the A file, because at least with

 7    regard to Mr. Saunders, it would indicate previous contacts

 8    with law enforcement and both sides agreed that wasn't

 9    admissible, it shouldn't be included in the A file, so it has

10    also been removed from the exhibit of Mr. Rodriguez's A file.

11              But I do have the NCIC with me, and I believe that

12    the Government has correctly represented that this is a very

13    broad warrant search; that they put in the criteria of

14    Mr. Rodriguez's name and his date of birth and sometimes it

15    comes back with information that's not specific to him.

16              I didn't recognize that when I first looked at it

17    because it's in his alien file, and I intend to cross-examine

18    him appropriately, with the understanding that is, in fact, the

19    case.

20              THE COURT:  Okay.  So is there an objection from

21    either side on this issue?

22              MR. McMILLAN:  I have no objection to the Defendant

23    or Defense Counsel cross-examining the Defendant about anything

24    he wants to in this regard.  I just want him to know that the I

25    expect the answer is going to be, I don't know what you are

1    talking about.

2            THE COURT:  Okay, all right.  But I hear no objection

3    from the Government.

4            Any objection from Mr. Roth?

5            MR. McMILLAN:  I'm not objecting, Your Honor, and I'm

6    sorry, I didn't mean to interrupt, but Government's Exhibit 10,

7    which apparently it's correct is now in evidence, I would

8    submit that we should take that out of evidence.  That's

9    Mr. Saunders' A file, and I don't think under any circumstances

10   the whole thing should go into evidence, it contains a whole

11   bunch of information which is problematic going to the jury.

12           THE COURT:  Such as?

13           MR. McMILLAN:  His criminal history, all of the

14   interviews that were conducted, large quantities of hearsay,

15   all of the complaint affidavits and everything for this case.

16           THE COURT:  Okay, all right.

17           Mr. Roth.

18           MR. ROTH:  I certainly agree with that.  I thought

19   that we had made that agreement prior to trial, but if that's

20   in the exhibit, it should come out.

21           THE COURT:  All right.  So what I'm going to direct

22   the parties to do over our first break is to confer on the

23   subject of Government's 10 and ensure that there is an

24   agreement on what should be contained in that A file and remove

25   whatever should not be there.

1               Any questions on that subject, Mr. Roth?

2               MR. ROTH:  No, Your Honor.

3               THE COURT:  Mr. McMillan?

4               MR. McMILLAN:  Your Honor, we can simply admit the

5     exhibits that we marked from the file separately, which is what

6     we always intended to do.  I conferred with Mr. Roth, he was in

7     agreement that those can come in; that is, the order of

8     deportation, the confirmation of deportation, and nothing else

9     from that A file needs to come into evidence as far as the

10    Government is concerned.

11              THE COURT:  All right.  But I'm just looking here, in

12    this exhibit list, and now you are talking about taking things

13    out and perhaps renumbering them, I want to keep things

14    organized, so are you saying the entirety of Government's 10 is

15    removed, according to your proposal, because there are other

16    exhibits that constitute whatever it is you believe should be

17    introduced?

18              MR. McMILLAN:  Yes, Your Honor, and let me explain

19    why.

20              When we prepared this exhibit list, which was two

21    weeks before trial, to file it in a timely fashion, we had no

22    agreement as to the introduction of these documents.  If we

23    wanted to get those documents into evidence, we had to

24    anticipate --

25              THE COURT:  That's fine, but when I you asked to

1    pre-admit exhibits yesterday, there was no discussion of the

2    complexity to Government Exhibit 10, so at this point, I want

3    to make things clear.

4           Mr. Roth, do you object to removal of Government's

5    Exhibit 10 in its entirety?

6           MR. ROTH:  No, Your Honor.

7           MR. McMILLAN:  Thank you, Your Honor.

8           THE COURT:  Mr. McMillan, any objection?

9           MR. McMILLAN:  No, Your Honor.

10          THE COURT:  Okay.  So Government's 10 is now removed

11   from evidence and the Court's prior ruling admitting it without

12   objection is vacated and Government's 10 is not in evidence.

13          MR. McMILLAN:  Thank you, Your Honor.

14       (Government Exhibit No. 10 is withdrawn from evidence and

15         the Court's prior ruling admitting it is vacated.)

16          THE COURT:  All right.  Any other issues to address

17   before we turn to the charge conference, Mr. McMillan?

18          MR. McMILLAN:  No, Your Honor.

19          THE COURT:  Mr. Roth?

20          MR. ROTH:  No, Your Honor.

21          THE COURT:  One moment.  Okay, I have taken a look at

22   the parties' proposal, and I see a few areas of disagreement.

23          So I'm going to turn first to Mr. Roth for you to

24   identify the various instructions that you think are different

25   than what the Government has proposed and why, starting with

1  your first item.

2           MR. ROTH:  Yes, Your Honor.

3           The first area which I think is the easiest to set

4  out is the jury instruction regarding aiding and abetting,

5  which applies to count 79.

6           As Your Honor knows, there was a motion pretrial to

7  dismiss count 79 arguing a matter of law, and I read Your

8  Honor's order denying the motion, I read it carefully, and I

9  understand the Court's reasoning in denying the motion.

10          I would imagine for the reasons stated in Your

11  Honor's order, you're probably going to deny my request to add

12  this fourth element of proof to the aiding and abetting

13  instruction, but I really think maybe in order for me to

14  preserve that issue with the record, I need to request the

15  instruction, so I do request a modification of the aiding and

16  abetting instruction that's filed at document 45 in the court

17  file.

18          THE COURT:  Just to follow-up, do you agree that your

19  argument for the addition of this additional mens rea component

20  is currently foreclosed by Eleventh Circuit precedent?

21          MR. ROTH:  I think the latest Eleventh Circuit

22  precedent on this issue would be consistent with the Court's

23  denial of that modified instruction, and as the Court is aware,

24  I'm relying on a Supreme Court opinion.

25          THE COURT:  Any further argument on this issue,

```
 1   Mr. McMillan?

 2           MR. ROTH:  No, Your Honor.  I believe that the

 3   instruction as written is consistent with this Court's prior

 4   ruling in the matter and also consistent with Eleventh Circuit

 5   binding precedent as it exists presently.

 6           THE COURT:  Okay.  So just remind me, Mr. Roth, what

 7   docket entry reflects your proposed instruction?

 8           MR. ROTH:  Your Honor --

 9           MR. McMILLAN:  It's 45, Your Honor.

10           MR. ROTH:  45, right, filed on May 4th of 2023.

11           THE COURT:  All right.  That request to add an

12   element to the aiding and abetting instruction under 1327 will

13   be denied for the reasons stated in the Court's order denying

14   the motion to dismiss that count.

15           I think that order tracks current Eleventh Circuit

16   law correctly, and I think to the extent anyone were to

17   reconsider *Lopez* in the future, such reconsideration would, on

18   the merits, be inappropriate, even under the *Rosmon* case,

19   because adding such a specific mens rea requirement that would

20   require the Government to prove the Defendant's knowledge of

21   the specific issues, such as an alien's prior conviction for a

22   felony, I think stretches the mens rea line of cases too far

23   and beyond a fair reading of *Rehaif* and other similar

24   decisions; not to mention the fact that functionally and

25   practically speaking, what qualifies as an aggravated felony is
```

Tuesday, May 9th, 2023

1    something that is oftentimes a fluctuating concept based on

2    things such as the categorical approach and other legal

3    technicalities, so for those reasons, along with what I said in

4    the order denying the motion to dismiss, the request to add the

5    instruction is denied, but it is preserved.

6         Let's move on, Mr. Roth, to your next argument.

7         MR. ROTH:  Judge, we had previously requested the

8    Eleventh Circuit standard duress and coercion instruction and

9    then withdrew it once we made the -- the Defense made the

10   decision not to attempt to enter into evidence the text

11   messaging found on the Defendant's phone, but the Government

12   has introduced those text messagings.

13        THE COURT:  Well, not yet, it seeks to.  I have

14   indicated a preliminary intention to admit them, so long as the

15   Government can establish a foundation for them.

16        MR. ROTH:  So if they are admitted, I would like to

17   again request the duress and coercion instruction.

18        THE COURT:  All right.  I can't rule on that issue

19   without seeing how things play out.  At this point, to me,

20   there appears to be no authentic, and I say authentic in sort

21   of quotes, factual basis to warrant such an instruction, and so

22   while the exhibits themselves might be inadmissible -- I'm

23   sorry, admissible to prove they were essentially concocted by

24   the Defendant in advance of his smuggling venture, that doesn't

25   necessarily mean that there has been a valid factual basis to

1   warrant a duress instruction.  But in any case, I will defer

2   ruling on that issue until a later date, perhaps later today,

3   once I can see some of this evidence play out.

4           Mr. McMillan, anything else on this issue, which as I

5   understand it, is a request to instruct the jury on a purported

6   duress defense?

7           MR. McMILLAN:  No, Your Honor.  I believe the Court

8   has already captured the entire state of things as they are

9   now.

10          THE COURT:  Okay, thank you.

11          Okay.  Next issue, Mr. Roth.

12          MR. ROTH:  The Government has requested the

13   instruction regarding redaction of the recordings, and we think

14   it would be best to --

15          THE COURT:  Can you get closer to the microphone, and

16   I'm sorry that it is a shorter one.  There is a taller one over

17   there, maybe we can switch them around a bit.

18          MR. ROTH:  So I also request that instruction, I

19   think that would be a good instruction for the jury to receive

20   because it may be that there are matters that were in the

21   original recording that both parties deem to be not admissible

22   or should not be admitted and it wouldn't be right for the jury

23   to think that one party or the other just intentionally is

24   hiding evidence from them.

25          THE COURT:  All right.  I think we discussed this

1   yesterday and the parties indicated their joint submission of

2   that proposed instruction, so I see no disagreement.

3            Mr. McMillan, are things the same way as they were

4   presented yesterday?

5            MR. McMILLAN:  They are, Your Honor.

6            THE COURT:  Okay.  So that instruction, which I think

7   you titled -- what is the formal title of it?

8            MR. McMILLAN:  The formal title of it, Your Honor, is

9   Requested Recording Redaction Instruction, and I have an extra

10   copy if the Court needs one.

11            THE COURT:  Yes, that would be helpful, if you have

12   an extra copy, please.

13            MR. McMILLAN:  May I approach, Your Honor?

14            THE COURT:  Actually, I have it here, nevermind, I

15   don't need another copy.

16            Okay, okay.  Any additional points of disagreement,

17   Mr. Roth, as far as the instructions are concerned?

18            MR. ROTH:  Yes, Your Honor.  We are objecting to the

19   instruction regarding fleeing, we don't think there is any

20   factual basis for that.

21            THE COURT:  What about concealment?

22            MR. ROTH:  Concealment -- I mean, I see where this

23   goes two ways, it is either concealment or it's coercion, and

24   that's why I request the instruction now, because that issue is

25   in play and it is a valid defense, if proven, and I think

1    whether or not it's proven or how to receive the evidence and

2    what exactly to believe I think is the province of the jury, so

3    I think they should be instructed on both alternatives.

4            THE COURT:  All right.

5            Mr. McMillan?

6            MR. McMILLAN:  Your Honor, as I believe the Court has

7    accurately assessed already, the issue here is not one of

8    flight, but rather concealment; that the jury can infer from

9    the Defendant's concealment of himself if they, as the fact

10   finders, conclude that he, himself, made the decision to go and

11   hide there, it was consciousness of guilt, and so proposed

12   instruction Number 11, I believe, we have already established

13   the factual basis to justify it.

14           I think it will become stronger after the jury has an

15   opportunity to see the video of the Defendant coming out of the

16   compartment.

17           THE COURT:  All right.  Mr. Roth, do you disagree

18   that there has been at least the minimum factual showing

19   necessary to warrant the instruction given the evidence of the

20   Defendant's concealment?

21           MR. ROTH:  No, Your Honor, because I don't see it as

22   concealment.

23           THE COURT:  You don't see someone putting themselves

24   in a compartment on a vessel immediately before law enforcement

25   descends on a boat as at least evidence from which a fact

 1   finder could conclude that he intentionally concealed himself?

 2       MR. ROTH:  Standing alone, yes, but once the

 3   Defendant's statement comes in, and I understand the Government

 4   is going to play that for the jury, there will be evidence on

 5   both sides.

 6       THE COURT:  All right.  So there might be a contested

 7   question, but as far as the level of proof required for the

 8   Court to issue the instruction, do you have any argument to say

 9   that hasn't been met?

10       MR. ROTH:  No, I'm trying to make a little bit more

11   nuanced argument.  What I'm saying is that perhaps it's been

12   met, that's within, I think, the province of the jury to decide

13   what him being in that compartment reflects.

14       I think when Mr. Saunders' statement comes in, there

15   will also be evidence from which the jury can conclude that he

16   was put in there, that he was threatened and coerced.

17       THE COURT:  Okay.  So I think what I'm hearing is you

18   don't disagree that factually, there has been that minimal

19   showing sufficient to warrant the instruction, but you think

20   there should be the duress Defense instruction, I guess as a

21   counterpoint for the jury, is that correct?

22       MR. ROTH:  I think that's exactly correct.

23       THE COURT:  All right.  Because I'm not going to rule

24   on the duress instruction right now prematurely, I'm not going

25   to make a final decision on the flight/concealment instruction,

```
 1   although I do believe there has been sufficient showing for the
 2   issuance of that flight/concealment instruction given the
 3   testimony of Mr. Rodriguez, and I presume additional evidence
 4   to come on the concealment question.
 5            Any other points of disagreement on the instructions,
 6   Mr. Roth?
 7            MR. ROTH:  No, Judge.
 8            THE COURT:  Okay.  Any points of disagreement or
 9   additional discussion from the Government?
10            MR. McMILLAN:  No, Your Honor.
11            THE COURT:  Let me confirm that both parties
12   submitted the same verdict form without disagreement.
13            Mr. Roth?
14            MR. ROTH:  Yes, Judge.
15            THE COURT:  Okay.  Mr. McMillan?
16            MR. McMILLAN:  Yes, Your Honor, we did.
17            THE COURT:  Okay.  We are going to get started.  We
18   will have another opportunity to discuss the final instructions
19   and prior to that final discussion, I will you circulate the
20   Court's final draft to receive any additional objections on the
21   record.
22            With that, let me see whether the jurors have
23   arrived.  Ms. Cassisi?
24            THE COURTROOM DEPUTY:  They have, Your Honor.
25            THE COURT:  Okay.  Then let me ask the marshals to
```

 1   please bring in Mr. Rodriguez.

 2        (Pause in proceedings.)

 3             THE COURT:  Good morning, Mr. Rodriguez.

 4             THE WITNESS:  Good morning, Your Honor.

 5             THE COURT:  All rise for the jury.

 6        (Jury in at 9:12 a.m)

 7             THE COURT:  Please be seated.

 8             Good morning, ladies and gentlemen, thank you for

 9   your punctuality.  We are resuming trial today with the

10   cross-examination of Mr. Carlos Rodriguez-Rodriguez.

11             Mr. Roth.

12             MR. ROTH:  Thank you, Judge.

13                        CROSS-EXAMINATION

14   BY MR. ROTH:

15   Q   Good morning, Mr. Rodriguez.

16   A   Good morning, sir.

17   Q   You are a Defendant in this alien smuggling case, correct?

18   A   Yes, sir.

19   Q   And have you come to an agreement with the Government on

20   how to resolve these charges against you?

21   A   Well, what I have written.

22   Q   What you have written?

23   A   On my charges.

24   Q   Have you come to an understanding with the United States

25   Attorney's Office on how you would resolve these charges?

```
 1    A    I can't understand the question too well.
 2    Q    Okay.  Have you made an agreement with the Government on
 3    what to do about these charges against you?
 4    A    Plead guilty, yes, sir.
 5    Q    You are charged in a 79 count indictment, if I read it
 6    right, and in 78 of those charges, is that correct?
 7    A    Yes, sir.
 8    Q    Most of the charges involve smuggling in illegal aliens for
 9    profit, right?
10    A    That's correct.
11    Q    One of the counts involves the fact that you are an
12    aggravated felon and you made an attempt to reenter the United
13    States.
14    A    That's correct.
15    Q    Okay.  You pled guilty to that.
16    A    That's correct.
17    Q    So as to the -- well, let me take a look at the indictment.
18              As to the 76 counts of smuggling in an alien -- an
19    illegal alien into the United States for profit, as to those
20    counts, isn't it a fact that you only pled guilty to counts 1
21    and 2?
22    A    I pled guilty to 1 and 2?
23    Q    Isn't it a fact that with regard to the 76 counts that
24    allege you smuggled an alien into the United States for profit,
25    that consistent with your plea agreement, you have only pled
```

1    guilty to the -- to count 1 and to count 2 of that offense?

2    A   To my understanding about pleading guilty or me pleading

3    guilty, I supposed to be charged of -- I think it was 1 and 2,

4    and I supposed to be deducting some -- can you bring me the

5    document so I can read it?

6    Q   Sure.

7           MR. ROTH:  Your Honor, may I approach the witness?

8           THE COURT:  You may.

9    BY MR. ROTH:

10   Q   I'm going to hand you, to perhaps to refresh your

11   recollection, a copy of your plea agreement, and I'm also going

12   to put the indictment in front of you, okay?

13   A   Yes, sir.

14   Q   Take your time and take a look at those.

15          So Mr. Rodriguez, having had a chance to review those

16   documents, is it correct to say that you're charged in a 79

17   count indictment, and within that indictment, you're charged in

18   77 counts?

19   A   Yes, sir.

20   Q   And pursuant to your agreement with the Government, did you

21   plead guilty to just three counts of the indictment?

22   A   I pleaded guilty to those counts because it's bringing

23   me -- what you call -- my --

24   Q   Well, it reduces your criminal exposure at sentencing,

25   doesn't it?

```
 1   A    It's --

 2   Q    Instead of pleading guilty to all of the counts for

 3   smuggling aliens for profit, you are only pleading to two,

 4   correct?

 5   A    That's for accepting responsibility and pleading guilty,

 6   yes, sir, that's what I did.

 7   Q    What about responsibility for the other 74 aliens that you

 8   are not pleading guilty to, did you accept responsibility for

 9   that, also?

10   A    According to my plea -- to my plea agreement, yes, sir.

11   Q    According to your --

12   A    I am guilty of whatever I signed for.

13   Q    But you only signed for smuggling in two aliens, correct?

14   A    Not two aliens, sir.

15   Q    Well, what are they?

16   A    What?

17   Q    What kind of individuals did you smuggle in, if not aliens?

18   A    I can't understand your question.

19   Q    If the people were American citizens, you wouldn't be

20   sitting here in court, correct?

21   A    That is correct.

22   Q    They were aliens with no paperwork or no rights to be

23   admitted to the United States, correct?

24   A    Yes, sir.

25   Q    And you pled guilty to smuggling in two of them, right?
```

1  A    No, I plead guilty to smuggling all of them.

2  Q    Let's look at your plea agreement, then.

3         MR. McMILLAN:  Your Honor, at this point, is Defense

4  Counsel going to mark --

5         THE COURT:  No.

6         You are not marking this exhibit, correct?

7         MR. ROTH:  I'm just refreshing his recollection.

8         THE COURT:  Okay, thank you.

9         MR. McMILLAN:  Thank you.

10 BY MR. ROTH:

11 Q    So I don't want to pressure you to say anything, I just

12 want you to read the agreement and tell me, does it clearly say

13 that you are pleading guilty to counts 1, 2 and 78 of --

14        THE COURT:  Ladies and gentlemen, can you hear,

15 Mr. Roth?

16        THE JURY:  No.

17        MR. ROTH:  I'm terrible with that.

18 BY MR. ROTH:

19 Q    So do you see in the plea agreement where you are agreeing

20 to plead guilty to counts 1, 2 and 78?

21 A    Yes, sir.

22 Q    You are not pleading guilty to any other counts, are you?

23 A    According to my reading, that's what I'm pleading guilty

24 for.

25 Q    Well, you read it before you pled guilty, right?

1   A   Yes, sir.

2   Q   Did you know what you were doing?

3   A   Yes, sir.

4           THE COURT:  Mr. Roth, why don't you back up and go to

5   the lectern, and he can hold on to that for a while so you can

6   ask him questions.

7           MR. ROTH:  Yes, ma'am.

8   BY MR. ROTH:

9   Q   So by law, you only pled guilty to smuggling two aliens, so

10  isn't it correct that you escape responsibility on the charges

11  that charge you with smuggling the other 74 aliens?

12  A   Well, this is written -- this document was presented to me,

13  sir, and so I accept responsibility for the -- according to the

14  United States, crimes I committed and I'm pleading guilty for

15  that, I'm not hiding that.

16  Q   And you are obtaining a dismissal of the other 74 charges

17  regarding the other 74 aliens you smuggled into the United

18  States for profit.

19  A   For accepting responsibility I say again, sir.

20  Q   What do you mean by accepting responsibility?

21  A   For what I just tell you, for what I did.

22  Q   So by accepting that, the Government will dismiss the other

23  74 counts and to you, that means accepting responsibility?

24  A   I don't know how to read it, but I don't know how to write

25  it to you, but I just say it again:  I'm pleading guilty for

Tuesday, May 9th, 2023

1    what I have done, sir, I'm not hiding that from no one.

2    Q    Do you know how to read and write?

3    A    Yes, sir.

4    Q    So you understand what that says, right?

5    A    Yes, sir.

6    Q    And you have the assistance of an excellent lawyer that

7    made sure you understood it.

8    A    Yes, sir.

9    Q    The fact is, and I'm not holding it against you, but you

10   made a fantastic deal for yourself, didn't you?

11   A    It was not a deal, sir.

12   Q    Well, it is a written --

13   A    I'm pleading guilty for my responsibility, I say it

14   again --

15   Q    Well, weren't you --

16   A    -- for what I have done.

17   Q    Weren't you responsible for smuggling the other 74 illegal

18   aliens?

19   A    I'm saying again --

20   Q    Were you not also responsible?

21   A    Yes.

22   Q    How have you accepted responsibility for that?

23   A    What do you mean, how I accept responsibility?

24   Q    That's what you keep saying to me.

25   A    I accepted responsibility.

1   Q    The fact is, you pled not guilty originally and then at the

2   time you entered into this written plea, you pled guilty, but

3   only to smuggling two illegal aliens for profit, so what I'm

4   saying to you is, in what way have you accepted responsibility

5   for the entirety of the crime that you committed?

6   A    Well, this plea agreement they have for me, sir, what was

7   presented to me.  I committed to plead guilty for whatever is

8   written there, that's what I'm pleading guilty for.

9   Q    And all I'm trying to say and ask is if would you agree,

10  you got one heck of a deal, didn't you?

11  A    It's not a deal to me.

12  Q    So for each alien that you smuggle for profit, the law

13  requires that you receive a minimum sentence of three years per

14  alien, right?

15  A    If I read that right.

16  Q    So if you had pled guilty to smuggling in all of these

17  aliens, you would be facing a mandatory sentence of 228 years.

18  A    According to the law.

19  Q    According to the law.  Are you agreeing with me?

20  A    Well, to my charges, I supposed to be sentenced between 10

21  to 20 years in jail.

22  Q    You don't know what you are --

23  A    And I plead guilty.

24  Q    You have been in the federal system before, right?

25  A    Yes, sir.

1   Q    The previous time, you smuggled drugs into the United

2   States, do I have that right?

3   A    I pled guilty to conspiracy.

4   Q    Did you smuggle those drugs into the United States?

5   A    Along with somebody, yes, sir.

6   Q    Did you use you're training and skill as a boat captain to

7   do that?

8   A    Not to come to the United States, my job was to help to

9   take the boat up to the Bahamas.

10  Q    So you smuggled drugs to the Bahamas so they could be

11  smuggled into the United States.

12  A    I did not smuggle drugs to the Bahamas.

13  Q    How did you take the drugs to the Bahamas?

14  A    The boat depart from Nassau to the United States.

15  Q    Did you captain the boat to the United States?

16  A    No, sir, Eliazer did.

17  Q    So what did you do to participate in that conspiracy?

18  A    I say again, I help sail the boat.

19  Q    You helped him sail the boat from where to where?

20  A    From Nassau to -- to Florida.

21  Q    So you did help smuggle drugs to the United States?

22  A    That's correct.

23  Q    And you used your skill as a boat captain, as a mariner, to

24  smuggle drugs into the United States.

25  A    You are asking me that question again.  I said, I did not

1  use my skills as a captain.  I cannot captain an American

2  vessel with a Bahamian license, all right?  As a Bahamian

3  captain, I cannot captain any U.S. vessel.

4  Q   Well, you didn't use your captain's credentials, but what

5  I'm saying is you used your captain's skills, experience, your

6  training.

7  A   To travel to the Bahamas and come back.

8  Q   And to the United States.

9  A   To the Bahamas because I did not travel to the American

10 waters.

11 Q   Okay, I'm confused, maybe you can help me out.  You

12 smuggled the drugs from the Dominican Republic to the Bahamas.

13 A   That's negative.

14 Q   What did you do?

15 A   What do I do?

16 Q   Yeah.  As part of your conviction for five or more kilos of

17 cocaine, your conspiracy conviction, what is it that you did?

18 A   A plea was never mentioned on my indictment, sir.

19 Q   Where did the drugs originate?

20 A   The drugs came from Nassau, Bahamas to the States.

21 Q   How did they get to the States?

22 A   By boat.

23 Q   And who was on the boat?

24 A   Eliazer and myself.

25 Q   You didn't use any of your skill or training to take the

1    boat from Nassau to the United States?

2    A    To travel in the Bahamian waters, I did help.  I help

3    Mr. Eliazer to navigate through the Bahamian waters, yes, sir.

4    Q    And then what did you do, jump off the boat after you got

5    out of Bahamian waters?

6    A    No.

7    Q    You stayed on the boat.

8    A    That's correct.

9    Q    And the boat went to the United States.

10   A    That's correct.

11   Q    Where did it go?

12   A    It came to Florida, I think it was Fort *[unintelligible]*.

13              THE COURT REPORTER:  I didn't hear that.

14              THE COURT:  Fort Lauderdale, I think.

15   BY MR. ROTH:

16   Q    Fort Lauderdale?

17   A    Broward, if that's the same.

18   Q    Okay.  Now, on this case where you have obtained a

19   dismissal of 74 of the alien smuggling counts, have you been

20   sentenced yet?

21   A    I haven't been sentenced yet.

22   Q    Now, you are cooperating with the United States to present

23   a case against Mr. Saunders, right?

24   A    That's my codefendant, is the captain who traveled with me,

25   the person who travel with me.

```
1    Q    You are a captain, too, right?

2    A    That's correct.

3    Q    You keep saying that he is the captain, but you're the one

4    who is a licensed captain, correct?

5    A    I'm a licensed captain.  By the way, my license expired in

6    December.

7    Q    Well, that's what happens when you have trouble like this,

8    right?

9    A    Pardon me?

10   Q    Licenses tend to expire when you get yourself in this kind

11   of trouble, right?

12   A    It's not a fact that it just tend to expire, my license

13   expire every 31st of December.

14   Q    Okay.  And you can't renew it when you are charged with a

15   felony of using your captain skill to smuggle, right?

16   A    If I can't renew it?

17   Q    Yeah.  You think the Bahamians would renew your captain's

18   license even though you have pending charges of smuggling 76

19   illegal aliens for profit?

20   A    But I would say this to you, sir, I don't think this would

21   affect me or my Bahamian status.

22   Q    Okay.  So now you're here testifying because you wanted to

23   get a reduction of whatever sentence it is that you eventually

24   get from the Judge.

25   A    That is not the truth, sir.  I'm here testifying to tell
```

```
 1   the truth.

 2   Q   Just to tell the truth, out of the goodness of your heart.

 3   A   That's correct.

 4   Q   Okay.  Because you just want to help solve this human

 5   smuggling problem, right?

 6   A   That's not a fact that I want to help the human smuggling,

 7   sir; it's I want to testify and say what was my part of the

 8   smuggling, and that's why I plead guilty and I don't know how

 9   my role or enroll (sic), should I say, on this matter.

10   Q   Are you telling --

11   A   My enrollment [sic], so to speak.

12   Q   Are you telling the jury that you told the truth in your

13   testimony so far about your role in this offense?

14   A   That's correct.

15   Q   Even before Mr. Saunders came into the picture, you had

16   plans with the boss to take this boat and take these aliens and

17   smuggle them to the United States, right?

18   A   I did not make this plan, sir, I never had this plan.

19   Q   Didn't you testify on direct examination that the first

20   trip had to be canceled because the captain was no longer

21   available?

22   A   They was having everything planned, I took no part of the

23   plan, sir.  I was there --

24   Q   That's not what I asked you.

25           Didn't you testify on direct examination that you had
```

1  another plan to come in and smuggle these aliens, but it had to

2  be canceled because the captain was no longer available?

3  A   I don't understand when you say a plan, what do you mean by

4  a plan?

5  Q   Had you agreed to assist in smuggling aliens to the United

6  States before this venture where you got caught, but which had

7  to be canceled because the captain that was going to go with

8  you on the boat became unavailable?

9  A   Not the captain was not available, he just didn't want to

10 come on the trip.

11 Q   So you did have a previous plan to smuggle aliens to the

12 United States.

13 A   We were supposed to depart from -- Tuesday morning.

14       THE COURT REPORTER:  From what?

15       THE WITNESS:  On Tuesday morning, and that trip was

16 canceled.

17       THE COURT:  Are you saying Tuesday morning, sir?

18       THE WITNESS:  So to speak, Monday morning from

19 Tuesday.  What I say, from Monday morning to Tuesday morning,

20 that would be like 6:00, 7:00 o'clock in the morning.

21       THE COURT:  Thank you.

22 BY MR. ROTH:

23 Q   And then this opportunity which you're indicted for became

24 available to you, right?

25 A   Yes, sir.

1    Q    And you were going to go with Mr. Saunders.

2    A    But at that time, I don't know Mr. Saunders.

3    Q    And Lubin Phillip, you knew him, right?

4    A    I saw him a couple times.

5    Q    Okay.  A couple times?

6    A    Yes.

7    Q    When did you see him?

8    A    I saw him that Monday and that Tuesday.

9    Q    He worked for your boss?

10   A    I can't answer that question because I don't know what was

11   what, what his role was.

12   Q    So maybe he was the boss?

13   A    By the way, he is not my boss, sir.  That's a person I met,

14   and he is not my boss, he was not ever my boss.

15   Q    Well, what was he?

16   A    Pardon me?

17   Q    Why was he on the ship?

18   A    To me, he is the organizer, he just organized.  I never

19   know him as a boss, just an organizer.

20   Q    What does an organizer do in these human smuggling

21   operations?

22   A    I can't really explain that to you because I do not find

23   that information.

24   Q    Well, you called him an organizer, so in your mind, what do

25   you think an organizer is?

Tuesday, May 9th, 2023

```
 1   A    To me is the one who put everything together.

 2   Q    Gets the boat?

 3   A    Pardon me?

 4   Q    The organizer obtains the boat.

 5   A    The organizer obtains the boat?

 6   Q    Yeah, you need a boat to do this.  You need a nice big

 7   yacht to smuggle all of these aliens, don't you?

 8   A    Yes.

 9   Q    Is that the organizer's job?

10   A    Basically.

11   Q    And the boat needs gas.

12   A    That's correct.

13   Q    And I presume the relatives of the aliens need to know

14   where the boat is going so when the boat gets there, they can

15   pick up their relatives and take them home.

16   A    That is not really my part.

17   Q    Is that the organizer's part?

18   A    Basically.

19   Q    And this vessel, would it have to be filled with gas when

20   you got to Florida?

21   A    That's supposed to be.

22   Q    Did you have any American dollars on you?

23   A    No, I came here with about five or eight dollars.

24   Q    Do you have a credit card?

25   A    No, sir.
```

1   Q   Now, you were previously deported from the United States,

2   correct?

3   A   That was in 2009.

4   Q   Was that at the expiration of your prison sentence for drug

5   smuggling?

6   A   Sir, what you mean by expiration?

7   Q   When your sentence was over for smuggling five or more

8   kilos to the United States, is that when you went into the

9   custody of the Department of Homeland Security and they

10  deported you?

11  A   At the end of my sentence, I was deported to Santa Domingo.

12  Q   If you know, before they deported you, did they check

13  through the National Crime Information Computer system to see

14  whether you had any prior convictions or any pending warrants

15  for jurisdictions that wanted you?

16  A   I would say that's not my duty, I can't really tell.  I

17  don't know.

18  Q   Have you seen your alien file, your removal file?

19  A   No.

20  Q   So do you know the methods that they used before they

21  actually put you on a plane and deported you to see whether you

22  are wanted anywhere else?

23  A   Like I say to you, that is not really my duty, sir.  I

24  don't know.

25  Q   So you have never seen your own file?

```
1   A    No.

2   Q    And would you be surprised to know that in your alien file

3   maintained by the Department of Homeland Security, you're

4   listed here under 30 plus aliases, multiple convictions, are

5   any of those you?

6   A    That I be what?

7   Q    You are listed as having 30 plus aliases and multiple

8   convictions all throughout the United States.  Are any of those

9   persons you?

10  A    I know nothing about that, sir.

11  Q    Is this a mistake?

12  A    I would like to see the documents.

13  Q    If you want to see it, I'll show them to you.

14  A    I would like to see it.

15          THE COURT:  Mr. Roth, you handed the witness a large

16  stack of papers.  What do you propose?

17          MR. ROTH:  Your Honor, that is an NCIC printout.

18          THE COURT:  Okay.  Your question needs to be oriented

19  so the witness can fairly --

20          MR. ROTH:  Can I point out some biographical

21  information to Mr. -- I think it will help the witness.

22          THE COURT:  Yes.

23  BY MR. ROTH:

24  Q    These are actually very difficult to read.  Is this your

25  name, Carlos Rodriguez?
```

```
 1    A    Carlos Rodriguez.

 2    Q    Yeah.  Is that you, is that your name?

 3    A    My name is Carlos Rafael Rodriguez-Rodriguez, that's Carlos

 4    Rodriguez.

 5    Q    And were you born in 1975?

 6    A    Second of May 1975, yes, sir.

 7    Q    That's what it says, right, May 2nd, 1975?

 8              MR. McMILLAN:  Your Honor, may I see that document,

 9    please?

10              THE COURT:  You may.

11              Mr. Roth, do you have an extra copy of that?

12              MR. ROTH:  No, Your Honor.

13              THE COURT:  All right.  Just take a moment to present

14    that to Mr. McMillan.

15    BY MR. ROTH:

16    Q    This document says that you arrived in the United States on

17    September -- it looks like September 23rd of the year 2005, is

18    that when you got arrested for smuggling cocaine?

19    A    September 1st of 2005?

20    Q    Well, let me ask it to you this way:  When were you

21    arrested for smuggling cocaine?

22    A    That was back in December 2006, if I remember.  In

23    December 2006 -- no, no; 2005.

24              THE COURT:  Mr. Rodriguez, can you bring the

25    microphone closer to you.
```

```
 1                THE WITNESS:  Okay.

 2    BY MR. ROTH:

 3    Q   And have you made any other entries into the United States,

 4    other than the one you attempted to make when you smuggled

 5    cocaine?

 6    A   I don't remember, no.

 7    Q   Otherwise, you have never been in the United States?

 8    A   I've been to the United States, yes, sir.

 9    Q   How many times have you been to the United States?

10    A   I've been coming to the United States from the '90s,

11    early '90s.

12    Q   Okay.  And have you only been convicted of one felony?

13    A   Yes, sir.

14    Q   You have never --

15    A   Conspiracy of, as you say, smuggling cocaine.

16    Q   All of that time in the United States, and you don't have

17    any other felony convictions?

18    A   No, sir.

19    Q   So are these records mistaken and pertaining to someone

20    other than you, because this has a whole list of felony

21    convictions?

22    A   As far as that's concerned, I don't have those kind of

23    convictions, I don't have no other conviction.

24    Q   That's why I'm asking you about this.

25    A   That's correct.
```

1   Q   Because these records prepared by the Department of

2   Homeland Security indicate numerous records, but maybe it's a

3   different Carlos Rodriguez.

4   A   It has to be because it ain't me, I'm sorry to tell you

5   that.

6   Q   No, you don't have to be sorry for that, that's a good

7   thing.

8   A   No, I'm sorry to tell you that to let you know that I am

9   not that person.

10  Q   Now, you have described your role in this conspiracy, in

11  this crime of bringing aliens to the United States.  Have you

12  been truthful in explaining your role?

13  A   That's correct.

14  Q   When agents first took notice of the boat you were on, were

15  you holding the wheel?  Were you, like, the steerer, the

16  captain?

17  A   I was not at the wheel.  I was up behind the wheel when

18  they came on board.

19  Q   So you were in control of the vessel when they came on

20  board?

21  A   I had to be in control of the vessel, otherwise it have

22  crashed into the green buoy light.

23  Q   Well, somebody had to steer it, right?

24  A   That's correct.

25  Q   So that's what I asked, were you in charge of the wheel?

1    A    As I said again to you, the reason why I was behind the

2    wheel, it was because after Mr. Saunders push the throttle down

3    full throttle, we were going to crash, sir, so I had to take

4    actions at the moment.

5              Do you understand what I'm saying?  I have to get

6    control of the vessel; other than that, it would have been -- I

7    don't even know how to explain that to you.

8    Q    So if you were to answer my question with a simple yes or

9    no, were you in control of the vessel when law enforcement took

10   notice of you, your answer would be yes?

11   A    Yes.

12   Q    All right.  And you say that when you saw that Coast Guard

13   or law enforcement personnel wanted to board and take control

14   of the vessel, you say that you took the throttle and you moved

15   it into the neutral position?

16   A    No.  Before they come on board, the boat was already in

17   neutral, the boat already stop.

18   Q    And if a law enforcement agent would testify that they had

19   to board the boat while the boat was moving at a good high

20   speed and they had to get to the helm and they had to place the

21   throttle in neutral, would that agent be mistaken?

22   A    There was no -- that was never happen -- that never happen.

23   Q    Okay.  Because one of the requirements of your plea

24   agreement is you have to tell the truth.

25   A    That's correct.

1   Q   And you have to account truthfully for what you did, right?

2   A   That's correct.

3   Q   You can't just come in and say things about Mr. Saunders to

4   try and get him convicted.  Your agreement requires that you

5   also explain truthfully your own involvement in the smuggling

6   operation.

7   A   I'm not here to convict nobody, sir.  I come in to tell the

8   truth.

9   Q   You testified in court and have been a state witness

10  against other defendants, right?  You have done this before.

11  A   What you mean, another witness?

12  Q   Have you testified in court before this case?

13  A   Not before this case.

14  Q   You received a sentence reduction on your federal case.

15  A   I testify in court back in 2008.

16  Q   I just asked you if you have ever done this before, and you

17  said no.

18  A   You said before this case.

19  Q   Okay.  2008 is before this case.

20  A   Yeah, but --

21  Q   We are in 2023.

22  A   I would appreciate if you'd be more specific with your

23  questions to me, please.

24  Q   I'll try.  Before this case, have you testified against

25  other people in court to try to get them convicted?

```
1    A    Yes, sir.

2    Q    And it worked out pretty good for you, right?

3    A    At the moment, I just do what I have to do.  I tell the

4    truth, I testify and tell the truth while being here.

5    Q    Your version of the truth.

6    A    Yes, sir.

7    Q    You do what you have to do for yourself, right?

8    A    Not for myself, sir.  I have a family, also.  I don't know

9    if you do.

10   Q    Were you thinking about your family when you smuggled drugs

11   into the United States?

12   A    Yes, very deeply.

13   Q    You did that for your family?

14   A    Yes, sir.

15   Q    You have children?

16   A    Yes, sir.

17   Q    Have you seen what cocaine does to people?

18   A    You are changing the question now.  You say -- you say when

19   I come in, what I do here on this trip.  You mean -- what you

20   saying, say it again.

21   Q    Sir, you don't care what you do that's bad for the United

22   States, correct?

23   A    I never say that, sir.

24   Q    Well, you brought drugs here, you smuggled illegal aliens,

25   you are an aggravated felon and you were instructed never to
```

Tuesday, May 9th, 2023

1  return to the United States, and you came back and attempted to

2  return with a boat load of 76 illegal aliens that you had

3  packed into a ship with no life preservers.  You did that for

4  your family?

5  A   Say it again.  You say that I pack --

6  Q   Did you see how those people were packed into the ship?

7  A   I notice that it was a lot of people, and I saw when I went

8  to use the restroom, that was almost ten hours later.

9  Q   And as a captain, did you check on board to see whether you

10  had the proper provisions for the number of people on the ship,

11  including safety devices?

12  A   As I say before, I been told it was going to be ten people

13  or less or more, that's what I been told.

14  Q   You care about your family, but you don't care about

15  anybody else's family, do you?

16  A   I never say that.

17  Q   But your actions showed that, didn't they?

18  A   (Witness shakes head side to side)

19  Q   Do you recall on or about February 25th, 2023, being served

20  with a determination of inadmissibility and an order of removal

21  under the Immigration Act?

22  A   Repeat the question again, please.

23  Q   Do you recall being served, on February the 25th, 2023,

24  with a determination of inadmissibility and an order of removal

25  under the Immigration Act?

1    A    What is admissibility, sir?

2    Q    Admissibility means you can't be admitted into the United

3    States because you are an aggravated felon, do you recall that?

4         THE COURT:  Ladies and gentlemen, at the end of this

5    case, you will receive instructions about what the term

6    inadmissible means, so please don't construe the questions as a

7    directive about what the law requires.

8         Please proceed.

9    BY MR. ROTH:

10   Q    So Government's Exhibit 13, let me show you pages three and

11   four of the exhibit to refresh your recollection.  Do you see

12   where it says, "This is a termination of inadmissibility"?

13        Do you want to take it closer to you?

14   A    I don't really understand the words of -- I don't know what

15   you mean by that.

16   Q    It means you can't be admitted to the United States.

17   A    Okay.

18   Q    You're a person who will not be admitted.

19        THE COURT:  Is there a question?

20   BY MR. ROTH:

21   Q    And then do you see over here where it says, "Order of

22   removal"?  Do you see where you have been ordered to be removed

23   from the United States?

24   A    Yes.

25   Q    And then on the last page, you were asked to sign --

```
 1              MR. McMILLAN:  Your Honor, I'm sorry, I can't hear

 2   Counsel.

 3   BY MR. ROTH:

 4   Q   Then you were asked to sign an acknowledgment of receiving

 5   this notice, do you see that?

 6   A   Uh-huh, yes, sir.

 7   Q   And it says you refused to sign.

 8   A   I can't really remember or recall because I don't know --

 9   what year you say that was, say again?

10   Q   What is it?

11   A   Yeah, the date and the year.

12   Q   Okay.  Here it is, so you can look at it to your heart's

13   content, but it is dated February the 25th of 2023.  It's

14   called a determination of inadmissibility, and then it's

15   followed by an order under a certain section of the Immigration

16   Act, and it says you're being deported, you are inadmissible,

17   you are being removed from the United States.  And then it asks

18   you to sign an acknowledgment that you received this notice;

19   and it says, "Refused to sign," do you see that?

20   A   I never -- I never refused to sign any papers, sir.  All of

21   the papers I been having, I always sign.  Where I refuse to

22   sign at, where it at, when that was?

23   Q   This is all on February the 25th, 2023.  Is that your

24   photograph right there?

25   A   That's me.
```

1  Q   And I guess you wouldn't know, but that purports to be your

2  fingerprint, right?

3  A   Yeah, but I never refused to sign any papers, sir.

4  Q   So when it is stamped over here refused to sign, was that

5  you accepting responsibility, refusing to sign?

6  A   By the way, I don't remember seeing that paper.  That is

7  the first time the paper come in front of me.

8  Q   It is part of your United States Immigration file.

9  A   But I never seen that paper, sir.

10 Q   Maybe that's because you refused to sign.

11 A   Now you bring it to my attention, I never seen that paper

12 before.

13 Q   So on your first federal conviction, you had your sentence

14 reduced from 78 months to 39 months for your substantial

15 assistance, correct?

16 A   That is my understanding.

17 Q   And in this case, you have 75 counts that will be dismissed

18 under your plea agreement; is that correct?

19         The counts that you didn't plead guilty to, isn't it

20 true you expect the Government to dismiss those counts at your

21 sentencing?

22 A   Sir, as I said to you again, in the plea agreement, I

23 already sign it for what was written to me.

24 Q   Your plea agreement does not include all of the charges

25 against you.  It includes that some of those charges will be

1    dismissed, correct?

2    A    Again, if you read my plea agreement, you have to

3    understand my charges by me pleading guilty.

4    Q    We have read your plea agreement, and I have shown it to

5    you.  You are only pleading guilty to three of the charges,

6    right?

7    A    According to my understanding.

8    Q    And all of the other charges are to be dismissed, correct?

9    A    They will be up to the Court.

10   Q    Well, you are not pleading guilty to them, are you?

11   A    I don't understand.  I really -- I really I don't know how

12   to go back and forth with the question you keep asking me, and

13   I already answered the question.

14   Q    Well, it is not your first case.  I think you know a little

15   more than you are showing.

16           Don't you know you are only going to be held

17   accountable for the charges you pled guilty to and the other

18   charges are going to be dismissed?  That's what is in your plea

19   agreement, isn't it?

20   A    Well, that's what I read.

21           MR. ROTH:  Judge, with the Court's permission, I

22   would like to mark the plea agreement as Defendant's Exhibit 1.

23           THE COURT:  You want to mark the exhibit?

24           MR. ROTH:  I would like to have that marked as D1 and

25   offer it at this time.

```
 1              THE COURT:  Any objection, Mr. McMillan?

 2              Let's have a sidebar on the issue.

 3         (Following proceedings were had in bench conference)

 4              THE COURT:  Please speak up.

 5              MR. ROTH:  Judge, I would like you to make Carlos

 6    Rodriguez-Rodriguez's plea agreement part of the record.  I

 7    would like to enter it into evidence.  I can't get anything

 8    other than an ambiguous answer from him about what he signed

 9    for, what he agreed to, and this is the best evidence of it.  I

10    would like it in evidence.

11              MR. McMILLAN:  I think the Defense has to introduce

12    that kind of exhibit in their case in chief, but I have no

13    objection to it, Your Honor.

14              The only other problem I have with it, though, is

15    that it improperly brings up the issue of penalties, which are

16    equally applicable to the Defendant, and I would hope that

17    that's not going to be used as a tool by the Defense because

18    that's completely inappropriate as to the Defendant.

19              THE COURT:  I don't think it is appropriate, at this

20    point, to introduce the entire agreement.  Can the parties come

21    up with a stipulation that makes it clear he pled guilty to

22    three counts in the indictment, he has essentially admitted

23    that.  And you keep asking the same question, which I think is

24    confusing the witness, frankly.

25              But there is a lot of other content in that agreement
```

1   that is not fodder for the jury, in my view, not to mention the

2   fact that there is case law suggesting real caution in the

3   introduction of codefendant plea agreements as substantive

4   evidence, so I think it's somewhat of a dangerous territory,

5   and I think we can achieve your desired goal in a different

6   way.

7           MR. ROTH:  I think it's the best evidence to clarify

8   what he agreed to, and he doesn't give clear answers.

9           THE COURT:  Well, there has been some confusion in

10  the questioning.  Why don't you give it one final attempt, ask

11  him to explain; did you plead guilty to count 1, yes; did you

12  plead guilty to count 2, yes; did you plead guilty to count 3,

13  no, et cetera, et cetera.  You don't need to go through all of

14  the others, but make it as simple as you can so that he

15  understands.

16          MR. ROTH:  Okay.

17          THE COURT:  All right.  And then if that does not

18  work, then we can discuss a possible stipulation, but I'm still

19  not convinced that submission of the entire plea agreement is

20  warranted, so please continue.

21      (Proceedings in open court)

22  BY MR. ROTH:

23  Q   Mr. Rodriguez, let me just go over this one more time and

24  try to be much more clear and simple.

25          Pursuant to your plea agreement, did you plead guilty

1    to count 1 charging you with smuggling aliens into the United

2    States for profit?

3    A   Yes, sir.

4    Q   And did you plead guilty to Count 2, which charges the same

5    offense?

6    A   Yes, sir.

7    Q   Now, you're aware -- well, did you plead guilty to count 3

8    charging the same offense?

9    A   Yes, sir.

10          THE COURT:  Mr. Roth, if you can show him the plea

11   agreement.

12          Mr. Rodriguez, please look at the plea agreement so

13   that you can explain to the jury what it is that you plead

14   guilty to and what it is that you did not plead guilty to.

15          THE WITNESS:  Do you want me to read it?

16   BY MR. ROTH:

17   Q   Take a look at the first paragraph, do you see where you

18   are pleading guilty to counts 1 and 2?

19   A   That's correct.

20   Q   You are not pleading guilty to count 3, are you?

21   A   You say I don't plead guilty?

22   Q   Your plea agreement does not call for you to plead guilty

23   to count 3, does it?

24   A   What I understand, I plead guilty to what was presented to

25   me.

1    Q    So you don't know, you don't understand that you plead

2    guilty to count 1, to count 2, and count 78, but you persisted

3    in your plea of not guilty to all of the other counts in the

4    indictment.

5    A    I'm not saying I don't plead guilty, sir.

6    Q    Excuse me?

7    A    You keep asking me a question, I done say to you -- I did

8    not say I did not plead guilty; I pled guilty.

9    Q    What counts are you pleading guilty to?

10   A    What was presented to me.

11   Q    Counts 1, 2 and 78, correct?

12   A    You keep saying the same thing, yes, sir.

13   Q    I just want a straight answer from you.

14   A    Like I say again, I pled guilty for the charges that was

15   presented to me.

16   Q    You were presented with a 78 count indictment in which you

17   are charged in 77 of the counts, correct?

18   A    Yes.

19   Q    But did you plead guilty to all 77 counts?

20   A    Yes.

21   Q    And was that pursuant to your plea agreement?

22   A    It is right in front of me.

23        MR. ROTH:  Judge, I would renew my motion.

24        THE COURT:  All right.

25        Ladies and gentlemen, we are going to take our

Tuesday, May 9th, 2023

 1    morning break.  It is 10:04, so we can all use the restroom.

 2    It is 10:04, this will be 15 minutes, so we will see you all at

 3    10:20.

 4                All rise for the jury.

 5        (The jury retired from the courtroom at 10:04 A.M.)

 6                THE COURT:  All right.  Marshal Tracey, I would ask

 7    that you please escort the witness to the restroom so that I

 8    can meet with the lawyers outside the presence of the witness.

 9                MARSHAL TRACEY:  Yes, Your Honor.

10                THE COURT:  All right.  What do the parties propose

11    to do?  I'm hearing a motion by Mr. Roth to introduce the

12    entirety of Mr. Rodriguez's plea agreement.

13                Mr. McMillan, what is your position?

14                MR. McMILLAN:  Actually, Your Honor, I have gone back

15    over the plea agreement, I don't have any objection.  I mean,

16    the only thing I don't like about it is that it gets into the

17    statutory penalties of the offenses, and the jury can

18    extrapolate from that Defendant Saunders is charged with the

19    same thing.  For argument purposes, that would obviously be

20    inappropriate, but for cross-examination purposes, there is

21    nothing in here that I have a problem with, so...

22                THE COURT:  All right.  I want to make clear that

23    both sides are proposing entire and unredacted admission of

24    this plea agreement, is that correct, Mr. Roth?

25                MR. ROTH:  Yes, Judge.

```
 1              THE COURT:  Mr. McMillan, is that correct?

 2              MR. McMILLAN:  That's fine, Your Honor.

 3              THE COURT:  All right.  Then I will, in the absence

 4    of any objection and seeing as this is being moved for

 5    admission by the Defendant, I will grant the motion, and you

 6    can go ahead and mark that as an exhibit.

 7              With respect to comments about sentencing exposure,

 8    Mr. Roth, I did hear you ask a question about a three year

 9    maximum sentence, and then you alluded to the cumulative nature

10    of that charge.  There was no objection to that, but I would

11    caution you, Mr. Roth, insinuating to the jury that they should

12    consider matters of punishment with respect to this Defendant,

13    of course, is not appropriate under the instructions and under

14    the law.

15              So with that, let's take our break.  Mark your

16    exhibit, and then how much longer do you envision, Mr. Roth, on

17    your cross?

18              MR. ROTH:  Not very much longer, Your Honor, but I

19    would say his exposure goes to his motive.

20              THE COURT:  Certainly.  That's true, and I think you

21    can discuss that he has made this fantastic deal, as you have

22    described it.  I will, however, as noted in the final

23    instructions, caution the jury that they aren't to consider

24    matters of punishment and of course, he hasn't been sentenced.

25              Anything further, Mr. McMillan?
```

Tuesday, May 9th, 2023

1          MR. McMILLAN:  No, Your Honor.

2          THE COURT:  All right, that's all I have.  I will see

3     the parties at 10:20.

4     (Recess was had at 10:08 a.m.; and the proceedings

5     Resumed at 10:24 a.m.)

6          THE COURT:  All right.  Let's call the jury in,

7     please.

8     (Jury in at 10:25 a.m.)

9          THE COURT:  Please be seated.

10         You may continue, Mr. Roth.

11         MR. ROTH:  Thank you, Your Honor.

12    BY MR. ROTH:

13    Q   Mr. Rodriguez, if I heard correctly on your direct

14    examination, you said that you saw some packing tape on the

15    vessel.

16    A   A roll of tape, yes, sir.

17    Q   What is that normally used for?

18    A   It is used for many different things.

19    Q   Well, what is it used for on a boat like that?

20    A   As I say, you can use it for many different things.

21    Q   Okay.  So you said that you used it -- and I wrote this

22    down, I hope I wrote it right.  You said you used the tape to,

23    quote, "cut the flag," end of quote.  What did you mean by

24    that?

25    A   No, no, no, that's not correct.  I say I taped the rope.

1    We have a brand new roll of rope, and I cut the rope.  I put

2    the tape around the rope and I cut it so I can hang the flag,

3    the U.S. flag.

4    Q    Okay.  And you put tape around the rope so that it

5    doesn't -- the twine doesn't come apart?

6    A    That's correct.

7    Q    Even I know that, good.  So you did touch the tape.

8    A    That's correct, Lubin and I.

9    Q    Therefore -- you and Lubin?

10   A    Yes, sir.

11   Q    So therefore, it would be reasonable to assume that your

12   fingerprints and Lubin's fingerprints are on the tape.

13   A    That's correct.

14   Q    Now, did you ever tell Mr. Saunders that you were a

15   convicted drug smuggler?

16   A    Pardon me?

17   Q    Did you ever tell Mr. Saunders that you were a convicted

18   drug smuggler?

19   A    I never had conversations with Mr. Saunders.

20   Q    Okay.  And can you explain to the jury why Mr. Saunders

21   received $5,000 and you received 10,000 to be paid $15,000 more

22   later?

23   A    I can't -- I speak for himself, I speak for me --

24   Q    Okay.

25   A    -- for what I received.  I never know what or what he don't

1    get, sir.

2    Q    Why were you to be paid so much more than Mr. Saunders?

3              MR. McMILLAN:  Objection, calls for a conclusion and

4    speculation.

5              THE COURT:  Sustained.

6    BY MR. ROTH:

7    Q    Do you know why you were paid the amount that you were

8    paid?

9              MR. McMILLAN:  Objection.

10             THE COURT:  I'll overrule.

11             THE WITNESS:  Say again.

12   BY MR. ROTH:

13   Q    Do you know why you were paid the amount of money that you

14   were paid?

15   A    That was offered to me.  That's actually was paying $10,000

16   to come and $10,000 when I get back; and he was giving me extra

17   $5,000 to help me for my financial situation, that's what I was

18   getting paid.

19   Q    So had this smuggling operation been successful, you would

20   have been paid a total of $25,000.

21   A    That's correct.

22             MR. ROTH:  Those are my only questions.  Thank you.

23             THE COURT:  Thank you, Mr. Roth.

24             Did you intend to introduce an exhibit?

25             MR. ROTH:  Yes, Your Honor.  I have marked Defense

1    Exhibit 1, the plea agreement, and I have asked my office to

2    e-file the Defense Exhibit list, so I believe it is done or it

3    will be done shortly.

4           THE COURT:  Any objection to admission of Defendant's

5    Exhibit 1, Rodriguez's plea agreement?

6           MR. McMILLAN:  No, Your Honor.

7           THE COURT:  All right.  Defendant's Exhibit 1 is

8    admitted without objection.

9       (Evidence admitted as Defense Exhibit No. 1)

10          THE COURT:  Thank you, Mr. Roth.

11          Any redirect?

12          MR. McMILLAN:  Yes, Your Honor.

13          Do we have a copy of the marked exhibit around here

14   somewhere?

15          MR. ROTH:  Right here.

16          MR. McMILLAN:  Thank you.

17          MR. ROTH:  You're welcome.

18                      REDIRECT EXAMINATION

19   BY MR. McMILLAN:

20   Q   Mr. Rodriguez, do you remember the questions that Defense

21   Counsel asked you about your plea agreement?

22   A   Kind of because he was like back and forth with it.

23   Q   Okay.  And I'm showing you what has been admitted as

24   Defendant's Exhibit 1.

25          THE COURT:  One moment.

```
 1              Jurors, are all of your screens working?
 2              Okay, excellent.  Let's continue.
 3    BY MR. McMILLAN:
 4    Q   Okay.  And you see paragraph two, Mr. Rodriguez, that's
 5    down here at the bottom?
 6    A   Yes, bottom; right here.
 7    Q   Okay.  In paragraph one, you agree to plead guilty to
 8    counts 1, 2 and 78, is that correct?
 9    A   That's correct.
10    Q   If we go to page two, in the top paragraph here, as part of
11    your plea agreement, the Government agrees to dismiss -- move
12    to dismiss counts 3 to 76 of the indictment as to the Defendant
13    at the time of the sentencing.
14    A   That's correct.
15    Q   Was that your understanding of your agreement with the
16    Government?
17    A   Yes, sir.
18    Q   However, let's go to page three, paragraph five, and then
19    does it continue on the next page, sir?
20    A   Put it down a little bit, please.
21    Q   Okay.  And right here in paragraph 5C, there is a total
22    possible penalty, isn't there, sir?
23    A   That's what it say, yes, sir.
24    Q   What is the total penalty that you face right now?
25    A   "The Defendant further understands and acknowledge that the
```

1   total penalty -- maximum penalty he face is 40 years in

2   prison."

3   Q   So as things stand right now, you face up to 40 years

4   imprisonment, is that correct, sir?

5   A   Yes, sir.

6   Q   So does that sound like a sweet deal to you, to use Defense

7   Counsel's wording?

8   A   Before I sign this, I -- I really thought about it because

9   this is my life, and I put it on the line for my own family, as

10  I explained to him, so it will be totally up to my judge.

11  Q   So with respect to these other counts that are being

12  dismissed, your plea agreement says they are being dismissed,

13  doesn't it?

14  A   Say it again.

15  Q   Well, when you go to the sentencing --

16  A   Yes.

17  Q   -- under this agreement, the United States Government has

18  agreed to move to dismiss those additional counts that you

19  didn't plead guilty to, is that correct?

20  A   Yes, sir.

21  Q   But you still face up to 40 years in prison?

22  A   That's correct.

23  Q   How old are you right now?

24  A   I just turned 48.

25  Q   Forty-eight, okay.  But you do understand, if we turn to

1   paragraph three because -- you met with your attorney, didn't

2   you?

3   A   Yes, sir.

4   Q   And she explained to you -- without telling us what she

5   said, but she explained what these things meant to you, did she

6   not?

7   A   A few times, yes, sir.

8   Q   Did you understand that?

9   A   100 percent.

10  Q   Okay.  And do you see here in paragraph three where it

11  says, "The Defendant acknowledges and understands that the

12  Court will compute an advisory sentence, which may include

13  relevant conduct under Section 1B1.1 of the sentencing

14  guidelines."

15          Does relevant conduct, in your understanding, include

16  the fact that there were 76 illegal aliens on board the boat?

17  A   That's correct.

18  Q   And who is going -- who is going to be the person

19  sentencing you?

20  A   My judge.

21  Q   Where is she?

22  A   My judge, Judge Cannon.

23  Q   Where is the judge?

24  A   That's her.

25  Q   Under the circumstances, is it fair to say that you have

1  made the Court aware of the fact that there were 76 people on

2  board this boat?

3  A   That's correct.

4  Q   And with respect to the circumstances that Defense Counsel

5  was asking you about, did you see the people massed together

6  downstairs; you did see that, didn't you?

7  A   I did see them.

8  Q   And remember when he asked you about you cared about your

9  family, but not other people's families?

10  A   I do.

11  Q   Who was the other person helping you with these people

12  stuffed below, bringing them to the United States like that?

13  A   Mr. Saunders.

14  Q   With respect to the questions you were asked about pleading

15  not guilty, that was when you had an attorney, wasn't it?

16  A   That's correct, sir.

17  Q   And she was the one who entered that plea on your behalf,

18  wasn't she?

19  A   Yes, sir.

20  Q   From the moment that you were arrested by the police in

21  this case, did you confess to them about what happened?

22  A   Yes, sir.

23  Q   Did you tell them where Mr. Saunders was located from the

24  beginning?

25  A   Yes, sir, when we was on the boat.

1   Q   But did you ever try to hide your role in this, that you

2   were piloting the boat, too?

3   A   No.

4   Q   Now, do you recall the questions that you were asked about

5   your skill in captaining a boat by Mr. Roth?

6   A   Say that again.

7   Q   Do you recall the questions that you were asked about your

8   skill in captaining a boat --

9   A   Yes, sir.

10  Q   -- by Mr. Roth because you are, in fact, a professional

11  captain, correct?

12  A   I'm a licensed captain, yes, sir.

13  Q   Okay.

14  A   Bahamian licensed captain, correct.

15  Q   Because your expertise lies in piloting boats in the

16  Bahamas, does it not?

17  A   Yes, sir.

18  Q   Which are filled with reefs, rock outcroppings, do you know

19  what a reef is?

20  A   Yes, I understand.

21  Q   Coral.

22  A   Coral reef.

23  Q   Yes.

24  A   Yes, yes, a lot of coral reef, yes.

25  Q   It can be very dangerous in some of the island areas, the

1    channels, if you don't know what to look for.

2    A    That's correct.  You could cause a lot of problems, a lot

3    of damage.

4    Q    But you have been a professional boat captain in the

5    Bahamas for how long?

6    A    From 1996, after I graduate from school.

7    Q    A long time?

8    A    Yes, sir.

9    Q    And would it be fair to say that you have managed to go and

10   get from Nassau to Freeport all by yourself on a bunch of

11   different occasions?

12   A    Every other -- every island in the Bahamas, yes, sir.

13   Q    Can you explain to us why -- is it Cuse Gully, is that his

14   name?

15   A    Cuse Gully.

16   Q    Cuse Gully, the man that hired you, why you would need

17   Raymond Saunders to go from merely Nassau to Freeport?

18   A    I do not need any company in terms of traveling Bahamas or

19   the Bahamian waters, other than my deckhand who help me steer

20   the boat.

21   Q    But you had never been up the St. Lucie Inlet before, had

22   you, sir?

23   A    Never in my life, no, sir.

24   Q    Okay.  And for the record, I'm just showing you Government

25   Exhibit 109, which shows the positioning between Nassau and

1    Freeport, which is right there; is that correct, sir?

2    A    Yes.  That's about 127 miles, if I remember.

3    Q    That's on Government's Exhibit 109, is that right, sir?

4    A    Yes, sir.

5    Q    Okay.  Do you remember those questions that you were asked

6    about criminal records in your alien file?

7    A    Yes, sir.

8    Q    Do you have any control over what goes in your alien file?

9    A    What goes in my alien files?

10   Q    Yeah, the U.S. Government's file on you.

11   A    No, I have no control, sir.

12   Q    Did anybody ever show it to you before?

13   A    No, sir.

14   Q    Do you know what a Soundex check is?

15   A    No, not really.

16   Q    Okay.  And you have been convicted of a felony before you

17   were arrested in this case, is that correct?

18   A    That's correct.

19   Q    Have you told the ladies and gentlemen of the jury about

20   that?

21   A    Yes, I pled guilty to that.

22   Q    And you also pled guilty to a felony in this case.

23   A    That's correct, sir.

24   Q    And you told the ladies and gentlemen of the jury about

25   that as well.

1    A    That's correct.

2    Q    Do you have any other U.S. convictions; that is,

3    convictions for any offense in the United States of America

4    except for this case and the drug case that preceded it?

5    A    That's, to my knowledge -- best of my knowledge, I don't

6    have any other cases out.

7    Q    Well, let's be very clear.  To the best of your knowledge,

8    did you ever plead guilty in the United States to any other

9    crime?

10   A    No, sir.

11   Q    Now, at what -- as you approached the U.S. coastline, who

12   was driving the boat at that point in time?

13   A    Mr. Sanders.

14   Q    Okay.  And why was that?

15   A    Because he take over after we left, after we passed

16   actually the barrier island -- between barrier islands in

17   Freeport, he take over navigation.

18   Q    But at some point, you acknowledged to the Defense

19   Attorney, you ended up having to take control of the throttle

20   and the steering wheel.

21   A    That's correct.

22   Q    Why was that?

23   A    That was after the fact that for some reason, he got

24   really -- what should I say, nervous, so to speak, and he moved

25   forward and he say to me, Hold the wheel, and he looked very

1  good because as I say to you yesterday, I can't really identify

2  what is -- is a running light or is a boat, or is just the land

3  because, you know, as I say, I wear glasses.  And when he look

4  and he saw what he saw, which I know he know what he see, it

5  was the blinking lights I couldn't identify.  I thought it was

6  the buoy light, the marker light, but it was, in fact, actually

7  the police was coming, that's what I understood.

8           And when he pushed the throttle down, I had to take

9  control of the vessel because when I saw him grab the tape, the

10 sweater, and his phone, he was just gone, and I had to take

11 control of the boat.  I mean, we was crashing, we was going to

12 crash with the running lights buoy.

13 Q   What did you think was going to happen if you crashed?

14 A   As I said, again, it could have been a catastrophe.

15 Q   Why would that be?

16 A   Because if the boat hit the buoy, which I understand the

17 buoy is made of pure steel, it would have cracked the boat wide

18 open.

19 Q   Then what would have happened?

20 A   The boat could have sink definitely.

21 Q   What would have happened to the people below?

22 A   They would have died, we don't swim or can't swim.

23 Q   Do many of the Haitian people that you encounter, are they

24 good swimmers?

25 A   Oh, no.

```
 1              MR. ROTH:  Objection.

 2              THE COURT:  What is the basis of your objection?

 3              MR. ROTH:  Speculation, the Haitian people.

 4              THE COURT:  Overruled, the question was framed in

 5     terms of individuals that the witness had encountered.

 6              Please continue.

 7     BY MR. McMILLAN:

 8     Q    You may continue.

 9     A    Yeah, I'm saying to my knowledge being around -- I don't

10     want to discriminate, but most the Haitian people I know, they

11     are not good swimmers.

12              MR. McMILLAN:  Thank you.

13              I have no further questions, Your Honor.

14              THE COURT:  All right.

15              MR. McMILLAN:  May the witness be excused?

16              THE COURT:  Ladies and gentlemen, we are going to

17     take an additional brief break at this time.

18              All rise for the jury.

19        (The jury retired from the courtroom at 10:43 a.m.)

20              THE COURT:  You may be seated.

21              Thank you, Mr. Rodriguez.

22              I'm sorry, Mr. Rodriguez.  Thank you, you may be

23     excused.

24        (Witness excused)

25              THE COURT:  Thank you, Marshal Tracey.
```

```
 1              MARSHAL TRACEY:  Is it okay if I send him back to the

 2    jail?

 3              THE COURT:  Yes.  While you are here, Ms. McCrae,

 4    would you like to meet with your client?

 5              MS. McCRAE:  If the marshals will have him available

 6    downstairs and I can leave and go back to West Palm Beach.

 7              THE COURT:  Unless the parties indicate they have a

 8    further need for this witness, I believe the answer is yes.

 9              Mr. McMillan, are you all set with this witness?

10              MR. McMILLAN:  I'm done with him for today, Your

11    Honor.  I cannot -- further use of him would depend upon

12    whether or not Mr. Saunders takes the stand, so...

13              THE COURT:  All right.  Let me just then, Marshal

14    Tracey, when you say take him back to the jail, do you mean the

15    St. Lucie County Jail?

16              MARSHAL TRACEY:  Yes, Your Honor.

17              THE COURT:  If there were a need in the future for

18    his testimony that we can't foresee what that would be, I

19    assume your agency can make him available again, if necessary.

20              MARSHAL TRACEY:  Yes, Your Honor.

21              THE COURT:  But I think, Ms. McCrae, for today, we

22    are all done with this witness.

23              MS. McCRAE:  Thank you, Your Honor.

24              THE COURT:  All right, Mr. McMillan, I just want to

25    get a sense of your witness lineup, if you could tell me the
```

Tuesday, May 9th, 2023

```
 1    lineup of the next three.

 2              MR. McMILLAN:  The next three witnesses would be CBP

 3    Agent Clayton Kendall, followed by CBP Agent Jason Dimart, and

 4    Martin County Sheriff's Officer Deputy James Holloran.

 5              THE COURT:  Okay.  That's enough for now, thank you.

 6              Ms. Cassisi, the jury.

 7              THE COURTROOM DEPUTY:  Yes, Your Honor.

 8              COURTROOM SECURITY OFFICER:  They are using the

 9    restroom, Your Honor.  As soon as they are done, they will come

10    in.

11              THE COURT:  Mr. McMillan, can you have your next

12    witness come into the courtroom and be seated.

13              MR. McMILLAN:  Yes, Your Honor.  He is on his way.

14              THE COURT:  Good afternoon, sir.  Please make your

15    way to the witness stand.  We are awaiting on the jury, they

16    should be here momentarily.

17              THE WITNESS:  Okay.

18              COURTROOM SECURITY OFFICER:  All rise for the jury.

19        (Jury in at 10:48 a.m.)

20              THE COURT:  Jurors, you may be seated.

21              Sir, if you could remain standing to be sworn in.

22              THE COURTROOM DEPUTY:  Please raise your right hand.

23               CLAYTON KIMBALL, GOVERNMENT WITNESS, SWORN

24              THE COURTROOM DEPUTY:  Thank you.  State your name

25    for the record, spelling your last name.
```

```
 1              THE COURT:  You may be seated to do that, thank you.

 2              THE WITNESS:  Clayton Kimball, K-I-M-B-A-L-L.

 3              MR. McMILLAN:  May I you inquire, Your Honor?

 4              THE COURT:  Yes.

 5                        DIRECT EXAMINATION

 6   BY MR. McMILLAN:

 7   Q   Can you please state what your official title is with the

 8   agency that you are employed by.

 9   A   Marine interdiction agent for U.S. Customs and Border

10   Protection and the Department of Homeland Security.

11   Q   So you're what is abbreviated as CBP?

12   A   CBP/MIA, so I'm in the air marine unit and I'm a marine

13   interdiction agent.

14   Q   Because we may be throwing around a lot of Government type

15   acronyms, there is -- we also have CBP, and that's Customs and

16   Border Protection?

17   A   Yes.

18   Q   And it's part of the Department of Homeland Security.

19   A   Yes.

20   Q   And are you a brother or a sister service to the U.S.

21   Border Patrol?

22   A   Yes, under that, there is Border Patrol, Office of Field

23   Operations and us, which is air marine operations and I'm on

24   the marine side, marine interdiction agent.

25   Q   Now, the Border Patrol also has some marine agents as well,
```

1    is that true?

2    A    True.

3    Q    But you're under the CBP side of things, which is largely

4    responsible for large bodies of water, like the oceans, and

5    defending the United States from vessels coming in from that

6    direction.

7    A    Yeah.  Our area responsibility is known as coastal, so we

8    are more offshore ocean oriented, where Border Patrol is river

9    oriented.

10   Q    So for example, on the Rio Grande between Mexico and the

11   United States, that would largely by Border Patrol.

12   A    True.

13   Q    But when you are looking at the oceans of the United

14   States, whether it be the Pacific coming into the United

15   States, U.S. Territorial Waters or the Atlantic, in our case,

16   or the Gulf Mexico, those are the areas that you would patrol?

17   A    Yes.

18   Q    Okay.  And as a Customs and Border Protection Agent, do you

19   have authority to go and board ships to conduct inspections in

20   what is called the customs territory of the United States?

21   A    Yes.

22   Q    And do you know where your statutory authority for that

23   comes from?

24   A    We have several statutes that cover that, but under

25   19 U.S.C. 1581, we are authorized to board vessels and do

1   document checks and then there is a series of authorizations

2   after that that can allow us to take that further if we suspect

3   different types of activity.

4   Q   Now, the agency that you're involved with also has an air

5   wing, is that correct?

6   A   Yes.

7   Q   So in some circumstances, boats can be tracked many miles

8   out while they are still in international waters.

9   A   Yes.

10  Q   And that's all part of what is called AMO, is that correct?

11  A   Correct.

12  Q   What is AMO?

13  A   Air Marine Operations, so we have an airside and a marine

14  side.  Airside obviously handles helicopters and aircraft and

15  we handle the vessels.

16  Q   Now, if I can go and take you to February 22nd of 2023,

17  were you on duty that day?

18  A   Yes.

19  Q   And where were you on duty?

20  A   That day, we were patrolling all of St. Louis Inlet in one

21  of our coastal interceptor vessels.

22  Q   Is the St. Lucie Inlet located in Martin County in the

23  Southern District of Florida?

24  A   Yes.

25  Q   And is that area -- do you know what something called the

1   contiguous zone is in terms of U.S. territory?

2   A   We have our territorial seas out to three nautical miles,

3   and then a contiguous zone out to 12 nautical miles.

4   Q   So with respect to that contiguous zone, can you stop

5   vessels as a United States officer going all the way out there?

6   A   Yes.

7   Q   Now, the Coast Guard, they have jurisdiction that goes

8   beyond you?

9   A   Yes.

10  Q   Now, you mentioned something about a three mile or three

11  nautical mile zone, what is that?

12  A   That's our territorial seas of the United States.  At least

13  off this coast of Florida, it is three nautical miles, in some

14  areas, it's out to nine nautical miles.  Here it is three

15  nautical miles and we consider that the territorial seas of the

16  United States and a maritime border, so any vessel that crosses

17  that is considered to have made a border crossing into the

18  United States.

19  Q   So once they hit the three mile limit, they are considered

20  legally within the United States of America?

21  A   They are then in our territorial seas.

22  Q   They don't have to go and set foot on the ground, they are

23  already here.

24  A   No.  That three nautical mile demarcation line is what we

25  consider a border for maritime patrol.

1   Q   Okay.  Now, on February 22nd of 2023, around 9:00 p.m.,

2   were you on duty then?

3   A   Yes.

4   Q   And what kind of vessel were you in, if any?

5   A   That night, we were in a coastal interceptor vessel, which

6   is a 44-foot patrol boat.

7   Q   When you say it is a 44-foot patrol boat, can you describe

8   what it looks like, its markings?

9   A   It is a large aluminum vessel, four outboards on it, it has

10  very distinct coloration and markings with our law enforcement

11  emblems, our Department of Homeland Security seal, it's

12  unmistakable as a law enforcement boat.

13  Q   Okay.  Does it have blue lights on it?

14  A   Yes.

15  Q   That you can turn on when you need to?

16  A   Yes.

17  Q   And a siren?

18  A   Yes.

19  Q   And do you carry arms; that is, firearms when you are on

20  board the vessel?

21  A   Yes.

22  Q   Do you also have what are called tactical vest carriers

23  that you keep your equipment on and flotation devices?

24  A   Yes.

25  Q   And on this occasion, were you wearing all of those things?

1    A    Yes, I had full uniform duty gear with all of the insignia

2    and all of the markings of federal law enforcement.

3    Q    Okay.  And does -- and when you say it has markings of

4    federal law enforcement, does it say police on the exterior of

5    your vest?

6    A    On the front of my vest it says police in big letters.

7    Q    And it also identifies you as a federal agent on there?

8    A    Yes.

9    Q    If I can take you to around 9:00 p.m. that evening, what

10   were -- who else were you with?

11   A    So that evening, we were just on a basic patrol and we had

12   a vessel commander, Mr. Williams; myself as a tactical boarding

13   officer, and another tactical boarding officer, Jason Dimart,

14   who are all air marine agents, and we were just off the inlet

15   using visual means and radar to see if any other vessels were

16   out there.

17   Q    If I can ask you, when you say you were just off the inlet,

18   what does that mean?

19   A    We were in the open ocean, maybe a mile off the St. Lucie

20   Inlet.

21   Q    And did you observe anything unusual happening around that

22   time?

23   A    Initially we saw lights on the horizon from the -- to the

24   east of us and it was approaching the St. Lucie Inlet, and we

25   watched as that vessel got closer, we tracked it on radar, and

1  we had night vision equipment to assess what the vessel was and

2  watched it approach the St. Lucie Inlet.

3  Q   I should have asked you this before, were you running with

4  your full vessel lights on at that point in time or sitting

5  there in the dark?

6  A   At that time, we had basic navigation lights on, just

7  common vessel navigation lights that are required to run at

8  night.

9  Q   So people could see if there was a boat there --

10 A   Yeah.

11 Q   -- if they approached, but they couldn't tell what kind of

12 boat.

13 A   I can't say what they would be able to tell, we didn't have

14 any law enforcement lights or additional lights, we just had

15 the typical red, green, white navigation lights of any vessel

16 that would be out there.

17 Q   Did you see a vessel coming in?

18 A   Yes.

19 Q   And how large did it appear to be?

20 A   It was big.  I had on night vision equipment, as I said.

21 It was a large sport-fish style vessel, it was pushing a very

22 large wake, so we could tell from the wake that it was pretty

23 big and as it approached our position, we could tell it was a

24 good sized sea vessel.

25 Q   What happened next?

1    A    So from there, we moved into a better assessment position

2    on that vessel, just to see if we could ascertain who was on

3    board, any markings, any flags, any names on the transom,

4    anything to identify that vessel, and maybe who was on it.

5    Q    Did you see any U.S. identification markings on the vessel?

6    A    No.  We noted that it did have navigation lights on and

7    there was a name on the transom and once we got closer, we

8    could see that name was Alpha, but other than that, there

9    wasn't a lot we could tell as it passed our position.

10   Q    I'm showing you what has been previously admitted as

11   Government Exhibit 1, do you recognize this photograph?

12   A    Yes, that's the vessel we stopped that night.

13   Q    Okay, and do your initials appear on this document

14   indicating that you had identified it previously?

15   A    Yes, CK.

16   Q    And that's right here on the upper right-hand corner, is

17   that correct?

18   A    Yes.

19   Q    And showing you Government's Exhibit 2, does it also bear

20   your initials indicating you previously reviewed that

21   photograph?

22   A    Yes.

23   Q    And does it fairly and accurately depict the vessel in

24   question?

25   A    Yes.

1    Q   And finally, showing you Government's Exhibit 122, do you

2    recognize that item?

3    A   Yes, that's the helm area of the vessel.

4    Q   Okay.  So as the vessel you described as the Alpha

5    approached, what happened next?

6    A   We were assessing to try and see if we would identify

7    anyone on board or any other markings or anything noticeable

8    about it.

9         When it passed our position, we turned to observe it

10   go into the inlet and as I'm watching it in night vision

11   equipment, I can tell that it's too far south of the

12   navigation, it is further south than it should be to go into

13   that channel.

14        So I'm commenting to my crew members, he is going too

15   far south, I think he is going to run into the jetties, which

16   are --

17             THE COURT REPORTER:  You need to slow down, please.

18             THE WITNESS:  Sorry.

19        I think he is going to run into the jetties, which is

20   the rock formation that marks that inlet, and he went -- I

21   don't know who was at the helm, but the vessel went between the

22   green marker to the south and that rock formation, almost

23   hitting both of them, and we thought at that point we were

24   going to have a grounding, so we were calling that amongst our

25   crew, like, It looks like it is going to hit something.

1  Q   Is this basically the maritime or the waterborne equivalent

2  of a trooper seeing a car exiting or getting on the off ramp

3  the wrong way on a highway?

4  A   You could equate it to something similar, it was very

5  obviously poorly navigated.

6  Q   And you anticipated it was going to crash?

7  A   We thought at that moment, it was going to crash and this

8  was going to turn into some kind of rescue response.

9  Q   So what did you do next?

10 A   So we watched it miss that marker and the rock jetty on the

11 south side of the inlet and it continued into the inlet and at

12 that point, we said, There is something not right here, we are

13 going to pull behind this vessel, initiate a stop and see what

14 is going on.

15 Q   Now, for anyone who isn't familiar with this particular

16 area, does that inlet go up a river of some sort?

17 A   It goes into the St. Lucie River.

18 Q   Where does the St. Lucie River go, if you are coming from

19 the ocean and continuing westward?

20 A   There is a lot of directions it goes from there.  The

21 St. Lucie River itself goes west, then splits into a north and

22 a south fork.  There is also the Intracoastal Waterway that

23 runs north and south, there is some tributaries and other

24 little areas that go into neighborhoods there, there's a public

25 boat ramp there, so there is a lot in that area.

1  Q   So from the inlet, a vessel can travel in a number of

2  different directions.

3  A   Yes.

4  Q   Unless it crashes.

5  A   Yes.

6  Q   So in this case, what did you and your partners on board

7  the vessel decide to do?

8  A   So at that point we had seen it, you know, navigating

9  dangerously in our opinion and we decided to initiate a stop on

10  the vessel, find out more about it, why it seemed to be out of

11  control almost.

12       So we pulled up behind the vessel, we energized our

13  blue lights, sirens, spreader lights, we have some white lights

14  as well that we use to just illuminate the scene, so we can see

15  on to the vessel and we pulled up behind him and at this point,

16  there was still nobody on the back deck.

17       I could see one person up in the bridge, but he was

18  kind of obscured, just kinda by the way the lights were and it

19  was at night, so we started -- myself and my parter started

20  giving verbal commands toward the vessel, just to try to get

21  anybody's attention and find out who was on board.

22  Q   At that point in time, approximately how far were you from

23  the vessel depicted in Government's Exhibit 2?

24  A   We were approaching -- I mean, protocol is we approach, we

25  try to make verbal contact and then we come alongside to the

1    point that we are touching, and then we are either going to get

2    answers or we are going on board.

3    Q    So from the time that you first observed there being a

4    problem to the time that you had caught up to this vessel,

5    approximately how much time took place?

6    A    That happened fast, 30 seconds, if that.

7    Q    Okay.

8    A    I mean, as soon as we saw it almost hit the jetty inside

9    the inlet, we said, Okay, we are going now, and once we make

10   that decision, we are going to come alongside.

11   Q    At what point did you energize your emergency blue

12   equipment lights and/or use a siren?

13   A    The vessel commander controls all of that, that was not me

14   at the time.  So the vessel commander is driving and then

15   myself and my other partner are TBO, tactical boarding

16   officers, so we are preparing to go on board the vessel.

17          So I moved up to the bow, he moved up to the side

18   that we were coming up -- approaching on.  At that point, we

19   were preparing to go on board the vessel, and the vessel

20   commander is the one who hit the blue light, the sirens, and is

21   working all of the signaling equipment.

22   Q    Okay.  Now, when you moved forward to prepare to board,

23   were you carrying long guns or just have your pistol, which is

24   on your equipment belt?

25   A    At that time, I just had the pistol on my belt.

1    Q    And your partner, Agent Dimart --

2    A    Yes.

3    Q    -- same thing?

4    A    Same thing.

5    Q    Okay.  And was the vessel depicted in Government's

6    Exhibit 2, the Alpha, as you were approaching it with the

7    emergency equipment activated --

8            It was activated at that point, was it not?

9    A    Yes.  Once we turned and said, Okay, we are going to

10   approach the vessel, the vessel commander activated all the

11   lights, sirens, identifying law enforcement equipment.

12   Q    Okay.  Was the vessel speeding up, slowing down or dead in

13   the water?

14   A    It was it -- it was going slower than it had been as it was

15   approaching the inlet, but still moving forward into the inlet.

16   Q    And you are on a boat literally every day, is that correct?

17   A    Most days.

18   Q    Okay.  In a boat, especially a large boat, after you pull

19   the throttle back, does it stop immediately?

20   A    It may still have some forward momentum if they brought it

21   back to neutral, but I mean, a large heavy boat like that would

22   come close to dead in the water in a short amount of time, I

23   can't say exactly, but it was still moving forward under power.

24   Q    Did the power appear to be increasing, the same or

25   decreasing?

1  A   It was kind of ghost riding at that point, it was just

2  moving down the inlet at maybe five to ten knots.

3  Q   Okay.  What did you and Agent Dimart do next?

4  A   So our vessel commander pulled us alongside and I was up on

5  the bow, so I was the closest one.  I could see there was a

6  shape up on the bridge, I couldn't identify what it was at

7  first, but I started, just as loudly as I could, giving verbal

8  commands; you know, Captain, come down, bring the boat down,

9  stop your speed, come to the back where we can see you, just

10  giving various verbal commands trying to get a response from

11  the boat.

12  Q   Did you get any reaction from the people or persons in the

13  boat?

14  A   Initially, I didn't.  I mean, I was pretty much yelling at

15  that point, so anybody who was there would be able to hear me

16  and I was just giving commands trying to get somebody to

17  respond to us to stop the vessel and identify themselves.

18  Q   Well, on the Intracoastal, in addition to drug smugglers

19  and things like that, can you have drunken people coming back

20  from an evening of partying?

21  A   Definitely.

22  Q   At this point in time, did you have any idea what was going

23  on on the boat?

24  A   Other than the navigation was suspicious and now we don't

25  have anybody identifying themselves and there is no real

1    markings or flags on the boat, but at that point, we are still

2    trying to ascertain who is in charge and why this boat is where

3    it is.

4    Q    Okay.  So what happened next, do you know where Agent

5    Dimart took his position?

6    A    So he was aft of -- so on the vessel, the vessel commander

7    was sitting at the helm; I was up front at the bow, closest as

8    we were approaching this boat; and Dimart was kind of back by

9    the vessel commander, just watching as I continued to give

10   commands.

11           Finally after a minute, an Hispanic male came to the

12   side and kind of put his head -- I don't know if you can tell

13   from here, but there is kind of -- they look clear in the

14   daylight, those curtains, but they kind of reflect at night, so

15   there was -- all you could really see was a shadow.

16           So he came to the side I was on, kind of put his head

17   out, looked down; I'm down in our boat, he is up in the bridge

18   here, he puts his head out and looks down, and I start talking

19   to him, and I say, Bring the boat down, how many people are on

20   board.  I'm speaking to him in English at first, and he's just

21   shrugging, he's not answering anything, he's just kind of

22   staring at me, looking at me.

23   Q    If I could interrupt you for just a second, the person that

24   you are describing, I'm not sure if you were aware of this, but

25   if you touch the screen on your computer on the monitor before

1   you, you can go in and draw shapes and things and it may be

2   helpful for the ladies and gentlemen of the jury if you can

3   show where the man was located that you are speaking to, and

4   where you were situated on board the Alpha.

5   A    Okay.  So as I said, this happened at night, we are looking

6   at a daytime picture, you can see there is clear curtains here

7   on the back of the bridge, you can see through them in the day,

8   but at night, they are kind of reflective.  They are an

9   Isinglass, almost like a plastic, so we really couldn't see

10  what was in there, but I could see kind of a shadow person

11  standing here.

12          Our vessel came alongside here, and I would have been

13  standing up on the front of our vessel, our vessel commander

14  and the other agent here.  So I was on the bow giving commands,

15  just kind of yelling up at the bridge for anybody to come and

16  he walked over to the side.  So he was right here on the side

17  of the bridge, I'm standing down here yelling at him, Hey,

18  bring the vessel down, trying to get some kind of response and

19  he is just looking at me shrugging.

20  Q   At that point in time, were you able to go and ascertain

21  any physical characteristics about the person that you were

22  talking to?

23  A   I could tell he was an Hispanic male and just based on

24  encounters in this area, maybe he doesn't speak English is what

25  I thought.  So then I said to him in Spanish, Quantos pasajeros

1  aqui.  I don't know a lot of Spanish, but a spoke a little bit

2  to just see if that elicited some kind of response.

3  Q   We need to help the court reporter, quantos pasajeros aqui?

4  A   Yeah, how many people are here, just -- I only know basic

5  Spanish for these kind of things, but I said that to see if

6  there was some kind of response because I'm thinking maybe he

7  didn't speak English and that's why he is not responding and

8  still shrugging.

9  Q   What did you do next?

10  A   So at that point, we know something is not right.  I look

11  back at Agent Dimart and our protocol is we have to go over --

12  when we board a vessel, it has to be two agents.  So I look at

13  him, he looks at me and he says, Let's go, and we go and jump

14  on the back of the vessel.

15  Q   If I can clear this off, can you show the ladies and

16  gentlemen of the jury where you jumped on the vessel with Agent

17  Dimart.

18  A   So our vessel -- at that moment, our vessel commander hears

19  us communicating that's what we decided to do, he puts our

20  vessel right alongside and we both jumped over to the back.

21  Q   Okay.  Now, at that point in time when you jumped over, the

22  Alpha boat depicted in Government's Exhibit 2 was not speeding

23  away from you, would that be accurate?

24  A   No, it was not speeding, it was just making a slow motion

25  down the inlet.  It was still in gear, underway and moving, but

1    it wasn't -- like I say, kind of just ghost riding.  I could

2    see there was nobody on the helm at that point, so we are

3    thinking somebody has to get upstairs and we need to secure

4    this vessel.

5    Q   And at this particular time of day, were you actually in

6    the inlet when this was occurring?

7    A   Yeah.  By the time we made contact here and gone overboard,

8    we are now, I don't know, 100 yards down the inlet.  I mean, we

9    are well into the inlet at that point.

10   Q   When you say down in the inlet, you are talking about

11   you're closer to the interior of the United States.

12   A   They are still traveling, you know, toward land, up the

13   river, going toward, you know, landfall somewhere.

14   Q   And were the tidal effects at that time of day going out or

15   in if you recall?

16   A   The tide was coming in, so it was pushing into the inlet as

17   well.

18   Q   Okay.  So you and Agent Dimart jump on board the back of

19   the Alpha, and what happens next, what do you observe?

20   A   So we jump on the back.  He -- the door is still closed on

21   the bottom at this point, so this picture you are looking at is

22   after the vessel was seized and searched, and there is some

23   things that have been moved around, but that night, when we got

24   on, everything was kind of in order, clean, you couldn't see

25   anything on the deck.  This back door on the bottom was closed,

1   this hatch had a hatch cover on it, everything was closed

2   there.

3          So Agent Dimart went to this back door and just

4   covered it, he left it closed at first, and I went up the

5   ladder, put the boat in neutral.  I just -- it all happened

6   fast, but I put my hand on the throttle, made sure it was in

7   neutral.  The Hispanic male was just standing there like this,

8   with his hands up, looking.  I'm talking to him, he is still

9   not saying a word to me, so I grabbed him.

10          Now we have the boat in neutral, I know that Agent

11   Dimart is now on the back deck with a door that is closed, we

12   don't know what is in there, so I tell the Hispanic male, Get

13   down with me, and I bring him down the ladder.

14   Q   Now, when you are acting operationally, do you and Agent

15   Dimart rely on just oral voice communications or do you have

16   radio communications as well?

17   A   In that scenario, it is just him and I with oral

18   communications.

19   Q   Okay.  Did he indicate to you that he spotted something

20   that caused you --

21   A   So as I was coming down the ladder, I hear him.  He has now

22   opened the door and I hear him giving commands to the people

23   inside, Put your hands up, stay still.  He is giving various

24   commands to the people inside.

25   Q   At that point, did you realize something else was going on

1   here?

2   A   At that point, I look over and I'm coming down the ladder

3   and I can see into that doorway, and it is just people as far

4   as I can see, so now I know what we believe is happening.

5   Q   Now, at that point in time, did you and Officer Dimart

6   decide that you needed to go and call for backup of some sort,

7   or did your vessel commander?

8   A   So at that point, I put the captain down on the deck, kind

9   of just secured him next to us, and I stood next to the door

10  with Dimart, we had guns drawn at that point because we had a

11  large amount of people, we don't know what is in there

12  otherwise.  There is not even enough space to go in and see

13  what is going on in there because it was so full of people, we

14  don't know if there's a weapon or what other threats may be

15  there, so we both have guns out, we are just kind of holding

16  that door, with the captain on the deck, and Agent Dimart

17  called for backup.

18  Q   Now, when you refer to that person as the captain, that was

19  the person at the helm when you first got on board the ship, is

20  that correct?

21  A   Yeah, we didn't know who the captain was.  He was the only

22  person that I identified immediately in the helm area.

23  Q   Do you know to this day what that individual's name is or

24  not?

25  A   Mr. Rodriguez.

1    Q    Okay.  He was subsequently identified to you as Rodriguez?

2    A    He was.  We identified him and we later found personal

3    effects of his in the helm area with his ID.

4    Q    So the record is clear, the person that you are referring

5    to as the Hispanic male was Carlos Rodriguez.

6    A    Yes.

7    Q    Okay.  And did Carlos Rodriguez say anything to you about

8    anybody else being on board while you were taking him away?

9    A    Not at that time.  Later, he did say -- you know, with me,

10   he didn't want to speak much English.  I understand that he

11   knows more English than he was willing to speak to me, but he

12   did try to tell that there had been -- later, after we had

13   secured the scene, he did attempt -- and he is on the deck in

14   handcuffs and he is saying, There was somebody else up there

15   driving the boat, he did say something along those lines to me.

16   Q    Okay.  And did you arrange for a Martin County Sheriff's

17   Office -- when I say you, I don't mean you personally, but did

18   you, Agent Dimart and your vessel commander arrange for Martin

19   County Sheriff's Office backup?

20   A    Yes.  So we work closely with the local Sheriff's Office

21   and we knew they were on duty that night, so as we were

22   covering this door, you know, it's two guys on the boat to as

23   many people we can see inside.  We don't know what the threats

24   are, so we call for backup and Martin County, their substation

25   for their vessels is very close to this location, so they

1    responded.

2    Q    And were they there within a matter of minutes?

3    A    Yeah, it was very quick.  I mean, I don't know how long,

4    but it was quick.

5    Q    Okay.  Did there come a point in time when you discovered

6    that there was someone else on board the vessel, in the upper

7    structure of the vessel that I have just indicated with a very

8    poorly drawn circle on Government Exhibit 2, that's where the

9    command center of the vessel was, where the controls were, is

10   that accurate?

11   A    Yeah.  The bridge area is the only place that vessel can be

12   driven from.

13   Q    When you originally went up there, there was the Hispanic

14   male you described, was there anybody else?

15   A    At that time, he was the only person I saw there when I

16   initially went into the bridge, he was standing with his hands

17   up, I brought him down, then we knew we had a bunch of people

18   downstairs in the salon, in the cabin area.

19         We called for backup.  As we knew backup was on the

20   way, we started bringing a few of the people out of the cabin

21   on to the back deck to start clearing some area and start

22   processing the scene, so at that point, I was still on the back

23   deck.

24   Q    Okay.  And when you arrested the boat captain or the person

25   that you believed to be the boat captain based on your

1   observations, was that at gunpoint or not?

2   A   When I initially took him down, he was -- he was compliant,

3   so he obviously understood what I was telling him to do even

4   though he wasn't giving me much feedback.  He kept his hands

5   up, I brought him down the ladder, I put him on the deck face

6   down, until we could secure the scene, and he was compliant.

7   Q   But were you forced to go and utilize a firearm or not?

8   A   We both -- myself and Agent Dimart drew our firearms on

9   that back door because, again, there were so many people in

10  there, we weren't able to go in the door, we didn't know what

11  kind of threats were possibly in there and that's just how, you

12  know, we are trained to respond to that situation until we can

13  clear the area.

14  Q   Well, and recently in Puerto Rico, three of your colleagues

15  were shot to death doing an entry similar to this, were they

16  not?

17  A   We had three shot; one died, yes.

18  Q   And so this has to be a concern to you whenever you do a

19  maritime interdiction.

20  A   Any time you have a noncompliant vessel like this and it

21  looks like it is -- you know, there are unknown threats inside,

22  then, yeah, we are going to be at a heightened level until we

23  are able to clear the area and make sure it's safe.

24  Q   Did there come a time when you discovered, though, that

25  there was another person hidden on the upper deck of the

1   vessel?

2   A    So I was on the back deck, we were trying to get some of

3   the bodies out of the cabin, so we could just start to process

4   the area and again make sure it is safe and ascertain what

5   exactly is inside there, and my vessel commander, that's still

6   alongside us in our boat, says to me, Hey, you're about to run

7   aground, the vessel is about to drift aground, he said

8   something to that effect, you need to take care of it.

9          So I just run up the ladder, get to the helm, put the

10  boat in gear, you know, gauge my surroundings and start trying

11  to maneuver the boat back into safe water because it would have

12  run aground in the inlet as we were processing because nobody

13  was at the helm, it was out of control, so I came back, got the

14  vessel back into safe water.

15  Q    Did you hear any unusual noises at that point?

16  A    So at that point, I was up there by myself, I was fully

17  engaged in driving the vessel.  I mean, that was -- safety was

18  paramount for me at that moment to make sure the vessel didn't

19  go aground and I know we have a lot of people on board, so I'm

20  just trying to control the vessel safety, and I hear, you know,

21  banging, yelling, I hear some noises, but I'm thinking maybe

22  it's coming from downstairs in the cabin at that moment.  I'm

23  hearing noises, but I'm not really able to ascertain where they

24  are coming from.

25  Q    Because the -- and at this point in time, did you ascertain

1  that the people below were, in fact, illegal Haitian aliens on

2  board the vessel?

3  A   Based on the conduct of the vessel and the fact that it was

4  grossly overloaded with people, it matched up to probable

5  migrant smuggling, but I wasn't -- I didn't know that for a

6  fact at the moment, but that's what it appeared to be.

7  Q   At that point in time, you hadn't actually checked

8  everyone's identification to the extent that they had any or

9  spoken to them.

10  A   Yeah, there's our reasonable suspicion of what is

11  happening, and then we have to process the scene, and we have

12  to identify all of these people, and it is a long process to

13  make that determination that they are illegal, but that's what

14  it appeared to be.

15  Q   But the people that were down below, were they speaking in

16  English, or did they speak what appeared to be Creole to you?

17  A   There was some Creole speaking going on, there was some

18  crying, some yelling, there was a lot of noise.  There was

19  nobody speaking English or, you know, identifying themselves as

20  somebody who was able to communicate with us.

21  Q   Okay.  And returning to the vessel, Government's Exhibit 2

22  on your screen, those people were all situated in the deck

23  cabin area of the vessel?

24  A   They were all in the cabin, yes.  So Mr. Rodriguez had been

25  in the helm and everyone else that we were encountering at that

1    point were in the cabin with the door closed when we got on the

2    vessel.

3    Q    Okay.  And when you returned upstairs to the control

4    level -- what is that technically called in maritime terms, do

5    you know?

6    A    The bridge.

7    Q    When you returned to the bridge area, you said you heard a

8    banging and initially you thought it could have been coming

9    from below, what happened next?

10   A    At that point, I'm just driving the boat.  I hear this

11   commotion, it sounds like it is kind of around me, but I know

12   that there is a lot of people downstairs, so I'm thinking maybe

13   it is the commotion downstairs, and I don't know what is going

14   on downstairs.

15          We now have another one of our guys that has boarded

16   the vessel and a Martin County Sheriff's Officer that's on the

17   vessel assisting, we have other boats around us now, so there

18   is a lot going on, so at first, I can't really tell where the

19   noise is coming from.

20   Q    Okay.  And did you ultimately -- well, did you have anybody

21   else assisting you up there?

22   A    So as I'm driving, Martin County Sheriff's Deputy Holloran,

23   who responded to the scene and boarded the vessel, came

24   upstairs and I said, I think I hear something and he says,

25   Yeah, I hear something, and he looked in front of the bridge.

1    There is a seating area right in front of the helm and --

2    Q    And showing you Government's Exhibit 122, is this the helm

3    that you are referring to?

4    A    So this is the helm.  At this point, I'm standing at the

5    helm, I'm driving the vessel, and just trying to keep it safe.

6    Deputy Holloran comes up and right in front of the control

7    panel that you can see here, down on the floor is a seating

8    area, so people can sit in front of the helm up on the bridge

9    and he comes up and starts to do a sweep to see if anybody else

10   is up there because we were both hearing sounds.

11   Q    If I can interrupt you for a second, is the area that you

12   are referring to, would it be below the front of the console in

13   the area that I have drawn the red arrows?

14   A    So it is down in front of the console, just where you drew

15   the arrows.  And so I'm driving, I'm looking around, and he

16   comes up and goes in front and there is an individual laying on

17   the floor there that I couldn't see from standing right there

18   at the helm.

19          He was laying up against the seat cushions in front

20   of the console, and so he took that individual, quick pat down,

21   took him down to the back deck and secured him, and then he

22   came back up to continue doing a sweep and we both said, I'm

23   still hearing noises, I'm hearing something coming from around

24   the helm, so we are still hearing a noise, but we can't

25   identify exactly where.

1  Q   So if I can interject for just a second, that person that

2  you initially encountered hiding in front of this console area,

3  is that person in this courtroom anywhere?

4  A   No.

5  Q   Okay.  Can you describe his general outside appearance as

6  to what he looked like?

7  A   He was a younger black male with short, maybe shaved hair,

8  nothing really outstanding about him.

9  Q   Were you able to later figure out what his identity was?

10  A   He was later identified.  I can't remember his name off the

11  top of my head, but he was later identified through records

12  checks.

13  Q   Did you encounter anyone with the last name Lubin on this

14  particular journey?

15  A   Yes, that name is the one that was later told to me as his

16  name.

17         I didn't do any identification of these individuals,

18  I was more responsible for securing the scene and the vessel.

19  Q   Okay.  But the first man that you have already identified

20  as Mr. Rodriguez was an Hispanic male.

21  A   Rodriguez was an Hispanic male that we encountered first in

22  the helm, he was secured on the deck.  The second guy that

23  Martin County found was Mr. Lubin, who was just laying on the

24  floor there, trying to be out of view.

25         He took him down, secured him on the back deck and

1    then when Deputy Holloran came back to the bridge where I was

2    still driving, we continued hearing noises.

3    Q   And can you describe what those noises were like, I don't

4    know if you can replicate them.

5    A   It was -- it was banging and kind of just muffled yelling,

6    and when I heard him at first, I almost thought there was some

7    kind of alteration downstairs.  I heard the banging and was

8    thinking, Is there some kind of altercation in the cabin

9    downstairs, but then I kept hearing it and I was like, no, this

10   is really close to me, it sounds like it's somewhere in my

11   vicinity.  And I'm driving the vessel, I'm kind of looking, I

12   don't -- nothing is apparent to me, and Deputy Holloran

13   continued searching the helm.

14   Q   Okay.  And at some point, did he indicate to you a

15   surprise, like something might be happening?

16   A   So we had a flashlight out and was lifting hatches and he

17   kind of looked in and he was like, I think there is a person

18   under the helm and he might be bound, and that was a shocking

19   statement to me, so I took out my phone at that point and

20   started taking a video so we could capture whatever was about

21   to be discovered.

22            MR. McMILLAN:  May I approach the witness, Your

23   Honor?

24            THE COURT:  You may.

25

Tuesday, May 9th, 2023

1    BY MR. McMILLAN:

2    Q   I'm showing you what has been admitted already as

3    Government's Exhibit 4, do you recognize this item?

4    A   Yes.

5    Q   And does it bear your initials?

6    A   Yes.

7    Q   Does it fairly and accurately depict the events as you

8    observed them on February 22nd, 2023?

9    A   Yes.

10   Q   And this is a video that you actually shot yourself?

11   A   This was as I'm driving the vessel and with the other hand,

12   I have my phone out, just recording the scene as Holloran is

13   doing a search because now he says there appears to be somebody

14   under the helm, possibly bound and at that point, I decided,

15   Let's get video of what we may discover here.

16   Q   Okay.  And was this the very first moment that you yourself

17   or any of the people you were with saw anyone emerge from the

18   control panel of the vessel as depicted on this video?

19   A   Yes.

20   Q   Okay.

21           MR. McMILLAN:  May I publish, Your Honor?

22           THE COURT:  Any objection?

23           MR. ROTH:  No, Your Honor.

24           THE COURT:  Yes, you may.

25       (Video recording played in open court.)

1  BY MR. McMILLAN:

2  Q   Okay.  And were you able to identify the person who came

3  out of the compartment?

4  A   Once he came out of the compartment and he was assisted in

5  removing the tape from around his mouth, he identified himself.

6  Q   Okay.  Who did he tell you he was?

7  A   Raymon Saunders.

8  Q   Pardon me?

9  A   Raymon Saunders is how he said it to me.

10 Q   Do you see that person in court today?

11 A   Yes.

12 Q   Can you point to him and describe what he is wearing.

13 A   White shirt.

14         MR. McMILLAN:  Your Honor, may the record reflect the

15 witness has identified the Defendant, Raymond Saunders.

16         THE COURT:  The record so reflects.

17 BY MR. McMILLAN:

18 Q   Now, when Mr. Saunders came out of the compartment, you

19 said that there was tape on him.

20 A   Yes.

21 Q   Okay.  And was that duct tape or some other sort of tape?

22 A   Some kind of clear packing tape.

23 Q   Okay.  And did you notice anything particularly unusual

24 about the locations that the Defendant was bound by the tape?

25 A   The entire thing was unusual, I was shocked.  I mean, I

```
 1    hadn't encountered something like that and I noticed he was
 2    bound or had tape wrapped around his face, and had tape around
 3    his ankles.
 4    Q   Okay.  And did the Defendant explain to you how he got
 5    there, did he say anything to you?
 6    A   He stated that he had had a conflict with the other guys in
 7    the helm and they assaulted him and placed him in that
 8    compartment.
 9    Q   Okay.  They assaulted him?
10    A   That's what he stated to me when he came up.
11    Q   That they physically struck him?
12    A   That's what he stated to me when he came up.
13    Q   Okay.  Now, you had a flashlight with you.
14    A   Yes.
15    Q   Did you take a look at Mr. Saunders to see whether he had
16    any injuries consistent with what he was telling you happened?
17    A   We conversed back and forth for a while, I looked at him a
18    number of times, didn't see any visible injuries.  He pushed
19    the issue to the point, saying that he was bleeding and had a
20    cut, this and that, that I actually took the flashlight out of
21    my belt to clearly inspect closely because at that point, we
22    are also caring for anybody who may be injured on this vessel,
23    so I really wanted to get a good look at if he was actually
24    injured.  There was no blood, there was no visible injury.
25    Q   And Martin County Fire Rescue was actually on their way to
```

1  assist in any medical emergencies, weren't they?

2  A   They did eventually have an EMT come out to assist, if

3  anybody on the vessel had a medical issue.

4  Q   But was Mr. Saunders required to be seen by them in any

5  way?

6  A   No.  He -- you know, he told me he was injured, I didn't

7  observe any injuries.  I told him if he needed medical

8  intervention, that he would eventually get that once we had

9  those personnel respond to the vessel, somebody who could

10  handle that.  He said that was fine.

11  Q   Was there anything unusual to your mind about the tape

12  covering the Defendant's mouth as he emerged from the

13  compartment?

14  A   Myself and Deputy Holloran remarked that he was yelling for

15  help through the tape around his mouth, yet his hands were free

16  and would have been easily able to remove that tape if he was,

17  indeed, yelling for help.

18  Q   In fact, he could also remove the tape from his legs, too,

19  using his hands, couldn't he?

20  A   We remarked that if we were in a similar situation, the

21  first thing we would have done is remove tape from our mouth to

22  communicate that we needed help.

23  Q   Not to mention breathe more easily.

24  A   Breathe, yes.

25  Q   But the Defendant, he didn't do any of that, did he?

1    A    Nope.

2    Q    By the way, did you and the other officers locate a roll of

3    tape someplace on board the vessel?

4    A    Deputy Holloran found a roll of tape inside of the same

5    compartment.

6    Q    And that appeared to be the same clear tape that was

7    wrapped around Mr. Saunders --

8    A    Yes.

9    Q    -- in some locations.

10   A    Yes.

11        MR. McMILLAN:  The Court's indulgence for a moment,

12   Your Honor.

13   BY MR. McMILLAN:

14   Q    Now, if I can take you back to the boarding for just a

15   second, the entire boarding.  At any time of this boarding,

16   were there any female agents, officers or deputies on board the

17   Alpha's boarding?

18   A    No, there is no female agents in our unit and there are no

19   female deputies in Martin County's marine unit as far as I'm

20   aware.

21   Q    But you were able to go and see everyone who was on board

22   the vessel.

23   A    There were only a few of us and we were all male.

24   Q    In particular, the persons who found Defendant Saunders

25   were you.

1    A    Myself.

2    Q    And Deputy Sheriff Halloran.

3    A    Yes.

4    Q    And to some extent, Agent Dimart.

5    A    Yes.

6    Q    And none of you is female.

7    A    Nope, and there was one more, Agent Santiago, who had also

8    boarded the vessel at that point, also male.

9    Q    Okay.

10          MR. McMILLAN:  The United States tenders the witness,

11   Your Honor.

12          THE COURT:  All right.  Thank you.

13          Mr. Roth, how long do you think you will need for

14   cross-examination, just for planning purposes.

15          MR. ROTH:  Ten minutes, Your Honor.

16          THE COURT:  Okay.  Please proceed.

17                    CROSS-EXAMINATION

18   BY MR. ROTH:

19   Q    Agent Kimball --

20   A    Yes.

21   Q    -- good morning.

22          So you are with the Customs and Border Protection.

23   A    Yes.

24   Q    And you're in the marine unit.

25   A    Yes.

1  Q   If I heard you carefully, and I tried, in this case, you

2  and your colleagues were actually required to board a moving

3  vessel.

4  A   I wouldn't say required, but that's our duty, yes.  I mean,

5  we make those judgment calls every day when we are out there,

6  but yes.

7  Q   So that's what you did.

8  A   Yes.

9  Q   Your vessel was moving at approximately the pace of the

10  other vessel and you guys were athletic enough and trained and

11  able to board the moving vessel.

12  A   Yes.

13  Q   Okay.  And you were able to basically keep the security of

14  yourself and your fellow officers and bring the vessel under

15  control.

16  A   Yes.

17  Q   And initially, it was just you and Agent Dimart?

18  A   We were the first to board.

19  Q   I imagine that's not easy to do.

20  A   We train for it.  It is not easy, it can be dangerous, but

21  we try to put safety first and we train for it.

22  Q   At this point, you don't know who is on the vessel.

23  A   No idea.  As we were boarding, no; other than the one

24  Hispanic male we saw on the bridge, we didn't no.

25  Q   So there could be -- they may be doing something wrong, but

1    they could be maybe basically harmless people or they could be

2    very dangerous people.

3    A    The whole range.

4    Q    And with all of that in mind, you and Dimart were able to

5    get control of this vessel and basically make it safe, the two

6    of you boarding it while was moving.

7    A    Yes.

8    Q    And the gentleman that was captaining the vessel, at the

9    point that you were able to make eye contact with someone at

10   the helm, that was Carlos Rodriguez?

11   A    He was in the bridge area, he was -- I never actually saw

12   anyone on the helm.  He came to the side of the bridge and

13   talked to me and then when I got up into the bridge, he was

14   still standing away from the helm, so I never actually saw

15   anybody on the helm.

16   Q    And he was the only one there.

17   A    Well, we found out that there were three people there.

18   Q    Well, there were two people that were hidden in

19   compartments.

20   A    Mr. Rodriguez was the only one visible to me in that

21   dynamic situation in that moment, I took him down.

22         The other, Mr. Lubin, wasn't concealed.  I couldn't

23   see him from my vantage, but he was laying on the floor.

24   Q    Did you see Rodriguez -- as you made contact with the

25   vessel and tried to communicate with him, did you see him

1  throttle the vessel back?

2  A   Like I said, the way the curtains were on the bridge, there

3  was glare on them, I couldn't see anybody's actual actions

4  there.   I could see that there was one person standing from my

5  vantage point.

6  Q   And when I say throttle, is this the kind of vessel that

7  has more than one throttle or does it have two?

8  A   It's a dual diesel engine vessel, so it has two throttles,

9  but they work simultaneously.

10  Q   Can you work them independently?

11  A   You could, but that wasn't the state of the vessel, they

12  were forward together and I put them in neutral together.

13  Q   So you had to -- you had to take the throttles and put them

14  in neutral?

15  A   Yeah, it was still slightly engaged.   I put it in neutral

16  and then assessed the scene from there.

17  Q   They weren't in neutral when you got on the vessel?

18  A   No.

19  Q   So if Mr. Rodriguez said that he put them in neutral, that

20  would be different from your perception, correct?

21  A   That's not the state that I found the vessel.

22  Q   Now, when you were trying to communicate with

23  Mr. Rodriguez, did he initially act like he didn't understand

24  the English language?

25  A   That was my perception and why I attempted to speak Spanish

1  to him.

2  Q   And then ultimately, you found that he is more or less

3  fluent in English.

4  A   Not during my encounter with him, I was told this later.

5  But even as -- this situation went on for hours and I spoke to

6  him a few times during the scene and he -- my perception was he

7  was not a strong English speaker, but that just may have just

8  been how he chose to interact with me.

9  Q   Did he tell you that both his fingerprints and the other

10  guy, Lubin, that his fingerprints would be found on the packing

11  tape?

12  A   He never discussed the tape with me.

13  Q   He never said that he and Lubin had used the tape?

14  A   Mr. Rodriguez?

15  Q   Yeah.

16  A   No.

17  Q   Okay.

18  A   He didn't have -- as far as his conversation with me, he

19  didn't have any awareness of that.

20  Q   Did you ever find any rope on the vessel that had been cut

21  and then had that kind of packing tape wrapped around it so it

22  wouldn't untwine?  I don't know if that's the right maritime

23  word.

24  A   No.

25           MR. ROTH:  Other than to comment that you guys did an

```
 1   excellent job, I have no further questions.

 2               THE WITNESS:  Thank you.

 3               THE COURT:  Any redirect?

 4               MR. McMILLAN:  Briefly, Your Honor.

 5                       REDIRECT EXAMINATION

 6   BY MR. McMILLAN:

 7   Q    Agent Kimball, did you ever have occasion to question

 8   Mr. Rodriguez as to whether he ever used the tape to go and

 9   wrap the end of a cut end of rope?

10   A    I didn't question him about that at all, I didn't really

11   question him much.  He volunteered that there had been another

12   driver and was -- again, why I thought was the a Spanish

13   speaker is because instead of saying what happened, he was

14   illustrating that someone dove under the helm to me and still

15   not using very strong English, but I never correlated him with

16   tape, never questioned him about any of that.

17               MR. McMILLAN:  Thank you.

18               I have no further questions, Your Honor.  May the

19   witness be excused?

20               THE COURT:  Yes.  Thank you, Agent Kimball, you may

21   be excused.

22               THE WITNESS:  Thank you.

23        (Witness excused).

24               THE COURT:  Ladies and gentlemen, we are going to

25   take our lunch break now for one hour and 15 minutes, so we
```

```
 1   will resume trial at promptly 1:00 in the afternoon.

 2                All rise for the jury.

 3        (The jury retired from the courtroom 11:44 a.m.)

 4                THE COURT:  All right.  I will see the attorneys at

 5   12:45.  Anything pressing to discuss right now, Mr. McMillan?

 6                MR. McMILLAN:  No, Your Honor.

 7                THE COURT:  All right.  Mr. Roth?

 8                MR. ROTH:  No, Judge.

 9                THE COURT:  Okay, have a nice lunch.

10                MR. McMILLAN:  Thank you, Your Honor.

11        (A lunch recess was had at 11:45 a.m.; proceedings

12         resumed at 12:55 p.m.)

13                THE COURT:  Thank you, I hope you had a nice lunch.

14                Mr. McMillan, do you have your next witness?

15                MR. McMILLAN:  Yes, Agent Dimart.  May he take the

16   stand, Your Honor, or do you want him to wait?

17                THE COURT:  He can take the stand.

18                Call in the jurors, please, a few minutes early.

19        (Jury in at 12:57 p.m.)

20                THE COURT:  Please be seated.

21                And Agent, if you could remain standing to be sworn

22   in.

23                THE WITNESS:  Yes, ma'am.

24                THE COURTROOM DEPUTY:  Raise your right hand.

25                JASON DIMART, GOVERNMENT WITNESS, SWORN
```

Tuesday, May 9th, 2023

```
 1                THE COURT:  You may be seated and please state your
 2    full name for the record, spelling your last name.
 3                THE WITNESS:  First name is Jason, J-A-S-O-N, last
 4    name is Dimart, D-I-M-A-R-T.
 5                MR. McMILLAN:  May I proceed, Your Honor?
 6                THE COURT:  Yes.
 7                          DIRECT EXAMINATION
 8    BY MR. McMILLAN:
 9    Q    Agent Dimart, can you please describe for the ladies and
10    gentlemen of the jury how you are employed and how long you
11    have been so employed.
12    A    I'm with United States Customs and Border Protection Agent,
13    I work for air and marine for the last year, and prior to that,
14    I was a Border Patrol agent for 12 years, so United States
15    Customs and Border Protection is part of the agency.
16    Q    And are you what is called a boarding officer on board one
17    of the maritime units of CBP?
18    A    Yes, I'm on interdiction.
19    Q    Did you have a partner when you were -- well, were you
20    working on February 22nd, of 2022?
21    A    That's correct.
22    Q    And on that date, were you at the Port St. Lucie Inlet with
23    other law enforcement officers?
24    A    Yes.
25    Q    And directing your attention to approximately 9:00 p.m.
```

1   that day, where were you?

2   A    About 9:00 p.m., I was just south of the St. Lucie Inlet in

3   an area called Hobe Sound, I would say about a mile offshore.

4   Q    All right.  Is that location within Martin County in the

5   Southern District of Florida?

6   A    Yes, Stuart, Martin County.

7   Q    And did you notice anything unusual at approximately that

8   time of day in terms of traffic on the water?

9   A    Yes.

10   Q    What did you see?

11   A    I saw a vessel inbound coming from foreign waters, probably

12   Bahamas.

13   Q    And did that strike you as unusual or not?

14   A    It's normal to see a vessel coming into the inlet, that's

15   pretty normal.

16   Q    Now, at this point in time, was it dark or light out?

17   A    It was dark.

18   Q    Okay.  And did you see the boat go some place?

19   A    While he was coming through the inlet, what caught my

20   attention was -- so you have two lights, you have your red

21   light and you have your greenlight, so the general rule is

22   right way return, you stay on the right side of the inlet, it's

23   like traffic, and this boat decided to go on the left side of

24   the eight and there is rocks on this side and there's the green

25   eight, so he decided to go in the middle, which is not normal.

```
 1   Q   So like someone driving on the wrong side of the road or

 2   taking the wrong direction on an offramp to I-95?

 3   A   Exactly.  That indicated to me that the person didn't

 4   either have experience or didn't have the knowledge of the

 5   area, that's just not normal, to go on the left side.  It is

 6   like going on the highway, driving northbound in the southbound

 7   lane.

 8   Q   What did you and the other officers on board your vessel do

 9   thereafter?

10   A   We decided to follow and that's when Josh Williams, our

11   vessel commander, engaged the lights and siren and we decided

12   to do a vessel stop.

13   Q   Josh Williams is another person, not Josh Woodbury, the

14   agent in this case.

15   A   That's correct, Josh is like our boat driver for the night.

16   Q   Did you catch up to the vessel that you saw crossing in the

17   wrong area?

18   A   Yes.  Our vessel is a 41-foot vessel with four engines and

19   pretty much it is faster than the normal boat, I would say.

20   Q   What happened next?

21   A   As soon as we stopped, I saw two people up on the bridge, I

22   saw an Hispanic male, because he started talking Spanish, and I

23   saw an African-American on the left side of the vessel, and

24   that's when we were alongside the boat and pretty much close to

25   the inlet.
```

1   Q    Now, Agent Dimart, do you speak any languages in addition

2   to English?

3   A    Yes, sir, I'm fluent in Portuguese and Spanish.

4   Q    Okay.  And as you -- and when I say you, I mean you and the

5   other agents on board your vessel, approached the larger vessel

6   that was incoming, did you attempt to go and communicate with

7   the people on board?

8   A    We try, we usually ask two questions.  The first one is

9   where are you coming from, and usually how many people on

10  board.  For the question of how many people, he just shrugged

11  and answered in Spanish that he didn't know.

12  Q    And the person that you are referring to as shrugging and

13  answering in Spanish, what ethnicity did he appear to be to

14  you?

15  A    To me, Hispanic male.  Based on the accent, from my

16  experience, he was from Dominican Republic.

17  Q    Okay.  And have you encountered people from a variety of

18  Spanish speaking countries in the course of your employment, as

19  well as your personal life in the past?

20  A    Yes, sir.

21  Q    And do you -- do they have, in many cases, distinctive

22  accents from various Latin American countries?

23  A    That is correct, it is a unique accent.  You recognize

24  the -- you know, the country, Columbian, Panama, China -- I

25  mean Honduras, Guatemala, Dominican.

1   Q    In your own case, you grew up speaking Spanish in your own

2   home?

3   A    That's correct.

4   Q    And your parents are both -- well, Cuban and also from

5   Columbia, is that correct?

6   A    That is correct, my mom.

7   Q    And so you are familiar with a wide variety of accents.

8   A    Yes.

9   Q    And when you heard this man on board the boat speak to you,

10   it was representative of a Dominican Republic accent?

11   A    100 percent, yes.

12   Q    So what happened next?

13   A    He didn't stop and he was aiming towards land, towards the

14   north side of Jupiter island.  That's when we decided to do

15   something called a swift boarding, we pretty much jumped into

16   the vessel as fast as we could.

17   Q    When you say he didn't stop, was the boat trying to escape

18   you or was it -- did it just not stop moving forward?

19   A    The boat didn't come off plane, he was still engaging the

20   throttle and still moving toward the north side of the island.

21   Q    What happened next, did you board the boat?

22   A    Yeah.  We closed the gunnel, I landed on the deck and the

23   was a closed door, and that's when Matt Kimball, my partner, he

24   went up the bridge.

25        MR. McMILLAN:  May we energize the overhead

1  projector, Your Honor.

2  BY MR. McMILLAN:

3  Q   Agent Dimart, I'm showing you what has been previously

4  admitted as Government Exhibit 2, do you recognize this exhibit

5  yourself?

6  A   Yes, sir, 100 percent.

7  Q   And does it bear your initials on it, indicating you viewed

8  it previously?

9  A   Yes, to the right.

10 Q   Does it fairly and accurately depict the vessel that you

11 boarded on February 22nd, 2023?

12 A   Yes.

13 Q   And these are your initials up here, is that correct, sir?

14 A   Yes.

15 Q   All right.  Can you show the ladies and gentlemen of the

16 jury -- if you touch your screen -- let me just clear this --

17 you should be able to draw on it.  Can you show the ladies and

18 gentlemen of the jury where you boarded the vessel.

19 A   I boarded through here, yes.

20 Q   Okay.

21 A   I jumped and I landed exactly by this carpet.

22 Q   Okay.  And then when you got to that level, were you able

23 to see in -- I should ask you, this was at nighttime, was it

24 not?

25 A   Yes.

```
 1   Q    So did you have illumination; that is, lighting, or was it
 2   still dark on board the vessel?
 3   A    I carry a Glock 47 pistol and I have a flashlight on my
 4   pistol.
 5   Q    That's what we would call a weapon mounted light.
 6   A    It's a mounted weapon light, yes, sir.
 7   Q    Which is actually mounted to the pistol itself?
 8   A    It is mounted to the lower rail of the weapon.
 9   Q    Now, at this point in time, given the behavior of the
10   people on board this vessel, were you concerned about your
11   safety in boarding the vessel?
12   A    Yes.
13   Q    Is that why you drew your weapon?
14   A    Absolutely.
15   Q    And were you able to go and see -- were you able to see
16   inside this cabin area here in the dark what was, if anything,
17   inside there?
18   A    When I came closer to the door, you could see hands and
19   people inside.
20   Q    Hands of people?
21   A    By the door.
22   Q    Did that seem unusual to you?
23   A    Yes.
24   Q    Well, I mean, surely you are used to there being people on
25   board boats, why was this unusual to you?
```

Tuesday, May 9th, 2023

1  A   According to the specs of this vessel, you can fit up to

2  six people and there were more than -- I would say several

3  people, not the normal fishing trip, not the normal, you know,

4  Bahamas weekend.  It was different, it was way too many people.

5  Q   What do you mean by way too many?

6  A   As I said before, this vessel has three estate rooms and

7  the max capacity for this specific vessel is six, so this one

8  had more than six passengers.

9  Q   Okay.  So what did you do next?

10  A   At that time, Kimball, my partner, came down with the

11  Dominican, Rodriguez I believe is his last name, and he put him

12  on the ground and Rodriguez told me that the driver was hiding

13  up on the bridge.  That's what he told me in Spanish, that's

14  the first thing he did.

15  Q   I was going to ask you, when you communicated with the

16  Codefendant, Rodriguez in this case, were your communications

17  in English or Spanish?

18  A   Spanish.

19  Q   At that point in time, did you know that Mr. Rodriguez

20  spoke English?

21  A   I spoke to him in English, he responded to me in Spanish,

22  that's why I assumed he spoke only Spanish and I decided to

23  continue in Spanish.

24  Q   But specifically, did he tell you about a particular

25  individual in Spanish?

1    A    He told me the driver is hiding in the bridge.

2    Q    And was the word he used driver?

3    A    Driver.

4    Q    Okay.  Is hiding in the bridge?

5    A    Yeah.

6    Q    Okay.  If you look at Government Exhibit 2, what does the

7    term bridge mean to you?

8    A    To me, the bridge in maritime is the area where you pretty

9    much drive the vessel from, it is called a flybridge.

10   Q    Can you show the ladies and gentlemen of the jury --

11            Okay.  You are circling an area on the second or

12   upper level in a blue circle, indicating what you understood

13   that to be the bridge?

14   A    Yes.  And initially, I don't know if it matters, but the

15   Dominican was standing on this side, and the other subject was

16   right here.

17   Q    And for the record, on Government's Exhibit 2, the area

18   that you were circling is at the top of a staircase, a silver

19   staircase, which is on the left side of the vessel, is that

20   correct?

21   A    Yes.

22   Q    Okay.  What did you do next?

23   A    When I saw the hands, I decided to open the door.  This

24   door was shut and it had blinders here, and there's blinders

25   here, so I decided to open this door this way.

1  Q   And when you did, what did you see inside?

2  A   I saw a number that I couldn't count with my hands, it was

3  way too many people, the vessel was overloaded.

4  Q   Well, were the people inside, at least as you were able to

5  go in and see them, were they free to move about freely inside

6  the cabin?

7  A   I don't think you had enough space to even walk in there,

8  there was a pregnant female, children, females and males, and

9  as far as you could see inside and down below, you could see

10  eyes and people, eyes and people, eyes and people.

11  Q   Have you interdicted smuggling boats in the past yourself?

12  A   Yes, sir.

13  Q   Is it not uncommon for the people who are being smuggled to

14  throw up?

15  A   Yes, sir.

16  Q   And that produces an odor in the air, did you encounter

17  that on this occasion?

18  A   Yeah, there was a unique odor.

19  Q   After encountering those people, did you and Agent Kimball

20  decided that you needed further assistance in some way?

21  A   Yes.

22  Q   And was another unit requested to assist you?

23  A   I decided to pull my cell phone to call James Holloran from

24  the Martin County Sheriff's Office, he is in the marine unit.

25  Q   He has a boat, too?

```
1    A    Yes.

2    Q    So he could come to your assistance.

3    A    Yes.

4    Q    Did he do that?

5    A    He came.

6    Q    Did there come a time when you noticed that there was

7    additional people involved in the driving of the boat on board

8    this vessel located in the bridge area?

9    A    To be honest, I only saw two people, Rodriguez and another

10   African male that I don't know what happened to him, but I

11   didn't see him after.

12   Q    That African male you don't see -- or African-American

13   male, you don't see in this courtroom, do you?

14   A    No, he is not here.

15   Q    And did it come to your attention -- well, was there any

16   time that evening that you actually encountered Defendant

17   Saunders?

18   A    Yes.

19   Q    Okay.  And do you see the person I'm referring to as

20   Defendant Saunders in this courtroom anywhere?

21   A    Yes, sir.

22   Q    Can you point to him and describe what he is wearing,

23   please.

24   A    He is sitting at the table wearing a white T-shirt and I

25   believe a red tie, yeah.
```

1    Q    Is that a T-shirt?

2    A    It is a long sleeved shirt.

3    Q    Okay.

4         MR. McMILLAN:  Your Honor, may the record reflect the

5    witness has identified the Defendant, Raymond Saunders.

6         THE WITNESS:  The record so reflects.

7    BY MR. McMILLAN:

8    Q    At what time did you encounter Mr. Saunders?

9    A    So once we secured the vessel and I spoke to one of the

10   Haitians inside of the vessel, he told me they were from Haiti,

11   I decided to go pick up my rifle, Kimball had it up on the

12   bridge, to store it back in our vessel just for the safety

13   aspect of it, so that's when I went up to the bridge to get my

14   rifle.

15   Q    At that point in time, did you end up seeing Saunders?

16   A    That's when I saw Saunders sitting right across from the

17   captain's chair on the starboard side, he was sitting there

18   talking.

19   Q    Okay.  And did you -- did it come to your attention that

20   Mr. Saunders had said that he had been attacked or assaulted by

21   anyone?

22   A    He was talking that he needed to talk to somebody, that he

23   was assaulted, that he was bit, but I didn't see any bruises or

24   scars or blood or anything, he just was talking, talking,

25   talking.

```
 1   Q   Were you able to go, and was there sufficient light that
 2   you could go and see Mr. Saunders' body?
 3   A   No, not without illumination, like a flashlight.
 4   Q   Did you use a flashlight?
 5   A   I did.
 6   Q   I'm sorry, you did or didn't?
 7   A   I did.  I had two flashlights, one in my vest and I carry
 8   one extra in my pocket for interdictions.
 9   Q   Okay.  Because the weapon's mounted light is good when you
10   are -- when you need to protect yourself, but --
11   A   Yes.
12   Q   -- for regular purposes, you have a separate flashlight so
13   you don't have to point a gun at someone?
14   A   Yes, you don't point the pistol at something you don't want
15   to shoot unless deadly force is necessary.
16   Q   Utilizing that light, were you able to go and inspect
17   Mr. Saunders' body?
18   A   I did.
19   Q   Did you see any signs that Mr. Saunders had suffered any
20   sort of physical trauma in any way?
21   A   No, I didn't see anything.
22   Q   No blood?
23   A   No.
24   Q   Any bruises or contusions about his body?
25   A   No.
```

Tuesday, May 9th, 2023

```
 1   Q    How about a fattened lip or anything?

 2   A    Nothing.

 3   Q    Marks around his neck?

 4   A    No.

 5   Q    Did you see him when he was taped or not?

 6   A    I didn't see that part, sir, to be honest, I didn't see

 7   him.

 8   Q    Okay.  When you and Agent Kimball were ultimately joined by

 9   Deputy Holloran --

10   A    James.

11   Q    James Holloran from Martin County Sheriff's Office, and

12   there was one other agent that joined you, is that correct?

13   A    Yes.  He is an aviation enforcement agent out of

14   Jacksonville, I believe his name is Rickey --I forget his last

15   name, I believe it was Rickey Ricardo, he was with us, too.

16   Q    Rickey Ricardo?

17   A    Don't quote me, I don't remember, but we call him Rickey.

18   Q    At any time during the boarding of the Alpha vessel, which

19   we are showing on Government's Exhibit 2 here, on

20   February 22nd, 2023, were there any female law enforcement

21   officers of any sort present on board the vessel?

22   A    No.

23   Q    They didn't assist -- no females assisted you in any way?

24   A    No.

25   Q    Okay.  And were there any female paramedics or medical
```

```
 1   personnel that assisted later on?

 2   A    I saw medical coming in with Libasci, another deputy, I

 3   didn't see any females, mostly males.  I don't remember seeing

 4   any females, only males.

 5            MR. McMILLAN:  We tender the witness, Your Honor.

 6            THE COURT:  Okay, thank you.

 7            MR. McMILLAN:  Oh, I'm sorry, I did have one other

 8   question.

 9            THE COURT:  That's okay.

10   BY MR. McMILLAN:

11   Q    Did you have occasion to go and check whether there were

12   life jackets on board the vessel?

13   A    Once we did the search, I believe we only found one.

14   Q    One?

15   A    One PFD, personal flotation device.

16   Q    When the illegal aliens were transferred off the boat, did

17   they use life jackets that were given to them by U.S.

18   Government personnel or did they use ones they had from on

19   board the vessel?

20   A    By policy, we have to provide them with a PFD.  For the

21   safety of them and ourselves, we provided PFDs and I believe

22   our vessel has maybe 50.

23   Q    Fifty, five zero?

24   A    Five zero.

25   Q    Did you find any more than one life jacket present on board
```

Tuesday, May 9th, 2023

1    the boat Alpha?

2    A    No, just one.

3    Q    Did you look?

4    A    Yes, I saw one.

5    Q    Okay.  And you didn't see any more than one?

6    A    No.

7              MR. McMILLAN:  Thank you.

8              Tender the witness, Your Honor.

9              THE COURT:  Cross-examination, Mr. Roth, you may

10   begin.

11             MR. ROTH:  Thank you, Judge.

12                      CROSS-EXAMINATION

13   BY MR. ROTH:

14   Q    Agent Dimart, good afternoon.

15   A    How are you, Counsel, how is your day?

16   Q    I've been doing pretty good.

17   A    Thank you, sir.

18   Q    When you first -- your vessel first pulled up to this

19   suspect vessel and you were able to use a flashlight to

20   illuminate the area around the bridge, if I understand from

21   your testimony --

22   A    That's correct, sir.

23   Q    -- you saw two subjects, you saw Rodriguez and an African

24   American man.

25   A    Yes, yes.

```
1   Q   Not Mr. Saunders.

2   A   No.

3   Q   And what was he doing, do you know?

4   A   Rodriguez?

5   Q   No, the African American that we haven't identified?

6   A   He was standing right here in this area.

7   Q   Okay.  So he wasn't one of the aliens being smuggled, was

8   he?

9   A   I don't know if he was being smuggled or he was part of

10  this case, I don't know.

11  Q   Okay.  There was a guy that was encountered on the vessel

12  named Lubin Phillip, do you know if he was arrested?

13  A   I have no idea, sir, I don't know.

14  Q   And the African American male that was on the bridge over

15  there, that you saw, was that Lubin Phillip?

16  A   I don't know.

17  Q   Did Rodriguez tell you anything about there being another

18  conspirator?

19  A   Rodriguez only told me that the driver was hiding inside of

20  the bridge.

21  Q   He never identified Lubin Phillip to you?

22  A   No.

23  Q   Do you know if later on, he said Lubin Phillip was the

24  organizer of the trip?

25  A   I don't know.
```

Tuesday, May 9th, 2023

```
 1   Q   And he was right on board the vessel, right?

 2   A   I don't know, I just saw an African American male on the

 3   left side, on the portside.

 4   Q   Okay.  And Rodriguez only spoke Spanish?

 5   A   He spoke to me in Spanish and I'm fluent in Spanish.

 6   Q   Did you see Saunders with packing tape around him?

 7   A   No.

 8   Q   Do you know if any officer collected the packing tape that

 9   was removed from Mr. Saunders so it could be checked for

10   fingerprints or DNA?

11   A   I believe it was collected.

12   Q   Okay.  And do you know if it was examined?

13   A   I don't know.

14           MR. ROTH:  Okay.  Thank you, sir.

15           THE WITNESS:  You're welcome, sir.

16           THE COURT:  Any redirect?

17           MR. McMILLAN:  No thank you, Your Honor.

18           THE COURT:  All right.  Thank you, Agent, you may be

19   excused.

20           THE WITNESS:  Thank you, ma'am, appreciate it.

21       (Witness excused)

22           MR. McMILLAN:  Your Honor, our next witness is

23   Deputy Holloran from the Martin County Sheriff's Office.

24           THE COURT:  All right.  Is Mr. Holloran coming into

25   the courtroom?
```

```
 1              MR. McMILLAN:  Yes, Your Honor, he is coming in right

 2    now.

 3              THE COURT:  Good afternoon, Deputy, if you could

 4    please make your way to the witness stand.

 5              THE WITNESS:  Yes, ma'am.

 6              THE COURT:  Remain standing to be sworn in.

 7              THE COURTROOM DEPUTY:  Raise your right hand.

 8               JAMES HOLLORAN, GOVERNMENT WITNESS, SWORN

 9              THE COURT:  Please be seated and tell us your full

10    name, spelling your last name.

11              THE WITNESS:  My name is James

12    Holloran, H-O-L-L-O-R-A-N.

13                          DIRECT EXAMINATION

14    BY MR. McMILLAN:

15    Q    How are you employed, sir?

16    A    I'm a deputy with the Martin County Sheriff's Office.

17    Q    How long have you been employed by the Martin County

18    Sheriff's Office?

19    A    I have been employed since 3/3 of 2003.

20    Q    Do you have any special duties or units that you are

21    assigned to at MCSO?

22    A    I'm currently assigned to the marine unit, I'm a roaming

23    deputy for the county.

24    Q    How long have you worked at the Martin County Sheriff's

25    Office in that capacity?
```

Tuesday, May 9th, 2023

1    A    Seven years.

2    Q    Okay.  So are you assigned a particular patrol vessel of

3    some sort?

4    A    I'm assigned to a marked agency patrol vessel, it is called

5    a Contender, it is 32 feet long.

6    Q    If I can ask you, is the St. Lucie Inlet located in your

7    jurisdiction?

8    A    Yes, it is.

9    Q    And so that would be Martin County in the Southern District

10   of Florida?

11   A    Yes.

12   Q    And if I can direct your attention to February 22nd of

13   2023, were you on duty in the evening hours on that date?

14   A    Yes, I was.

15   Q    And in the vicinity of the St. Lucie Inlet?

16   A    I was -- well, I mean, in my jurisdiction.  It is in my

17   area, but I was actually in the Manatee pocket at that

18   particular time.

19   Q    And when you were at the Manatee pocket at that particular

20   time, did you receive a request for assistance of some sort

21   from some other agency?

22   A    I did.

23   Q    And how did you receive that communication?

24   A    A telephone call from Agent Dimart.

25   Q    And did you know Agent Dimart from past exchanges with him

1    in your professional capacity?

2    A    Yes, absolutely.

3    Q    Was he asking you to assist him with something?

4    A    He said they conducted a vessel stop in the area of

5    St. Lucie Inlet and was requesting immediate assistance.

6    Q    Were you able to go and provide immediate assistance?

7    A    Yes, we were there.  Between the time we got the call and

8    the time we arrived, it was about nine minutes.

9    Q    When you are say we, who are you referring to?

10   A    The vessel commander was Michael Libasci and then myself as

11   the crewman.

12   Q    If you wouldn't mind, the vessel commander, would you mind

13   spelling his or her last name?

14   A    Michael, L-I-B-A-S-C-I.

15   Q    And that is a male?

16   A    Yes.

17   Q    Okay.  When you responded to the vessel, did you -- what

18   did you encounter?

19   A    Well, as we pulled up to the St. Lucie Inlet, I could see a

20   smaller sport fish, and by smaller I mean it is not 60 foot, it

21   is in the 50 range, and I could see the U.S. Customs' boat with

22   activated lights.

23   Q    I would like to show you what is on the screen right now,

24   Government's Exhibit 2, do you recognize that vessel?

25   A    Yes, it is the Alpha.

Tuesday, May 9th, 2023

1   Q    Is that the vessel you saw on February 22nd, 2023?

2   A    Yes, sir, it is.

3   Q    And what did you do once you arrived there?

4   A    We pulled up to the portside of the vessel or the left side

5   of the vessel, and I encountered Agent Dimart on the deck along

6   with several individual males laying on the deck, and suspected

7   a migrant smuggling venture.

8   Q    Just so everybody who isn't familiar with nautical terms is

9   clear, the portside is what we ordinarily think of as which

10  side?

11  A    The left, the left side of the vessel.

12  Q    And also when you are trying to determine what the left

13  side of the vessel is, is that always looking at the front of

14  the ship or from the rear of the ship?

15  A    It would be the left side -- well, I mean, if you are

16  looking at it from the front, it is the right -- or excuse me,

17  it is the left with the red side of the marking, so it would be

18  as you are pulling up to the back of the vessel, if you are

19  pulling up to the vessel from the front it would be the right,

20  depending where you are sitting.

21  Q    Obviously the Alpha ship, which is depicted in Government's

22  Exhibit 2, is docked at port in this photograph, correct?

23  A    Yes.

24  Q    But when you encountered it, it was in the inlet?

25  A    Yes.

Tuesday, May 9th, 2023

1    Q    And there wasn't this cemented wood structure to the left?

2    A    No, that is the Fort Pierce Inlet.

3    Q    I don't know if you are aware of this, but you can actually

4    draw things on here, if you choose to do so.  Can you just show

5    the ladies and gentlemen of the jury where the Customs and

6    Border Protection boat was and where your vessel was when you

7    approached the Alpha ship?

8    A    So Customs would have been in this general area.  Again,

9    this is in the inlet, not in the Fort Pierce Harbor.  This

10   would have been the Customs area, and then we would have pulled

11   up on this side here, pulling up to starboard, which is the

12   right to the portside, so you would pull up parallel to the

13   vessel.

14   Q    Did you board the Alpha vessel?

15   A    I did.

16   Q    And what did you do then?

17   A    I was instructed by Agent Dimart to ascend to the helm to

18   assist the other agent who was upstairs with searching that

19   particular area of the vessel.

20   Q    And for the record, can you draw a square around the helm

21   area that you are referring to.

22   A    So I boarded and then up the ladder, into this general

23   area.

24   Q    Okay.  And for the record, you're showing an indication

25   that you have enclosed by a box that is at the top of a silver

1   ladder on the left-hand side of the vessel, is that correct?

2   A    That's correct.

3   Q    Okay.  And when you got up there, what happened next?

4   A    I met with Agent Matt, who was already at the helm, which

5   is driving the vessel, and I encountered a Spanish male on the

6   forward of the steering console, and placed him into custody.

7   Q    If I can ask you, do you know what that individual's name

8   is now?

9   A    Actually, I don't know his name.

10   Q    Okay.  But he appeared to be Spanish, you said?

11   A    Yeah, he was of Spanish descent.

12   Q    Was that because you heard him speaking Spanish?

13   A    He didn't understand English.

14   Q    Okay.  And what happened next?

15   A    I escorted him down the ladder and placed him just behind

16   the ladder, where the other agents were there to monitor his

17   being, and then returned to the helm to finish searching the

18   area to make sure that the helm was clear.

19   Q    When you got back up to the top of the helm, did you find

20   anything else unusual up there?

21   A    When we were up there, you could hear banging and muffling

22   screaming -- or not screaming, but you know, loud talking and

23   so on and so forth, but you could hear a definitive banging on

24   the superstructure of the vessel.

25   Q    Other than the Hispanic male, did you find anybody else on

 1    the exterior of the ridge area of this vessel?

 2    A    On the exterior, no.

 3    Q    Okay.  Well, showing you -- whoops.

 4         I'm showing you what's been admitted as Government's

 5    Exhibit 122, do you recognize what is shown in this picture?

 6    A    Yes, that's the helm.

 7    Q    Okay.  And you said you heard a banging noise.

 8    A    I did.

 9    Q    And when you were up there, were you with any other law

10    enforcement officer?

11    A    I was up there with Agent Matt.

12    Q    Agent what?

13    A    Kimball.

14    Q    Kimball?

15    A    Yeah.

16    Q    And when you were up there with Agent Kimball, did you have

17    occasion to go and check other parts of this control console,

18    having heard the banging?

19    A    Yes.

20    Q    What, if anything, unusual did you notice?

21    A    So I'm going to draw again.  In this general area right

22    here, this is an opening that goes back into this general area

23    all through here, and in looking in that area, I found

24    Mr. Saunders, I could see Mr. Saunders under there.

25    Q    How could you see him?

```
1    A    Well, I can see him using illumination from a flashlight, I

2    could see him actually tucked up underneath this console area

3    right in here.

4    Q    And did you say anything to Agent Kimball about your

5    observations?

6    A    I did.

7    Q    What did you tell him?

8    A    That there was someone under there.

9    Q    When did you do?

10   A    And that that individual appeared to be bound.

11   Q    Okay, and what happened next?

12   A    I attempted to coax the individual to come out of the hatch

13   that I was looking through and he wasn't following instruction.

14   Q    He wasn't?

15   A    No, sir.

16   Q    What were you asking him to do?

17   A    To come to us, to come out.

18   Q    Okay.  But that wasn't happening?

19   A    No, sir.

20   Q    What happened next?

21   A    So from there, I walked around the scope of the helm, and

22   this is an open area or a lounge and there is a hatch right

23   here that I was able to open up and get a clear and could see

24   his entire person.

25   Q    Okay.  Were you able to see whether -- well, what happened
```

Tuesday, May 9th, 2023

1   next?

2   A    So then I called him out again, identified ourselves as

3   police officers.  He questioned us as to if we were police

4   officers, and then he came out of the helm.

5   Q    Okay.  And what happened next?

6   A    He came out, hands free out of the helm.  His face was

7   taped, his knees were taped, and stood him out into the lounge

8   area, where he was freed from the tape and then subsequently, I

9   placed him in custody.

10  Q    Now, I'm sorry, did you say his hands were taped or not

11  taped?

12  A    Not taped.

13  Q    Okay, but his legs were restrained by tape.

14  A    Yeah, right around the knee, he had a round of tape around

15  his knee.

16  Q    Okay.  And you indicated there was some around his head?

17  A    Yes, his face.

18  Q    Were you attired in what we would call a tactical uniform

19  for use on the boat?

20  A    I was wearing exactly what I have on now, which is my

21  assigned marine uniform for the Martin County Sheriff's Office,

22  but I also had a vest on top clearly marked sheriff.

23  Q    And for emergency usage purposes, do you commonly carry a

24  cutting device of some sort on your vest?

25  A    Yes.

1    Q    What is that?

2    A    I carry tactical sheers on my vest for several reasons.

3    One is obviously to cut tape off somebody I encounter, but two,

4    if you are wrapped in lines on boats, you have the ability to

5    cut yourself free, and then they are just overly handy in just

6    about every scenario.

7    Q    Okay.  And did you use those sheers to go and free someone?

8    A    I did.

9    Q    What did you do with the tape after you had freed

10   Mr. Saunders?

11   A    Dropped it to the deck.

12   Q    Okay.

13           MR. McMILLAN:  May I approach witness, Your Honor?

14           THE COURT:  Yes.

15   BY MR. McMILLAN:

16   Q    I'm showing you what's been previously admitted as

17   Government Exhibits 7 and 8, do you recognize these two items?

18   A    I do.

19   Q    Can you describe for the ladies and gentlemen of the jury

20   what Government Exhibits 7 and 8 are.

21   A    Exhibit 7 is the tape that I actually removed from

22   Mr. Saunders, from his face and his legs.  As you can see, it

23   is not much.

24   Q    Okay.  That's the entirety of the tape?

25   A    That's the entirety of it.

1    Q    Okay.  And what is the other exhibit?

2    A    The other exhibit is the tape on the roll that was actually

3    found in this general area on the vessel.  After everything was

4    said and done, I was actually looking for the tape and it was

5    there.

6    Q    Now, at the time you cut the tape off the Defendant's arms

7    and everything, were you trying to preserve it for DNA

8    purposes?

9    A    No, sir.

10   Q    Why?

11   A    Because there was just so much going on.

12   Q    Okay.

13   A    And everything was flowing, I mean, there was nothing

14   static about this situation at all.

15   Q    Okay.  With respect to the tape on the Defendant, did you

16   notice anything unusual about its locations?

17   A    The things that struck me unusual about it was simply why

18   was it there.  Your hands are free, you were underneath there,

19   there is nobody there, why would you remain in that position,

20   why would you remain taped if there is no reason to be taped,

21   so that's what raised my concern to put him into custody.

22   There was just -- there was nothing about it that was correct

23   in just my years of training and experience.

24   Q    Can you describe what the tape around the Defendant's head

25   consisted of; I mean, did it cover everything but his nostrils

1    or what?

2    A    Yeah, he was covered -- so as I recall, he was covered up

3    underneath the face, he could clearly breathe, and this was

4    tight to the face, so it had been wrapped around --

5    Q    Okay.

6    A    -- a couple of times, I would say no more than three.

7    Q    But was there anything keeping the Defendant, as you first

8    saw him coming out of that compartment, from simply pulling the

9    tape off of his head whenever he wanted to?

10   A    No.  I mean, I think he could have pulled it straight down.

11   Q    How about the tape on his knee area, could he have pulled

12   that off whenever he wanted to?

13   A    This tape, you can rip it, you could have opened your legs

14   and the tape would have been broken. I mean, there was nothing

15   that was bounding about it, it was theatrical.

16   Q    I'm sorry, did you bounding or binding?

17   A    Binding, bounding, however you want to say it.  Like I

18   said, it was theatrical, there was nothing from stopping any

19   normal person from removing it.

20   Q    Did you have occasion to go and check Mr. Saunders' person

21   to see whether he had sustained any physical injuries on his

22   body?

23   A    Yes.

24   Q    Why did you do that?

25   A    Well, just simply -- well, first off is where he was, I

1    mean, we were going to make sure; two is that he said he was

2    placed in there; and then three, it is just -- it's just a

3    courtesy.  I mean, I'm there to assist and at that particular

4    moment in time, I don't care if you are a good guy or a bad

5    guy, if you're hurt, you're hurt, so we want to take that off

6    the table as soon as possible.

7    Q    Did you assist the CBP personnel in calling for Martin

8    County Fire Rescue to respond out there in case anybody needed

9    medical assistance?

10   A    Yes, we did, and we transported Fire Rescue to the vessel.

11   Q    You indicated that there were children on board, too.

12   A    Yes.

13   Q    Did they need to be attended to, if need be?

14   A    If anybody needed to be attended to, we were going to take

15   care of it.

16   Q    Deputy Holloran, after this whole incident took place, you

17   wrote a report, is that correct?

18   A    I did.

19   Q    Okay.  And in your report, did you write things down

20   accurately as you perceived them at the time?

21   A    Yes.

22   Q    Okay, but did you make a mistake?

23   A    I did.

24   Q    What was that mistake?

25   A    I wrote that his hands were taped, and it was just a fluid

```
 1   statement and I just -- it just got past me.
 2   Q   Okay.  Well, let's be clear about this because, I mean, you
 3   have been a law enforcement officer now for well over ten
 4   years, correct?
 5   A   Almost 30.
 6   Q   Yeah.  And when you went to the academy and from that point
 7   on, you realized that writing reports is really important.
 8   A   Absolutely.
 9   Q   And that people depend on your reports.
10   A   Yes.
11   Q   And that little details matter.
12   A   Yes, absolutely.
13   Q   And you acknowledge that you made a mistake in that
14   respect?
15   A   Yes, absolutely.
16   Q   Did you have an opportunity to go and view the videotape
17   that was taken by Agent Kimball of the Defendant emerging from
18   the compartment?
19   A   Yes.
20   Q   Okay.  And does that fairly and accurately depict what you
21   saw in terms of Mr. Saunders emerging from that compartment on
22   February 22nd of 2023?
23   A   100 percent.
24   Q   Okay.  And do you honestly at any time believe that you saw
25   the Defendant's hands bound in any way?
```

Tuesday, May 9th, 2023

1   A   No, I did not.

2   Q   But that was a mistake in your report.

3   A   It was.

4   Q   Now, once you were aware of the fact that that mistake had

5   taken place, did you write a supplement to correct that?

6   A   I did.

7   Q   Okay.

8   A   It was my responsibility for the mistake.

9   Q   But you were correct about the other locations the tape was

10  on the Defendant, just not that one.

11  A   Yes.

12          MR. McMILLAN:  Thank you.

13          We tender the witness, Your Honor.

14          THE COURT:  Thank you.

15          Mr. Roth.

16          MR. ROTH:  Thank you, Judge.

17                    CROSS-EXAMINATION

18  BY MR. ROTH:

19  Q   So Deputy, February 22nd, 2023, that was quite an exciting

20  day on the water, wasn't it?

21  A   It was one of many, sure.

22  Q   Okay.  And you and your fellow agents stopped the smuggling

23  of a very large number of aliens that had basically no legal

24  authority to come into the United States, right?

25  A   I assisted in that stop, yes.

1   Q   So all and all, it was a good day.

2   A   I would believe so.

3   Q   And as far as you know, those aliens, they were taken back

4   to whatever country they came from and they did not make land

5   to the United States.

6   A   They did not make land to the United States.

7   Q   Okay.  And after you did this, that very day, you wrote a

8   report.

9   A   Well, the 23rd, yes.

10  Q   Okay.

11  A   Because, I mean, the incident didn't end on the 22nd, it

12  went well into the 23rd.

13  Q   So I'm looking at your first report, it has the 22nd, but

14  that could be a mistake?

15  A   No.  So the way the reports are generated on my end, it is

16  called a Tyler System, so it is from the moment that I start

17  the event is the moment that that report is generated, so that

18  date, but when I actually wrote it itself is the following day,

19  but the report generation, the computer generates the dates.

20  Q   Thank you for bringing me up to date on that, I wasn't

21  aware of that.

22  A   Yes.

23  Q   You wrote in the report that you were wearing a worn --

24  like a body worn camera.

25  A   Yes.

1    Q    And you uploaded the footage to evidence.com.

2    A    Yes.

3    Q    Evidence.com is a system that retains evidence in the state

4    court system, right?

5    A    Okay.  So for the record, I don't know much about it.  What

6    I know is it is a website, that website is contracted with the

7    Sheriff's Office through Axios, which is our body worn camera

8    system, and then we download that into -- so any pictures that

9    I take, any footage off my body cam gets downloaded to that

10   website.

11          But as to what happens and how it gets disseminated

12   from there, that's beyond me.  And it is a brand-new system, so

13   we have had it -- I actually had that body cam three or four

14   days prior to this incident, it was issued to me, so everything

15   about that system is brand-new, so I really couldn't explain to

16   you how it works.  I just know what I'm supposed to do to get

17   my evidence to that website.

18   Q    Before writing you're records, reports, did you have an

19   opportunity to review the footage off of the body worn camera

20   that you had that day?

21   A    I did.

22   Q    Where is that video?

23   A    It is with evidence.com, so once it's uploaded, I no longer

24   have access to it.

25   Q    Was it provided to federal law enforcement or the United

1   States Attorney's Office?

2   A   Yes, because I -- there it is.

3   BY MR. ROTH:

4   Q   And when did you review it?

5   A   I reviewed it the day of and then I reviewed it last week.

6   Q   Okay.

7   A   Well, I didn't review the whole thing.  It is four hours, I

8   just reviewed the highlights.  Me sitting there watching people

9   is not very interesting.

10  Q   Did you review it before you authored your report on

11  February 22nd, 2023?

12  A   I did, but if you are asking if I reviewed it to see if

13  Mr. Saunders' hands were bound or not, I didn't have it on at

14  that moment in time.

15          Again, it is new system, I forgot to turn it on when

16  I boarded the vessel, it wasn't until shortly after all of that

17  had taken place, my sergeant, and you can see it in the video,

18  he's texting me, Turn on your body worn camera, because I just

19  simply forgot to.

20  Q   New system.

21  A   Right, it wasn't a reflex at the time.

22  Q   Even if we were to play this for the jury, you have advised

23  us that at the time you had Mr. Saunders come out of that

24  little compartment, your camera wasn't rolling.

25  A   My camera wasn't rolling, but Ammo's camera was.

Tuesday, May 9th, 2023

```
 1   Q   You aren't in the picture, are you?

 2   A   Yes.

 3   Q   You are in the picture when Saunders comes out of the

 4   compartment?

 5   A   Yes, sir.

 6   Q   Can you be heard giving him commands to come out?

 7   A   I didn't hear it with volume, I only saw the video, I

 8   didn't listen to it with volume.

 9   Q   But you saw yourself?

10   A   Yes.

11   Q   When you wrote this report on the 23rd, you wrote -- and

12   I'm not going to read you the whole report.

13   A   Sure.

14   Q   But I'm going to read you the part that says, "I then

15   removed the hatch cover and discovered that the male had tape

16   around his legs, face and hands."

17   A   Yes.

18   Q   That's what you wrote, right?

19   A   Yes.

20   Q   That was on the 23rd of February?

21   A   Yes.

22   Q   And your supervisor, David Joseph Rosco, reviewed and

23   approved your report on March 1st, 2023.

24   A   If that's the date, sure.

25   Q   Okay.  With no corrections.
```

```
 1   A    With no corrections.

 2   Q    And then you were meeting with the federal prosecutor's

 3   office --

 4   A    Yes.

 5   Q    -- to basically prepare for their presentation at this

 6   trial, right?

 7   A    Yes.

 8   Q    And somebody said to you, Deputy Holloran, this report is a

 9   problem for us because this report says that --

10   A    No one said that.

11   Q    -- he had tape around his hands.

12   A    No one said that.

13   Q    So you wrote a new report.

14   A    I wrote an addendum.

15   Q    An addendum four days before jury selection in this case.

16   A    That's when I noticed that I had made the error.

17   Q    While you and the Government were preparing for your

18   presentation at this trial.

19   A    I saw CBP's -- I read my report and then the CBP video and

20   realized that I had made an error.

21   Q    They told you that you were wrong when you wrote in your

22   report that he had tape around his hands.

23   A    Who is they?

24   Q    CBP?

25   A    No, I noticed the error.
```

1    Q    You noticed it?

2    A    Yeah.  I mean, even through grand jury, I had said that his

3    hands weren't bound, I made an error.

4    Q    I don't have your grand jury testimony.

5    A    I didn't do a grand jury.  When I gave my interview to HSI

6    about what had taken place on the vessel, I had always said his

7    hands were not bound, I did not go to grand jury.

8    Q    You did not testify before the grand jury?

9    A    I did not.

10   Q    Okay, thank you.  So in your report that you wrote on

11   May the 4th, four days before jury selection, you described

12   your previously typed description was, quote, "an inaccurate

13   typographical error."

14   A    Correct.

15   Q    Typographical error?

16   A    Yeah, I inappropriately -- or I typed hands when I

17   shouldn't have, it was a typographical error.  I made an error.

18   Q    Is that a typographical error?

19   A    It is an error.  I typed it and it was an error, it is a

20   typographical error.

21   Q    Because you are a very good report writer, I have read your

22   report, there is not a single misspelled word, the grammar is

23   perfect.

24   A    I'm pretty good at punctuation, too.

25   Q    I would say maybe better than me, probably better than me,

```
 1   and I detect no what I commonly understand to be typographical

 2   errors, right?

 3   A    All right.

 4   Q    Your error is an error in stating a fact.

 5   A    It's an error, and I own it.

 6   Q    It is an error about a fact that's significant in this

 7   case.

 8   A    It is an error that I own.

 9   Q    And you are the first person who saw him come out of that

10   compartment.

11   A    Yes.

12   Q    And you said the day it happened that he had tape on his

13   hands.

14   A    I wrote that in my report, yes.

15   Q    And then you changed it four days before trial.

16   A    I corrected my mistake four days before trial, yes.

17   Q    I mean, are you backing off that this was some sort of

18   typographical error?

19   A    No.  I made an error and I typed it, it is a typographical

20   error.

21   Q    So to me a typographical error is like if you were going to

22   say there was tape around his hands, but you left the H off and

23   it just said ands, that would be a typographical error.

24   A    We can agree to disagree.

25   Q    And as far as what would have been depicted on your body
```

1    cam, we will never know because you didn't turn it on.

2    A    Correct.

3            MR. ROTH:  Thank you, sir.

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Any redirect?

6            MR. McMILLAN:  Yes, Your Honor.

7                        REDIRECT EXAMINATION

8    BY MR. McMILLAN:

9    Q    First of all, Deputy Halloran, did you bring up the fact

10   that you had made the mistake to us or did we confront you with

11   your mistake?

12   A    It was me.

13   Q    You noticed it and said, I want to bring it to your

14   attention that I made a mistake?

15   A    Yeah, I made a mistake.

16   Q    With respect to the mysterious missing body camera --

17           MR. McMILLAN:  First of all, may I approach the

18   witness, Your Honor?

19           THE COURT:  Yes.

20   BY MR. McMILLAN:

21   Q    Government's Exhibit 3, which has already been admitted in

22   evidence, do you recognize that, sir?

23   A    Yes.

24   Q    Is that your body camera footage?

25   A    Yes.

1    Q    Does it capture the entirety of your actions on

2    February 22nd of 2023, at least insofar as they were recorded

3    on your body camera?

4    A    Yes.

5    Q    So there is over an hour of footage here, is there not?

6    A    I believe it is four.

7    Q    Four hours, which if the jury wishes to, they can view if

8    they would like to.

9    A    Yes.

10   Q    This shows how many people were packed on board the vessel,

11   does it not?

12   A    Yes.

13   Q    Okay.  Which are also captured in still photographs that

14   you were shown earlier.

15   A    Yes.

16   Q    And the vessel was very packed with people, was it not?

17   A    Yes.

18   Q    However, this particular body camera system that you got,

19   the Axios, and I believe that is A-X-I-M, or A-X-I-O-S?

20   A    I-O-S.

21   Q    Axios System, how long had you had that when this event

22   took place?

23   A    Just a couple days.

24   Q    Okay.

25   A    So it is a brand-new system to the Martin County Sheriff's

Tuesday, May 9th, 2023

 1   Office, we haven't had them until just recently.

 2   Q   Well, these systems are kind of expensive for departments

 3   to buy?

 4   A   Incredibly.

 5   Q   And to your knowledge, does your cousin department in Palm

 6   Beach County, which would you say is a more wealthy county than

 7   Martin County?

 8   A   I wouldn't go that far, but yes.

 9   Q   Well, contemporaneous in terms of --

10   A   Size.

11   Q   -- its size.

12   A   Sure.

13   Q   They still don't have body cameras, do they?

14   A   No.

15   Q   And you had just gotten these.

16   A   Yes.

17   Q   And are these things running every second of every day or

18   not?

19   A   No.  So the system that we have, we have to actually press

20   a button twice in order to get the system to activate itself.

21   Q   Okay.  And that's so that when you are going to the

22   bathroom, it is not videotaping you?

23   A   Among other things, yes, but that would be the simplest.

24   Q   So you have to go and turn it on.

25   A   Yes.

1  Q   Did you think you had turned it on in this instance?

2  A   No, I didn't, no, I didn't.

3  Q   Why was that?

4  A   I simply didn't remember to.

5  Q   Because you have been a police officer now for 30 years.

6  A   Almost, yes.

7  Q   And you had had a body camera at this point in time for a

8  week?

9  A   Yeah, not long.

10 Q   So would it be -- what was your state of muscle memory at

11 this point with respect to your body camera?

12 A   Zero.

13 Q   Okay.  Once your commanding officer reminded you of it,

14 what did you do?

15 A   Turned it right on.

16 Q   Then did you record the next however many hours of footage?

17 A   Yes, 100 percent.

18 Q   But you didn't capture this moment on your own body cam.

19 A   I did not.

20        MR. McMILLAN:  May I approach the witness again, Your

21 Honor?

22        THE COURT:  Yes.

23 BY MR. McMILLAN:

24 Q   I'm showing you what's been admitted as Government

25 Exhibit's 4, do you recognize this video?

1    A    Yes, that's Mr. Saunders getting removed from the hatch.

2    Q    Did you watch this video yourself personally?

3    A    I did.

4    Q    Pardon me?

5    A    I did four days ago.

6    Q    Okay.

7         MR. McMILLAN:  May we republish Government Exhibit 4,

8    Your Honor?

9         THE COURT:  Yes.

10   (Video played in open court.)

11        MR. McMILLAN:  Can you stop it, Special

12   Agent Woodbury.

13   BY MR. McMILLAN:

14   Q    Because you were asked by Defense Counsel earlier whether

15   you were depicted on this video, do you remember those

16   questions?

17   A    I do.

18   Q    Are you depicted on this video?

19   A    That's me.

20   Q    Can you draw a circle around where you are.

21        Oh, in the green pants, that's you?

22   A    Yes.

23   Q    So you are there.

24   A    Yes.

25   Q    Would it be fair to say your head is pointed directly at

1    Defendant Saunders?

2    A    Yes.

3    Q    So you are at a pretty good vantage point to be able to see

4    Mr. Saunders' hands as he emerged.

5    A    Yes.

6    Q    Do you see, at this moment, any tape on his hands?

7    A    I do not.

8    Q    And outside of the mistake on your report, have you ever

9    maintained at any time that the Defendant had tape on his

10   hands?

11   A    No, I have not.

12   Q    When you were dealing with the other law enforcement

13   officers in this case, did you find it significant and

14   noteworthy of mention among yourselves that the Defendant

15   didn't have bound hands when you encountered him?

16   A    Absolutely.

17   Q    But you made a mistake on your report.

18   A    I did.

19   Q    Oh, and as for your supervisor reviewing you're report, do

20   you remember those questions?

21   A    Yes.

22   Q    Was your supervisor there?

23   A    No.  Well, the only reason why my supervisor asked me to

24   turn my body cam on is because we all knew what was happening

25   and they can actually review the live feed from the camera from

1   my body cam and see what is happening.  So when he logged on to

2   see what was happening, he is like, You need to turn your

3   camera on, that's how I knew to turn my camera on.

4   Q   So you can digitally broadcast back to your commanding

5   officers what you are seeing on the street?

6   A   Yeah, live.

7   Q   Okay.

8   A   Well, to the supervisors, no one else.

9   Q   But in this case, they discovered, Hey, where is the

10  footage, and he reminded you to turn it on?

11  A   That's it 100 percent, exactly.

12  Q   And you did that.

13  A   Yes, you can see the camera right there in the picture, it

14  is right there.

15          MR. McMILLAN:  Please continue the remainder of the

16  video.

17      (Video recording played in open court.)

18          MR. McMILLAN:  Okay, thank you.

19          No further questions, Your Honor.

20          THE COURT:  All right.  Thank you, Deputy, you may be

21  excused.

22          THE WITNESS:  Am I released from my subpoena?

23          THE COURT:  Yes.

24      (Witness excused.)

25          MR. McMILLAN:  The United States respectfully calls

```
 1   Ron Anderson from ICE, Your Honor.

 2          THE COURT:  Please have Mr. Anderson escorted in.

 3          Good afternoon, sir.

 4          Please come up to the witness stand to be sworn in,

 5   and remain standing while you are sworn.

 6           RONALD ANDERSON, GOVERNMENT WITNESS, SWORN

 7          THE COURT:  Thank you sir, you may be seated.  Please

 8   tell us your full name, spelling your last name.

 9          THE WITNESS:  My name is Ronald Anderson,

10   A-N-D-E-R-S-S-O-N.

11          MR. McMILLAN:  May I proceed, Your Honor?

12          THE COURT:  Yes.

13                       DIRECT EXAMINATION

14   BY MR. McMILLAN:

15   Q   What is your official title?

16   A   Deportation officer.

17   Q   Okay.  And which part of the United States Government are

18   you employed by?

19   A   By Immigration Customs Enforcement, and Enforcement Removal

20   Offices.

21   Q   So that's what we ordinarily think of as ICE?

22   A   Correct.

23   Q   And with respect to ICE, do you have to, in the course of

24   your duties, utilize the administrative filing system that ICE

25   maintains on foreign nationals who have either been encountered
```

1    in the United States or have applied for admission to the

2    United States?

3    A    Yes.

4    Q    Okay.  And are those what we would consider generally the

5    immigration records of the United States of America?

6    A    Yes.

7    Q    And in particular, the immigration records maintained by

8    the Department of Homeland Security?

9    A    Yes.

10   Q    Are those records kept and maintained in the ordinary

11   course of the Department of Homeland Security's duties to

12   enforce U.S. Immigration law?

13   A    Yes.

14   Q    And are you familiar with how those records are kept and

15   maintained?

16   A    Yes.

17   Q    Now, if a person is deported -- well, are you familiar with

18   the term removed?

19   A    Yes.

20   Q    What does that mean?

21   A    Essentially to be deported from the United States.

22   Q    Okay.  So what we ordinarily think of is the term deported,

23   but in legal terms that the Department of Homeland Security

24   deals with, what is it technically called?

25   A    I'm not following you.

1    Q    Okay.  Well, if you and I talked about someone being

2    deported, do you know what I'm saying?

3    A    To be physically removed from the United States.

4    Q    And is the legal term that is used by federal law currently

5    removed?

6    A    Yes.

7    Q    But it means deported.

8    A    Correct.

9    Q    And in this case, were you asked to go and conduct indices

10   searches of the Department of Homeland Security to determine

11   whether certain people involved in this case had ever been

12   encountered by U.S. Immigration authorities before?

13   A    Yes.

14   Q    And with respect to one of those individuals, was that

15   person's name Raymond Saunders?

16   A    Yes.

17   Q    Did you have occasion to go and see and receive the

18   official copy of Raymond Saunders' U.S Immigration file?

19   A    Yes.

20   Q    Now, in common usage, when we refer to these files, are

21   they commonly called an A file for alien file?

22   A    Correct.

23   Q    And when a person is a foreign national and they are

24   encountered in the United States, if they are applying for

25   lawful status, are they given something that is called an A or

1   alien number?

2   A   Yes.

3   Q   Similarly, if the person is encountered as an illegal or an

4   unlawful alien, are they also given an A number that they are

5   tracked with?

6   A   Yes.

7   Q   And so even though they may use a different name every

8   time, their identity is tracked under an A number?

9   A   Correct.

10  Q   Now, for example, a person may have applied for a visa at

11  the embassy in Port-au-Prince, Haiti and given an A number that

12  they applied for a visa at that location.

13  A   Correct, at times.

14  Q   However, that visa may have been denied for one reason or

15  another, so even though they were never permitted to come to

16  the United States, they still had what we would call an

17  A number.

18  A   Correct.

19  Q   Similarly, if someone commits a crime who is lawfully in

20  the United States, they can be deported from the United States

21  for certain crimes, such as aggravated felonies, is that right?

22  A   Correct.

23  Q   And that person also gets an A number.

24  A   Yes.

25  Q   And they have a file that you can search to go and see what

 1   their immigration history is.

 2   A   Yes.

 3   Q   And did you do this -- did you do that, sir, in this case

 4   with respect to an individual by the name of Carlos

 5   Rodriguez-Rodriguez?

 6   A   Yes.

 7   Q   Okay.  And did you get the entire A file for that

 8   individual?

 9   A   Yes.

10   Q   And had Mr. Rodriguez previously been removed from the

11   United States at some date?

12   A   Yes.

13           MR. McMILLAN:  May we energize the Elmo, please, Your

14   Honor.

15   BY MR. McMILLAN:

16   Q   And Officer Anderson, I'm showing you what has been

17   previously admitted as Government's Exhibit 14, have you seen

18   this document before, sir?

19   A   Yes.

20   Q   And what is it?

21           THE JURY:  Our monitors are not working.

22   A   We call that a final order of --

23           THE COURT:  Hold on, excuse me.

24           Ms. Cassisi, perhaps turn it off and then turn it

25   back on.

```
 1              Does anybody's screen not work?

 2              Okay, let's continue.

 3              THE WITNESS:  We call it a final order of removal.

 4    BY MR. McMILLAN:

 5    Q    Okay.  And is that because it goes and orders a person to

 6    be removed from the United States, and it's the last order they

 7    get before they are actually shipped out of the United States?

 8    A    Yes.

 9    Q    All right.  And in this specific instance, this order is

10    dated what?

11    A    10/27/2009 -- sorry, October 19th, 2009.

12    Q    Okay.

13    A    Actually 10/27/2009.

14    Q    First of all, we have a file number, do we not, up above

15    that's A087709255, is that correct?

16    A    Yes.

17    Q    That is the A number which would stick with Carlos

18    Rodriguez-Rodriguez for his entire life?

19    A    Yes.

20    Q    Any time he is encountered by the U.S. Immigration

21    authorities, those documents would end up in that file number

22    file.

23    A    Yes.

24    Q    However, when that file is put together, does it include

25    things like warrant checks in it?
```

1   A    Yes.

2   Q    Okay.  And for example, you obtained the certified copy of

3   Mr. Rodriguez-Rodriguez's full alien file from Citizenship and

4   Immigration Services, did you not?

5   A    Yes.

6   Q    And they are the subcomponent of the Department of Homeland

7   Security that maintains those records.

8   A    Correct.

9   Q    Did they give you a choice of some sort between something

10  and nothing in terms of certification?

11  A    No.  If you want an A file certified, it needs to be

12  certified in its entirety.

13  Q    In other words, take this exhibit right here, Government's

14  Exhibit 14, you could not simply get a copy of Government's

15  Exhibit 14 certified, you have to have literally the entire

16  file certified by them en masse, is that accurate?

17  A    Correct.

18  Q    Inside of that file, does the Department of Homeland

19  Security have both a permanent file and what they call a

20  T file?

21  A    Yes.

22  Q    What is a T file?

23  A    Temporary file.

24  Q    And in that temporary file, is one of the obligations of

25  the agent who puts it together to go and run what we call a

```
 1   criminal warrants check?

 2   A    Yes.

 3   Q    Okay.  And a criminal warrants check, have you done those

 4   yourself?

 5   A    Yes, very often.

 6   Q    Frequently?

 7   A    Yes.

 8   Q    Hundreds of times?

 9   A    Sure.

10   Q    When you do those, do you use something called a Soundex

11   S-O-U-N-D-E-X, system or program to go and do your search?

12   A    Yes, at times, I do.

13   Q    What does that mean, for the ladies and gentlemen of the

14   jury?

15   A    Soundex is basically you are just running the name, the

16   person's first and last name, it is not limited to one specific

17   person.  So Carlos Rodriguez, if he was run through a Soundex,

18   you would get a hit on every single Carlos Rodriguez with wants

19   and warrants in the United States.

20   Q    Every one ever encountered in the United States of America?

21   A    Correct.

22   Q    In addition to that, based on your training and experience,

23   is Carlos combined with Rodriguez a highly unusual Hispanic set

24   of names?

25   A    No, it is a very common name.
```

Tuesday, May 9th, 2023

1   Q   And accordingly, might there be more than one in the world

2   that is encountered by U.S. Immigration authorities?

3   A   Yes.

4   Q   So at the end of the day, what do you have to look at to go

5   and figure out who the exact match is to a particular A number?

6   A   The most accurate is biometrics, fingerprints.

7   Q   And in this case, did you review Mr. Rodriguez's A file?

8   A   Yes.

9   Q   And does he, based on your review, have a grand total of

10   one felony conviction for drug trafficking that preceded his

11   alien smuggling conviction in this case?

12   A   Yes.

13   Q   Did he have any other criminal history that you were able

14   to determine in the United States?

15   A   No prior criminal history in the United States.

16   Q   However, in his A file, there were NCIC or National Crime

17   Information computer printouts for other individuals who had

18   similar names.

19   A   Yes.

20   Q   That you were able to conclude were not ever him.

21   A   Correct.

22   Q   Now, if I can return to Government's Exhibit 14, based on

23   your review of Mr. Rodriguez's A file, was he ordered to be

24   removed in Government's 14 from the United States based on his

25   having been convicted of what we would call an aggravated

1   felony?

2   A    Yes.

3   Q    And is conspiracy to possess with intent to distribute over

4   5 kilograms of cocaine an aggravated felony under federal law?

5   A    Yes.

6   Q    Would Mr. Rodriguez-Rodriguez ever be eligible to return to

7   the United States having been convicted of an aggravated

8   felony?

9   A    No.

10   Q    He was prohibited from even applying for a particular

11   period of time, was he not?

12   A    Correct.

13   Q    But in actuality, you're barred from the United States

14   forever.

15   A    Correct.

16   Q    You can apply, but you are not going to be granted.

17   A    That's correct.

18   Q    Were you also able to confirm that Mr. Rodriguez-Rodriguez

19   was physically removed from the United States to the Dominican

20   Republic?

21   A    Yes.

22   Q    After this final order was entered?

23   A    Yes, sir.

24   Q    Okay.  Did you also have occasion to go and conduct a

25   separate inquiry of the Department of Homeland Security's

1    filing system as to Defendant Saunders in this case?

2    A   Yes.

3    Q   And were you able to determine that Raymond Saunders had

4    been previously encountered by United States Immigration

5    authorities in connection with having been illegally present in

6    the United States?

7    A   Yes.

8    Q   I'm showing you what's been admitted as Government's

9    Exhibit 11.

10             THE COURT:  Jurors, can you see that okay?

11   BY MR. McMILLAN:

12   Q   And this form is called a I-860, is that correct?

13   A   Correct.

14   Q   And we talked earlier about people being assigned

15   A numbers.  Was Raymond Saunders assigned an A number or alien

16   number based on this case?

17   A   Yes.

18   Q   What was that number?

19   A   206860601.

20   Q   Okay.  And directing your attention to this document, on

21   December 3rd of 2016, was there a determination of

22   inadmissibility rendered by the Department of Homeland Security

23   with respect to the Defendant, Raymond Saunders?

24   A   Yes.

25   Q   Okay.  And what was the result of that decision?

```
 1    A    He was ordered removed by an immigration official.

 2    Q    Okay.  And is that the actual order of removal on the

 3    bottom part of the I-860 form depicted in Government's Exhibit

 4    11?

 5    A    Yes.

 6    Q    Now, after that order of removal took place, is it common

 7    to go and for agents to go and execute a DHS form I-296 to

 8    memorialize the fact that that person was shipped out of the

 9    United States?

10    A    Yes.

11    Q    And have you actually done those yourself for some people?

12    A    Yes.

13    Q    Okay.  I'm showing you what has been admitted as

14    Government's Exhibit 12.  Do you recognize this form?

15    A    Yes, departure verification.

16    Q    Okay.  And you identified a particular A number as

17    belonging to Mr. Saunders before, do you recall that?

18    A    Yes.

19    Q    Okay.  And does that A number similarly appear on

20    Government's Exhibit 12 in the top right-hand corner area?

21    A    Yes, the same number.

22    Q    Okay.  And so the ladies and gentlemen of the jury can

23    compare, it was A -- this is Government's Exhibit 11,

24    206860601, is that correct?

25    A    Correct.
```

1   Q    That's on Plaintiff's Exhibit 11 and on Government's

2   Exhibit 12, 206860601, so they are identical?

3   A    Yes.

4   Q    In addition to that, is a verification of removal made by

5   the authority at the time that the Defendant is removed?

6   A    Yes.

7   Q    And at that point in time, when they are -- depending upon

8   where they are being removed from, for example, if it is

9   Mexico, it may be a Port in Texas where the removal is done on

10  foot or by bus, but in this case, where it is an island nation,

11  such as the Bahamas, how does the deportation usually take

12  place?

13  A    Through a flight through Miami.

14  Q    And in this case, there was a verification of removal

15  completed, was there not?

16  A    Yes, American Airlines flight 4769, Miami to Bahamas.

17  Q    What was the departure date of Mr. Saunders' flight to the

18  Bahamas?

19  A    January 12th, 2017.

20  Q    Okay.  And does that bear a photograph of the individual

21  being deported?

22  A    Yes.

23  Q    As well as the right index finger.

24  A    Correct.

25  Q    Okay.  And do you see the person in the photograph that's

1    depicted at the bottom of Government's Exhibit 12 in this

2    courtroom here today?

3    A    Yes.

4    Q    Where is he?

5    A    He is sitting right over there.

6    Q    What is he wearing?

7    A    A white shirt, red tie.

8          MR. McMILLAN:  Your Honor, may the record reflect the

9    witness has identified the Defendant, Raymond Saunders.

10         THE COURT:  The record reflects the identification.

11   BY MR. McMILLAN:

12   Q    Okay.  Now on the top of this form, Officer Anderson, it

13   also gives a notification that the person -- it says, "For a

14   period of five years from the date of your departure from the

15   United States, as a consequence of your having been found

16   inadmissible as an arriving alien in proceedings under section

17   240 -- I'm sorry, 235B1 or 240 of the act," does that say that

18   you are only banned from the United States for five years?

19   A    Yes.

20   Q    Okay.  But are you not, as a deported individual, actually

21   banned from the United States forever?

22   A    No, you can request to reenter, but you have to request to

23   reenter legally.

24   Q    But that's what I'm trying to get at.  The five year period

25   that they are talking about here means that you have to wait

1    five years before you can apply to come back here --

2    A    Yes.

3    Q    -- is that correct?

4    A    Correct.

5    Q    It doesn't mean that after five years -- if I had received

6    this notice, after five years, can I just come back here, no

7    problem --

8    A    No.

9    Q    -- if I had been removed from the United States previously?

10   A    No.

11   Q    And in fact, is there a warning down below in this area

12   here warning for all removed aliens, it is a crime.  Can you

13   read that warning, please.

14   A    "It is a crime under United States code section 1326 for an

15   alien who has been removed from the United States to enter,

16   attempt to enter or be found in the United States without the

17   Secretary of Homeland Security's express consent.  Depending on

18   the circumstances of the removal, conviction for this crime can

19   result in imprisonment of a period from two to 20 years and a

20   fine of up to $250,000."

21   Q    Okay.  Now, in this case, did you check to go and see

22   whether either Mr. Saunders or his codefendant, Mr. Rodriguez,

23   had ever made an attempt to seek permission to reenter the

24   United States of America from the Secretary of Homeland

25   Security?

1    A    I did.

2    Q    And what was the result of your search?

3    A    Negative findings.

4    Q    Okay.  And can you explain to the ladies and gentlemen how

5    you searched to go and make sure that they didn't make a

6    request like that?

7    A    We utilize numerous law enforcement databases, flight

8    systems, legal entrance, boarder entries and I found no entries

9    on them, no legal entries for those individuals.

10   Q    Now, in particular, there is a system that Homeland

11   Security uses called CLAIMS, that's C-L-A-I-M-S, have you heard

12   of that system?

13   A    Yes.

14   Q    What does that system log?

15   A    Applications and petitions that an individual may submit to

16   retain benefits to the United States.

17   Q    And that CLAIMS system exists, does it not, to go and log

18   in anybody who requests to come back to the United States after

19   having been deported previously, does it not?

20   A    Yes.

21   Q    And it also does other things.

22   A    Yes.

23   Q    But that's one of the primary purposes that it serves, is

24   as a central repository so that you can check and see whether

25   someone applied to come back here.

1    A    Correct.

2    Q    And did you search both for Defendant Saunders and

3    Defendant Rodriguez, whether either of them had submitted

4    requests to come back in the United States?

5    A    I did.

6    Q    And what were your results?

7    A    Zero results, no results.

8    Q    Now, did you have occasion to go and assist -- well, I

9    should ask you, do you know Special Agent Josh Woodbury of

10   Homeland Security Investigations?

11   A    Yes.

12   Q    And do you work with one another on occasion in enforcement

13   of federal immigration law?

14   A    Yes.

15   Q    And in particular on this case, in the days after

16   February 22nd of 2023, did you assist Special Agent Woodbury in

17   the identification and processing of a number of individuals

18   who were found on board a vessel in the St. Lucie Inlet that

19   day?

20   A    I did.

21   Q    Okay.  And did you possess -- in the course of your duties

22   as an ICE enforcement officer, did you ask them for their

23   identification and any paperwork that any of them had to

24   lawfully enter the United States?

25   A    We did.

1    Q    And at the end of that, did you determine that all of those

2    people were illegal aliens; that is, people who were not United

3    States nationals or permanent resident aliens, who are not

4    permitted to come into the United States without visas?

5    A    Yes, we did.

6    Q    And I would like to show you what's been marked for

7    identification as Government's Exhibits 20 through 95.

8         MR. McMILLAN:  May I approach the witness, Your

9    Honor?

10        THE COURT:  You may.

11   BY MR. McMILLAN:

12   Q    And do Government Exhibit's 20 through 95 show pictures of

13   individuals that you and Special Agent Woodbury encountered?

14   A    Yes, these are the 78 migrants that we took photographs and

15   fingerprints of.

16   Q    And so if the jury wants to look at individually any of

17   those people, they can actually look at those individual

18   exhibits and see who the initials in the indictment actually

19   corresponded to?

20   A    Yes.

21   Q    And their date of birth, at least in terms of the month and

22   year, you actually had the date of birth available to you, the

23   full date of birth?

24   A    Correct.

25   Q    But for purposes of these documents, which will be publicly

1    filed, we have just included the month and year of their birth.

2    A   Correct.

3    Q   In addition to that, there are several instances where we

4    don't have pictures of individuals, are you aware of that?

5    A   Yes.

6    Q   Does the Department of Homeland Security in this region

7    have a policy about the photographing and fingerprinting of

8    minors?

9    A   It is not practice to take photos and fingerprints of

10   minors.

11   Q   Is that your idea or a current policy directive of DHS?

12   A   It's current DHS policy.

13   Q   That is why pictures of the children are not included in

14   there?

15   A   Yes.

16   Q   Just their names and dates of birth.

17   A   Correct.

18   Q   But you saw them yourself, personally.

19   A   Yes, six of them.

20   Q   And they did exist.

21   A   Yes.

22           MR. McMILLAN:  The Court's indulgence just for a

23   moment.

24           THE COURT:  Mr. McMillan, I think you referenced

25   those exhibits as marked for identification, I just wanted to

Tuesday, May 9th, 2023

1    make the record clear, and correct me if I'm wrong, they were,

2    in fact, admitted without objection.

3              MR. McMILLAN:  Your Honor is exactly correct.

4              THE COURT:  Okay, all right.

5              MR. McMILLAN:  With that, the United States tenders

6    the witness, Your Honor.

7              THE COURT:  All right.  Thank you.

8              Mr. Roth, I would like to take a break.  The question

9    is whether to do so now or after your cross-examination, how

10   long do you anticipate the cross taking?

11             MR. ROTH:  Five or six minutes.

12             THE COURT:  All right, then let's proceed.

13                          CROSS-EXAMINATION

14   BY MR. ROTH:

15   Q   So it's Mr. Anderson, right?

16   A   Yes, sir.

17   Q   Is this one of the individuals you have a photograph of?

18   A   Give me a moment.

19             Yes.

20   Q   And your agency identified him as one of the aliens that

21   was being smuggled?

22   A   Correct.

23   Q   Are you aware that he was actually one of the crew persons

24   on the ship and that he was involved in smuggling all of the

25   other people?

```
 1   A    No, I'm not aware of that.

 2   Q    Has anybody told you that?

 3   A    No.

 4   Q    Have you ever spoken to Mr. Rodriguez, a defendant in this

 5   case?

 6   A    Briefly.

 7   Q    And have you read any reports of his statements?

 8   A    No.

 9   Q    Now, why is Mr. Rodriguez barred for life from reentering

10   the United States, whereas Mr. Saunders is only under a five

11   year prohibition?

12   A    Mr. Rodriguez was convicted of an aggravated felony, he was

13   sentenced to a year or more in jail.

14   Q    That makes it a greater restriction?

15   A    Correct.

16   Q    So he can never come back.

17   A    Correct.

18   Q    Unless he comes back illegally.

19   A    Yes.

20   Q    Which he tried to do.

21   A    Yes.

22             MR. ROTH:  Thank you.  No further questions.

23                        REDIRECT EXAMINATION

24   BY MR. McMILLAN:

25   Q    Just to be clear, Officer Anderson, Mr. Saunders is barred
```

1    for life from reentering the United States, too, isn't he,

2    unless he gets permission.

3    A    Unless he gets permission to enter, correct.

4    Q    Okay.  So there is no difference, is there, between

5    Saunders and Rodriguez, except that Saunders, if I understood

6    you earlier, can apply to the Department of Homeland Security,

7    to the secretary, after a five year period is over, to reenter

8    the United States, whereas Rodriguez never can.

9    A    That is correct.

10   Q    However, it makes no difference, does it, in this case

11   because you found no record that either person had ever sought

12   permission to reenter the United States.

13   A    That's correct.

14            MR. McMILLAN:  Thank you.

15            No further questions, Your Honor.

16            THE COURT:  Thank you.

17            All right.  Ladies and gentlemen, we are going to

18   take a break at this time, it is 2:25, we will resume at 2:40.

19            All rise for the jury.

20   (The jury retired from the courtroom at 2:26 p.m.)

21            THE COURT:  All right.  Thank you, Officer, you may

22   be excused.

23   (Witness excused)

24            THE COURT:  Mr. McMillan.

25            MR. McMILLAN:  Yes, Your Honor.

Tuesday, May 9th, 2023

```
1              THE COURT:  All right.  Am I correct that you have

2    one remaining witness?

3              MR. McMILLAN:  That's correct, Your Honor.

4              THE COURT:  Okay.  Mr. Roth, do you plan on offering

5    any witness testimony?

6              MR. ROTH:  Unless someone surprises me, the answer is

7    no.

8              THE COURT:  Okay.  Well, we will handle particular

9    colloquy of the Defendant on that point later, but for now, we

10   will take our break until 2:40.  Thank you.

11      (Recess was had at 2:27 p.m.; and the proceedings

12      Resumed at 2:48 p.m.)

13             THE COURT:  Let's call in the jurors.

14             MR. McMILLAN:  Your Honor, how many copies of the

15   transcripts would the Court like for court personnel?

16             THE COURT:  Two, please.

17             MR. McMILLAN:  Thank you.

18             THE COURT:  And then Ms. Miller, the court reporter,

19   a third one.

20             COURTROOM SECURITY OFFICER:  All rise for the jury.

21      (Jury in at 2:49 p.m.)

22             THE COURT:  You may be seated.

23             All right, Mr. McMillan, please call your next

24   witness.

25             MR. McMILLAN:  Thank you, Your Honor.  The United
```

Tuesday, May 9th, 2023

1    States calls Special Agent Josh Woodbury to the stand.

2            THE COURT:  All right.  Agent Woodbury, remain

3    standing to be sworn.

4            JOSHUA WOODBURY, GOVERNMENT WITNESS, SWORN

5            THE COURT:  Thank you, sir.  Please be seated and

6    tell us your full name again, spelling your last name.

7            THE WITNESS:  Josh Woodbury, W-O-O-D-B-U-R-Y.

8            MR. McMILLAN:  May I inquire, Your Honor?

9            THE COURT:  Yes.

10                   DIRECT EXAMINATION

11   BY MR. McMILLAN:

12   Q    Special Agent Woodbury, how are you employed, sir?

13   A    I'm currently a criminal investigator with Homeland

14   Security Investigations.

15   Q    And how long have you been employed by Homeland Security

16   Investigations?

17   A    Since 2008.

18   Q    Okay.  And before that, what did you do for a living?

19   A    I was a Customs and Border Protection officer and U.S.

20   Customs inspector.

21   Q    So you have actually been on both sides of the CBP or

22   Homeland Security Investigations side, both uniformed and as an

23   investigator yourself.

24   A    Correct.

25   Q    Now, an investigator, do they have to go to a special

1  training academy before they are made what we call a series

2  1811?

3  A   Yes.

4  Q   And the series 1811 means a special agent investigator.

5  A   Correct.

6  Q   In this case, your responsibilities include the enforcement

7  of U.S. Immigration laws.

8  A   That's part of it, yes.

9  Q   And are you detailed to a particular unit at the HSI office

10 in West Palm Beach, which is primely directed towards the

11 interdiction and investigation and prosecution of alien

12 smuggling cases?

13 A   Correct, I'm currently assigned to group two, which is

14 marine investigations.

15 Q   As opposed to another group, which may be involved

16 primarily in drug trafficking activities or another group that

17 may be investigating child pornography cases.

18 A   That's correct, if it relates to narcotics and human

19 trafficking or human smuggling via the navigational waterways

20 for the United States, that usually would fall in our group.

21 Q   As part of your training and experience, do you understand

22 the difference between the contiguous zone and the United

23 States territory?

24 A   I do.

25 Q   Okay.  And what is the contiguous zone?

```
 1    A    The contiguous zones pushes the border of the United States

 2    out for the purposes of Customs and customs boarding up to the

 3    12 mile line.  It extends another 9 miles past the 3 mile line,

 4    which is the coastal -- which is the coast, if you will, or the

 5    line, the 3 mile demarcation line of the Continental United

 6    States.

 7    Q    In terms of arresting someone, if you arrest someone in the

 8    contiguous zone, is the venue determined by where you first

 9    land them in the United States?

10    A    That is correct.

11    Q    And venue is where you would try them for the offense?

12    A    That's correct.

13    Q    Now, if the person or persons are within 3 miles, is venue

14    where you encounter them?

15    A    For the most part, yes.

16    Q    In this case, Defendant Saunders was encountered in what

17    county and in what district of the United States?

18    A    It was Martin County, which is the Southern District of the

19    United States -- Martin County, Florida in the Southern

20    District of Florida.

21    Q    And was the encounter within the 3 mile limit?

22    A    Yes.

23    Q    You actually visited the boat that night yourself, did you

24    not?

25    A    That night?
```

1    Q    The 22nd.

2    A    No, I did not.

3    Q    But you encountered the aliens themselves the next day.

4    A    Correct, on the 23rd.

5    Q    Okay.  And did that include Defendant Saunders?

6    A    It did.

7    Q    Do you see Defendant Saunders in this courtroom?

8    A    I do.

9    Q    Okay.  Can you point to him and describe what he is

10   wearing, please.

11   A    He is sitting right over there, he has got a white button

12   up shirt with a reddish tie.

13          MR. McMILLAN:  Your Honor, may the record reflect the

14   witness identified the Defendant, Raymond Saunders.

15          THE COURT:  The record reflects the identification.

16   BY MR. McMILLAN:

17   Q    Now, did you have occasion to go and speak to the agents

18   that actually did the boarding of the vessel?

19   A    I have, yes.

20   Q    Okay.  Well, did you, in the course of your investigation

21   on the 22nd, going into the 23rd?

22   A    I believe I spoke with some of them in like the later hours

23   of the 23rd, I don't recall speaking to any of them on the 22nd

24   itself.

25   Q    And perhaps we should explain to the ladies and gentlemen

1   of the jury, when you had the uniformed CBP marine officers do

2   the boarding, why didn't they just handle the whole

3   investigation themselves?

4   A    There is a -- within Homeland Security, there is a chain of

5   how things happen, you have your maritime agents, your marine

6   officers, who is the Customs and Border Protection marine

7   interdiction agents.  They are responsible for your waterways,

8   stopping vessels, things on the water.  There is not very many

9   of them, so if they were tied up with maritime cases and things

10  like that, it would be a bit of a strain on them, plus we have

11  the specialized training of the criminal investigative side,

12  that's what we went to school for.

13        We went to the Criminal Investigator Training Program

14  at FLETC in Georgia, as well as the special agent add on, to, I

15  guess, handle it a little better.  We have our training, they

16  are trained on the boats.  I'm not a boat person, so I could

17  never say I could do their job as good as they could.

18  Q    Okay.  When you processed the aliens in this case, did you

19  do so with Officer Anderson?

20  A    I did, yes.

21  Q    Okay.  Did you have the assistance of a Haitian Creole

22  speaking interpreter to assist you?

23  A    We did.  At that time, we had two agents that were assigned

24  temporary duty to assist the South Florida area, due to the

25  large influx of migrant vessels coming in, that were fluent in

Tuesday, May 9th, 2023

```
 1    the Creole language.
 2    Q   I should note the week this happened, February 22nd of
 3    2024, this was actually the second interdiction --
 4            THE COURT:  I think you meant 2023.
 5            MR. McMILLAN:  I'm sorry, 2023.
 6            Thank you, Your Honor.
 7    BY MR. McMILLAN:
 8    Q   Was this the only interdiction that took place that day --
 9    or I'm sorry, that week?
10    A   I can't recall how many, but I think we had two, maybe
11    three within a ten day timeframe.  I know there were two at
12    least for our group, and there may have been three within ten
13    days.
14    Q   Because immediately preceding this vessel, was there one
15    boatful of Irish people?
16    A   There was.
17    Q   Okay.  And that was also interdicted?
18    A   Correct.
19    Q   Now, when a vessel is interdicted like this and the people
20    are found to be unlawfully entering the United States, what
21    happens to them?
22    A   Usually what happens, if the boarding officer goes on and
23    once, if you will, for lack of better term, once the dust
24    settles and they see what they have on board the vessel, if
25    they determine the alienage of the individuals, and that
```

1    basically means asking them simple questions; where are you

2    from, if they can communicate with them, this had all the

3    telltale signs of marine smuggling -- a human smuggling

4    venture, so all individuals were -- I believe for this

5    particular one, all of the individuals were transferred either

6    to the Customs and Border Protection marine vessel and the

7    U.S. Coast Guard vessel and they were taken out to a Coast

8    Guard cutter, and once they get on board the cutter, that's

9    when we went out and conducted a biometrics check.

10   Q   What does that mean, biometrics check?

11   A   We have a fingerprint scanner and it runs the immigration

12   system for any checks, any previous encounters here in the

13   United States; applications for visas that include denials, for

14   some it may be inclusive of prior interdictions out at sea and

15   repatriation back to their countries.

16   Q   Well, because if someone had lawful permission in the

17   United States, you would not be seeking to remove them, would

18   you?

19   A   That is correct.  If somebody has legal means of getting

20   here, then there is nothing we can do to prevent them from at

21   least attempting to make entry to the United States.  Whether

22   they are denied entry by the inspector that inspects them, that

23   is another story.

24   Q   Can you tell the ladies and gentlemen of the jury what the

25   breakdown was of people on board this boat in terms of the

1   numbers of Bahamians, Dominicans, and Haitians on board?

2   A   So there were 78 souls on board, there was 74 Haitians,

3   three Bahamians and one Dominican national.

4   Q   The Dominican national was Carlos Rodriguez-Rodriguez --

5   A   That's correct.

6   Q   -- that the jury heard from before, is that correct?

7   A   That's correct.

8   Q   And then the Bahamians were who?

9   A   Defendant Saunders, Lubin Phillip, and an unaccompanied

10  minor.

11  Q   Okay.  Now, we have heard throughout the trial of this

12  Lubin Phillip or Phillip Lubin person.  He is represented by

13  one of the counts that is charged against the Defendant, is

14  that correct?

15  A   Correct.

16  Q   Because he was on board the ship, is that accurate?

17  A   Yes.

18  Q   And he was brought into the United States; that is, within

19  the 3 mile limit.

20  A   Correct.

21  Q   But he hasn't been prosecuted.

22  A   He has not.

23  Q   Why is that?

24  A   When we attempted to interview him on the 24th of February,

25  Mr. Phillip would not speak English and when we were

1   approximately 5 to 6 miles off the coast on a Coast Guard

2   cutter.  It's windy, it's tough to do recorded post-Miranda

3   interviews, and the only spot that we had was inside a lower

4   hold of the United States Coast Guard cutter.  Anywhere in the

5   lower parts of those ships are very loud, it is tough.

6           We would have had to have used the services of a

7   Creole language line that we -- we, as Homeland Security, have

8   a language line, it is supposed to cover all sorts of lines,

9   whether it is Chinese, whether it's Spanish, whether it's

10  Creole, Italian, Portuguese, whatever.

11          However, when you are down there, we could not get

12  out to the Creole speaker when we were there, and the Coast

13  Guard would not bring us in closer to shore for fear that they

14  didn't want anybody to jump off the ship.

15          Also -- so at that point in time, we decided not to

16  conduct the interview of Mr. Phillip and we conducted our other

17  interviews.

18  Q   And just so the jury understands, people have tried to jump

19  off Coast Guard cutters before to make it to land, haven't

20  they?

21  A   They have, yes.

22  Q   And with respect to the -- you did have a Creole

23  interpreter at some points in time during the investigation,

24  didn't you?

25  A   That was on the 23rd.

1   Q   So that's the next day.

2   A   Correct.  On the 24th is when we went back out and we spoke

3   to Mr. Saunders and Mr. Rodriguez.

4   Q   Okay.  But at the -- before you had to make the decision as

5   to who got sent back to the Bahamas and/or Haiti and who would

6   get prosecuted, were you able to ascertain that Lubin was one

7   of the smugglers to the point that you believe he should be

8   prosecuted?

9   A   It was alluded to by Mr. Saunders, but we didn't have a

10  chance to speak with him, and then by the time -- on the 25th

11  when we were able to formally interview him, the Coast Guard

12  cutter had already embarked for the Bahamas to repatriate the

13  other two Bahamian nationals.

14  Q   Okay.  Now, did you have occasion to go and interview

15  Defendant Saunders?

16  A   I did.

17  Q   Now, before you made any effort to interview Defendant

18  Saunders, did you advise him of something?

19  A   As with anybody that we are going to interview in a

20  potential criminal investigation, we advised him of his Miranda

21  rights or statement of rights.

22          MR. McMILLAN:  May I approach the witness, Your

23  Honor?

24          THE COURT:  Yes.

25

1    BY MR. McMILLAN:

2    Q    Special Agent Woodbury, I'm showing you what's been marked

3    for identification as Government's Exhibit 99, do you recognize

4    this item?

5    A    I do.

6    Q    And did you witness the execution of this form?

7    A    I did.

8    Q    Does it bear the signature and initials of Raymond

9    Saunders?

10   A    That's correct.

11          MR. McMILLAN:  Your Honor -- well, I think it has

12   already been admitted as Government's Exhibit 99.

13          THE COURT:  That's correct, it was previously

14   admitted without objection.

15          MR. McMILLAN:  Thank you, Your Honor.

16          May I publish?

17          THE COURT:  You may.

18   BY MR. McMILLAN:

19   Q    So Special Agent Woodbury, whenever you interview somebody

20   who is in custody -- and in this case, Mr. Saunders was in

21   custody, is that correct?

22   A    For purposes of this questioning, yes.

23   Q    Did you advise him of his Miranda warnings?

24   A    I did.

25   Q    And did the Defendant speak English in all of his dealings

1    with you?

2    A    Yes, sir.

3    Q    And do you happen to know whether English is the native

4    language of the Bahamas?

5    A    It is.

6    Q    In addition to that, are you also familiar with the

7    Bahamian dollar versus the U.S. dollar?

8    A    I am.

9    Q    Is there an exchange rate between the two?

10   A    It's currently dollar for dollar, it is a mutual exchange,

11   one is not greater than the other.

12   Q    So one is worth equivalent to the other?

13   A    Correct, one Bahamian dollar is worth one U.S. dollar.

14   Q    So if you can return to Government's Exhibit 99, can you

15   explain to the ladies and gentlemen of the jury the rights and

16   the warnings that you gave Mr. Saunders before you asked him

17   any questions.

18   A    So this here is one of our standard forms that we use.  You

19   can recite it off of a card, you can have them initial the card

20   or you can say it to them, you don't have to have them going to

21   the point of initialing and things like that.

22          I like to -- personally what I like to do is I'm

23   reading and then this copy here would be sitting in the

24   individual -- is sitting in front of the individual, and I

25   would have drawn the lines or the other agent there would have

Tuesday, May 9th, 2023

1   drawn the lines, as you can see right here, how it is down

2   here.

3           So what I do is I'll explain to them what I'm going

4   to do, I'm going to read them their rights, that usually -- not

5   usually, but what they are going to sign is not an admission of

6   guilt, it doesn't mean they did anything, and the initials next

7   to each lien is just that they understood it.  Because I'll

8   read it and I'll stop and ask them, Do you understand, and ask

9   them to respond in the affirmative so there is no question that

10  they understand it.

11          And then once that is complete, I then ask them,

12  Would you like to talk to us, give us your side of the story or

13  tell us what happened.  At that point in time, I would read the

14  waiver, which is waiving their rights, allowing me to ask them

15  questions without an attorney present, and as you can see, the

16  individual signs it and prints their name, puts the date, and

17  then myself and the other agent that was there at the time put

18  our names there.

19  Q   Okay.  And those lines that we see to the left that you

20  have highlighted there, those may be difficult to see, are

21  those in the original document in blue ink?

22  A   Yes, I believe so.  It looks like it is, yeah, they are in

23  blue.

24          MR. McMILLAN:  My I re-approach the witness, Your

25  Honor?

Tuesday, May 9th, 2023

```
 1              THE COURT:  Yes.

 2              THE WITNESS:  Yes, they are blue.

 3   BY MR. McMILLAN:

 4   Q   Okay.  And who made those lines?

 5   A   I believe it was myself that put those lines prior to

 6   giving it to Mr. Saunders.  I could be mistaken, it could have

 7   been Agent Schmidt that was there.  It is just standard, that

 8   way they have a reference in order to put their initials.

 9   Q   I just wanted to clarify for the jury, though, that isn't

10   someone scratching out their initials, but rather writing on

11   the line you gave them for their initials.

12   A   No.  The blue line would have been one that we would have

13   put and then the RS was Mr. Saunders putting his initials

14   there.  We didn't cross anything out, that's how he wrote it on

15   the line, he wrote it through the line.

16   Q   Did Mr. Saunders indicate that he understood his rights and

17   was willing to talk to you?

18   A   Yes, sir.

19   Q   And after that, did you conduct an audio and video recorded

20   interview of Mr. Saunders?

21   A   We did.

22              MR. McMILLAN:  May I approach the witness, Your

23   Honor?

24              THE COURT:  You may.

25
```

Tuesday, May 9th, 2023

1    BY MR. McMILLAN:

2    Q    Showing you what has been admitted, I believe already, as

3    Government's Exhibit 101.

4              THE COURT:  It has not.

5    BY MR. McMILLAN:

6    Q    At this point, I would ask if you can examine Government

7    Exhibit's 101, Special Agent Woodbury.

8    A    Yes, sir.

9    Q    Did you participate personally in the preparation of

10   Government's Exhibit 101?

11   A    I did.

12   Q    And is it a -- let me step back a second.

13             MR. McMILLAN:  May I return to the --

14             Thank you.

15   BY MR. McMILLAN:

16   Q    Special Agent Woodbury, I apologize, I should have shown

17   you this first.  Do you recognize Government Exhibit 100?

18   A    Yes, I do.

19   Q    What is Government's Exhibit 100?

20   A    That is the interview on the U.S. Coast Guard cutter.

21   Q    Does it bear your initials and handwriting?

22   A    No initials, but that is my handwriting on the DVD.

23   Q    And is Government Exhibit 100 a fair and accurate recording

24   of your conversation with Defendant Raymond Saunders on

25   February 24th of 2023?

```
1   A    Correct.

2   Q    Okay.  Now, this particular exhibit has been edited, is

3   that correct?

4   A    It has.

5            MR. McMILLAN:  Your Honor, at this point, I believe

6   it would be appropriate for the instruction that we had

7   discussed with Your Honor previously, please.

8            THE COURT:  All right.

9            MR. ROTH:  There is no objection.

10           THE COURT:  Thank you, Mr. Roth.

11           Ladies and gentlemen of the jury, during the course

12  of this trial, you may be watching audio and video recorded

13  evidence.  For perfectly legal and legitimate reasons, that

14  audio and video may have been edited or redacted by the

15  agreement of the parties.

16           This is legally appropriate and you should not

17  attribute any negative inference as to either party because of

18  such edits, nor should you speculate as to what may have been

19  edited from the evidence introduced in court.

20           Please continue.

21           MR. McMILLAN:  Thank you, Your Honor.

22  BY MR. McMILLAN:

23  Q    So Special Agent Woodbury, with the exception of the agreed

24  upon edits in Government's Exhibit 100, is this a fair and

25  accurate recording of your interview?
```

Tuesday, May 9th, 2023

1    A    It is.

2            MR. McMILLAN:  At this time, I move for the admission

3    of Government's Exhibit 100, Your Honor.

4            THE COURT:  Any objection to the admission of 100?  I

5    believe it was previously admitted without objection.

6            MR. ROTH:  No, I don't object.

7            THE COURT:  All right.  Government's Exhibit 100 is

8    in the record, and it was previously as well.

9            MR. McMILLAN:  Thank you, Your Honor.

10   BY MR. McMILLAN:

11   Q    And then turning to Government's Exhibit 101, which you

12   have in front of you, did you initial that document in the

13   lower right-hand corner?

14   A    I did.

15   Q    Did that indicate that you reviewed it and fairly and

16   accurately provided the statements which were made to you by

17   both Raymond Saunders, Alex Schmidt and the attendant Coast

18   Guard personnel on February 24th of 2023?

19   A    Correct.

20           MR. McMILLAN:  At this time, I would move to publish

21   Government Exhibits 100 and 101, Your Honor.

22           THE COURT:  All right.  Are you moving to admit 101?

23           MR. McMILLAN:  Yes, Your Honor.

24           THE COURT:  Any objection to the admission of 101?

25           MR. ROTH:  No, Your Honor.

```
 1              THE COURT:  All right.  Government Exhibit 101 is

 2   admitted without objection.

 3        (Evidence admitted as Government Exhibit No. 101)

 4              THE COURT:  Ladies and gentlemen, I do want to advise

 5   you that I'm admitting this transcript for the limited and

 6   secondary purpose of helping you follow the content of the

 7   conversation.

 8              Are you going to be playing the tape?

 9              MR. McMILLAN:  We are, yes, please, Your Honor.

10              THE COURT:  Okay.

11              Helping you follow the content of the conversation as

12   you listen to the tape recording and also to help you identify

13   the speakers, but you are instructed that whether the

14   transcript correctly reflects the content of the conversation

15   or the identity of the speakers is entirely for you to decide

16   based on your own evaluation of the testimony you have heard

17   and from your own examination of the transcript in relation to

18   hearing the tape recording itself as the primary evidence of

19   its own contents.  If you determine that the transcript is

20   incorrect or unreliable in any respect, you should disregard it

21   to that extent.

22              Please continue.

23              MR. McMILLAN:  Thank you, Your Honor.

24              May I publish the individual copies to the jurors?

25              THE COURT:  You may.
```

1          Ladies and gentlemen, Mr. McMillan will now equip you

2    with copies of Government's Exhibit 101.

3          MR. McMILLAN:  Okay.  At this point, we would like to

4    commence the playing of Government's Exhibit 100.

5          THE COURT:  All right.  Just for my understanding,

6    how long is Government Exhibit 100 approximately?

7          MR. McMILLAN:  Special Agent Woodbury?

8          THE WITNESS:  Fifteen minutes and two seconds, Your

9    Honor.

10         THE COURT:  All right.  Then let's play Government's

11   Exhibit 100, and ladies and gentlemen, you have the transcript

12   at Government's Exhibit 101.

13         Ms. Cassisi, please make sure the audio is at its

14   full potential.

15    (Video recording played in open court.)

16         MR. McMILLAN:  For the record, I have stopped the

17   recording at 03:39, which is on the counter in the lower

18   left-hand corner.

19         May I approach the witness, Your Honor?

20         THE COURT:  Yes.

21   BY MR. McMILLAN:

22   Q    Special Agent Woodbury, did you ask the Defendant in that

23   recording to go and identify a particular cellular phone that

24   was recovered from the vessel as his?

25   A    That is correct.

1   Q   And that was amongst several cell phones that were

2   recovered?

3   A   Out of two in particular, yes.

4   Q   I'm showing you what has been marked for identification as

5   Government's Exhibit 116, do you recognize this item?

6   A   I do.

7   Q   How do you recognize it?

8   A   That is the cellular phone that Mr. Saunders pointed out.

9   Q   Did you keep this in your continuing evidence since that

10  date?

11  A   We did.

12          MR. McMILLAN:  Your Honor, I move for the admission

13  of Government Exhibit's 116.

14          THE COURT:  Any objection?

15          MR. ROTH:  No, Judge.

16          THE COURT:  Government Exhibit 116 is admitted

17  without objection.

18      (Evidence admitted as Government Exhibit No. 116.)

19  BY MR. McMILLAN:

20  Q   Special Agent Woodbury, have you done anything to alter the

21  data in any way yourself?

22  A   No.

23          MR. McMILLAN:  Please continue with the recording.

24      (Video recording played in open court.)

25          MR. McMILLAN:  For the record, I requested the video

1    be stopped at 22:07 using the lower left-hand counter.

2            May I approach the witness, Your Honor?

3            THE COURT:  Yes.

4    BY MR. McMILLAN:

5    Q    Special Agent Woodbury, I would like to show you what's

6    been marked for identification as Government's Exhibit 115, do

7    you recognize this document, sir?

8    A    I do.

9    Q    How do you recognize it?

10   A    This is the consent to search form that we had just gone

11   over and what Agent Schmidt is having Mr. Saunders sign.

12   Q    And did you witness that personally being signed by

13   Defendant Saunders in this case?

14   A    I did.

15   Q    And does it give him -- does it advise him of his right to

16   refuse to a search if he wishes to do so?

17   A    The very first paragraph.

18           MR. McMILLAN:  Your Honor, at this time, I move for

19   the admission of Government's Exhibit 115.

20           THE COURT:  Any objection?

21           MR. ROTH:  No, Your Honor.

22           THE COURT:  Government's Exhibit 115 will be admitted

23   without objection.

24       (Evidence admitted as Government Exhibit No. 115.)

25           MR. McMILLAN:  Now, please continue with the video.

```
 1          (Video recording played in open court)
 2               MR. McMILLAN:  First if we could revert to the Elmo.
 3    BY MR. McMILLAN:
 4    Q    Special Agent Woodbury, I'm showing you what I have shown
 5    you earlier, Government's Exhibit 115, so everyone can see it.
 6    What is that document, sir?
 7    A    That was a consent to search form for Mr. Saunders'
 8    cellular phone, it is what I read him during that recorded
 9    interview.
10    Q    Okay.  And does it bear Mr. Saunders' signature down below
11    here?
12    A    It does.
13    Q    Okay.  And then I would note that in the upper left-hand
14    corner, as well as on page two, I'm referring to a circled
15    number at the bottom, down here in the lower right, it has some
16    peculiar looking figures that look kind of like a reverse --
17    well, a nine on the top and some reverse nine shaped things on
18    the bottom, what are those?
19    A    Mr. Saunders was trying to remember the pattern for his
20    cellular phone to unlock it.
21    Q    And that was a phone that required the usage of drawing a
22    pattern with your finger?
23    A    Yes, it was a design to unlock the cell phone.
24    Q    Now, if I can return to our transcript, on page four of the
25    transcript, the third line from the top, Mr. Saunders is
```

```
1    talking about his cellular phone, is that correct?

2    A    I'm sorry, you said the fourth page?

3    Q    It would be the fourth page --

4    A    Correct.

5    Q    -- on Government's Exhibit 101.

6    A    Which line was it?

7    Q    It would be the third line from the top.

8    A    The, "Can I just show you a message before it turns off"?

9    Q    Right.

10   A    Correct.

11   Q    And that's a reference to the cellular phone in front of

12   you, is that correct?

13   A    That's correct.

14   Q    And what is the exhibit number on that for the record,

15   please?

16   A    That is 116.

17   Q    Okay.  And at that point in time -- well, this is very

18   early on in the conversation, is that right?

19   A    Very early, yes, sir.

20   Q    But Defendant Saunders, he wants to show you a message on

21   his phone?

22   A    That's what it appeared, yes, sir, from what he asked us.

23   Q    Did that strike you as unusual?

24              MR. ROTH:  Objection, relevance.

25              THE COURT:  Overruled.
```

Tuesday, May 9th, 2023

1              THE WITNESS:  A lot of cases are unique and

2    different, but it is unusual for people to try to show you

3    stuff like right off the bat, like we were just there to

4    specifically ask him about how he came to be in that front hull

5    and he was very -- it seemed like at that point, he was very

6    adamant to try to show us what was on his phone.

7    BY MR. McMILLAN:

8    Q   And at that point in time, what is it you were primarily

9    interested in finding out as to Mr. Saunders?

10   A   How Mr. Saunders ended up in the position he was in on the

11   boat when law enforcement found him.

12   Q   Now, after you received the report from the law enforcement

13   officers about where the tape was located, were you suspicious?

14   A   Suspicious of how they told me or suspicious after the

15   interview?

16   Q   Were you suspicious that Mr. Saunders may have staged his

17   kidnapping to make it appear he had been kidnapped?

18   A   Yes, it seems very unusual for someone to be in that

19   position.

20   Q   But did you assume that that was the case or did you

21   investigate to see where it led you?

22   A   No, we investigated and tried to see where it led us, which

23   is the limited scope of the very first interview here on the

24   cutter.

25   Q   Okay.  And then going to page six of Government Exhibit

Tuesday, May 9th, 2023

1    101, the fourth line from the top, "I do -- I don't have

2    nothing on my phone, I really want to show you all of the death

3    threats, and may I explain the dead box."

4          Do you recall those statements?

5    A    I do.

6    Q    Now, at that point in time, did you indicate that you had

7    any interest in pursuing that aspect of things?

8    A    At that point in time, no.

9    Q    Did you ask the Defendant for a passcode to his phone?

10   A    I did.

11   Q    Oh, and I should ask you, why didn't you want to go and

12   pursue it at that time?

13   A    If we were going to talk to people as far as in furtherance

14   of a criminal investigation, it is not a very comfortable place

15   to be sitting on a United States Coast Guard cutter 5 miles off

16   the coast of the United States to conduct these interviews,

17   that's why this interview here was very limited in scope and

18   specifically in regards and relation to how Mr. Saunders ended

19   up where he did, supposedly tied up in the bow of the boat.

20   Q    Okay.  And when you proceed to pages seven and eight of the

21   transcript, where did the Defendant tell you he was situated

22   for the entirety of his trip to the United States?

23   A    When I said, "Okay.  So when law enforcement approached the

24   boat, where were you?"

25          "I was in the front bow."

1          "Front bow?"

2          "Yes, sir."

3          "Okay.  Not downstairs in the bow in the front?"

4          And Mr. Saunders replied, Stairwell cabin up front."

5          "A cabin up front?"

6          "Yes, sir."

7          "And what were you doing there," and that's when he

8   proceeded to tell us a story where a Dominican and a black

9   dude -- he says, "The Dominican and the black dude, they are

10  from Freeport.  We were supposed to go in to Freeport, they

11  didn't go in to Freeport, they was going off to Freeport."

12         "So I was like, I promised the boss that I told -- I

13  already talked to the boss that I -- my only intent was to

14  bring the boat to Freeport and from Freeport, you all would do

15  the rest.  You all wait to go where you all going because I

16  can't meet specifically."

17  Q   Okay.  And by the way, did you have an occasion to go, and

18  as the jury can see now in the videotape, observe the

19  Defendant's face and general body area for any injuries?

20  A   Yes, sir, on the 23rd and the 24th.

21  Q   Now, granted this was the day after, but were you able to

22  observe any swelling, lacerations, cuts, any sort of injuries

23  on the Defendant at all?

24  A   I'm not a medical expert or trained in the field of doctors

25  or anything like that, but I did not observe any swelling, any

1   bruising, any areas of contusions that I could see physically

2   on his face or hands.  As you can see from the video, the rest

3   of the body was pretty much covered up by the Tyvek suit.

4   Q   At the time you conducted this interview, did you have the

5   opportunity yourself to personally witness the video that had

6   been shot by Agent Kendall (sic)?

7   A   Yes, sir, from Agent Kimball, yes.

8   Q   Kimball.  So did you know when the Defendant came out of

9   the compartment, he didn't have any tape on his hands?

10  A   That's true and correct.

11  Q   When you are asking him these questions about the tape, did

12  you already know the answers?

13  A   I did.

14  Q   And where did the Defendant say -- first of all, he

15  referred to himself, and this is on page nine, and it would be

16  the -- if we count the partial paragraph at the top as the

17  first one, it would be the fifth, so Mr. Saunders said that he

18  was duct taped, is that right?

19  A   That is what he said.

20  Q   Was this duct tape that was used to bind him?

21  A   No, it was like the clear packaging tape that's been seen

22  prior today.

23  Q   Is there a difference between the two, the strength of duct

24  tape and packing tape?

25  A   If you were comparing normal duct tape to this tape, I

1   would -- I can't make an expert opinion or an expert statement

2   on it, but in my opinion, duct tape would be stronger than this

3   packaging material, yes, sir, or this packaging tape.

4   Q   You're indicating, "But you just said you were biting off

5   the tape," and that's in about the sixth line on the same page.

6   A   Correct, I see it.

7   Q   So you are asking the Defendant whether he was trying to

8   bite the tape off of his mouth area?

9   A   Correct.

10  Q   Why are you asking that question?

11  A   Well, to ascertain like if maybe when he went in there, if

12  his story was true and correct that he was beaten up and he was

13  tied up, that, you know, his -- that, you know, at some point,

14  maybe it was -- you know, he was able to push the tape up above

15  his mouth and actually bite the tape off his hands, but from

16  the video, you could clearly see that there was no tape on his

17  hands, and that --

18  Q   By the way, is it an easy thing to do to utilize that roll

19  of tape to try to get tape around both your wrists or, for that

20  matter, both parts of your arm without assistance?

21  A   I have never tried to tie myself up with tape personally,

22  whether outside of a compartment on a boat or inside of a

23  compartment on a boat.  I would assume that would be very

24  difficult to get your hands taped together.  I would assume it

25  would be a lot easier to do your face and your legs because you

1    would have your hands free at the time.

2    Q   Well, but have you thought about the process of doing that?

3    A   Yeah, I think it would be very difficult to -- I don't

4    know, in order to actually bound your hands together.

5    Q   And have you seen the compartment that the Defendant was

6    hiding in yourself?

7    A   Physically, have I been on the boat to see it, no, sir.

8    Q   Okay.  But was it roughly, from the photographs, about

9    somewhat smaller than the side of this cabinet?

10   A   Correct.

11   Q   So it would be difficult to go and manipulate a roll of

12   tape around both wrists under those circumstances, would it

13   not?

14   A   I believe it would be, yes.

15   Q   And as you saw in the video, the Defendant could have

16   pulled the tape off of his face any time he wanted to.

17   A   Correct.  At that particular time, when he was pulled out

18   of there, he had no tape on his hands and could have removed

19   all of the tape.

20   Q   Okay.  Now, the Defendant said that he made phone calls to

21   ICE to report this smuggling venture on page ten, do you see

22   that?

23   A   Yes, sir, I'm familiar with it.

24   Q   He said, "On the same phone number, I called Washington on

25   that same SIM card I have in there.  I contacted Washington,

1    D.C. on that and reported them about Sailfish Marina."

2           First of all, did you find any phone calls on that

3    cell phone to ICE anyplace?

4    A   I didn't see any 202 in the recent calls, nor did I

5    subpoena the Bahamian phone records.

6    Q   And with respect to the statement towards the bottom of

7    page ten, "They pulled me out."

8           And you say, "They pulled you out," was that an

9    accurate statement by Mr. Saunders?

10   A   No, it was not because as you can clearly see in the video,

11   he pulled himself out of the compartment.

12   Q   And then below that, you again confirm with Mr. Saunders

13   that his hands were tied when law enforcement found you, right?

14   A   That is correct.

15   Q   And Mr. Saunders says what?

16   A   "Yes, sir."

17   Q   So he responds that his hands were tied?

18   A   Correct.  I had asked, "Hands tied when law enforcement

19   found you, right?"

20          "Yes, sir."

21   Q   Was that statement accurate?

22   A   No.

23   Q   Now, if we turn to page 11, what was essentially

24   Mr. Saunders' claim regarding travel to the United States and

25   Freeport, the Bahamas in his statement to you?

1    A    He said -- he initially told us that he wasn't -- that he

2    was supposed to get dropped off in Freeport.

3    Q    And in the middle of the page, does he say, "I didn't want

4    to get dropped off at Freeport.  The deal was that I negotiated

5    with their boss was for me to only go to Freeport with the

6    boat."

7    A    Correct.  It starts out, it says, "I didn't want to get

8    dropped off at Freeport.  The deal was that I negotiated with

9    their boss was for me to only go to Freeport with the boat,"

10   that's correct, that's what Mr. Saunders stated to us.

11   Q    And then turning to page 12, about two-thirds of the way

12   down the page, you ask, "You said your mouth was tied up."

13            Defendant Saunders:  "My two hands."

14            You:  "Your two hands?"

15            Defendant Saunders:  "My thighs."

16            You:  "Your thighs and your feet, and when law

17   enforcement found you, your mouth was still taped up."

18            "Yes, sir."

19            Special Agent Woodbury:  "Your hands were taped up."

20            Raymond Saunders:  "Yes, sir."

21            Were those statements made by the Defendant accurate?

22   A    They were not.

23            Well, let me rephrase that.  Some of those statements

24   were correct.  When he refers to his mouth and his thigh area,

25   like the leg area, those statements are correct, but when it

1    comes to his hands, those are incorrect statements.

2    Q   Now, after this initial interview, did you have a chance to

3    reflect on the case further and decide that you needed to

4    conduct a more thorough interview of the Defendant the next

5    day?

6    A   Correct.

7    Q   And had the circumstances changed in terms of where you

8    could conduct that interview that wasn't quite as awful

9    conditions?

10   A   Yes.

11   Q   Where was that?

12   A   We conducted the interview at the U.S. Border Patrol

13   Station located in Riviera Beach, Florida.

14   Q   Okay.  Now, at that point, the Defendant was still in

15   custody, was he not?

16   A   Aboard the U.S. Coast Guard cutter, yes, sir.

17   Q   So at that time, did you feel obliged to readvise him of

18   his Miranda warnings?

19   A   When him and Mr. Saunders were brought off the U.S. Coast

20   Guard cutter and then brought to U.S. Border Patrol, because

21   there had been such a -- it was 18:48 hours, so 6:48 p.m., on

22   the evening of the 24th when we last conducted our interview

23   with Mr. Saunders, and I'm not 100 percent sure of the exact

24   time on the 25th, but because there is such a large gap in time

25   in the transfer of him to the boat from there, we did readvise

1    Mr. Saunders of his rights.

2              MR. McMILLAN:  May I approach the witness, Your

3    Honor?

4              THE COURT:  Yes.

5    BY MR. McMILLAN:

6    Q   I'm showing you what's been marked for identification as

7    Government's Exhibit 102, do you recognize this document?

8    A   I do.

9    Q   Did you personally witness Mr. Saunders sign that document?

10   A   I did.

11             MR. McMILLAN:  Your Honor, at this time, I move for

12   the admission of Government's Exhibit 102.

13             THE COURT:  Any objection?

14             MR. ROTH:  No, Your Honor.

15             THE COURT:  Government's Exhibit 102 is admitted

16   without objection.

17        (Evidence admitted as Government Exhibit No. 102.)

18             MR. McMILLAN:  May I publish, Your Honor?

19             THE COURT:  Yes.

20   BY MR. McMILLAN:

21   Q   And Special Agent Woodbury, Government Exhibit 102, does it

22   bear, again, the initials of Robert Saunders on the left-hand

23   column?

24   A   Of Raymond Saunders.

25   Q   I'm sorry, Raymond Saunders on the left-hand column, and

1    then it also was witnessed by two individuals, who were they?

2    A    One is myself and one is Border Patrol Agent Robert

3    Vasquez.

4    Q    After you obtained the waiver of the Defendant's Miranda

5    warnings, did you conduct an audio and video recorded interview

6    of him on the 25th day of February?

7    A    We did, Your Honor -- I'm sorry.

8         Yes, sir, we did.

9         MR. McMILLAN:  May I approach the witness, Your

10   Honor?

11        THE COURT:  Yes.

12   BY MR. McMILLAN:

13   Q    Special Agent Woodbury, I'm showing you what's been marked

14   for identification as Government's Exhibits 103 and 104, do you

15   recognize both of these items?

16   A    Yes.  103 is the second audio and video recorded interview

17   at U.S. Boarder Patrol on the 25th of February, and 104 is the

18   transcription of that specific recording.

19   BY MR. McMILLAN:

20   Q    Now, with respect to Government Exhibits 103 and 104, both

21   of these exhibits have also been edited for time and other

22   reasons as the Court instructed the jury earlier, is that

23   correct?

24   A    That is correct.

25   Q    By the way, I should have asked you earlier, did you

1    recently have shoulder surgery?

2    A    I did.  If you see me moving kind of like that or doing

3    this, I'm stretching it.

4    Q    That was a few weeks ago, wasn't it?

5    A    I'm on week six right now.

6    Q    Week six, okay.

7            Now, with respect to Government's Exhibit 103 and

8    104, they have been redacted by the agreement of both parties,

9    is that correct?

10   A    That is correct.

11   Q    But other than that, do they fairly and accurately reflect

12   both of your communications with Mr. Saunders on the 25th day

13   of February, and as to 104, a fair and accurate transcript of

14   those communications with Mr. Saunders?

15   A    That's correct.

16   Q    Including the identification of the participants on that

17   date?

18   A    Yes, sir.

19   Q    And who were the participants on the 25th day of February?

20   A    Mr. Saunders; myself, Josh Woodbury; Special Agent Brian

21   Riordan, and that's spelled R-I-O-R-D-A-N.  He is a special

22   agent with Homeland Security Investigations; Robert Vasquez,

23   special agent with the United States Border Patrol; and

24   Deportation Officer Ronald Anderson, who testified before

25   myself.

1    Q    Okay.

2              MR. McMILLAN:  At this point, Your Honor, I move for

3    the admission of Government's Exhibits 103 and 104.

4              THE COURT:  Any objection, Mr. Roth?

5              MR. ROTH:  No, Your Honor.

6              THE COURT:  Government's Exhibits 103 and 104 are

7    admitted without objection.

8              And Mr. McMillan will, as before, give you copies of

9    the transcript of the second interview.

10             The same instruction I read to you earlier still

11   applies, ladies and gentlemen.  For perfectly legal and

12   legitimate reasons, the audio and video you are going to see

13   has been edited or redacted by agreement of the parties.  This

14   is legally appropriate, and you should not attribute any

15   negative inference as to either party because of such

16   redactions, nor should you speculate as to what may have been

17   edited from the evidence introduced in court.

18             (Evidence admitted as Government Exhibits 103 and 104.)

19             MR. McMILLAN:  Thank you.  May I provide the jurors

20   with copies, Your Honor?

21             THE COURT:  Yes.

22             MR. McMILLAN:  May we now publish the audio and video

23   recording of Government's Exhibit 103, Your Honor?

24             THE COURT:  Yes.  I just want to make sure, have all

25   of the jurors received the transcript?

Tuesday, May 9th, 2023

1          Are there any extra copies you want to discard?

2     Okay, just leave them there for now.

3          Yes, please play the tape.

4     (Video recording played in open court.)

5          MR. McMILLAN:  For the record, I stopped it at 22:11

6     using the left-hand counter.

7     BY MR. McMILLAN:

8     Q   I would like to ask you, Special Agent Woodbury, the money

9     in the shoes there the Defendant is talking about in the

10    transcript --

11    A   Uh-huh, yes.

12    Q   -- did you find that money?

13    A   Me personally, no.

14    Q   Well, let me rephrase the question.  Was the money found in

15    shoes that the Defendant put into evidence -- well, in his

16    property?

17    A   Correct.

18    Q   I'm showing you what's been previously admitted as

19    Government's Exhibit 105, and what does 105 show?

20    A   That shows the Bahamian currency in Mr. Saunders' shoes.

21    Q   Okay.  And did Mr. Saunders sign, in your presence, a

22    property receipt for those shoes when the property was turned

23    over to the Palm Beach County Sheriff's Office?

24    A   That's correct.

25    Q   And was that property receipt executed and signed by

1    Mr. Saunders in your actual presence?

2    A    It was.

3    Q    And are the shoes, the white shoes referenced on this

4    document, the white shoes which are depicted in Government's

5    Exhibit 105?

6    A    They are.

7             MR. McMILLAN:  Your Honor, may I approach the

8    witness?

9             THE COURT:  Yes.

10   BY MR. McMILLAN:

11   Q    Showing you what's been marked for identification as

12   Government's Exhibit 108, do you recognize that document?

13   A    I do.

14   Q    Did you personally watch Defendant Raymond Saunders sign

15   for that property receipt in front of you?

16   A    Correct.

17            MR. McMILLAN:  Your Honor, at this time, I move for

18   the admission of Government's Exhibit 108.

19            MR. ROTH:  No objection.

20            THE COURT:  Thank you, Mr. Roth.

21            Government's Exhibit 108 is admitted without

22   objection.

23       (Evidence admitted as Government Exhibit No. 108.)

24            MR. McMILLAN:  May I publish, Your Honor?

25            THE COURT:  Yes.

1   BY MR. McMILLAN:

2   Q   Now, the Palm Beach County Sheriff's Office continues to

3   use carbon forms, is that correct?

4   A   That is correct.

5   Q   So what was item number 2?

6   A   Item number 2 was listed as white shoes.

7   Q   And are you certain those white shoes are the same white

8   shoes at issue in Government's Exhibit 105?

9   A   That's correct.

10  Q   And did you sign this indicating that you witnessed this?

11  A   I signed it as the official that was taking the property.

12  Q   Do your initials occur anyplace here?

13  A   They do.

14  Q   Can you show us where that is.

15  A   Well, you have, on the lower corner of the lower middle of

16  the very first part, you have J. Woodbury, which is what I

17  wrote; 4956, which is my badge number, and my signature.

18          The other initial where it says, "Prisoner is

19  wearing" on number six, I'm not sure what that was, but I

20  believe that may -- whatever number six was may have been

21  transferred up to the other property or thrown out at the time

22  and that's why it is crossed out and initialed.

23  Q   Okay.  And whose signature is this that appears on the

24  left-hand middle below box 11?

25  A   That is Mr. Saunders'.

Tuesday, May 9th, 2023

1   Q    So the Defendant acknowledged, in your interview of him,

2   receiving $5,000 in cash from the organizers of this trip.

3   A    Correct.

4   Q    And you actually found the cash in his shoes right where he

5   described it would be.

6   A    Correct.

7        (Video recording played in open court.)

8            MR. McMILLAN:  For the record, I stopped it again at

9   27:21 minutes.

10           THE COURT:  Ladies and gentlemen, we are going to

11  take a final break to stretch our legs and use the restroom.

12  It is 4:30, this will be a bit shorter and we will resume at

13  4:40.

14           All rise for the jury.

15       (The jury retired from the courtroom at 4:30 p.m.)

16           THE COURT:  We are in recess.

17       (Recess was had at 4:30 p.m.; and the proceedings

18       Resumed at 4:41 p.m.)

19           THE COURT:  All right.  Let's bring in the jury,

20  please.

21       (Jury in at 4:41 p.m.)

22           THE COURT:  Please be seated.

23           You may continue.

24           MR. McMILLAN:  Thank you, Your Honor.

25

1   BY MR. McMILLAN:

2   Q   Special Agent Woodbury, if I can go back a little bit, I'm

3   showing you what's been already admitted as Government's

4   Exhibit 9.

5   A   Yes, sir.

6   Q   Did you take that photograph?

7   A   I did.

8   Q   Okay.  And what does it depict?

9        MR. McMILLAN:  I move for -- well, it's been

10  admitted, Your Honor.

11       THE COURT:  Ladies and gentlemen, as I indicated

12  yesterday, certain exhibits were admitted without objection by

13  either side and this is one of them, Government's Exhibit 9.

14       THE WITNESS:  That is the upper deck of the United

15  States Coast Guard cutter.

16  BY MR. McMILLAN:

17  Q   Why are all of the people wearing those white outfits?

18  A   When the migrants are taken from the smuggling vessel to

19  the Coast Guard cutter, they are all given the opportunity to

20  get out of their wet clothes and then given a Tyvek suit, which

21  is dry, along with flip-flops and given the wool blankets, as

22  you see.  It also makes it easier for us to identify each

23  person because as they come on the cutter, they give them a

24  number, so they write the numbers usually on their arms or on

25  their chest or their backs, so you know who each person is.

1    Q    And for the court reporter, is Tyvek, T-Y-V-E-K or --

2    A    T-Y-V-E-X (sic).

3    Q    And those are basically disposable clothing.

4    A    Correct, yes.

5    Q    And so when you were interviewing Mr. Saunders the first

6    time and he is wearing -- what was he wearing?

7    A    I believe they had them separate, he was in a blue Tyvek

8    suit, I believe it was blue, yes.  Some are white, some are

9    blue.

10   Q    But it was a Tyvek suit?

11   A    Correct.  And in the second interview, he was swapped out

12   to clothes that we gave him at the U.S. Border Patrol station,

13   it was a sweatshirt, T-shirt, and I believe he had a pair of

14   sweatpants on if I'm not mistaken, and a pair of socks.

15          MR. McMILLAN:  May I approach the witness, Your

16   Honor?

17          THE COURT:  You may.

18   BY MR. McMILLAN:

19   Q    Special Agent Woodbury, I'm showing you what has been

20   marked for identification as Government's Exhibit 107, do you

21   recognize this picture?

22   A    I do.

23   Q    Who took this picture?

24   A    I did.

25   Q    At this point, does it fairly and accurately reflect the

 1   items that you spread out depicted in the picture?

 2   A    Yes.

 3          MR. McMILLAN:  At this time, I move for admission of

 4   Government's Exhibit 107, Your Honor.

 5          MR. ROTH:  No objection.

 6          THE COURT:  Government's Exhibit 107 is admitted

 7   without objection.

 8       (Evidence admitted as Government Exhibit No. 107.)

 9          MR. McMILLAN:  May I publish, Your Honor?

10          THE COURT:  You may.

11   BY MR. McMILLAN:

12   Q    Special Agent Woodbury, what is Government Exhibit 107?

13   A    That is 50 $100 Bahamian bills, or approximately 5,000

14   Bahamian dollars, that was removed from Mr. Saunders' shoes.

15   Q    So if I can return to our transcript right now, has the

16   Defendant told you that he was paid $5,000 in Bahamian currency

17   by this guy named Dave?

18   A    Not Dave, I believe his --

19   Q    Mark?

20   A    -- name was Mark.

21   Q    And that was to go and do what?

22   A    To get the vessel to Freeport.

23          And I don't want to jump too far ahead, I'm not sure

24   if we got to that point, but it was to tell them where to go to

25   Riverside Marina.

1    Q    Okay.  But so far, he is getting paid $5,000 to take a boat

2    being driven by a professional captain in the Bahamas from one

3    city in the Bahamas to the other.

4    A    Correct.

5    Q    So did that make any sense to you?

6    A    No, and it plays out later on in the interview that what he

7    was telling us did not make sense.

8              MR. ROTH:  Judge, I have to object to that, and I

9    would move to strike that.  What makes sense to the Agent,

10   that's not relevant, it's for the jury to decide what makes

11   sense.

12             THE COURT:  All right.  Mr. McMillan.

13             MR. McMILLAN:  It explains his actions, Your Honor,

14   in continuing the interview.

15             THE COURT:  All right.  Why don't you -- I'm going to

16   overrule the objection, but Mr. McMillan, for future questions,

17   just lay a greater foundation to establish the witness's

18   understanding for what is unusual or common in his experience.

19             MR. McMILLAN:  Thank you, Your Honor, yes, I will do

20   so.

21             THE COURT:  Let's play the tape.

22        (Video recording played in open court.)

23   BY MR. McMILLAN:

24   Q    Special Agent Woodbury, I stopped the recording at 36:12 on

25   the left-hand counter.

```
 1              Do you remember all of the questions I asked earlier

 2    of the other witnesses as to whether there were any female

 3    agents or officers involved in this boarding?

 4    A    Correct.

 5    Q    Does that put those questions in context here now?

 6    A    Correct.

 7    Q    What did the Defendant tell you the person was who

 8    allegedly cut the tape off his hands?

 9    A    The Defendant said it was a lady, a female officer.

10    Q    Based on the testimony at trial, were there any females

11    present?

12              MR. ROTH:  Objection.

13              THE COURT:  Sustained.

14              MR. McMILLAN:  Let's continue with the recording.

15         (Video recording played in open court)

16    BY MR. McMILLAN:

17    Q    Special Agent Woodbury, directing your attention to

18    Exhibit 104, page 30, the second to the last line, there is a

19    statement by Defendant Saunders, "I did delete it, but listen,

20    Officer."  Do you see that?

21    A    I do.

22    Q    What was Mr. Saunders referring to when he said, "I did

23    delete it"?

24    A    Navionics.

25    Q    Didn't he tell you just earlier in the same conversation
```

Tuesday, May 9th, 2023

```
 1    that he didn't know how Navionics couldn't be on his phone?

 2    A    Correct.

 3    Q    Thank you.

 4              MR. McMILLAN:  Please continue.

 5         (Video recording played in open court)

 6    BY MR. McMILLAN:

 7    Q    Special Agent Woodbury, so at the tail end of his

 8    conversation with you, the Defendant acknowledges he knows that

 9    there are aliens on aboard the ship.

10    A    Correct.

11    Q    And that the ship is going to the United States.

12    A    Correct.

13    Q    And that he got paid $5,000 to go and give this location

14    off the Loxahatchee River for some camp or something?

15    A    Yeah, to the marina.

16    Q    Do you know where that marina is?

17    A    In general location, yes.

18    Q    Okay.

19    A    I've never been to it, but the general location.

20    Q    Okay.  Incidentally, the times when the Defendant appears

21    to be bursting into crying fits, were you able to physically

22    observe him yourself?

23    A    Yeah, I was sitting right in front of him.

24    Q    Was he really crying, were there tears coming out of his

25    ears -- excuse me, his eyes?
```

1    A    Not that I could see.  It seemed more of -- I don't know

2    the right word for it, he was just trying to act emotional.

3    Q    Okay.  With respect to the communications that the

4    Defendant was talking about, did he repeatedly try to tell you

5    that someone had been threatening him?

6    A    He did.

7    Q    And who did he attribute those threats to?

8    A    A 786 number.

9    Q    Okay.  Now, these are the same people that he claims are

10   paying him $5,000 to go and take a boat from one city to the

11   other in the Bahamas, right?

12   A    He said they were threatening him, I'm not sure if it was

13   the guy Mark or the boss that he said had paid him, but he

14   said, They were threatening me to do it, so I assume it was the

15   organization.

16   Q    Okay.

17   A    Or possibly somebody in the organization was threatening

18   him.

19   Q    Okay.  And so did he show you in his phone where these

20   threatening communications were?

21   A    No, I found them in the messages myself.

22   Q    Okay.

23               MR. McMILLAN:  May I approach the witness, Your

24   Honor?

25               THE COURT:  You may.

Tuesday, May 9th, 2023

```
 1                  How much longer do you anticipate your direct to be,

 2   Mr. McMillan?

 3                  MR. McMILLAN:  Ten minutes, Your Honor.

 4                  THE COURT:  Okay, all right.

 5                  Ladies and gentlemen, if would you like to stay with

 6   us for another ten minutes to finish up the direct of

 7   Mr. McMillan, we can do that.  I'm also totally fine with

 8   breaking now, at our usual time, and resuming tomorrow morning

 9   at 9:00, so I'll just see if I can get a feel for the jury's

10   preference.

11                  THE JUROR:  Ten minutes.

12                  THE COURT:  Mr. McMillan, go ahead, please.

13                  MR. McMILLAN:  May I approach the witness, Your

14   Honor?

15                  THE COURT:  Yes.

16   BY MR. McMILLAN:

17   Q   Special Agent Woodbury, did you conduct an investigation of

18   the contents of Government Exhibit 116, the cellular phone?

19   A   That's true.

20                  MR. McMILLAN:  This is in evidence now, Your Honor.

21                  THE COURT:  Yes.

22   BY MR. McMILLAN:

23   Q   You said you found what appeared to be threatening

24   communications directed to Mr. Saunders in that phone.

25   A   When you try to decipher them, there was an attempt to be
```

1    threatening.

2    Q    I'm showing you what's been marked for identification as

3    Government Exhibit 117, do you see that document?

4    A    I do.

5    Q    Are those copies of those communications that you made from

6    the cellular phone, Government's Exhibit 116?

7    A    They are.

8            MR. McMILLAN:  Your Honor, may I publish -- I would

9    like to move Government's Exhibit 117 into evidence.

10           MR. ROTH:  No objection.

11           THE COURT:  No objection to Government's Exhibit 117,

12   so it will be admitted without objection.

13       (Evidence admitted as Government Exhibit No. 117.)

14           MR. McMILLAN:  Move to publish, Your Honor.

15           THE COURT:  Granted.

16   BY MR. McMILLAN:

17   Q    Special Agent Woodbury, according to the phone's internal

18   computer system, does it assign a time and date to this

19   message?

20   A    Wednesday morning, 12:24 a.m., and that was on the 22nd of

21   February.

22   Q    Okay.  So to be clear, so the jury understands, when this

23   message was allegedly sent and received, this would have

24   occurred before Mr. Saunders left the Bahamas?

25   A    Correct.  In military time reference, it would be 00:24, so

1    it would be Tuesday night and 24 minutes into Wednesday

2    evening, so just with the vessel departing between 07:00 and

3    08:00 that Wednesday morning, so it was, you know, six and a

4    half, seven hours prior to them departing the Bahamas.

5    Q    And the departure time is from Mr. Saunders himself as

6    well?

7    A    Correct, it was from both him and the other defendant that

8    testified.

9    Q    Okay.  And so there is a message here, can you read that

10   for the ladies and gentlemen of the jury.

11   A    The whole thing?

12   Q    Yes, please.

13   A    "Hello.  I know you said you I can't do the trip forn,"

14   F-O-R-N, me, Wally told me, but I need you to drop it off to

15   Freeport or I'll have you on the news.  Don't play with me, all

16   of this money you borrow from me, blood."

17          The next message is, Is that you or -- it's you or

18   that bitch you got, so tell me Monday," M-O-N-D, which I take

19   for Monday.

20          "This don't need to go that for, I'll take it to

21   Freeport, but like I said, that other run, I can't."

22   Q    And "This don't need to go that for, I'll take it to

23   Freeport," is that the sender or recipient responding back in

24   the light blue?

25   A    The one on the right is the person on the phone replying,

1    it would be Mr. Saunders replying.

2    Q   Okay.  And then on page two of Government's Exhibit 117,

3    what does it say there?

4    A   It says, "You already slapped off my head, pull gun on me,

5    what more you want; my life?  You and your -- N word -- ran in

6    my house, tried to kill me for what?  I ain't doing it, bro, I

7    can't go over, I'll do time, please don't force me.  Only to

8    Freeport, right?"

9            YH dis Mikey, M-I-K-E-Y, NW TLK, so I'm assuming

10   that's talk straight, STR8, so WHT, probably for what, you

11   never learned a cut ass, ain't gird, or probably good enough fo

12   yah, so for you.  Better go on da run or bring that car for the

13   boss, yah see.

14           I ain't want no problems.  My life on the line for

15   what, so I don't own my life no more, what life is this, you --

16   N word -- cold B.

17           And that last line down is, BEY, I ain't slapping up

18   with yah sissy ass, I know where you family is be, you know and

19   I know.

20   Q   Do did you go and conduct a search of the Defendant's phone

21   to see where this message came from?

22   A   I did a search of the Defendant's phone to see if there was

23   any other way that maybe he sent it to himself.

24   Q   Why did you think that?

25   A   Because the text message, to me reading it, did not make

```
 1   sense, it seemed like it was a coverup, like a very

 2   ill-prepared coverup for in case they got in trouble.

 3   Q   And did you find any unusual applications on the

 4   Defendant's phone consistent with that theory?

 5   A   I did.

 6   Q   What application did you find?

 7   A   It's called TextNow.

 8   Q   And did you make a copy of the TextNow file in the

 9   Defendant's phone?

10   A   Yes, sir.

11   Q   Showing you what is marked for identification as

12   Government's Exhibit 118, do you recognize those documents?

13   A   I do.

14   Q   And did you prepare those?

15   A   I did.

16   Q   Did they come from the Defendant's phone, Government's

17   Exhibit 116?

18   A   Correct.

19           MR. McMILLAN:  Your Honor, at this time, move for the

20   admission of Government's Exhibit 118.

21           THE COURT:  Any objection, Mr. Roth?

22           MR. ROTH:  No, Your Honor.

23           THE COURT:  Government's Exhibit 118 is admitted

24   without objection.

25           (Evidence admitted as Government Exhibit No. 118.)
```

Tuesday, May 9th, 2023

```
 1              MR. McMILLAN:  May I publish, Your Honor?

 2              THE COURT:  Yes.

 3   BY MR. McMILLAN:

 4   Q    Okay.  And showing you Exhibit 118, what is that document?

 5              THE COURT:  Just wait for it to focus, please.

 6              MR. McMILLAN:  I'm sorry.

 7   BY MR. McMILLAN:

 8   Q    Special Agent Woodbury, what is Government's Exhibit 118?

 9   A    That is the user information on the application.

10   Q    Okay.  And it indicates a name up here by the name of Leroy

11   Dames, is that correct?

12   A    Correct.  When you open up this here on the phone, it will

13   say your number, but then it pops up Leroy Dames.

14   Q    And in the conversations that Defendant Saunders had with

15   you, he repeatedly kept alluding to a, quote, "786 area code

16   number," do you recall that?

17   A    Correct.

18   Q    Does this is appear to be the number to which he is

19   referring?

20   A    Correct.

21   Q    And that is attributable to Leroy Dames?

22   A    It is the user name that was assigned to it, correct.

23   Q    But were you able to go and find out who Leroy Dames is on

24   this phone?

25   A    It's the person's name that's a subscriber for the app.
```

Tuesday, May 9th, 2023

1   Q    Well, who is me?

2   A    Me is the 242 number for Mr. Saunders' phone.

3   Q    Okay.  And were you able to determine that the messages

4   that had been sent to Mr. Saunders were sent from his own phone

5   using this application?

6   A    Correct.  That 786 number was texting the 242 number, which

7   was the me in the context of the cellular telephone.

8   Q    And since we just have a minute or two left here, can you

9   please demonstrate, using the Defendant's cellular phone, how

10  you are able to find it using the Elmo device?

11            MR. McMILLAN:  Would that be okay, Your Honor?

12            THE COURT:  Yes.

13            THE WITNESS:  So can you hear me?

14            THE COURT:  Yes.

15            THE WITNESS:  So as you can see here, right there, is

16  an application, it's called TextNow, you click on TextNow, and

17  the first one that comes up is a set of text messages and if I

18  click on that, it pretty much starts exactly from the 786

19  number.

20            Do I need a microphone?

21            THE COURT:  I can hear you.

22            Jurors, can you hear him?

23            THE WITNESS:  So that corresponds with the 786

24  numbers that I just read off the text messages, which I thought

25  kind of unique, that it was literally the same exact text

Tuesday, May 9th, 2023

1   messages, which did show proof to us that, yes, our hunch was

2   correct, that Mr. Saunders was doing this to himself, he was

3   using this application to text himself.

4           And then I'll just scroll all the way down to the

5   bottom, so you guys see it.  We will go back here, if I click

6   on this to part right here with the three bars, it goes to the

7   786 number, 802-7408 for Roy Dames.  If you go to settings

8   here, and you go to account, your name, full name is Leroy

9   Dames, so whoever created this account on this phone put in

10  that as Leroy Dames, and your TextNow number is (786)-802-7408.

11          Closing out the application, and going to messages,

12  here is that (786)-802-7408, and that corresponds and coincides

13  with the actual screenshots that I just read off here, and the

14  text messages from TextNow to show that it was sent back and

15  forth to each other.  There is no time difference, it's here on

16  the phone.

17          MR. McMILLAN:  Thank you.

18          THE COURT:  All right.  Mr. McMillan, we are going to

19  break now.  If you have any brief additional questioning, you

20  can finish that up in the morning and then we will flow

21  directly into cross-examination.

22          Agent Woodbury, you may return to counsel table for

23  now, and you remain under oath, of course, for tomorrow's

24  testimony.

25          For now, ladies and gentlemen, I'm going to remind

1    you again of all of the prohibitions that I mentioned

2    yesterday.  You are prohibited from discussing this case with

3    anyone or letting anybody discuss it with you.  Until you

4    retire to the jury room at the end of the case to deliberate on

5    your verdict, you simply aren't to talk about this case.  Also

6    remember not to read or listen to anything touching on this

7    case in any way.  If anybody should try it talk to you about

8    it, bring it to my attention promptly, please.

9            Again, do not conduct any research or make any

10   investigation about the case on your own.  The only evidence in

11   the case is the testimony and the evidence that is presented in

12   the official proceedings in the courtroom.

13           Also, you may not have any contact with the

14   attorneys, parties or witnesses in the case.  If you see them,

15   of course they are not being rude, they are just prohibited

16   from speaking with you.

17           And finally, please do not form any opinion about

18   this case.  Until all of the evidence has been presented, you

19   are required to keep an open mind until you start your

20   deliberations at the end of the case.

21           So with that, ladies and gentlemen, I wish you a

22   pleasant evening.

23           All rise for the jury.

24   (The jury retired from the courtroom at 5:43 p.m.)

25           THE COURT:  All right.  Agent Woodbury, please do not

1    discuss the substance of your testimony with anybody.

2              Any final issues to address before we break for the

3    evening, Mr. McMillan?

4              MR. McMILLAN:  No, Your Honor.

5              THE COURT:  Mr. Roth?

6              MR. ROTH:  No, Judge.

7              THE COURT:  All right.  Then I will see you all

8    tomorrow at 8:45 to finalize the jury instructions and complete

9    our discussion on those issues.

10             Overnight, please make sure to arrange all of the

11   admitted exhibits in an organized fashion, so we can present

12   those to the jurors seamlessly without delay, and of course

13   confer with each other about what is in the record thus far.

14             At this point, Mr. McMillan, do you intend on resting

15   your case after the conclusion of Mr. Woodbury's testimony?

16             MR. McMILLAN:  We do, Your Honor.

17             THE COURT:  Okay.  And Mr. Roth, do you have any

18   updates on the Defense case, if any?

19             MR. ROTH:  The Defense intends to not call any

20   witnesses.

21             THE COURT:  Okay, all right.  I have nothing else for

22   now, so I'll see you all, like I said, at 8:45 tomorrow

23   morning.

24             MR. ROTH:  Thank you, good night.

25             MR. McMILLAN:  Good night, Your Honor.

Tuesday, May 9th, 2023

```
1              THE COURT:  Have a nice evening.

2         (PROCEEDINGS ADJOURNED AT 5:46 P.M.)

3

4                    C-E-R-T-I-F-I-C-A-T-E

5              I hereby certify that the foregoing is

6         an accurate transcription and proceedings in the

7         above-entitled matter.

8
      10/2/2023                    /s/DIANE MILLER
9      DATE                 DIANE MILLER, RMR, CRR, CRC
                            Official Court Reporter
10                          United States District Court
                            101 South U.S. Highway 1
11                          Fort Pierce, FL  34950
                            772-467-2337
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, May 9th, 2023

**BY MR. McMILLAN: [61]**
55/19 56/3 65/7
68/6 96/25 98/1
98/17 101/13
107/6 109/8 114/2
120/7 123/10
127/14 136/15
149/8 149/20
152/23 153/13
156/14 160/15
161/4 166/11
169/11 173/11
176/24 179/11
182/16 184/7
188/25 189/18
192/3 192/25
193/5 193/15
194/22 195/10
197/21 198/19
199/4 200/3 202/7
211/5 211/20
212/12 212/19
215/7 216/10
217/1 218/25
219/16 220/18
221/11 222/23
223/16 224/6
226/16 226/22
227/16 231/3
231/7

**BY MR. ROTH: [22]** 17/14 19/9
21/18 22/8 27/15
30/22 34/23 35/15
36/2 42/9 42/20
43/3 47/22 48/16
52/12 54/6 54/12
102/18 124/13
141/18 144/3
175/14

**COURTROOM SECURITY OFFICER: [3]**
67/8 67/18 178/20

**MARSHAL TRACEY: [4]**
50/9 66/1 66/16
66/20

**MR. McMILLAN: [144]** 3/7 3/19

3/23 4/12 4/25
5/22 6/5 6/13 7/4
7/18 8/7 8/9 8/13
8/18 10/9 12/7
13/5 13/8 13/13
14/6 16/10 16/16
21/3 21/9 35/8
43/1 46/11 50/14
51/2 52/1 54/3
54/9 55/6 55/12
55/16 65/12 65/15
66/10 67/2 67/13
68/3 96/22 97/21
98/14 101/11
102/10 107/4
107/17 108/6
108/10 108/15
109/5 113/25
120/4 123/5 123/7
124/7 126/17
126/22 127/1
136/13 141/12
149/6 149/17
152/20 153/7
153/11 155/15
155/18 155/25
156/11 160/13
169/8 173/8
174/22 175/3
175/5 177/14
177/25 178/3
178/14 178/17
178/25 179/8
182/13 184/5
188/22 189/11
189/15 191/24
192/22 193/13
194/5 194/21
195/2 195/9
195/20 195/23
196/9 196/23
197/3 197/7
197/16 198/12
198/23 198/25
199/18 199/25
200/2 211/2
211/11 211/18
212/9 214/2
214/19 214/22
215/5 216/7
216/17 216/24
218/8 218/24
219/9 220/15

221/8 221/9
222/13 222/19
223/14 224/4
225/23 226/3
226/13 226/20
227/8 227/14
230/19 231/1
231/6 232/11
233/17 235/4
235/16 235/25

**MR. ROTH: [73]**
5/3 6/18 7/2 8/6
8/20 9/2 9/21 10/2
10/8 10/10 11/7
11/16 12/12 12/18
13/18 13/22 14/21
15/2 15/10 15/22
16/7 16/14 17/12
19/7 21/7 21/17
22/7 34/17 34/20
35/12 45/21 45/24
46/5 47/7 47/16
49/23 50/25 51/18
52/11 54/22 54/25
55/15 55/17 65/1
65/3 97/23 102/15
106/25 108/8
124/11 126/14
141/16 149/3
175/11 176/22
178/6 194/9 195/6
195/25 198/15
199/21 201/24
211/14 214/5
216/19 221/5
222/8 223/12
227/10 230/22
235/6 235/19
235/24

**MS. McCRAE: [2]**
66/5 66/23

**THE COURT: [234]** 3/2 3/12
3/22 4/8 4/18 5/1
5/20 6/2 6/12 6/16
6/21 7/3 7/11 7/25
8/8 8/10 8/16 8/19
8/21 9/18 9/25
10/6 10/11 11/13
11/18 12/10 12/15
12/25 13/6 13/11
13/14 13/21 14/4
14/17 14/23 15/6

15/17 15/23 16/8
16/11 16/15 16/17
16/25 17/3 17/5
17/7 19/8 21/5
21/8 21/14 22/4
27/14 30/17 30/21
34/15 34/18 34/22
35/10 35/13 35/24
42/4 42/19 45/23
46/4 46/14 46/19
47/9 47/17 48/10
49/24 50/6 50/10
50/22 51/1 51/3
51/20 52/2 52/6
52/9 54/5 54/10
54/23 55/4 55/7
55/10 55/25 65/2
65/4 65/14 65/16
65/20 65/25 66/3
66/7 66/13 66/17
66/21 66/24 67/5
67/11 67/14 67/20
68/1 68/4 96/24
97/22 97/24 98/16
102/12 102/16
107/3 107/20
107/24 108/4
108/7 108/9
108/13 108/17
108/20 109/1
109/6 123/6 123/9
124/9 126/16
126/18 126/24
127/3 127/6 127/9
136/14 141/14
149/5 149/19
152/22 153/9
155/20 155/23
156/2 156/7
156/12 160/23
166/10 169/10
173/10 174/24
175/4 175/7
175/12 177/16
177/21 177/24
178/1 178/4 178/8
178/13 178/16
178/18 178/22
179/2 179/5 179/9
182/15 184/4
188/24 189/13
189/17 192/1
192/24 193/4

194/8 194/10
195/4 195/7
195/22 195/24
196/1 196/4
196/10 196/25
197/5 197/10
197/20 198/14
198/16 199/3
199/20 199/22
201/25 211/4
211/13 211/15
211/19 212/11
214/4 214/6
214/21 214/24
216/9 216/20
216/25 218/10
218/16 218/19
218/22 219/11
220/17 221/6
221/10 222/12
222/15 222/21
223/13 225/25
226/4 226/12
226/15 226/21
227/11 227/15
230/21 230/23
231/2 231/5
232/12 232/14
232/21 233/18
234/25 235/5
235/7 235/17
235/21 236/1

**THE COURTROOM DEPUTY: [6]**
16/24 67/7 67/22
67/24 108/24
127/7

**THE JUROR: [1]**
226/11

**THE JURY: [2]**
21/16 160/21

**THE WITNESS: [29]** 17/4 30/18
36/1 48/15 54/11
67/17 68/2 76/18
107/2 107/22
108/23 109/3
120/6 126/15
126/20 127/5
127/11 149/4
155/22 156/9
161/3 179/7 192/2

**THE WITNESS:...**
**[6]** 197/8 202/1
219/14 232/13
232/15 232/23

**$**
**$10,000 [2]** 54/15
54/16
**$100 [1]** 221/13
**$15,000 [1]** 53/21
**$25,000 [1]** 54/20
**$250,000 [1]**
170/20
**$5,000 [7]** 53/21
54/17 218/2
221/16 222/1
224/13 225/10

**'**
**'90s [2]** 36/10
36/11

**-**
**-802-7408 [2]**
233/10 233/12

**/**
**/s/DIANE [1]**
236/8

**0**
**00:24 [1]** 227/25
**03:39 [1]** 197/17
**07:00 [1]** 228/2
**08:00 [1]** 228/3

**1**
**10 [9]** 6/6 6/23
7/14 8/2 8/5 8/10
8/12 8/14 24/20
**10,000 [1]** 53/21
**10/2/2023 [1]**
236/8
**10/27/2009 [2]**
161/11 161/13
**100 [11]** 193/17
193/19 193/23
194/24 195/3
195/4 195/7
195/21 197/4
197/6 197/11
**100 percent [7]**

58/9 113/11 114/6
140/23 152/17
155/11 210/23
**100 yards [1]**
85/8
**101 [14]** 193/3
193/7 193/10
195/11 195/21
195/22 195/24
196/1 196/3 197/2
197/12 201/5
203/1 236/10
**102 [6]** 2/8 211/7
211/12 211/15
211/17 211/21
**103 [8]** 212/14
212/16 212/20
213/7 214/3 214/6
214/18 214/23
**104 [9]** 212/14
212/17 212/20
213/8 213/13
214/3 214/6
214/18 223/18
**105 [4]** 215/19
215/19 216/5
217/8
**107 [6]** 2/9 220/20
221/4 221/6 221/8
221/12
**108 [4]** 216/12
216/18 216/21
216/23
**109 [3]** 2/11 61/25
62/3
**10:04 [3]** 50/1
50/2 50/5
**10:08 [1]** 52/4
**10:20 [2]** 50/3
52/3
**10:24 [1]** 52/5
**10:25 [1]** 52/8
**10:43 [1]** 65/19
**10:48 [1]** 67/19
**11 [7]** 14/12 166/9
167/4 167/23
168/1 208/23
217/24
**115 [5]** 199/6
199/19 199/22
199/24 200/5
**116 [8]** 198/5
198/13 198/16

198/22 201/16
226/18 227/6
230/17
**117 [5]** 227/3
227/9 227/11
227/13 229/2
**118 [6]** 230/12
230/20 230/23
230/25 231/4
231/8
**11:44 [1]** 108/3
**11:45 [1]** 108/11
**12 [8]** 71/3 109/14
167/14 167/20
168/2 169/1 181/3
209/11
**122 [3]** 76/1 94/2
133/5
**124 [1]** 2/12
**127 [1]** 2/14
**127 miles [1]** 62/2
**12:24 [1]** 227/20
**12:45 [1]** 108/5
**12:55 [1]** 108/12
**12:57 [1]** 108/19
**12th [1]** 168/19
**13 [1]** 42/10
**1326 [1]** 170/14
**1327 [1]** 10/12
**14 [5]** 160/17
162/14 162/15
164/22 164/24
**14013 [1]** 3/4
**141 [1]** 2/15
**149 [1]** 2/16
**15 [4]** 4/1 4/14
50/2 107/25
**156 [1]** 2/18
**1581 [1]** 69/25
**17 [1]** 2/4
**1700 [1]** 1/18
**175 [1]** 2/19
**176 [1]** 2/20
**179 [1]** 2/22
**1811 [2]** 180/2
180/4
**18:48 [1]** 210/21
**19 U.S.C [1]**
69/25
**1975 [3]** 35/5 35/6
35/7
**1996 [1]** 61/6
**19th [1]** 161/11

**1:00 [1]** 108/1
**1B1.1 [1]** 58/13
**1st [2]** 35/19
145/23

**2**
**20 [4]** 24/21
170/19 173/7
173/12
**2003 [1]** 127/19
**2005 [3]** 35/17
35/19 35/23
**2006 [2]** 35/22
35/23
**2008 [3]** 39/15
39/19 179/17
**2009 [4]** 33/3
161/11 161/11
161/13
**2016 [1]** 166/21
**2017 [1]** 168/19
**202 [1]** 208/4
**2022 [1]** 109/20
**2023 [25]** 1/6
10/10 39/21 41/19
41/23 43/13 43/23
70/16 72/1 97/8
114/11 122/20
128/13 130/1
140/22 141/19
144/11 145/23
150/2 172/16
184/4 184/5
193/25 195/18
236/8
**2024 [1]** 184/3
**206860601 [3]**
166/19 167/24
168/2
**228 [1]** 24/17
**22:07 [1]** 199/1
**22:11 [1]** 215/5
**22nd [20]** 70/16
72/1 97/8 109/20
114/11 122/20
128/12 130/1
140/22 141/19
142/11 142/13
144/11 150/2
172/16 182/1
182/21 182/23
184/2 227/20
**23-14013 [1]** 3/4

**23-CR-14013-AM
C [1]** 1/2
**2337 [2]** 1/25
236/11
**235B1 [1]** 169/17
**23rd [10]** 35/17
142/9 142/12
145/11 145/20
182/4 182/21
182/23 187/25
204/20
**24 [1]** 228/1
**240 [2]** 169/17
169/17
**242 [2]** 232/2
232/6
**24th [6]** 186/24
188/2 193/25
195/18 204/20
210/22
**25th [10]** 41/19
41/23 43/13 43/23
188/10 210/24
212/6 212/17
213/12 213/19
**267 [1]** 1/7
**27:21 [1]** 218/9
**296 [1]** 167/7
**2:25 [1]** 177/18
**2:26 [1]** 177/20
**2:27 [1]** 178/11
**2:40 [2]** 177/18
178/10
**2:48 [1]** 178/12
**2:49 [1]** 178/21
**2nd [1]** 35/7

**3**
**3 miles [1]** 181/13
**3/3 [1]** 127/19
**30 [6]** 34/4 34/7
79/6 140/5 152/5
223/18
**307 [1]** 1/18
**31st [1]** 28/13
**32 feet [1]** 128/5
**33301 [1]** 1/18
**33401 [1]** 1/15
**34950 [2]** 1/25
236/11
**36:12 [1]** 222/24
**39 [1]** 44/14
**3rd [1]** 166/21

**4**

**40 [3]** 57/1 57/3 57/21
**400 [1]** 1/14
**41-foot [1]** 111/18
**44-foot [2]** 72/6 72/7
**45 [3]** 9/16 10/9 10/10
**467-2337 [1]** 1/25
**47 [1]** 115/3
**4769 [1]** 168/16
**48 [1]** 57/24
**4956 [1]** 217/17
**4:30 [3]** 218/12 218/15 218/17
**4:40 [1]** 218/13
**4:41 [2]** 218/18 218/21
**4th [2]** 10/10 147/11

**5**

**5 kilograms [1]** 165/4
**5 miles [1]** 203/15
**5,000 [1]** 221/13
**50 [3]** 123/22 129/21 221/13
**500 [1]** 1/14
**55 [1]** 2/5
**5:43 [1]** 234/24
**5:46 [1]** 236/2
**5C [1]** 56/21

**6**

**6 miles [1]** 187/1
**60 [1]** 129/25
**68 [1]** 2/7
**6:00 [1]** 30/20
**6:48 [1]** 210/21

**7**

**74 [8]** 20/7 22/11 22/16 22/17 22/23 23/17 27/19 186/2
**7408 [3]** 233/7 233/10 233/12
**75 [1]** 44/17
**76 [7]** 18/18 18/23 28/18 41/2 56/12 58/16 59/1
**77 [3]** 19/18 49/17

**49/19
772 [1]** 1/25
**772-467-2337 [1]** 236/11
**78 [10]** 18/6 21/13 21/20 44/14 49/2 49/11 49/16 56/8 173/14 186/2
**786 [8]** 225/8 231/15 232/6 232/18 232/23 233/7 233/10 233/12
**79 [4]** 9/5 9/7 18/5 19/16
**7:00 o'clock [1]** 30/20

**8**

**802-7408 [1]** 233/7
**860 [2]** 166/12 167/3
**8:45 [2]** 235/8 235/22

**9**

**9 miles [1]** 181/3
**95 [3]** 111/2 173/7 173/12
**99 [3]** 189/3 189/12 190/14
**9:00 [5]** 72/1 73/9 109/25 110/2 226/9
**9:12 [1]** 17/6
**9TH [1]** 1/6

**A**

**a.m [10]** 17/6 50/5 52/4 52/5 52/8 65/19 67/19 108/3 108/11 227/20
**A087709255 [1]** 161/15
**abbreviated [1]** 68/11
**abetting [4]** 9/4 9/12 9/16 10/12
**ability [1]** 136/4
**aboard [2]** 210/16 224/9
**above [3]** 161/14

**206/24 236/7
above-entitled [1]** 236/7
**absence [1]** 51/3
**absolutely [7]** 4/12 115/14 129/2 140/8 140/12 140/15 154/16
**academy [2]** 140/6 180/1
**accent [3]** 112/15 112/23 113/10
**accents [2]** 112/22 113/7
**accept [3]** 20/8 22/13 23/23
**accepted [3]** 23/22 23/25 24/4
**accepting [6]** 20/5 22/19 22/20 22/22 22/23 44/5
**access [1]** 143/24
**according [10]** 7/15 20/10 20/11 21/23 22/13 24/18 24/19 45/7 116/1 227/17
**accordingly [1]** 164/1
**account [3]** 39/1 233/8 233/9
**accountable [1]** 45/17
**accurately [9]** 14/7 75/23 97/7 114/10 139/20 140/20 195/16 213/11 220/25
**achieve [1]** 47/5
**acknowledge [2]** 56/25 140/13
**acknowledged [2]** 63/18 218/1
**acknowledges [2]** 58/11 224/8
**acknowledgment [2]** 43/4 43/18
**acronyms [1]** 68/15
**across [1]** 120/16
**act [6]** 41/21 41/25 43/16 105/23 169/17

**225/2
acting [1]** 86/14
**actions [5]** 38/4 41/17 105/3 150/1 222/13
**activate [1]** 151/20
**activated [4]** 80/7 80/8 80/10 129/22
**activities [1]** 180/16
**activity [1]** 70/3
**actuality [1]** 165/13
**adamant [1]** 202/6
**add [4]** 9/11 10/11 11/4 183/14
**addendum [2]** 146/14 146/15
**adding [1]** 10/19
**addition [7]** 9/19 81/18 112/1 163/22 168/4 174/3 190/6
**address [2]** 8/16 235/2
**ADJOURNED [1]** 236/2
**adjudicate [1]** 4/21
**administrative [1]** 156/24
**admissibility [2]** 42/1 42/2
**admissible [3]** 5/9 11/23 12/21
**admission [15]** 50/23 51/5 55/4 157/1 191/5 195/2 195/4 195/24 198/12 199/19 211/12 214/3 216/18 221/3 230/20
**admit [4]** 7/4 8/1 11/14 195/22
**admitted [48]** 11/16 12/22 20/23 42/2 42/16 42/18 46/22 55/8 55/9 55/23 75/10 97/2 114/4 133/4

**136/16 149/21 152/24 160/17 166/8 167/13 175/2 189/12 189/14 193/2 195/5 196/2 196/3 198/16 198/18 199/22 199/24 211/15 211/17 214/7 214/18 215/18 216/21 216/23 219/3 219/10 219/12 221/6 221/8 227/12 227/13 230/23 230/25 235/11
admitting [3]** 8/11 8/15 196/5
**advance [1]** 11/24
**advisory [1]** 58/12
**affidavits [1]** 6/15
**affirmative [1]** 191/9
**African [8]** 111/23 119/10 119/12 119/12 124/23 125/5 125/14 126/2
**African-American [2]** 111/23 119/12
**aft [1]** 82/6
**afternoon [5]** 67/14 108/1 124/14 127/3 156/3
**agency [7]** 66/19 68/8 70/4 109/15 128/4 128/21 175/20
**agent [99]** 38/18 38/21 67/3 67/3 68/9 68/13 68/24 69/18 73/7 80/1 81/3 82/4 83/14 84/11 84/16 85/18 86/3 86/10 86/14 87/16 88/18 90/8 102/4 102/7 102/19 103/17 107/7 107/20 108/15 108/21

**A**

**agent... [69]**
109/9 109/12
109/14 111/14
112/1 114/3
118/19 122/8
122/12 122/13
124/14 126/18
128/24 128/25
130/5 131/17
131/18 132/4
133/11 133/12
133/16 134/4
140/17 153/12
162/25 172/9
172/16 173/13
179/1 179/2
179/12 180/4
183/14 189/2
189/19 190/25
191/17 192/7
193/7 193/16
194/23 197/7
197/22 198/20
199/5 199/11
200/4 205/6 205/7
209/19 211/21
212/2 212/13
213/20 213/22
213/23 215/8
219/2 220/19
221/12 222/9
222/24 223/17
224/7 226/17
227/17 231/8
233/22 234/25
**Agent Woodbury
[1]** 153/12
**agents [15]** 37/14
68/25 73/14 84/12
101/16 101/18
112/5 132/16
141/22 167/7
182/17 183/5
183/7 183/23
223/3
**aggravated [9]**
10/25 18/12 40/25
42/3 159/21
164/25 165/4
165/7 176/12
**agreement [45]**

6/19 6/24 7/7 7/22
17/19 18/2 18/25
19/11 19/20 20/10
21/2 21/12 21/19
24/6 38/24 39/4
44/18 44/22 44/24
45/2 45/4 45/19
45/22 46/6 46/20
46/25 47/19 47/25
48/11 48/12 48/22
49/21 50/12 50/15
50/24 55/1 55/5
55/21 56/11 56/15
57/12 57/17
194/15 213/8
214/13
**agreements [1]**
47/3
**aground [4]** 91/7
91/7 91/12 91/19
**aiding [4]** 9/4
9/12 9/15 10/12
**AILEEN [1]** 1/10
**aiming [1]** 113/13
**air [7]** 68/12
68/23 70/4 70/13
73/14 109/13
118/16
**aircraft [1]** 70/14
**Airlines [1]**
168/16
**airside [2]** 70/13
70/14
**Alex [1]** 195/17
**aliases [2]** 34/4
34/7
**alien [22]** 5/17
17/17 18/18 18/19
18/24 24/12 24/14
27/19 33/18 34/2
62/6 62/8 62/9
158/21 159/1
159/4 162/3
164/11 166/15
169/16 170/15
180/11
**alien's [1]** 10/21
**alienage [1]**
184/25
**aliens [37]** 18/8
20/3 20/7 20/13
20/14 20/17 20/22
22/9 22/11 22/17

23/7 24/3 24/17
28/19 29/16 30/1
30/5 30/11 32/7
32/13 37/11 40/24
41/2 48/1 58/16
92/1 123/16 125/7
141/23 142/3
170/12 173/2
173/3 175/20
182/3 183/18
224/9
**allege [1]** 18/24
**allegedly [2]**
223/8 227/23
**allow [1]** 70/2
**allowing [1]**
191/14
**alluded [2]** 51/9
188/9
**alluding [1]**
231/15
**almost [8]** 41/8
76/22 78/11 79/8
83/9 96/6 140/5
152/6
**alone [1]** 15/2
**alongside [7]**
78/25 79/10 81/4
83/12 84/20 91/6
111/24
**Alpha [12]** 75/8
76/4 80/6 83/4
84/22 85/19
122/18 124/1
129/25 130/21
131/7 131/14
**Alpha's [1]**
101/17
**alter [1]** 198/20
**alteration [1]** 96/7
**altercation [1]**
96/8
**alternatives [1]**
14/3
**although [1]** 16/1
**aluminum [1]**
72/9
**ambiguous [1]**
46/8
**AMC [1]** 1/2
**AMERICA [7]** 1/3
3/5 63/3 71/20
157/5 163/20

170/24
**American [12]**
20/19 26/1 26/9
32/22 111/23
112/22 119/12
124/24 125/5
125/14 126/2
168/16
**Ammo's [1]**
144/25
**AMO [2]** 70/10
70/12
**amongst [2]**
76/24 198/1
**amount [4]** 54/7
54/13 80/22 87/11
**ANDERSON [11]**
2/17 156/1 156/2
156/6 156/9
160/16 169/12
175/15 176/25
183/19 213/24
**ands [1]** 148/23
**ankles [1]** 99/3
**answer [8]** 5/25
31/10 38/8 38/10
46/8 49/13 66/8
178/6
**answers [3]** 47/8
79/2 205/12
**anticipate [3]**
7/24 175/10 226/1
**anticipated [1]**
77/6
**anybody's [3]**
78/21 105/3 161/1
**anyplace [2]**
208/3 217/12
**apologize [1]**
193/16
**app [1]** 231/25
**apparent [1]**
96/12
**appearance [1]**
95/5
**APPEARANCES
[1]** 1/13
**applicable [1]**
46/16
**application [6]**
230/6 231/9 232/5
232/16 233/3
233/11

**applications [3]**
171/15 185/13
230/3
**applied [4]** 157/1
159/10 159/12
171/25
**applies [2]** 9/5
214/11
**apply [3]** 165/16
170/1 177/6
**applying [2]**
158/24 165/10
**appreciate [3]**
4/18 39/22 126/20
**approach [22]**
11/2 13/13 19/7
74/2 78/24 80/10
96/22 136/13
149/17 152/20
173/8 188/22
191/24 192/22
197/19 199/2
211/2 212/9 216/7
220/15 225/23
226/13
**approached [7]**
63/11 74/11 74/23
76/5 112/5 131/7
203/23
**approaching [6]**
73/24 78/24 79/18
80/6 80/15 82/8
**appropriately [2]**
3/14 5/18
**approved [1]**
145/23
**aqui [2]** 84/1 84/3
**area [58]** 9/3 69/7
70/25 76/3 77/16
77/25 83/24 87/22
88/3 89/11 89/18
89/21 90/13 90/23
91/4 92/23 93/7
94/1 94/8 94/11
94/13 95/2 104/11
110/3 111/5
111/17 115/16
117/8 117/11
117/17 119/8
124/20 125/6
128/17 129/4
131/8 131/10
131/19 131/21

**A**

**area...** [19]
131/23 132/18
133/1 133/21
133/22 133/23
134/2 134/22
135/8 137/3
138/11 167/20
170/11 183/24
204/19 206/8
209/24 209/25
231/15
**areas** [6]  8/22
60/25 69/16 71/14
77/24 205/1
**aren't** [3]  51/23
145/1 234/5
**arguing** [1]  9/7
**argument** [6]
9/19 9/25 11/6
15/8 15/11 50/19
**arm** [1]  206/20
**arms** [3]  72/19
137/6 219/24
**arrange** [3]  88/16
88/18 235/10
**arrest** [1]  181/7
**arrested** [6]  35/18
35/21 59/20 62/17
89/24 125/12
**arresting** [1]
181/7
**arrived** [4]  16/23
35/16 129/8 130/3
**arriving** [1]
169/16
**arrows** [2]  94/13
94/15
**ascend** [1]
131/17
**ascertain** [8]  75/2
82/2 83/20 91/4
91/23 91/25 188/6
206/11
**aspect** [2]  120/13
203/7
**ass** [2]  229/11
229/18
**assaulted** [4]
99/7 99/9 120/20
120/23
**assess** [1]  74/1

**assessed** [2]  14/7
105/16
**assessing** [1]
76/6
**assessment** [1]
75/1
**assign** [1]  227/18
**assigned** [10]
127/21 127/22
128/2 128/4
135/21 166/14
166/15 180/13
183/23 231/22
**assist** [13]  30/5
100/1 100/2
118/22 122/23
129/3 131/18
139/3 139/7 172/8
172/16 183/22
183/24
**assistance** [10]
23/6 44/15 118/20
119/2 128/20
129/5 129/6 139/9
183/21 206/20
**assisted** [4]  98/4
122/23 123/1
141/25
**assisting** [2]
93/17 93/21
**associated** [1]
3/16
**assume** [6]  53/11
66/19 202/20
206/23 206/24
225/14
**assumed** [1]
116/22
**assuming** [1]
229/9
**athletic** [1]
103/10
**Atlantic** [1]  69/15
**attacked** [1]
120/20
**attempt** [8]  11/10
18/12 47/10 88/13
112/6 170/16
170/23 226/25
**attempted** [5]
36/4 41/1 105/25
134/12 186/24
**attempting** [1]

185/21
**attendant** [1]
195/17
**attended** [2]
139/13 139/14
**attired** [1]  135/18
**attorney** [4]  58/1
59/15 63/19
191/15
**Attorney's** [3]
1/14 17/25 144/1
**attorneys** [2]
108/4 234/14
**attributable** [1]
231/21
**attribute** [3]
194/17 214/14
225/7
**au** [1]  159/11
**audio** [8]  192/19
194/12 194/14
197/13 212/5
212/16 214/12
214/22
**AUSA** [1]  1/13
**Australian** [1]
1/14
**authentic** [2]
11/20 11/20
**authored** [1]
144/10
**authorities** [4]
158/12 161/21
164/2 166/5
**authority** [4]
69/19 69/22
141/24 168/5
**authorizations** [1]
70/1
**authorized** [1]
69/25
**Ave** [1]  1/14
**aviation** [1]
122/13
**awaiting** [1]
67/15
**awareness** [1]
106/19
**awful** [1]  210/8
**Axios** [3]  143/7
150/19 150/21

**B**

**backing** [1]
148/17
**backup** [6]  87/6
87/17 88/19 88/24
89/19 89/19
**badge** [1]  217/17
**Bahamas** [26]
25/9 25/10 25/12
25/13 26/7 26/9
26/12 26/20 60/16
61/5 61/12 61/18
110/12 116/4
168/11 168/16
168/18 188/5
188/12 190/4
208/25 222/2
222/3 225/11
227/24 228/4
**Bahamian** [16]
26/2 26/2 27/2
27/3 27/5 28/21
60/14 61/19
188/13 190/7
190/13 208/5
215/20 221/13
221/14 221/16
**Bahamians** [4]
28/17 186/1 186/3
186/8
**banging** [8]  91/21
93/8 96/5 96/7
132/21 132/23
133/7 133/18
**banned** [2]
169/18 169/21
**barred** [3]  165/13
176/9 176/25
**barrier** [2]  63/16
63/16
**bars** [1]  233/6
**basic** [3]  73/11
74/6 84/4
**basis** [5]  11/21
11/25 13/20 14/13
65/2
**bat** [1]  202/3
**bathroom** [1]
151/22
**Beach** [7]  1/15
66/6 151/6 180/10
210/13 215/23

217/2
**bear** [8]  75/19
97/5 114/7 168/20
189/8 193/21
200/10 211/22
**beaten** [1]  206/12
**behavior** [1]
115/9
**behind** [6]  37/17
38/1 77/13 78/12
78/15 132/15
**belong** [1]  3/20
**belonging** [1]
167/17
**below** [11]  59/12
64/21 92/1 92/15
93/9 94/12 118/9
170/11 200/10
208/12 217/24
**belt** [3]  79/24
79/25 99/21
**bench** [1]  46/3
**benefits** [1]
171/16
**BEY** [1]  229/17
**beyond** [3]  10/23
71/8 143/12
**bills** [1]  221/13
**bind** [1]  205/20
**binding** [3]  10/5
138/16 138/17
**biographical** [1]
34/20
**biometrics** [3]
164/6 185/9
185/10
**birth** [6]  5/14
173/21 173/22
173/23 174/1
174/16
**bitch** [1]  228/18
**bite** [2]  206/8
206/15
**biting** [1]  206/4
**black** [3]  95/7
204/8 204/9
**blankets** [1]
219/21
**bleeding** [1]
99/19
**blinders** [2]
117/24 117/24
**blinking** [1]  64/5

**B**

**blood [4]** 99/24
120/24 121/22
228/16
**blue [13]** 72/13
78/13 79/11 79/20
117/12 191/21
191/23 192/2
192/12 220/7
220/8 220/9
228/24
**Blvd [1]** 1/18
**board [60]** 37/18
37/20 38/13 38/16
38/19 41/9 58/16
59/2 69/19 69/25
72/20 75/3 76/7
78/6 78/21 79/2
79/16 79/19 79/22
82/20 83/4 84/12
85/18 87/19 88/8
89/6 91/19 92/2
101/3 101/16
101/21 103/2
103/11 103/18
109/16 111/8
112/5 112/7
112/10 113/9
113/21 115/2
115/10 115/25
119/7 122/21
123/12 123/19
123/25 126/1
131/14 139/11
150/10 172/18
184/24 185/8
185/25 186/1
186/2 186/16
**boarded [8]** 93/15
93/23 102/8
114/11 114/18
114/19 131/22
144/16
**boarder [2]** 171/8
212/17
**boarding [18]**
73/12 73/13 79/15
101/14 101/15
101/15 101/17
103/23 104/6
109/16 113/15
115/11 122/18

181/2 182/18
183/2 184/22
223/3
**boat [105]** 14/25
25/6 25/9 25/14
25/15 25/18 25/19
25/23 26/22 26/23
27/1 27/4 27/7
27/9 29/16 30/8
32/2 32/4 32/5
32/6 32/11 32/14
32/14 37/14 38/16
38/17 38/19 38/19
41/2 52/19 58/16
59/2 59/25 60/2
60/5 60/8 61/4
61/20 63/12 64/2
64/11 64/16 64/17
64/20 72/6 72/7
72/12 74/9 74/12
77/25 80/16 80/18
80/18 80/21 81/8
81/11 81/13 81/23
82/1 82/2 82/8
82/17 82/19 84/22
86/5 86/10 88/15
88/22 89/24 89/25
91/6 91/10 91/11
93/10 110/18
110/23 111/15
111/19 111/24
113/9 113/17
113/19 113/21
118/25 119/7
123/16 124/1
129/21 131/6
135/19 181/23
183/16 185/25
202/11 203/19
203/24 204/14
206/22 206/23
207/7 209/6 209/9
210/25 222/1
225/10
**boatful [1]** 184/15
**boats [7]** 60/15
70/7 93/17 115/25
118/11 136/4
183/16
**bodies [2]** 69/4
91/3
**body [23]** 121/2
121/17 121/24

138/22 142/24
143/7 143/9
143/13 143/19
144/18 148/25
149/16 149/24
150/3 150/18
151/13 152/7
152/11 152/18
154/24 155/1
204/19 205/3
**border [25]** 68/9
68/16 68/21 68/22
68/25 69/8 69/11
69/18 71/16 71/17
71/25 102/22
109/12 109/14
109/15 131/6
179/19 181/1
183/6 185/6
210/12 210/20
212/2 213/23
220/12
**born [1]** 35/5
**borrow [1]** 228/16
**boss [13]** 29/16
31/9 31/12 31/13
31/14 31/14 31/19
204/12 204/13
209/5 209/9
225/13 229/13
**bottom [10]** 56/5
56/6 85/21 85/25
167/3 169/1
200/15 200/18
208/6 233/5
**bound [11]** 96/18
97/14 98/24 99/2
134/10 140/25
144/13 147/3
147/7 154/15
207/4
**bounding [3]**
138/15 138/16
138/17
**bow [8]** 79/17
81/5 82/7 83/14
203/19 203/25
204/1 204/3
**box [3]** 131/25
203/3 217/24
**brand [4]** 53/1
143/12 143/15
150/25

**brand-new [3]**
143/12 143/15
150/25
**breakdown [1]**
185/25
**breathe [3]**
100/23 100/24
138/3
**Brian [1]** 213/20
**bridge [32]** 78/17
81/6 82/17 83/7
83/15 83/17 89/11
89/16 93/6 93/7
93/25 94/8 96/1
103/24 104/11
104/12 104/13
105/2 111/21
113/24 116/13
117/1 117/4 117/7
117/8 117/13
119/8 120/12
120/13 124/20
125/14 125/20
**brief [2]** 65/17
233/19
**bro [1]** 229/6
**broad [1]** 5/13
**broadcast [1]**
155/4
**broken [1]** 138/14
**brother [1]** 68/20
**Broward [1]**
27/17
**bruises [2]**
120/23 121/24
**bruising [1]** 205/1
**bunch [3]** 6/11
61/10 89/1
**buoy [5]** 37/22
64/6 64/12 64/16
64/17
**bursting [1]**
224/21
**bus [1]** 168/10
**button [2]** 151/20
182/11

**C**

**C-E-R-T-I-F-I-C-A-
T-E [1]** 236/4
**C-L-A-I-M-S [1]**
171/11
**cabin [12]** 89/18

89/20 91/3 91/22
92/23 92/24 93/1
96/8 115/16 118/6
204/4 204/5
**cabinet [1]** 207/9
**cam [6]** 143/9
143/13 149/1
152/18 154/24
155/1
**camera [17]**
142/24 143/7
143/19 144/18
144/24 144/25
144/25 149/16
149/24 150/3
150/18 152/7
152/11 154/25
155/3 155/3
155/13
**cameras [1]**
151/13
**camp [1]** 224/14
**canceled [4]**
29/20 30/2 30/7
30/16
**CANNON [2]** 1/10
58/22
**capacity [3]** 116/7
127/25 129/1
**captain [31]** 25/6
25/15 25/23 26/1
26/1 26/3 26/3
27/24 28/1 28/3
28/4 28/5 28/15
29/20 30/2 30/7
30/9 37/16 41/9
60/11 60/12 60/14
61/4 81/8 87/8
87/16 87/18 87/21
89/24 89/25 222/2
**captain's [4]** 26/4
26/5 28/17 120/17
**captaining [3]**
60/5 60/8 104/8
**capture [3]** 96/20
150/1 152/18
**captured [2]** 12/8
150/13
**car [2]** 77/2
229/12
**carbon [1]** 217/3
**card [4]** 32/24
190/19 190/19

# C

card... [1] 207/25
carefully [2] 9/8
103/1
CARLOS [17] 2/3
17/10 34/25 35/1
35/3 35/3 37/3
46/5 88/5 88/7
104/10 160/4
161/17 163/17
163/18 163/23
186/4
carpet [1] 114/21
carriers [1] 72/22
carry [5] 72/19
115/3 121/7
135/23 136/2
carrying [1] 79/23
cash [2] 218/2
218/4
Cassisi [4] 16/23
67/6 160/24
197/13
catastrophe [1]
64/14
catch [1] 111/16
categorical [1]
11/2
caught [3] 30/6
79/4 110/19
caution [3] 47/2
51/11 51/23
CBP [12] 67/2
67/3 68/11 68/12
68/15 69/3 109/17
139/7 146/19
146/24 179/21
183/1
CBP's [1] 146/19
CBP/MIA [1]
68/12
cell [4] 118/23
198/1 200/23
208/3
cellular [10]
197/23 198/8
200/8 200/20
201/1 201/11
226/18 227/6
232/7 232/9
cemented [1]
131/1

center [1] 89/9
central [1] 171/24
certification [3]
3/22 3/23 162/10
certified [7] 3/13
3/16 162/2 162/11
162/12 162/15
162/16
certify [2] 4/6
236/5
cetera [2] 47/13
47/13
chain [1] 183/4
chair [1] 120/17
chance [3] 19/15
188/10 210/2
channel [1] 76/13
channels [1] 61/1
characteristics
[1] 83/21
charge [5] 8/17
22/11 37/25 51/10
82/2
charged [8] 18/5
19/3 19/16 19/17
28/14 49/17 50/18
186/13
charges [19]
17/20 17/23 17/25
18/3 18/6 18/8
22/10 22/16 24/20
28/18 44/24 44/25
45/3 45/5 45/8
45/17 45/18 48/4
49/14
chest [1] 219/25
chief [1] 46/12
child [1] 180/17
children [4] 40/15
118/8 139/11
174/13
China [1] 112/24
Chinese [1] 187/9
choice [1] 162/9
choose [1] 131/4
chose [1] 106/8
circle [3] 89/8
117/12 153/20
circled [1] 200/14
circling [2]
117/11 117/18
Circuit [5] 9/20
9/21 10/4 10/15

11/2 267
circulate [1]
16/19
circumstances [7]
6/9 58/25 59/4
70/7 170/18
207/12 210/7
CIS [1] 4/5
citizens [1] 20/19
Citizenship [2]
4/5 162/3
city [2] 222/3
225/10
CK [1] 75/15
claim [1] 208/24
claims [3] 171/11
171/17 225/9
clarify [2] 47/7
192/9
CLAYTON [4] 2/6
67/3 67/23 68/2
clean [1] 85/24
clear [23] 8/3
46/21 47/8 47/24
50/22 63/7 82/13
83/6 84/15 88/4
90/13 90/23 98/22
101/6 114/16
130/9 132/18
134/23 140/2
175/1 176/25
205/21 227/22
clearing [1] 89/21
click [3] 232/16
232/18 233/5
client [1] 66/4
close [4] 80/22
88/25 96/10
111/24
closed [8] 85/20
85/25 86/1 86/4
86/11 93/1 113/22
113/23
closely [2] 88/20
99/21
closer [8] 12/15
35/25 42/13 73/25
75/7 85/11 115/18
187/13
closest [2] 81/5
82/7
Closing [1]
233/11

clothes [2]
219/20 220/12
coast [20] 38/12
71/7 71/13 181/4
185/7 185/7 187/1
187/1 187/4
187/12 187/19
188/11 193/20
195/17 203/15
203/16 210/16
210/19 219/15
219/19
coastal [4] 69/7
70/21 72/5 181/4
coastline [1]
63/11
coax [1] 134/12
cocaine [7] 26/17
35/18 35/21 36/5
36/15 40/17 165/4
code [2] 170/14
231/15
codefendant [5]
4/17 27/24 47/3
116/16 170/22
coerced [1] 15/16
coercion [3] 11/8
11/17 13/23
coincides [1]
233/12
cold [1] 229/16
colleagues [2]
90/14 103/2
collected [2]
126/8 126/11
colloquy [1]
178/9
coloration [1]
72/10
Columbia [1]
113/5
Columbian [1]
112/24
column [2]
211/23 211/25
combined [1]
163/23
comfortable [1]
203/14
command [1]
89/9
commander [16]

73/12 79/13 79/14
79/20 80/10 81/4
82/6 82/9 83/13
84/18 87/7 88/18
91/5 111/11
129/10 129/12
commanding [2]
152/13 155/4
commands [9]
78/20 81/8 81/10
81/16 82/10 83/14
86/22 86/24 145/6
commence [1]
197/4
comment [1]
106/25
commenting [1]
76/14
comments [1]
51/7
commits [1]
159/19
committed [3]
22/14 24/5 24/7
common [5] 74/2
158/20 163/25
167/6 222/18
commonly [3]
135/23 148/1
158/21
commotion [2]
93/11 93/13
communicate [6]
92/20 100/22
104/25 105/22
112/6 185/2
communicated
[1] 116/15
communicating
[1] 84/19
communication
[1] 128/23
communications
[10] 86/15 86/16
86/18 116/16
213/12 213/14
225/3 225/20
226/24 227/5
company [1]
61/18
compare [1]
167/23
compartment [20]
14/16 14/24

# C

compartment...
[18] 15/13 98/3
98/4 98/18 99/8
100/13 101/5
138/8 140/18
140/21 144/24
145/4 148/10
205/9 206/22
206/23 207/5
208/11

compartments [1]
104/19

complaint [1]
6/15

complete [2]
191/11 235/8

completed [1]
168/15

complexity [1]
8/2

compliant [2]
90/2 90/6

component [1]
9/19

compute [1]
58/12

computer [5]
33/13 82/25
142/19 164/17
227/18

concealed [2]
15/1 104/22

concealment [10]
13/21 13/22 13/23
14/8 14/9 14/20
14/22 15/25 16/2
16/4

concept [1] 11/1

concern [2] 90/18
137/21

conclude [4]
14/10 15/1 15/15
164/20

conclusion [2]
54/3 235/15

concocted [1]
11/23

conditions [1]
210/9

conduct [15]
58/13 58/15 69/19

92/3 158/9 165/24
187/16 192/19
203/16 210/4
210/8 212/5
226/17 229/20
234/9

conducted [8] 4/2
6/14 129/4 185/9
187/16 205/4
210/12 210/22

confer [2] 6/22
235/13

conference [2]
8/17 46/3

conferred [1] 7/6

confess [1] 59/21

confirm [3] 16/11
165/18 208/12

confirmation [1]
7/8

conflict [1] 99/6

confront [1]
149/10

confused [1]
26/11

confusing [1]
46/24

confusion [1]
47/9

connection [1]
166/5

consciousness
[1] 14/11

consent [3]
170/17 199/10
200/7

consequence [1]
169/15

consisted [1]
137/25

consistent [6]
9/22 10/3 10/4
18/25 99/16 230/4

console [7] 94/12
94/14 94/20 95/2
132/6 133/17
134/2

conspiracy [6]
25/3 25/17 26/17
36/15 37/10 165/3

conspirator [1]
125/18

constitute [1]

7/16 267

construe [1] 42/6

contained [1]
6/24

contains [1] 6/10

contemporaneou
s [1] 151/9

Contender [1]
128/5

content [5] 43/13
46/25 196/6
196/11 196/14

contents [3] 3/15
196/19 226/18

contested [1]
15/6

context [2] 223/5
232/7

contiguous [7]
71/1 71/3 71/4
180/22 180/25
181/1 181/8

Continental [1]
181/5

continued [4]
77/11 82/9 96/2
96/13

continuing [3]
77/19 198/9
222/14

contracted [1]
143/6

control [19] 37/19
37/21 38/6 38/9
38/13 62/8 62/11
63/19 64/9 64/11
78/11 91/13 91/20
93/3 94/6 97/18
103/15 104/5
133/17

controls [2] 79/13
89/9

contusions [2]
121/24 205/1

conversed [1]
99/17

convict [1] 39/7

convicted [9]
36/12 39/4 39/25
53/15 53/17 62/16
164/25 165/7
176/12

conviction [8]

10/21 26/16 26/17
36/23 44/13
164/10 164/11
170/18

convictions [8]
33/14 34/4 34/8
36/17 36/21 36/23
63/2 63/3

convinced [1]
47/19

cooperating [1]
27/22

coral [3] 60/21
60/22 60/24

corner [6] 75/16
167/20 195/13
197/18 200/14
217/15

corrected [1]
148/16

corrections [2]
145/25 146/1

correlated [1]
107/15

corresponded [1]
173/19

corresponds [2]
232/23 233/12

Counsel's [1]
57/7

count [21] 9/5 9/7
10/14 18/5 19/1
19/1 19/17 47/11
47/12 47/12 48/1
48/4 48/7 48/20
48/23 49/2 49/2
49/2 49/16 118/2
205/16

counter [4]
197/17 199/1
215/6 222/25

counterpoint [1]
15/21

countries [3]
112/18 112/22
185/15

country [2]
112/24 142/4

counts [29] 18/11
18/18 18/20 18/20
18/23 19/18 19/21
19/22 20/2 21/13
21/20 21/22 22/23

27/19 44/17 44/19
44/20 46/22 48/18
49/3 49/9 49/11
49/17 49/19 56/8
56/12 57/11 57/18
186/13

county [31] 66/15
67/4 70/22 88/16
88/19 88/24 93/16
93/22 95/23 99/25
110/4 110/6
118/24 122/11
126/23 127/16
127/17 127/23
127/24 128/9
135/21 139/8
150/25 151/6
151/6 151/7
181/17 181/18
181/19 215/23
217/2

County's [1]
101/19

court [47] 1/1
1/24 1/24 3/9 3/18
9/16 9/23 9/24
12/7 13/10 14/6
15/8 20/20 27/13
30/14 39/9 39/12
39/15 39/25 45/9
47/21 58/12 59/1
76/17 84/3 97/25
98/10 143/4
153/10 155/17
178/15 178/15
178/18 194/19
197/15 198/24
200/1 212/22
214/17 215/4
218/7 220/1
222/22 223/15
224/5 236/9
236/10

Court's [10] 8/11
8/15 9/9 9/22 10/3
10/13 16/20 45/21
101/11 174/22

courtesy [1]
139/3

courtroom [14]
50/5 65/19 67/12
95/3 108/3 119/13
119/20 126/25

**C**

courtroom... [6]
169/2 177/20
182/7 218/15
234/12 234/24
cousin [1] 151/5
cover [5] 69/24
86/1 137/25
145/15 187/8
covered [4] 86/4
138/2 138/2 205/3
covering [2]
88/22 100/12
coverup [2] 230/1
230/2
CR [1] 1/2
cracked [1] 64/17
crash [4] 38/3
64/12 77/6 77/7
crashed [2] 37/22
64/13
crashes [1] 78/4
crashing [1]
64/11
CRC [2] 1/23
236/9
created [1] 233/9
credentials [1]
26/4
credit [1] 32/24
Creole [8] 92/16
92/17 183/21
184/1 187/7
187/10 187/12
187/22
crew [3] 76/14
76/25 175/23
crewman [1]
129/11
crime [9] 24/5
33/13 37/11 63/9
159/19 164/16
170/12 170/14
170/18
crimes [2] 22/14
159/21
criminal [13] 3/4
6/13 19/24 62/6
163/1 163/3
164/13 164/15
179/13 183/11
183/13 188/20

203/14
criteria [1] 5/13
cross [22] 2/4 2/8
2/12 2/15 2/19
4/16 5/17 5/23
17/10 17/13 50/20
51/17 102/14
102/17 124/9
124/12 141/17
175/9 175/10
175/13 192/14
233/21
cross-examinatio
n [16] 2/4 2/8 2/12
2/15 2/19 17/10
17/13 50/20
102/14 102/17
124/9 124/12
141/17 175/9
175/13 233/21
cross-examine [1]
5/17
cross-examining
[2] 4/16 5/23
crossed [1]
217/22
crosses [1] 71/16
crossing [2]
71/17 111/16
CRR [2] 1/23
236/9
crying [3] 92/18
224/21 224/24
Cuban [1] 113/4
cumulative [1]
51/9
currency [2]
215/20 221/16
curtains [3] 82/14
83/6 105/2
Cuse [3] 61/13
61/15 61/16
cushions [1]
94/19
custody [7] 33/9
132/6 135/9
137/21 189/20
189/21 210/15
customs [17]
68/9 68/15 69/11
69/20 102/22
109/12 109/15
131/5 131/8

131/10 156/19
179/19 179/20
181/2 181/2 183/6
185/6
Customs' [1]
129/21
cut [11] 52/23
53/1 53/2 99/20
106/20 107/9
136/3 136/5 137/6
223/8 229/11
cuts [1] 204/22
cutter [13] 185/8
185/8 187/2 187/4
188/12 193/20
202/24 203/15
210/16 210/20
219/15 219/19
219/23
cutters [1] 187/19
cutting [1] 135/24

**D**

D-I-M-A-R-T [1]
109/4
D.C [1] 208/1
D1 [1] 45/24
da [1] 229/12
damage [1] 61/3
Dames [7] 231/11
231/13 231/21
231/23 233/7
233/9 233/10
dangerous [4]
47/4 60/25 103/20
104/2
dangerously [1]
78/9
dark [5] 74/5
110/16 110/17
115/2 115/16
data [1] 198/21
databases [1]
171/7
Dave [2] 221/17
221/18
David [1] 145/22
daylight [1] 82/14
daytime [1] 82/14
dead [3] 80/12
80/22 203/3
deadly [1] 121/15
dealings [1]

189/25
death [2] 90/15
203/2
December 2006
[2] 35/22 35/23
December 3rd [1]
166/21
decide [7] 4/20
15/12 78/7 87/6
196/15 210/3
222/10
decided [15] 78/9
84/19 97/14
110/23 110/25
111/10 111/11
113/14 116/22
117/23 117/25
118/20 118/23
120/11 187/15
decipher [1]
226/25
decision [6]
11/10 14/10 15/25
79/10 166/25
188/4
decisions [1]
10/24
deck [20] 78/16
85/25 86/11 87/8
87/16 88/13 89/21
89/23 90/5 90/25
91/2 92/22 94/21
95/22 95/25
113/22 130/5
130/6 136/11
219/14
deckhand [1]
61/19
decreasing [1]
80/25
deducting [1]
19/4
deem [1] 12/21
deeply [1] 40/12
defendant [79]
1/7 1/17 4/16 5/22
5/23 11/24 14/15
17/17 46/16 46/18
50/18 51/5 51/12
56/12 56/25 58/11
98/15 98/24 99/4
100/25 101/24
119/16 119/20

120/5 137/15
138/7 140/17
141/10 154/11
154/9 154/14
166/1 166/23
168/5 169/9 172/2
172/3 176/4 178/9
181/16 182/5
182/7 182/14
186/9 186/13
188/15 188/17
189/25 193/24
197/22 199/13
201/20 203/9
203/21 204/23
205/8 205/14
206/7 207/5
207/15 207/20
209/13 209/15
209/21 210/4
210/14 215/9
215/15 216/14
218/1 221/16
223/7 223/9
223/19 224/8
224/20 225/4
228/7 231/14
Defendant's [21]
10/20 11/11 14/9
14/20 15/3 45/22
55/4 55/7 55/24
100/12 137/6
137/24 140/25
204/19 212/4
229/20 229/22
230/4 230/9
230/16 232/9
defendants [1]
39/10
defending [1]
69/5
defense [20] 4/4
4/14 5/23 11/9
12/6 13/25 15/20
21/3 46/11 46/17
54/25 55/2 55/9
55/20 57/6 59/4
63/18 153/14
235/18 235/19
defer [1] 12/1
definitive [1]
132/23
delay [1] 235/12

**D**

**delete [2]** 223/19 223/23

**deliberate [1]** 234/4

**deliberations [1]** 234/20

**demarcation [2]** 71/24 181/5

**demonstrate [1]** 232/9

**denial [1]** 9/23

**denials [1]** 185/13

**denied [4]** 10/13 11/5 159/14 185/22

**deny [1]** 9/11

**denying [4]** 9/8 9/9 10/13 11/4

**depart [2]** 25/14 30/13

**department [17]** 33/9 34/3 37/1 68/10 68/18 72/11 151/5 157/8 157/11 157/23 158/10 162/6 162/18 165/25 166/22 174/6 177/6

**departments [1]** 151/2

**departure [4]** 167/15 168/17 169/14 228/5

**depend [2]** 66/11 140/9

**depending [3]** 130/20 168/7 170/17

**depict [5]** 75/23 97/7 114/10 140/20 219/8

**depicted [12]** 78/23 80/5 84/22 97/18 130/21 148/25 153/15 153/18 167/3 169/1 216/4 221/1

**deportation [5]** 7/8 7/8 156/16

**deported [15]** 33/1 33/10 33/11 33/12 33/21 43/16 157/17 157/21 157/22 158/2 158/7 159/20 168/21 169/20 171/19

**deputies [2]** 101/16 101/19

**deputy [19]** 67/4 93/22 94/6 96/1 96/12 100/14 101/4 102/2 122/9 123/2 126/23 127/3 127/16 127/23 139/16 141/19 146/8 149/9 155/20

**Deputy Holloran [1]** 126/23

**descends [1]** 14/25

**descent [1]** 132/11

**description [1]** 147/12

**design [1]** 200/23

**desired [1]** 47/5

**detailed [1]** 180/9

**details [1]** 140/11

**detect [1]** 148/1

**determination [5]** 41/20 41/24 43/14 92/13 166/21

**determined [2]** 3/15 181/8

**device [3]** 123/15 135/24 232/10

**devices [2]** 41/11 72/23

**DHS [3]** 167/7 174/11 174/12

**DIANE [3]** 1/23 236/8 236/9

**didn't have [1]** 188/9

**died [2]** 64/22 90/17

**diesel [1]** 105/8

**difference [5]** 177/4 177/10

182/22 205/23 233/15

**difficult [5]** 34/24 191/20 206/24 207/3 207/11

**digitally [1]** 155/4

**diligence [1]** 3/25

**DIMART [32]** 2/10 67/3 73/13 80/1 81/3 82/5 82/8 84/11 84/17 85/18 86/3 86/11 86/15 87/5 87/10 87/16 88/18 90/8 102/4 103/17 104/4 108/15 108/25 109/4 109/9 112/1 114/3 124/14 128/24 128/25 130/5 131/17

**direct [17]** 2/7 2/11 2/14 2/18 2/22 6/21 29/19 29/25 52/13 68/5 109/7 127/13 128/12 156/13 179/10 226/1 226/6

**directed [2]** 180/10 226/24

**direction [2]** 69/6 111/2

**directions [2]** 77/20 78/2

**directive [2]** 42/7 174/11

**dis [1]** 229/9

**disagree [3]** 14/17 15/18 148/24

**disagreement [6]** 8/22 13/2 13/16 16/5 16/8 16/12

**discard [1]** 215/1

**discover [1]** 97/15

**discovered [5]** 89/5 90/24 96/21 145/15 155/9

**discovery [1]** 3/14

**discriminate [1]** 65/10

**discussion [4]** 8/1 16/9 16/19 235/9

**dismiss [8]** 9/7 10/14 11/4 22/22 44/20 56/11 56/12 57/18

**dismissal [2]** 22/16 27/19

**dismissed [6]** 44/17 45/1 45/8 45/18 57/12 57/12

**disposable [1]** 220/3

**disregard [1]** 196/20

**disseminated [1]** 143/11

**distinct [1]** 72/10

**distinctive [1]** 112/21

**distribute [1]** 165/3

**district [11]** 1/1 1/1 1/11 1/24 70/23 110/5 128/9 181/17 181/18 181/20 236/10

**DIVISION [1]** 1/2

**DNA [2]** 126/10 137/7

**docked [1]** 130/22

**docket [1]** 10/7

**document [19]** 9/16 19/5 22/12 35/8 35/16 70/1 75/13 160/18 166/20 191/21 195/12 199/7 200/6 211/7 211/9 216/4 216/12 227/3 231/4

**documents [8]** 4/6 7/22 7/23 19/16 34/12 161/21 173/25 230/12

**dollar [6]** 190/7 190/7 190/10 190/10 190/13 190/13

**dollars [3]** 32/22

32/23 221/14

**Domingo [1]** 33/11

**Dominican [11]** 26/12 112/16 112/25 113/10 116/11 117/15 165/19 186/3 186/4 204/8 204/9

**Dominicans [1]** 186/1

**doorway [1]** 87/3

**dove [1]** 107/14

**download [1]** 143/8

**downloaded [1]** 143/9

**downstairs [10]** 59/6 66/6 89/18 91/22 93/12 93/13 93/14 96/7 96/9 204/3

**draft [1]** 16/20

**draw [6]** 83/7 114/17 131/4 131/20 133/21 153/20

**drawing [1]** 200/21

**drawn [5]** 87/10 89/8 94/13 190/25 191/1

**drew [3]** 90/8 94/14 115/13

**drift [1]** 91/7

**driver [7]** 107/12 111/15 116/12 117/1 117/2 117/3 125/19

**drop [1]** 228/14

**dropped [4]** 136/11 209/2 209/8 209/8

**drug [7]** 33/4 53/15 53/18 63/4 81/18 164/10 180/16

**drunken [1]** 81/19

**dry [1]** 219/21

**dual [1]** 105/8

**duct [6]** 98/21 205/18 205/20 205/23 205/25

**D**

duct... [1] 206/2
dude [2] 204/9
204/9
duress [6] 11/8
11/17 12/1 12/6
15/20 15/24
dust [1] 184/23
duties [4] 127/20
156/24 157/11
172/21
duty [10] 33/16
33/23 70/17 70/19
72/2 73/1 88/21
103/4 128/13
183/24
DVD [1] 193/22
dynamic [1]
104/21

**E**

e-file [1] 55/2
early [4] 36/11
108/18 201/18
201/19
ears [1] 224/25
easier [2] 206/25
219/22
easiest [1] 9/3
easily [2] 100/16
100/23
east [2] 1/18
73/24
easy [3] 103/19
103/20 206/18
edited [6] 194/2
194/14 194/19
212/21 214/13
214/17
edits [2] 194/18
194/24
effect [1] 91/8
effects [2] 85/14
88/3
effort [1] 188/17
eight [5] 32/23
57/25 110/24
110/25 203/20
element [2] 9/12
10/12
Eleventh [5] 9/20
9/21 10/4 10/15
11/8

Eliazer [3] 25/16
26/24 27/3
elicited [1] 84/2
eligible [1] 165/6
Elmo [3] 160/13
200/2 232/10
else's [1] 41/15
embarked [1]
188/12
embassy [1]
159/11
emblems [1]
72/11
emerge [1] 97/17
emerged [2]
100/12 154/4
emergencies [1]
100/1
emergency [3]
79/11 80/7 135/23
emerging [2]
140/17 140/21
emotional [1]
225/2
employment [1]
112/18
EMT [1] 100/2
en [1] 162/16
enclosed [1]
131/25
encounter [9]
64/23 95/13 106/4
118/16 120/8
129/18 136/3
181/14 181/21
encountered [22]
65/5 95/2 95/21
99/1 112/17
119/16 125/11
130/5 130/24
132/5 154/15
156/25 158/12
158/24 159/3
161/20 163/20
164/2 166/4
173/13 181/16
182/3
encountering [2]
92/25 118/19
encounters [2]
83/24 185/12
energize [3]
79/11 113/25

160/6 ?
energized [1]
78/12
enforce [1]
157/12
enforcement [30]
5/8 14/24 38/9
38/13 38/18 72/10
72/12 73/2 73/4
74/14 80/11
109/23 122/13
122/20 133/10
140/3 143/25
154/12 156/19
156/19 171/7
172/12 172/22
180/6 202/11
202/12 203/23
208/13 208/18
209/17
engaged [3]
91/17 105/15
111/11
engaging [1]
113/19
engine [1] 105/8
engines [1]
111/18
English [19]
82/20 83/24 84/7
88/10 88/11 92/16
92/19 105/24
106/3 106/7
107/15 112/2
116/17 116/20
116/21 132/13
186/25 189/25
190/3
enroll [1] 29/9
enrollment [1]
29/11
ensure [1] 6/23
enter [6] 11/10
46/7 170/15
170/16 172/24
177/3
entirely [1]
196/15
entirety [9] 7/14
8/5 24/5 50/12
136/24 136/25
150/1 162/12
203/22

entitled [1] 236/7
entrance [1]
171/8
entries [4] 36/3
171/8 171/8 171/9
entry [4] 10/7
90/15 185/21
185/22
envision [1]
51/16
equally [1] 46/16
equate [1] 77/4
equip [1] 197/1
equipment [9]
72/23 74/1 74/20
76/11 79/12 79/21
79/24 80/7 80/11
equivalent [2]
77/1 190/12
error [22] 146/16
146/20 146/25
147/3 147/13
147/15 147/17
147/17 147/18
147/19 147/19
147/20 148/4
148/4 148/5 148/6
148/8 148/18
148/19 148/20
148/21 148/23
errors [1] 148/2
escape [2] 22/10
113/17
escort [1] 50/7
escorted [2]
132/15 156/2
especially [1]
80/18
ESQ [1] 1/17
essentially [4]
11/23 46/22
157/21 208/23
establish [2]
11/15 222/17
established [1]
14/12
estate [1] 116/6
et [2] 47/13 47/13
ethnicity [1]
112/13
evaluation [1]
196/16
evening [11] 3/3

73/9 73/11 81/20
119/16 128/13
210/22 228/2
234/22 235/3
236/1
event [2] 142/17
150/21
events [1] 97/7
everybody [1]
130/8
everyone [3]
92/25 101/21
200/5
everyone's [1]
92/8
evidence [48] 5/4
5/5 6/7 6/8 6/10
7/9 7/23 8/11 8/12
8/14 11/10 12/3
12/24 14/1 14/19
14/25 15/4 15/15
16/3 46/7 46/9
46/10 47/4 47/7
55/9 143/3 143/17
149/22 194/13
194/19 196/3
196/18 198/9
198/18 199/24
211/17 214/17
214/18 215/15
216/23 221/8
226/20 227/9
227/13 230/25
234/10 234/11
234/18
evidence.com [3]
143/1 143/3
143/23
examination [38]
2/4 2/5 2/7 2/8 2/9
2/11 2/12 2/14
2/15 2/16 2/18
2/19 2/20 2/22
17/10 17/13 29/19
29/25 50/20 52/14
55/18 68/5 102/14
102/17 107/5
109/7 124/9
124/12 127/13
141/17 149/7
156/13 175/9
175/13 176/23
179/10 196/17

**E**

examination... [1] 233/21
examine [2] 5/17 193/6
examined [1] 126/12
examining [2] 4/16 5/23
excellent [3] 23/6 56/2 107/1
exception [1] 194/23
exchange [2] 190/9 190/10
exchanges [1] 128/25
exciting [1] 141/19
excuse [4] 49/6 130/16 160/23 224/25
excused [12] 65/15 65/23 65/24 107/19 107/21 107/23 126/19 126/21 155/21 155/24 177/22 177/23
execute [1] 167/7
executed [1] 215/25
execution [1] 189/6
exercises [1] 3/25
Exhibit 1 [1] 55/1
Exhibit 104 [1] 223/18
Exhibit 2 [1] 80/6
Exhibit 7 [1] 136/21
Exhibit's [4] 152/25 173/12 193/7 198/13
Exhibits 103 [1] 214/3
exist [1] 174/20
exists [2] 10/5 171/17
exiting [1] 77/2
expensive [1] 151/2

experience [7] 26/5 111/4 112/16 137/23 163/22 180/21 222/18
expert [3] 204/24 206/1 206/1
expertise [1] 60/15
expiration [2] 33/4 33/6
expire [3] 28/10 28/12 28/13
expired [1] 28/5
exposure [3] 19/24 51/7 51/19
express [1] 170/17
extends [1] 181/3
extent [4] 10/16 92/8 102/4 196/21
exterior [3] 73/4 133/1 133/2
extra [6] 13/9 13/12 35/11 54/16 121/8 215/1
extrapolate [1] 50/18
eye [1] 104/9
eyes [4] 118/10 118/10 118/10 224/25

**F**

F-O-R-N [1] 228/14
face [16] 56/24 57/1 57/3 57/21 90/5 99/2 135/6 135/17 136/22 138/3 138/4 145/16 204/19 205/2 206/25 207/16
facing [1] 24/17
fact [29] 3/16 5/18 10/24 14/9 14/25 18/11 18/20 18/23 23/9 24/1 28/12 29/6 47/2 58/16 59/1 60/10 63/23 64/6 92/1 92/3 92/6 100/18 141/4 148/4 148/6

149/3 167/8 170/11 175/2
factual [6] 4/20 11/21 11/25 13/20 14/13 14/18
factually [1] 15/18
fall [1] 180/20
families [1] 59/9
family [9] 40/8 40/10 40/13 41/4 41/14 41/15 57/9 59/9 229/18
fantastic [2] 23/10 51/21
fashion [2] 7/21 235/11
fast [3] 79/6 86/6 113/16
faster [1] 111/19
fattened [1] 122/1
fear [1] 187/13
February 22nd [14] 70/16 72/1 97/8 109/20 114/11 122/20 128/12 130/1 140/22 141/19 144/11 150/2 172/16 184/2
February 24th [2] 193/25 195/18
federal [11] 24/24 39/14 44/13 73/2 73/4 73/7 143/25 146/2 158/4 165/4 172/13
feed [1] 154/25
feedback [1] 90/4
fellow [2] 103/14 141/22
felon [3] 18/12 40/25 42/3
felonies [1] 159/21
felony [13] 10/22 10/25 28/15 36/12 36/17 36/20 62/16 62/22 164/10 165/1 165/4 165/8 176/12
female [9] 101/16 101/18 101/19

102/6 118/8 122/20 122/25 223/2 223/9
females [5] 118/8 122/23 123/3 123/4 223/10
Fifteen [1] 197/8
fifth [1] 205/17
Fifty [1] 123/23
figure [2] 95/9 164/5
figures [1] 200/16
file [51] 3/8 3/14 3/15 3/24 4/3 4/5 4/10 4/24 5/4 5/5 5/6 5/9 5/10 5/17 6/9 6/24 7/5 7/9 7/21 9/17 33/18 33/18 33/25 34/2 44/8 55/2 62/6 62/8 62/10 158/18 158/21 158/21 159/25 160/7 161/14 161/21 161/22 161/24 162/3 162/11 162/16 162/18 162/19 162/20 162/22 162/23 162/24 164/7 164/16 164/23 230/8
files [2] 62/9 158/20
filled [2] 32/19 60/18
final [11] 15/25 16/18 16/19 16/20 47/10 51/22 160/22 161/3 165/22 218/11 235/2
finalize [1] 235/8
finally [3] 76/1 82/11 234/17
financial [1] 54/17
finder [1] 15/1
finders [1] 14/10
findings [1] 171/3
finger [2] 168/23

200/22
fingerprint [2] 44/2 185/11
fingerprinting [1] 174/7
fingerprints [8] 53/12 53/12 106/9 106/10 126/10 164/6 173/15 174/9
finish [3] 132/17 226/6 233/20
firearm [1] 90/7
firearms [2] 72/19 90/8
fish [2] 74/21 129/20
fishing [1] 116/3
fit [1] 116/1
fits [1] 224/21
FL [2] 1/25 236/11
flag [3] 52/23 53/2 53/3
flags [2] 75/3 82/1
flashlight [9] 96/16 99/13 99/20 115/3 121/3 121/4 121/12 124/19 134/1
flashlights [1] 121/7
fleeing [1] 13/19
FLETC [1] 183/14
flight [7] 14/8 15/25 16/2 168/13 168/16 168/17 171/7
flight/concealment [2] 15/25 16/2
flip [1] 219/21
flip-flops [1] 219/21
floor [4] 94/7 94/17 95/24 104/23
flops [1] 219/21
FLORIDA [15] 1/1 1/5 1/15 1/18 25/20 27/12 32/20 70/23 71/13 110/5 128/10 181/19

## F

**FLORIDA... [3]**
181/20 183/24
210/13
**flotation [2]** 72/23
123/15
**flow [1]** 233/20
**flowing [1]**
137/13
**fluctuating [1]**
11/1
**fluent [4]** 106/3
112/3 126/5
183/25
**fluid [1]** 139/25
**flybridge [1]**
117/9
**fo [1]** 229/11
**focus [1]** 231/5
**fodder [1]** 47/1
**follow-up [1]** 9/18
**foot [6]** 71/22
72/6 72/7 111/18
129/20 168/10
**footage [7]** 143/1
143/9 143/19
149/24 150/5
152/16 155/10
**force [2]** 121/15
229/7
**forced [1]** 90/7
**foreclosed [1]**
9/20
**foregoing [1]**
236/5
**foreign [3]** 110/11
156/25 158/23
**foresee [1]** 66/18
**forget [1]** 122/14
**forgot [2]** 144/15
144/19
**fork [1]** 77/22
**form [10]** 16/12
166/12 167/3
167/7 167/14
169/12 189/6
199/10 200/7
234/17
**formal [2]** 13/7
13/8
**formally [1]**
188/11

**formation [2]**
76/20 76/22
**forms [2]** 190/18
217/3
**forn [1]** 228/13
**FORT [10]** 1/2 1/5
1/18 1/25 27/12
27/14 27/16 131/2
131/9 236/11
**Forty [1]** 57/25
**Forty-eight [1]**
57/25
**foundation [2]**
11/15 222/17
**fourth [4]** 9/12
201/2 201/3 203/1
**frankly [1]** 46/24
**free [7]** 100/15
118/5 135/6 136/5
136/7 137/18
207/1
**freed [2]** 135/8
136/9
**freely [1]** 118/5
**Freeport [21]**
61/10 61/17 62/1
63/17 204/10
204/10 204/11
204/11 204/14
204/14 208/25
209/2 209/4 209/5
209/8 209/9
221/22 228/15
228/21 228/23
229/8
**Frequently [1]**
163/6
**front [29]** 19/12
44/7 49/22 73/6
82/7 83/13 93/25
94/1 94/6 94/8
94/12 94/14 94/16
94/19 95/2 130/13
130/16 130/19
190/24 195/12
201/11 202/4
203/25 204/1
204/3 204/4 204/5
216/15 224/23
**functionally [1]**
10/24
**furtherance [1]**
203/13

## G  267

**gap [1]** 210/24
**gas [2]** 32/11
32/19
**gauge [1]** 91/10
**gear [3]** 73/1
84/25 91/10
**general [10]** 95/5
110/21 131/8
131/22 133/21
133/22 137/3
204/19 224/17
224/19
**generated [2]**
142/15 142/17
**generates [1]**
142/19
**generation [1]**
142/19
**gentleman [1]**
104/8
**gentlemen [34]**
17/8 21/14 42/4
49/25 62/19 62/24
65/16 83/2 84/16
107/24 109/10
114/15 114/18
117/10 131/5
136/19 163/13
167/22 171/4
177/17 182/25
185/24 190/15
194/11 196/4
197/1 197/11
214/11 218/10
219/11 226/5
228/10 233/25
234/21
**Georgia [1]**
183/14
**gets [8]** 32/2
32/14 50/16 143/9
143/11 159/23
177/2 177/3
**ghost [2]** 81/1
85/1
**gird [1]** 229/11
**gives [1]** 169/13
**glare [1]** 105/3
**glasses [1]** 64/3
**Glock [1]** 115/3
**goal [1]** 47/5

**goodness [1]**
29/2
**gotten [1]** 151/15
**GOVERNMENT
[64]** 1/13 5/5 5/12
6/3 7/10 8/2 8/14
8/25 10/20 11/11
11/15 12/12 15/3
16/9 17/19 18/2
19/20 22/22 44/20
56/11 56/16 57/17
61/24 67/23 68/14
75/11 89/8 108/25
114/4 117/6
123/18 127/8
136/17 136/20
146/17 152/24
153/7 156/6
156/17 173/12
179/4 193/6
193/17 193/23
195/21 196/1
196/3 197/6
198/13 198/16
198/18 199/24
202/25 211/17
211/21 212/20
214/18 216/23
221/8 221/12
226/18 227/3
227/13 230/25
**Government's
[84]** 6/6 6/23 7/14
8/4 8/10 8/12
42/10 62/3 62/10
75/19 76/1 78/23
80/5 84/22 92/21
94/2 97/3 117/17
122/19 129/24
130/21 133/4
149/21 160/17
162/13 162/14
164/22 164/24
166/8 167/3
167/14 167/20
167/23 168/1
169/1 173/7 189/3
189/12 190/14
193/3 193/10
193/19 194/24
195/3 195/7
195/11 197/2
197/4 197/10

197/12 198/5
199/6 199/19
199/22 200/5
201/5 211/7
211/12 211/15
212/14 213/7
214/3 214/6
214/23 215/19
216/4 216/12
216/18 216/21
217/8 219/3
219/13 220/20
221/4 221/6 227/5
227/9 227/11
229/2 230/12
230/16 230/20
230/23 231/8
**grab [1]** 64/9
**grabbed [1]** 86/9
**graduate [1]** 61/6
**grammar [1]**
147/22
**grand [6]** 147/2
147/4 147/5 147/7
147/8 164/9
**Grande [1]** 69/10
**grant [1]** 51/5
**granted [3]**
165/16 204/21
227/15
**greater [3]** 176/14
190/11 222/17
**green [5]** 37/22
74/15 76/22
110/24 153/21
**greenlight [1]**
110/21
**grew [1]** 113/1
**grossly [1]** 92/4
**ground [2]** 71/22
116/12
**grounding [1]**
76/24
**group [5]** 180/13
180/15 180/16
180/20 184/12
**Guard [16]** 38/12
71/7 185/7 185/8
187/1 187/4
187/13 187/19
188/11 193/20
195/18 203/15
210/16 210/20

## G

**Guard... [2]**
219/15 219/19
**Guatemala [1]**
112/25
**guidelines [1]**
58/14
**guilt [2]**  14/11
191/6
**guilty [65]**  18/4
18/15 18/20 18/22
19/1 19/2 19/3
19/21 19/22 20/2
20/5 20/8 20/12
20/25 21/1 21/13
21/20 21/22 21/23
21/25 22/9 22/14
22/25 23/13 24/1
24/2 24/7 24/8
24/16 24/23 25/3
29/8 44/19 45/3
45/5 45/10 45/17
46/21 47/11 47/12
47/12 47/25 48/4
48/7 48/14 48/14
48/18 48/20 48/21
48/22 48/24 49/2
49/3 49/5 49/8
49/8 49/9 49/14
49/19 56/7 57/19
59/15 62/21 62/22
63/8
**Gulf [1]**  69/16
**Gully [3]**  61/13
61/15 61/16
**gun [2]**  121/13
229/4
**gunnel [1]**  113/22
**gunpoint [1]**  90/1
**guns [3]**  79/23
87/10 87/15

## H

**hair [1]**  95/7
**Haiti [3]**  120/10
159/11 188/5
**Haitian [5]**  64/23
65/3 65/10 92/1
183/21
**Haitians [3]**
120/10 186/1
186/2
**Halloran [2]**

102/2 149/9
**handcuffs [1]**
88/14
**handle [5]**  70/15
100/10 178/8
183/2 183/15
**handles [1]**  70/14
**handwriting [2]**
193/21 193/22
**handy [1]**  136/5
**hang [1]**  53/2
**happy [1]**  4/12
**Harbor [1]**  131/9
**harmless [1]**
104/1
**hatch [6]**  86/1
86/1 134/12
134/22 145/15
153/1
**hatches [1]**  96/16
**hearing [10]**
15/17 50/11 91/23
94/10 94/23 94/23
94/24 96/2 96/9
196/18
**hearsay [1]**  6/14
**heart [1]**  29/2
**heart's [1]**  43/12
**heavy [1]**  80/21
**heck [1]**  24/10
**heightened [1]**
90/22
**helicopters [1]**
70/14
**Hello [1]**  228/13
**helm [38]**  38/20
76/3 76/21 82/7
85/2 87/19 87/22
88/3 91/9 91/13
92/25 94/1 94/2
94/4 94/5 94/8
94/18 94/24 95/22
96/13 96/18 97/14
99/7 104/10
104/12 104/14
104/15 107/14
131/17 131/20
132/4 132/17
132/18 132/19
133/6 134/21
135/4 135/6
**helpful [2]**  13/11
83/2

hereby[1]  236/5
**hidden [2]**  90/25
104/18
**hide [2]**  14/11
60/1
**hiding [9]**  12/24
22/15 23/1 95/2
116/12 117/1
117/4 125/19
207/6
**highlighted [1]**
191/20
**highlights [1]**
144/8
**highly [1]**  163/23
**highway [3]**  77/3
111/6 236/10
**hired [1]**  61/16
**Hispanic [13]**
82/11 83/23 86/7
86/12 88/5 89/13
95/20 95/21
103/24 111/22
112/15 132/25
163/23
**history [4]**  6/13
160/1 164/13
164/15
**hit [6]**  64/16
71/19 76/25 79/8
79/20 163/18
**hitting [1]**  76/23
**Hobe [1]**  110/3
**hold [4]**  22/5
63/25 160/23
187/4
**holding [3]**  23/9
37/15 87/15
**HOLLORAN [17]**
2/13 67/4 93/22
94/6 96/1 96/12
97/12 100/14
101/4 118/23
122/9 122/11
126/23 126/24
127/8 139/16
146/8
**Holloran, [1]**
127/12
**home [2]**  32/15
113/2
**Homeland [26]**
33/9 34/3 37/2

68/10 68/18 72/11
157/8 157/11
157/23 158/10
162/6 162/18
165/25 166/22
170/17 170/24
171/10 172/10
174/6 177/6
179/13 179/15
179/22 183/4
187/7 213/22
**Honduras [1]**
112/25
**honest [2]**  119/9
122/6
**honestly [2]**  4/14
140/24
**Honor [150]**  3/7
3/23 4/25 6/5 7/2
7/4 7/18 8/6 8/7
8/9 8/13 8/18 8/20
9/2 9/6 10/2 10/8
10/9 12/7 13/5
13/8 13/13 13/18
14/6 14/21 16/10
16/16 16/24 17/4
19/7 21/3 34/17
35/8 35/12 43/1
46/13 50/9 50/14
51/2 51/18 52/1
52/11 54/25 55/6
55/12 65/13 66/11
66/16 66/20 66/23
67/7 67/9 67/13
68/3 96/23 97/21
97/23 98/14
101/12 102/11
102/15 107/4
107/18 108/6
108/10 108/16
109/5 114/1 120/4
123/5 124/8
126/17 126/22
127/1 136/13
141/13 149/6
149/18 152/21
153/8 155/19
156/1 156/11
160/14 169/8
173/9 175/3 175/6
177/15 177/25
178/3 178/14
178/25 179/8

182/13 184/6
188/23 189/11
189/15 191/25
192/23 194/5
194/7 194/21
195/3 195/9
195/21 195/23
195/25 196/9
196/23 197/9
197/19 198/12
199/2 199/18
199/21 211/3
211/11 211/14
211/18 212/7
212/10 214/2
214/5 214/20
214/23 216/7
216/17 216/24
218/24 219/10
220/16 221/4
221/9 222/13
222/19 225/24
226/3 226/14
226/20 227/8
227/14 230/19
230/22 231/1
232/11 235/4
235/16 235/25
**Honor's [2]**  9/8
9/11
**HONORABLE [1]**
1/10
**hope [4]**  3/3
46/16 52/22
108/13
**horizon [1]**  73/23
**hour [2]**  107/25
150/5
**hours [9]**  41/8
106/5 128/13
144/7 150/7
152/16 182/22
210/21 228/4
**house [1]**  229/6
**HSI [2]**  147/5
180/9
**huh [2]**  43/6
215/11
**hull [1]**  202/4
**human [6]**  29/4
29/6 31/20 180/18
180/19 185/3
**hunch [1]**  233/1

**H**

**Hundreds [1]**
163/8
**hurt [2]**  139/5
139/5

**I**

**I-296 [1]**  167/7
**I-860 [2]**  166/12
167/3
**I-95 [1]**  111/2
**I-O-S [1]**  150/20
**ICE [7]**  156/1
156/21 156/23
156/24 172/22
207/21 208/3
**ID [1]**  88/3
**identical [1]**
168/2
**identification [19]**
75/5 92/8 95/17
169/10 172/17
172/23 173/7
174/25 182/15
189/3 198/4 199/6
211/6 212/14
213/16 216/11
220/20 227/2
230/11
**identity [3]**  95/9
159/8 196/15
**II [1]**  1/9
**III [1]**  1/9
**ill [1]**  230/2
**ill-prepared [1]**
230/2
**illegal [13]**  18/8
18/19 23/17 24/3
28/19 40/24 41/2
58/16 92/1 92/13
123/16 159/3
173/2
**illegally [2]**  166/5
176/18
**illuminate [2]**
78/14 124/20
**illumination [3]**
115/1 121/3 134/1
**illustrating [1]**
107/14
**imagine [2]**  9/10
103/19
**immediate [2]**

129/5 129/6
**immediately [4]**
14/24 80/19 87/22
184/14
**immigration [20]**
4/5 41/21 41/25
43/15 44/8 156/19
157/5 157/7
157/12 158/12
158/18 160/1
161/20 162/4
164/2 166/4 167/1
172/13 180/7
185/11
**imprisonment [2]**
57/4 170/19
**improperly [1]**
46/15
**inaccurate [1]**
147/12
**inadmissibility [5]**
41/20 41/24
42/12 43/14
166/22
**inadmissible [4]**
11/22 42/6 43/16
169/16
**inappropriate [3]**
10/18 46/18 50/20
**inappropriately
[1]**  147/16
**inbound [1]**
110/11
**incident [3]**
139/16 142/11
143/14
**Incidentally [1]**
224/20
**inclusive [1]**
185/14
**incoming [1]**
112/6
**inconsistencies
[1]**  4/23
**incorrect [2]**
196/20 210/1
**increasing [1]**
80/24
**Incredibly [1]**
151/4
**indeed [1]**  100/17
**independently [1]**
105/10

**index [2]**  2/1
168/23
**indication [1]**
131/24
**indices [1]**  158/9
**indicted [1]**  30/23
**indictment [12]**
18/5 18/17 19/12
19/17 19/17 19/21
26/18 46/22 49/4
49/16 56/12
173/18
**individual [20]**
3/21 3/25 4/6 4/11
94/16 94/20
116/25 130/6
134/10 134/12
160/4 160/8
168/20 169/20
171/15 173/17
190/24 190/24
191/16 196/24
**individual's [2]**
87/23 132/7
**individually [1]**
173/16
**individuals [16]**
4/2 4/15 20/17
65/5 95/17 158/14
164/17 171/9
172/17 173/13
174/4 175/17
184/25 185/4
185/5 212/1
**indulgence [2]**
101/11 174/22
**infer [1]**  14/8
**inference [2]**
194/17 214/15
**influx [1]**  183/25
**information [8]**
4/10 5/15 6/11
31/23 33/13 34/21
164/17 231/9
**initial [4]**  190/19
195/12 210/2
217/18
**initialed [1]**
217/22
**initialing [1]**
190/21
**initially [10]**
73/23 81/14 89/16

90/2 93/8 95/2
103/17 105/23
117/14 209/1
**initials [16]**  75/13
75/20 97/5 114/7
114/13 173/18
189/8 191/6 192/8
192/10 192/11
192/13 193/21
193/22 211/22
217/12
**initiate [2]**  77/13
78/9
**injured [3]**  99/22
99/24 100/6
**injuries [6]**  99/16
99/18 100/7
138/21 204/19
204/22
**injury [1]**  99/24
**ink [1]**  191/21
**inlet [39]**  61/21
70/20 70/22 73/14
73/17 73/20 73/24
74/2 76/10 76/20
77/11 77/11 77/16
78/1 79/9 80/15
80/15 81/2 84/25
85/6 85/8 85/9
85/10 85/16 91/12
109/22 110/2
110/14 110/19
110/22 111/25
128/6 128/15
129/5 129/19
130/24 131/2
131/9 172/18
**inquire [2]**  68/3
179/8
**inquiry [1]**  165/25
**ins [1]**  4/9
**insignia [1]**  73/1
**insinuating [1]**
51/11
**insofar [1]**  150/2
**inspect [2]**  99/21
121/16
**inspections [1]**
69/19
**inspector [2]**
179/20 185/22
**inspects [1]**
185/22

**instance [2]**
152/1 161/9
**instances [1]**
174/3
**instead [2]**  20/2
107/13
**instruct [1]**  12/5
**instructed [5]**
14/3 40/25 131/17
196/13 212/22
**instruction [32]**
9/4 9/13 9/15 9/16
9/23 10/3 10/7
10/12 11/5 11/8
11/17 11/21 12/1
12/13 12/18 12/19
13/2 13/6 13/9
13/19 13/24 14/12
14/19 15/8 15/19
15/20 15/24 15/25
16/2 134/13 194/6
214/10
**instructions [8]**
8/24 13/17 16/5
16/18 42/5 51/13
51/23 235/8
**intend [3]**  5/17
54/24 235/14
**intended [1]**  7/6
**intends [1]**
235/19
**intent [2]**  165/3
204/13
**intention [1]**
11/14
**intentionally [2]**
12/23 15/1
**interact [1]**  106/8
**interceptor [2]**
70/21 72/5
**interdicted [3]**
118/11 184/17
184/19
**interdiction [9]**
68/9 68/13 68/24
90/19 109/18
180/11 183/7
184/3 184/8
**interdictions [2]**
121/8 185/14
**interest [1]**  203/7
**interested [1]**
202/9

**I**

interior [1] 85/11
interject [1] 95/1
internal [1]
227/17
international [1]
70/8
interpreter [2]
183/22 187/23
interrupt [3] 6/6
82/23 94/11
intervention [1]
100/8
interview [28]
147/5 186/24
187/16 188/11
188/14 188/17
188/19 189/19
192/20 193/20
194/25 200/9
202/15 202/23
203/17 205/4
210/2 210/4 210/8
210/12 210/22
212/5 212/16
214/9 218/1
220/11 222/6
222/14
interviewing [1]
220/5
interviews [4]
6/14 187/3 187/17
203/16
Intracoastal [2]
77/22 81/18
introduce [4]
46/11 46/20 50/11
54/24
introduced [4]
7/17 11/12 194/19
214/17
introduction [2]
7/22 47/3
investigated [1]
202/22
investigating [1]
180/17
investigation [8]
180/11 182/20
183/3 187/23
188/20 203/14
226/17 234/10

investigations [6]
172/10 179/14
179/16 179/22
180/14 213/22
investigative [1]
183/11
investigator [5]
179/13 179/23
179/25 180/4
183/13
involvement [1]
39/5
Irish [1] 184/15
Isinglass [1] 83/9
island [6] 60/25
61/12 63/16
113/14 113/20
168/10
islands [1] 63/16
issuance [1] 16/2
issue [22] 3/8
3/12 4/20 4/20 5/1
5/3 5/21 9/14 9/22
9/25 11/18 12/2
12/4 12/11 13/24
14/7 15/8 46/2
46/15 99/19 100/3
217/8
issued [1] 143/14
issues [5] 3/10
8/16 10/21 235/2
235/9
it just [1] 28/12
Italian [1] 187/10
item [7] 9/1 76/2
97/3 189/4 198/5
217/5 217/6
items [3] 136/17
212/15 221/1

**J**

J-A-S-O-N [1]
109/3
jacket [1] 123/25
jackets [2] 123/12
123/17
Jacksonville [1]
122/14
jail [5] 24/21 66/2
66/14 66/15
176/13
JAMES [7] 2/13
67/4 118/23

122/10 122/11
127/8 127/11
January 12th [1]
168/19
JASON [5] 2/10
67/3 73/13 108/25
109/3
jetties [2] 76/15
76/19
jetty [2] 77/10
79/8
job [4] 25/8 32/9
107/1 183/17
JOHN [1] 1/13
joined [2] 122/8
122/12
joint [1] 13/1
Joseph [1]
145/22
Josh [8] 111/10
111/13 111/13
111/15 172/9
179/1 179/7
213/20
JOSHUA [2] 2/21
179/4
journey [1] 95/14
judge [21] 1/11
11/7 16/7 16/14
17/12 28/24 45/21
46/5 49/23 50/25
57/10 58/20 58/22
58/22 58/23 108/8
124/11 141/16
198/15 222/8
235/6
judgment [1]
103/5
jump [7] 27/4
84/13 85/18 85/20
187/14 187/18
221/23
jumped [5] 84/16
84/20 84/21
113/15 114/21
Jupiter [1] 113/14
jurisdiction [3]
71/7 128/7 128/16
jurisdictions [1]
33/15
jurors [11] 16/22
56/1 67/20 108/18
166/10 178/13

196/24 214/19
214/25 232/22
235/12
jury [81] 1/10
6/11 9/4 12/5
12/19 12/22 14/2
14/8 14/14 15/4
15/12 15/15 15/21
17/5 17/6 29/12
47/1 48/13 50/4
50/5 50/17 51/11
51/23 52/6 52/8
53/20 62/19 62/24
65/18 65/19 67/6
67/15 67/18 67/19
83/2 84/16 108/2
108/3 108/19
109/10 114/16
114/18 117/10
131/5 136/19
144/22 146/15
147/2 147/4 147/5
147/7 147/8
147/11 150/7
163/14 167/22
173/16 177/19
177/20 178/20
178/21 183/1
185/24 186/6
187/18 190/15
192/9 194/11
204/18 212/22
218/14 218/15
218/19 218/21
222/10 227/22
228/10 234/4
234/23 234/24
235/8
jury's [1] 226/9
justify [1] 14/13

**K**

K-I-M-B-A-L-L [1]
68/2
Kendall [2] 67/3
205/6
kidnapped [1]
202/17
kidnapping [1]
202/17
kilograms [1]
165/4
kilos [2] 26/16

33/8
KIMBALL [18] 2/6
67/23 68/2 102/19
107/7 107/20
113/23 116/10
118/19 120/11
122/8 133/13
133/14 133/16
134/4 140/17
205/7 205/8
kinda [1] 78/18
knee [3] 135/14
135/15 138/11
knees [1] 135/7
knots [1] 81/2
know how [1]
29/8
knows [3] 9/6
88/11 224/8

**L**

L-I-B-A-S-C-I [1]
129/14
lacerations [1]
204/22
lack [1] 184/23
ladder [10] 86/5
86/13 86/21 87/2
90/5 91/9 131/22
132/1 132/15
132/16
ladies [34] 17/8
21/14 42/4 49/25
62/19 62/24 65/16
83/2 84/15 107/24
109/9 114/15
114/17 117/10
131/5 136/19
163/13 167/22
171/4 177/17
182/25 185/24
190/15 194/11
196/4 197/1
197/11 214/11
218/10 219/11
226/5 228/10
233/25 234/21
lady [1] 223/9
land [7] 64/2
85/12 113/13
142/4 142/6 181/9
187/19
landed [2] 113/22

**L**

**landed... [1]**
114/21
**landfall [1]** 85/13
**lane [1]** 111/7
**language [5]**
105/24 184/1
187/7 187/8 190/4
**languages [1]**
112/1
**large [13]** 6/14
34/15 69/4 72/9
74/19 74/21 74/22
80/18 80/21 87/11
141/23 183/25
210/24
**largely [2]** 69/3
69/11
**larger [1]** 112/5
**Las [1]** 1/18
**latest [1]** 9/21
**Latin [1]** 112/22
**Lauderdale [3]**
1/18 27/14 27/16
**law [37]** 5/8 9/7
10/16 14/24 22/9
24/12 24/18 24/19
38/9 38/13 38/18
42/7 47/2 51/14
72/10 72/12 73/2
73/4 74/14 80/11
109/23 122/20
133/9 140/3
143/25 154/12
157/12 158/4
165/4 171/7
172/13 202/11
202/12 203/23
208/13 208/18
209/16
**lawful [2]** 158/25
185/16
**lawfully [2]**
159/19 172/24
**laws [1]** 180/7
**lay [1]** 222/17
**laying [5]** 94/16
94/19 95/23
104/23 130/6
**learned [1]**
229/11
**lectern [1]** 22/5

**led [2]** 202/21
202/22
**left-hand [9]**
132/1 197/18
199/1 200/13
211/22 211/25
215/6 217/24
222/25
**leg [1]** 209/25
**legal [12]** 3/17
3/19 4/20 11/2
141/23 157/23
158/4 171/8 171/9
185/19 194/13
214/11
**legally [4]** 71/20
169/23 194/16
214/14
**legitimate [2]**
194/13 214/12
**legs [7]** 100/18
135/13 136/22
138/13 145/16
206/25 218/11
**Leroy [6]** 231/10
231/13 231/21
231/23 233/8
233/10
**letters [1]** 73/6
**letting [1]** 234/3
**Libasci [2]** 123/2
129/10
**license [4]** 26/2
28/5 28/12 28/18
**licensed [4]** 28/4
28/5 60/12 60/14
**Licenses [1]**
28/10
**lien [1]** 191/7
**life [14]** 41/3 57/9
61/23 112/19
123/12 123/17
123/25 161/18
176/9 177/1 229/5
229/14 229/15
229/15
**lifting [1]** 96/16
**light [13]** 37/22
64/2 64/6 64/6
79/20 110/16
110/21 115/5
115/6 121/1 121/9
121/16 228/24

**lighting [1]** 115/1
**lights [20]** 64/5
64/12 72/13 73/23
74/4 74/6 74/7
74/14 74/14 74/15
75/6 78/13 78/13
78/13 78/18 79/12
80/11 110/20
111/11 129/22
**limit [3]** 71/19
181/21 186/19
**limited [4]** 163/16
196/5 202/23
203/17
**lines [8]** 88/15
136/4 187/8
190/25 191/1
191/19 192/4
192/5
**lineup [2]** 66/25
67/1
**lip [1]** 122/1
**list [4]** 7/12 7/20
36/20 55/2
**listen [4]** 145/8
196/12 223/19
234/6
**literally [3]** 80/16
162/15 232/25
**load [1]** 41/2
**local [1]** 88/20
**location [6]** 88/25
110/4 159/12
224/13 224/17
224/19
**locations [4]**
98/24 101/9
137/16 141/9
**log [2]** 171/14
171/17
**logged [1]** 155/1
**Lopez [1]** 10/17
**loud [2]** 132/22
187/5
**loudly [1]** 81/7
**Louis [1]** 70/20
**lounge [2]** 134/22
135/7
**lower [9]** 115/8
187/3 187/5
195/13 197/17
199/1 200/15
217/15 217/15

**Loxahatchee [1]**
224/14
**Lubin [16]** 31/3
53/8 53/9 95/13
95/23 104/22
106/10 106/13
125/12 125/15
125/21 125/23
186/9 186/12
186/12 188/6
**Lubin's [1]** 53/12
**Lucie [16]** 61/21
66/15 70/22 73/19
73/24 74/2 77/17
77/18 77/21
109/22 110/2
128/6 128/15
129/5 129/19
172/18
**lunch [4]** 107/25
108/9 108/11
108/13

**M**

**M-I-K-E-Y [1]**
229/9
**M-O-N-D [1]**
228/18
**maintained [5]**
34/3 154/9 157/7
157/10 157/15
**maintains [2]**
156/25 162/7
**male [23]** 82/11
83/23 86/7 86/12
88/5 89/14 95/7
95/20 95/21
101/23 102/8
103/24 111/22
112/15 119/10
119/12 119/13
125/14 126/2
129/15 132/5
132/25 145/15
**males [4]** 118/8
123/3 123/4 130/6
**man [5]** 61/16
83/3 95/19 113/9
124/24
**managed [1]** 61/9
**Manatee [2]**
128/17 128/19
**mandatory [1]**

24/17
**maneuver [1]**
91/11
**manipulate [1]**
207/11
**March 1st [1]**
145/23
**marina [4]** 208/1
221/25 224/15
224/16
**marine [22]** 68/9
68/12 68/12 68/23
68/24 68/24 68/25
70/13 70/13 73/14
101/19 102/24
109/13 118/24
127/22 135/21
180/14 183/1
183/5 183/6 185/3
185/6
**mariner [1]** 25/23
**maritime [10]**
71/16 71/25 77/1
90/19 93/4 106/22
109/17 117/8
183/5 183/9
**marker [3]** 64/6
76/22 77/10
**markings [8]** 72/8
72/10 73/2 73/3
75/3 75/5 76/7
82/1
**Marshal [3]** 50/6
65/25 66/13
**marshals [2]**
16/25 66/5
**MARTIN [27]** 1/17
1/17 67/4 70/22
88/16 88/18 88/24
93/16 93/22 95/23
99/25 101/19
110/4 110/6
118/24 122/11
126/23 127/16
127/17 127/24
128/9 135/21
139/7 150/25
151/7 181/18
181/19
**masse [1]** 162/16
**massed [1]** 59/5
**match [1]** 164/5
**matched [1]** 92/4

# M

**material [1]** 206/3
**Matt [3]** 113/23
132/4 133/11
**matter [7]** 9/7
10/4 29/9 89/2
140/11 206/20
236/7
**matters [4]** 12/20
51/12 51/24
117/14
**max [1]** 116/7
**maximum [2]**
51/9 57/1
**May 2nd [1]** 35/7
**May 4th [1]** 10/10
**May the [1]**
147/11
**McCrae [2]** 66/3
66/21
**McMILLAN [42]**
1/13 2/5 2/7 2/9
2/11 2/14 2/16
2/18 2/20 2/22 3/6
7/3 8/8 8/17 10/1
12/4 13/3 14/5
16/15 35/14 46/1
50/13 51/1 51/25
66/9 66/24 67/11
108/5 108/14
174/24 177/24
178/23 197/1
214/8 222/12
222/16 226/2
226/7 226/12
233/18 235/3
235/14
**MCSO [1]** 127/21
**medical [7]** 100/1
100/3 100/7
122/25 123/2
139/9 204/24
**meeting [1]** 146/2
**members [1]**
76/14
**memorialize [1]**
167/8
**memory [1]**
152/10
**mens [3]** 9/19
10/19 10/22
**merely [1]** 61/17

**merits [1]** 10/18
**message [8]**
201/8 201/20
227/19 227/23
228/9 228/17
229/21 229/25
**messages [7]**
225/21 232/3
232/17 232/24
233/1 233/11
233/14
**messaging [1]**
11/11
**messagings [1]**
11/12
**methods [1]**
33/20
**Mexico [3]** 69/10
69/16 168/9
**MIA [1]** 68/12
**Miami [2]** 168/13
168/16
**Michael [2]**
129/10 129/14
**microphone [3]**
12/15 35/25
232/20
**middle [4]** 110/25
209/3 217/15
217/24
**migrant [3]** 92/5
130/7 183/25
**migrants [2]**
173/14 219/18
**Mikey [1]** 229/9
**mile [11]** 71/10
71/11 71/19 71/24
73/19 110/3 181/3
181/3 181/5
181/21 186/19
**miles [11]** 62/2
70/7 71/2 71/3
71/13 71/14 71/15
181/3 181/13
187/1 203/15
**military [1]**
227/25
**MILLER [4]** 1/23
178/18 236/8
236/9
**minimal [1]** 15/18
**minimum [2]**
14/18 24/13

**minor [1]** 186/10
**minors [2]** 174/8
174/10
**Miranda [5]** 187/2
188/20 189/23
210/18 212/4
**miss [1]** 77/10
**missing [1]**
149/16
**misspelled [1]**
147/22
**mistake [15]**
34/11 139/22
139/24 140/13
141/2 141/4 141/8
142/14 148/16
149/10 149/11
149/14 149/15
154/8 154/17
**mistaken [4]**
36/19 38/21 192/6
220/14
**modification [1]**
9/15
**modified [1]** 9/23
**mom [1]** 113/6
**moment [22]** 8/21
35/13 38/4 40/3
55/25 59/20 77/7
84/18 91/18 91/22
92/6 97/16 101/11
104/21 139/4
142/16 142/17
144/14 152/18
154/6 174/23
175/18
**momentarily [1]**
67/16
**momentum [1]**
80/20
**Monday [5]** 30/18
30/19 31/8 228/18
228/19
**monitor [2]** 82/25
132/16
**monitors [1]**
160/21
**month [2]** 173/21
174/1
**months [2]** 44/14
44/14
**mostly [1]** 123/3
**motion [9]** 9/6 9/8

9/9 10/14 11/4
49/23 50/11 51/5
84/24
**motive [1]** 51/19
**mounted [5]**
115/5 115/6 115/7
115/8 121/9
**mouth [9]** 98/5
100/12 100/15
100/21 206/8
206/15 209/12
209/17 209/24
**move for [1]**
219/9
**Mr [48]** 2/4 2/5
2/7 2/8 2/9 2/11
2/12 2/14 2/15
2/16 2/18 2/19
2/20 2/22 3/8 4/15
8/17 17/15 19/15
21/10 34/21 35/24
47/23 48/12 50/12
51/1 53/20 55/20
56/4 87/25 92/24
95/20 104/20
105/19 106/14
116/19 160/10
162/3 164/23
165/6 165/18
170/22 176/4
176/9 176/12
177/24 188/3
230/21
**Mr. [186]** 3/6 3/13
3/17 4/11 5/2 5/4
5/7 5/10 5/14 6/4
6/9 6/17 7/1 7/3
7/6 8/4 8/8 8/19
8/23 10/1 10/6
11/6 12/4 12/11
13/3 13/17 14/5
14/17 15/14 16/3
16/6 16/13 16/15
17/1 17/3 17/10
17/11 21/15 22/4
27/3 27/23 29/15
31/1 31/2 34/15
35/11 35/14 38/2
39/3 46/1 48/10
50/11 50/13 50/24
51/8 51/11 51/16
51/25 52/10 52/13
53/14 53/17 53/19

54/2 54/23 55/10
59/13 59/23 60/5
60/10 63/13 65/21
65/22 66/9 66/12
66/24 67/11 73/12
95/23 98/18 99/15
100/4 101/7
102/13 104/22
105/23 107/8
108/5 108/7
108/14 120/8
120/20 121/2
121/17 121/19
124/9 125/1 126/9
126/24 133/24
133/24 136/10
136/22 138/20
140/21 141/15
144/13 144/23
153/1 154/4 156/2
164/7 167/17
168/17 170/22
174/24 175/8
175/15 176/10
176/25 178/4
178/23 186/25
187/16 188/3
188/9 189/20
190/16 192/6
192/13 192/16
192/20 194/10
197/1 198/8
199/11 200/7
200/10 200/19
200/25 202/9
202/10 202/16
203/18 204/4
205/17 208/9
208/12 208/15
208/24 209/10
210/19 210/23
211/1 211/9
213/12 213/14
213/20 214/4
214/8 215/20
215/21 216/1
216/20 217/25
220/5 221/14
222/12 222/16
223/22 226/2
226/7 226/12
226/24 227/24
228/5 229/1 232/2

**M**

**Mr.... [8]**  232/4
233/2 233/18
235/3 235/5
235/14 235/15
235/17
**Mr. Anderson [2]**
156/2 175/15
**Mr. Carlos [1]**
17/10
**Mr. Eliazer [1]**
27/3
**Mr. Holloran [1]**
126/24
**Mr. Lubin [2]**
95/23 104/22
**Mr. McMillan [29]**
3/6 7/3 8/8 10/1
12/4 13/3 14/5
16/15 35/14 46/1
50/13 51/25 66/9
66/24 67/11 108/5
108/14 174/24
178/23 197/1
214/8 222/12
222/16 226/2
226/7 226/12
233/18 235/3
235/14
**Mr. Phillip [2]**
186/25 187/16
**Mr. Rodriguez [9]**
4/11 16/3 17/1
17/3 52/13 65/21
65/22 105/23
107/8
**Mr. Rodriguez's
[3]**  5/10 5/14
164/7
**Mr.
Rodriguez-Rodri
guez [1]**  3/17
**Mr. Roth [43]**
3/13 5/2 6/4 6/17
7/1 7/6 8/4 8/19
8/23 10/6 11/6
12/11 13/17 14/17
16/6 16/13 17/11
21/15 22/4 34/15
35/11 48/10 50/11
50/24 51/8 51/11
51/16 52/10 54/23

55/10 60/5 60/10
102/13 108/7
124/9 141/15
175/8 178/4
194/10 214/4
216/20 235/5
235/17
**Mr. Sanders [1]**
63/13
**Mr. Saunders [73]**
5/7 27/23 29/15
31/1 31/2 38/2
39/3 53/14 53/17
53/19 54/2 59/13
59/23 66/12 98/18
99/15 100/4 101/7
120/8 120/20
121/19 125/1
126/9 133/24
133/24 136/10
136/22 140/21
144/23 153/1
167/17 170/22
176/10 176/25
188/3 188/9
189/20 190/16
192/6 192/13
192/16 192/20
198/8 199/11
200/19 200/25
202/9 202/10
202/16 203/18
204/4 205/17
208/9 208/12
208/15 209/10
210/19 210/23
211/1 211/9
213/12 213/14
213/20 215/21
216/1 220/5
223/22 226/24
227/24 228/5
229/1 232/4 233/2
**Mr. Saunders'
[16]**  5/4 6/9 15/14
121/2 121/17
138/20 144/13
154/4 168/17
200/7 200/10
208/24 215/20
217/25 221/14
232/2
**Mr. Williams [1]**

73/12 87
**Mr. Woodbury's
[1]**  235/15
**Ms [4]**  16/23 67/6
160/24 197/13
**Ms. [3]**  66/3 66/21
178/18
**Ms. McCrae [2]**
66/3 66/21
**Ms. Miller [1]**
178/18
**muffled [1]**  96/5
**muffling [1]**
132/21
**multiple [2]**  34/4
34/7
**muscle [1]**
152/10
**mutual [1]**  190/10
**mysterious [1]**
149/16

**N**

**narcotics [1]**
180/18
**Nassau [7]**  25/14
25/20 26/20 27/1
61/10 61/17 61/25
**nation [1]**  168/10
**national [5]**  33/13
158/23 164/16
186/3 186/4
**nationals [3]**
156/25 173/3
188/13
**native [1]**  190/3
**nature [1]**  51/9
**nautical [8]**  71/2
71/3 71/11 71/13
71/14 71/15 71/24
130/8
**navigate [1]**  27/3
**navigated [1]**
77/5
**navigating [1]**
78/8
**navigation [7]**
63/17 74/6 74/7
74/15 75/6 76/12
81/24
**navigational [1]**
180/19
**Navionics [2]**

223/24 224/1
**NCIC [8]**  3/8 3/12
3/25 4/9 5/6 5/11
34/17 164/16
**necessary [3]**
14/19 66/19
121/15
**neck [1]**  122/3
**negative [4]**
26/13 171/3
194/17 214/15
**negotiated [2]**
209/4 209/8
**neighborhoods
[1]**  77/24
**nervous [1]**  63/24
**neutral [12]**  38/15
38/17 38/21 80/21
86/5 86/7 86/10
105/12 105/14
105/15 105/17
105/19
**nevermind [1]**
13/14
**news [1]**  228/15
**nice [4]**  32/6
108/9 108/13
236/1
**nighttime [1]**
114/23
**nine [5]**  71/14
129/8 200/17
200/17 205/15
**nobody [6]**  39/7
78/16 85/2 91/12
92/19 137/19
**noise [4]**  92/18
93/19 94/24 133/7
**noises [6]**  91/15
91/21 91/23 94/23
96/2 96/3
**noncompliant [1]**
90/20
**none [1]**  102/6
**Nope [2]**  101/1
102/7
**north [4]**  77/21
77/23 113/14
113/20
**northbound [1]**
111/6
**nostrils [1]**
137/25

**noteworthy [1]**
154/14
**notice [10]**  37/14
38/10 41/7 43/5
43/18 98/23 110/7
133/20 137/16
170/6
**noticeable [1]**
76/7
**noticed [6]**  99/1
119/6 146/16
146/25 147/1
149/13
**notification [1]**
169/13
**nuanced [1]**
15/11
**number [42]**
14/12 41/10 78/1
99/18 118/2
141/23 159/1
159/4 159/8
159/11 159/17
159/23 161/14
161/17 161/21
164/5 166/15
166/16 166/18
167/16 167/19
167/21 172/17
200/15 201/14
207/24 217/5
217/6 217/17
217/19 217/20
219/24 225/8
231/13 231/16
231/18 232/2
232/6 232/6
232/19 233/7
233/10
**Number 11 [1]**
14/12
**number 2 [2]**
217/5 217/6
**numbers [4]**
166/15 186/1
219/24 232/24
**numerous [2]**
37/2 171/7
**NW [1]**  229/9

**O**

**o'clock [1]**  30/20
**oath [1]**  233/23

**O**

**object [3]**  8/4
195/6 222/8
**objecting [2]**  6/5
13/18
**objection [48]**
3/17 3/19 5/20
5/22 6/2 6/4 8/8
8/12 46/1 46/13
50/15 51/4 51/10
54/3 54/9 55/4
55/8 65/1 65/2
97/22 175/2
189/14 194/9
195/4 195/5
195/24 196/2
198/14 198/17
199/20 199/23
201/24 211/13
211/16 214/4
214/7 216/19
216/22 219/12
221/5 221/7
222/16 223/12
227/10 227/11
227/12 230/21
230/24
**objections [1]**
16/20
**obligations [1]**
162/24
**obliged [1]**
210/17
**obscured [1]**
78/18
**observations [2]**
90/1 134/5
**observe [8]**  73/21
76/9 85/19 100/7
204/18 204/22
204/25 224/22
**observed [2]**  79/3
97/8
**obtained [3]**
27/18 162/2 212/4
**obtaining [1]**
22/16
**obtains [2]**  32/4
32/5
**occasion [13]**
72/25 107/7
118/17 123/11

133/17 138/20
158/17 165/24
172/8 172/12
182/17 188/14
204/17
**occasions [1]**
61/11
**ocean [3]**  69/8
73/19 77/19
**oceans [2]**  69/4
69/13
**October 19th [1]**
161/11
**odor [2]**  118/16
118/18
**offense [6]**  19/1
29/13 48/5 48/8
63/3 181/11
**offenses [1]**
50/17
**offer [1]**  45/25
**offering [1]**  178/4
**office [21]**  1/14
17/25 55/1 68/22
88/17 88/19 88/20
118/24 122/11
126/23 127/16
127/18 127/25
135/21 143/7
144/1 146/3 151/1
180/9 215/23
217/2
**officer [24]**  67/4
71/5 73/13 73/13
87/5 93/16 109/16
126/8 133/10
140/3 152/5
152/13 156/16
160/16 169/12
172/22 176/25
177/21 179/19
183/19 184/22
213/24 223/9
223/20
**officers [15]**
79/16 101/2
101/16 103/14
109/23 111/8
122/21 135/3
135/4 154/13
155/5 183/1 183/6
202/13 223/3
**Offices [1]**  156/20

officer [8]  1/24
68/7 156/15
158/18 167/1
217/11 234/12
236/9
**offramp [1]**  111/2
**offshore [2]**  69/8
110/3
**oftentimes [1]**
11/1
**Oh [5]**  64/25
123/7 153/21
154/19 203/11
**Olas [1]**  1/18
**open [20]**  47/21
64/18 73/19 97/25
117/23 117/25
134/22 134/23
153/10 155/17
197/15 198/24
200/1 215/4 218/7
222/22 223/15
224/5 231/12
234/19
**opening [1]**
133/22
**operation [2]**
39/6 54/19
**operationally [1]**
86/14
**operations [4]**
31/21 68/23 68/23
70/13
**opinion [5]**  9/24
78/9 206/1 206/2
234/17
**opportunity [7]**
14/15 16/18 30/23
140/16 143/19
205/5 219/19
**opposed [1]**
180/15
**oral [2]**  86/15
86/17
**order [22]**  7/7 9/8
9/11 9/13 10/13
10/15 11/4 41/20
41/24 42/21 43/15
85/24 151/20
160/22 161/3
161/6 161/9
165/22 167/2
167/6 192/8 207/4

**orders [1]**  161/5
**ordinarily [3]**
130/9 156/21
157/22
**ordinary [1]**
157/10
**organization [2]**
225/15 225/17
**organized [3]**
7/14 31/18 235/11
**organizer [8]**
31/18 31/19 31/20
31/24 31/25 32/4
32/5 125/24
**organizer's [2]**
32/9 32/17
**organizers [1]**
218/2
**oriented [3]**  34/18
69/8 69/9
**original [2]**  12/21
191/21
**originally [2]**  24/1
89/13
**originate [1]**
26/19
**outboards [1]**
72/9
**outcroppings [1]**
60/18
**outfits [1]**  219/17
**outs [1]**  4/9
**outstanding [1]**
95/8
**overboard [1]**
85/7
**overhead [1]**
113/25
**overloaded [2]**
92/4 118/3
**overly [1]**  136/5
**Overnight [1]**
235/10
**overrule [2]**  54/10
222/16
**Overruled [2]**
65/4 201/25

**P**

**P-R-O-C-E-E-D-I-**
**N-G-S [1]**  2/24
**P.A [1]**  1/17
**p.m [17]**  72/1

73/9 108/12
108/19 109/25
110/2 177/20
178/11 178/12
178/21 210/21
218/15 218/17
218/18 218/21
234/24 236/2
**pace [1]**  103/9
**Pacific [1]**  69/14
**pack [1]**  41/5
**packaging [3]**
205/21 206/3
206/3
**packed [4]**  41/3
41/6 150/10
150/16
**packing [7]**  52/14
98/22 106/10
106/21 126/6
126/8 205/24
**page [20]**  2/2
42/25 56/10 56/18
56/19 200/14
200/24 201/2
201/3 202/25
205/15 206/5
207/21 208/7
208/23 209/3
209/11 209/12
223/18 229/2
**pages [3]**  1/7
42/10 203/20
**pair [2]**  220/13
220/14
**Palm [6]**  1/15
66/6 151/5 180/10
215/23 217/2
**Panama [1]**
112/24
**panel [2]**  94/7
97/18
**pants [1]**  153/21
**paper [4]**  44/6
44/7 44/9 44/11
**papers [4]**  34/16
43/20 43/21 44/3
**paperwork [2]**
20/22 172/23
**paragraph [10]**
48/17 56/4 56/7
56/10 56/18 56/21
58/1 58/10 199/17

**P**

paragraph... [1]
205/16

parallel [1]
131/12

paramedics [1]
122/25

paramount [1]
91/18

Pardon [6]  28/9
31/16 32/3 53/16
98/8 153/4

parents [1]  113/4

part [21]  26/16
29/7 29/22 32/16
32/17 44/8 46/6
56/10 68/18 70/10
125/9 145/14
156/17 167/3
180/8 180/21
181/15 217/16
233/6

parter [1]  78/19

partial [1]  205/16

participants [2]
213/16 213/19

participate [2]
25/17 193/9

parties [12]  6/22
12/21 13/1 16/11
46/20 50/10 52/3
66/7 194/15 213/8
214/13 234/14

parties' [1]  8/22

partner [5]  79/15
80/1 109/19
113/23 116/10

partners [1]  78/6

party [3]  12/23
194/17 214/15

partying [1]  81/20

pasajeros [2]
83/25 84/3

passcode [1]
203/9

passed [3]  63/15
75/9 76/9

passengers [1]
116/8

pat [1]  94/20

path [1]  4/16

patrol [19]  68/21
68/22 68/25 69/8
69/11 69/16 71/25
72/6 72/7 73/11
109/14 128/2
128/4 210/12
210/20 212/2
212/17 213/23
220/12

patrolling [1]
70/20

pattern [2]  200/19
200/22

Pause [1]  17/2

peculiar [1]
200/16

penalties [2]
46/15 50/17

penalty [4]  56/22
56/24 57/1 57/1

pending [2]  28/18
33/14

people [82]  4/10
20/19 39/25 40/17
41/6 41/7 41/10
41/12 59/1 59/5
59/11 64/21 64/23
65/3 65/10 74/9
81/12 81/19 82/19
84/4 86/22 86/24
87/3 87/11 87/13
88/23 89/17 89/20
90/9 91/19 92/1
92/4 92/12 92/15
92/22 93/12 94/8
97/17 104/1 104/2
104/17 104/18
111/21 112/7
112/9 112/10
112/17 115/10
115/19 115/20
115/24 116/2
116/3 116/4 118/3
118/4 118/10
118/10 118/10
118/13 118/19
119/7 119/9 140/9
144/8 150/10
150/16 158/11
166/14 167/11
173/2 173/2
173/17 175/25
184/15 184/19

185/25 187/18
202/2 203/13
219/17 225/9

people's [1]  59/9

perceived [1]
139/20

perception [3]
105/20 105/25
106/6

perfect [1]  147/23

perfectly [2]
194/13 214/11

perhaps [6]  7/13
12/2 15/11 19/10
160/24 182/25

period [5]  165/11
169/14 169/24
170/19 177/7

permanent [2]
162/19 173/3

permission [6]
45/21 170/23
177/2 177/3
177/12 185/16

permitted [2]
159/15 173/4

persisted [1]  49/2

person [50]  3/24
27/25 31/13 37/9
42/18 58/18 59/11
78/17 82/23 83/10
83/21 87/18 87/19
87/22 88/4 89/15
89/24 90/25 95/1
95/3 96/17 98/2
98/10 105/4 111/3
111/13 112/12
119/19 134/24
138/19 138/20
148/9 157/17
158/23 159/3
159/10 159/23
161/5 163/17
167/8 168/25
169/13 177/11
181/13 183/16
186/12 219/23
219/25 223/7
228/25

person's [3]
158/15 163/16
231/25

personal [3]  88/2

112/19 123/15

personnel [7]
38/13 100/9 123/1
123/18 139/7
178/15 195/18

persons [5]  34/9
81/12 101/24
175/23 181/13

pertaining [1]
36/19

petitions [1]
171/15

PFD [2]  123/15
123/20

PFDs [1]  123/21

Phillip [10]  31/3
125/12 125/15
125/21 125/23
186/9 186/12
186/12 186/25
187/16

phone [40]  11/11
64/10 96/19 97/12
118/23 197/23
198/8 200/8
200/20 200/21
200/23 201/1
201/11 201/21
202/6 203/2 203/9
207/20 207/24
208/2 208/3 208/5
224/1 225/19
226/18 226/24
227/6 228/25
229/20 229/22
230/4 230/9
230/16 231/12
231/24 232/2
232/4 232/9 233/9
233/16

phone's [1]
227/17

phones [1]  198/1

photograph [8]
43/24 75/11 75/21
130/22 168/20
168/25 175/17
219/6

photographing
[1]  174/7

photographs [3]
150/13 173/14
207/8

photos [1]  174/9

pick [2]  32/15
120/11

picture [10]  29/15
83/6 85/21 133/5
145/1 145/3
155/13 220/21
220/23 221/1

pictures [4]  143/8
173/12 174/4
174/13

PIERCE [6]  1/2
1/5 1/25 131/2
131/9 236/11

piloting [2]  60/2
60/15

pistol [6]  79/23
79/25 115/3 115/4
115/7 121/14

place [13]  38/20
79/5 89/11 110/18
139/16 141/5
144/17 147/6
150/22 167/6
168/12 184/8
203/14

Plaintiff [1]  1/5

Plaintiff's [1]
168/1

plan [8]  29/18
29/18 29/23 30/1
30/3 30/4 30/11
178/4

plane [2]  33/21
113/19

planned [1]  29/22

planning [1]
102/14

plans [1]  29/16

plastic [1]  83/9

play [9]  11/19
12/3 13/25 15/4
144/22 197/10
215/3 222/21
228/15

played [11]  97/25
153/10 155/17
197/15 198/24
200/1 215/4 218/7
222/22 223/15
224/5

playing [2]  196/8
197/4

**P**

plays [1]  222/6
plea [35]  18/25
19/11 20/10 20/10
21/2 21/19 24/2
24/6 26/18 38/23
44/18 44/22 44/24
45/2 45/4 45/18
45/22 46/6 47/3
47/19 47/25 48/10
48/12 48/22 49/3
49/21 50/12 50/15
50/24 55/1 55/5
55/21 56/11 57/12
59/17
plead [26]  18/4
19/21 21/1 21/20
24/7 24/23 29/8
44/19 47/11 47/12
47/12 47/25 48/4
48/7 48/13 48/14
48/21 48/22 48/24
49/1 49/5 49/8
49/19 56/7 57/19
63/8
pleaded [1]  19/22
pleading [20]
19/2 19/2 20/2
20/3 20/5 20/8
21/13 21/22 21/23
22/14 22/25 23/13
24/8 45/3 45/5
45/10 48/18 48/20
49/9 59/14
pleasant [2]  3/3
234/22
pled [17]  18/15
18/20 18/22 18/25
20/25 21/25 22/9
24/1 24/2 24/16
25/3 45/17 46/21
49/8 49/14 62/21
62/22
plus [3]  34/4 34/7
183/10
pocket [3]  121/8
128/17 128/19
point [85]  3/18
4/19 8/2 11/19
21/3 34/20 46/20
63/12 63/18 74/4
76/23 77/12 78/8

78/15 78/22 79/1
79/11 79/18 80/8
81/1 81/15 81/22
82/1 83/20 84/10
84/21 85/2 85/9
85/21 86/25 87/2
87/5 87/8 87/10
89/5 89/22 91/15
91/16 91/25 92/7
93/1 93/10 94/4
96/14 96/19 97/14
98/12 99/19 99/21
102/8 103/22
104/9 105/5
110/16 115/9
116/19 119/22
120/15 121/13
121/14 140/6
152/7 152/11
154/3 168/7 178/9
182/9 187/15
188/7 190/21
191/13 193/6
194/5 197/3
201/17 202/5
202/8 203/6 203/8
206/13 210/14
214/2 220/25
221/24 235/14
points [4]  13/16
16/5 16/8 187/23
police [7]  59/20
64/7 73/4 73/6
135/3 135/3 152/5
policy [4]  123/20
174/7 174/11
174/12
poorly [2]  77/5
89/8
pops [1]  231/13
pornography [1]
180/17
port [4]  109/22
130/22 159/11
168/9
Port-au-Prince [1]
159/11
portside [4]  126/3
130/4 130/9
131/12
Portuguese [2]
112/3 187/10
position [10]

38/25 50/13 74/23
75/1 75/9 76/9
82/5 137/19
202/10 202/19
positioning [1]
61/25
possess [2]
165/3 172/21
post [1]  187/2
post-Miranda [1]
187/2
potential [3]  4/23
188/20 197/14
power [2]  80/23
80/24
practically [1]
10/25
practice [1]  174/9
pre [1]  8/1
pre-admit [1]  8/1
preceded [2]  63/4
164/10
precedent [3]
9/20 9/22 10/5
preceding [1]
184/14
preference [1]
226/10
pregnant [1]
118/8
preliminary [1]
11/14
prematurely [1]
15/24
preparation [1]
193/9
prepared [4]  4/23
7/20 37/1 230/2
presence [3]  50/8
215/21 216/1
present [8]  27/22
35/13 122/21
123/25 166/5
191/15 223/11
235/11
presentation [2]
146/5 146/18
presently [1]  10/5
preserve [2]  9/14
137/7
preserved [1]
11/5
preservers [1]

41/3
press [1]  151/19
pressing [1]
108/5
pressure [1]
21/11
presume [2]  16/3
32/13
pretrial [1]  9/6
prevent [1]
185/20
primarily [2]
180/16 202/8
primary [2]
171/23 196/18
primely [1]
180/10
Prince [1]  159/11
printout [1]  34/17
printouts [3]  3/8
5/6 164/17
prints [1]  191/16
prison [3]  33/4
57/2 57/21
Prisoner [2]
217/18
probable [1]  92/4
problem [6]  29/5
46/14 50/21 79/4
146/9 170/7
problematic [1]
6/11
problems [2]  61/2
229/14
proceed [6]  42/8
102/16 109/5
156/11 175/12
203/20
proceeded [1]
204/8
proceedings [12]
1/10 17/2 46/3
47/21 52/4 108/11
169/16 178/11
218/17 234/12
236/2 236/6
process [4]  91/3
92/11 92/12 207/2
processed [1]
183/18
processing [3]
89/22 91/12
172/17

produces [1]
118/16
professional [4]
60/10 61/4 129/1
222/2
profit [9]  18/9
18/19 18/24 20/3
22/18 24/3 24/12
28/19 48/2
program [2]
163/11 183/13
prohibited [3]
165/10 234/2
234/15
prohibition [1]
176/11
prohibitions [1]
234/1
projector [1]
114/1
promised [1]
204/12
promptly [2]
108/1 234/8
proof [3]  9/12
15/7 233/1
proper [1]  41/10
property [7]
215/16 215/22
215/22 215/25
216/15 217/11
217/21
proposal [2]  7/15
8/22
proposed [4]
8/25 10/7 13/2
14/11
prosecuted [3]
186/21 188/6
188/8
prosecution [1]
180/11
prosecutor's [1]
146/2
protect [1]  121/10
Protection [10]
68/10 68/16 69/18
102/22 109/12
109/15 131/6
179/19 183/6
185/6
protocol [2]
78/24 84/11

United States vs. Raymond Saunders

**P**

**prove [2]** 10/20
11/23
**proven [2]** 13/25
14/1
**province [2]** 14/2
15/12
**provisions [1]**
41/10
**public [1]** 77/24
**publicly [1]**
173/25
**publish [11]**
97/21 189/100
195/20 196/24
211/18 214/22
216/24 221/9
227/8 227/14
231/1
**Puerto [1]** 90/14
**pull [5]** 77/13
80/18 118/23
131/12 229/4
**pulled [14]** 78/12
78/15 81/4 124/18
129/19 130/4
131/10 138/10
138/11 207/16
207/17 208/7
208/8 208/11
**pulling [4]** 130/18
130/19 131/11
138/8
**punctuality [1]**
17/9
**punctuation [1]**
147/24
**punishment [2]**
51/12 51/24
**pure [1]** 64/17
**purported [1]**
12/5
**purports [1]** 44/1
**purposes [10]**
50/19 50/20
102/14 121/12
135/23 137/8
171/23 173/25
181/2 189/22
**pursuant [3]**
19/20 47/25 49/21
**pursue [1]** 203/12

**pursuing [1]**
203/7
**push [2]** 38/2
206/14
**pushed [2]** 64/8
99/18
**pushes [1]** 181/1
**pushing [2]** 74/21
85/16
**puts [4]** 82/18
84/19 162/25
191/16

**Q**

**qualifies [1]**
10/25
**quantities [1]**
6/14
**quantos [2]** 83/25
84/3
**question [27]**
15/7 16/4 18/1
20/18 25/25 31/10
34/18 38/8 40/18
41/22 42/19 45/12
45/13 46/23 49/7
51/8 65/4 75/24
107/7 107/10
107/11 112/10
123/8 175/8 191/9
206/10 215/14
**questioned [2]**
107/16 135/3
**questioning [3]**
47/10 189/22
233/19
**questions [26]**
7/1 22/6 39/23
42/6 54/22 55/20
59/14 60/4 60/7
62/5 65/13 107/1
107/18 112/8
153/16 154/20
155/19 176/22
177/15 185/1
190/17 191/15
205/11 222/16
223/1 223/5
**quick [3]** 89/3
89/4 94/20
**quote [5]** 52/23
52/23 122/17
147/12 231/15

**quotes [1]** 11/21

**R**

**radar [2]** 73/15
73/25
**radio [1]** 86/16
**Rafael [1]** 35/3
**rail [1]** 115/8
**raise [3]** 67/22
108/24 127/7
**raised [1]** 137/21
**ramp [2]** 77/2
77/25
**range [2]** 104/3
129/21
**rate [1]** 190/9
**Raymon [2]** 98/7
98/9
**RAYMOND [19]**
1/6 3/5 61/17
98/15 120/5
158/15 158/18
166/3 166/15
166/23 169/9
182/14 189/8
193/24 195/17
209/20 211/24
211/25 216/14
**re [1]** 191/24
**re-approach [1]**
191/24
**rea [3]** 9/19 10/19
10/22
**reaction [1]** 81/12
**readvise [2]**
210/17 210/25
**realize [1]** 86/25
**realized [2]** 140/7
146/20
**rear [1]** 130/14
**receipt [3]** 215/22
215/25 216/15
**recent [1]** 208/4
**recently [3]** 90/14
151/1 231/1
**recess [2]** 52/4
108/11 178/11
218/16 218/17
**recipient [1]**
228/23
**recite [1]** 190/19
**recognize [23]**
5/16 75/11 76/2

97/3 112/23 114/4
129/24 133/5
136/17 149/22
152/25 167/14
189/3 193/17
198/5 198/7 199/7
199/9 211/7
212/15 216/12
220/21 230/12
**recollection [3]**
19/11 21/7 42/11
**reconsider [1]**
10/17
**reconsideration
[1]** 10/17
**record [29]** 9/14
16/21 46/6 61/24
67/25 88/4 98/14
98/16 109/2
117/17 120/4
120/6 131/20
131/24 143/5
152/16 169/8
169/10 175/1
177/11 182/13
182/15 195/8
197/16 198/25
201/14 215/5
218/8 235/13
**recorded [7]**
150/2 187/2
192/19 194/12
200/8 212/5
212/16
**recording [24]**
12/21 13/9 97/12
97/25 155/17
193/23 194/25
196/12 196/18
197/15 197/17
197/23 198/23
198/24 200/1
212/18 214/24
215/4 218/7
222/22 222/24
223/14 223/15
224/5
**recordings [1]**
12/13
**records [14]** 3/20
4/1 36/19 37/1
37/2 62/6 95/11
143/18 157/5

157/7 157/10
157/14 162/7
208/5
**recovered [2]**
197/24 198/2
**red [6]** 74/15
94/13 110/20
119/25 130/17
169/7
**redacted [3]**
194/14 213/8
214/13
**redaction [2]**
12/13 13/9
**redactions [1]**
214/16
**reddish [1]**
182/12
**redirect [12]** 2/5
2/9 2/16 2/20
55/11 55/18 107/3
107/5 126/16
149/5 149/7
176/23
**reduced [1]** 44/14
**reduces [1]** 19/24
**reduction [1]**
28/23 39/14
**reef [3]** 60/19
60/22 60/24
**reefs [1]** 60/18
**reenter [6]** 18/12
169/22 169/23
170/23 177/7
177/12
**reentering [2]**
176/9 177/1
**reference [3]**
192/8 201/11
227/25
**referenced [2]**
174/24 216/3
**reflect [8]** 82/14
98/14 120/4 169/8
182/13 210/3
213/11 220/25
**reflective [1]** 83/8
**reflects [7]** 10/7
15/13 98/16 120/6
169/10 182/15
196/14
**reflex [1]** 144/21
**refresh [2]** 19/10

# R

**refresh...** [1]
42/11

**refreshing** [1]
21/7

**refuse** [2]  43/21
199/16

**refused** [6]  43/7
43/19 43/20 44/3
44/4 44/10

**refusing** [1]  44/5

**region** [1]  174/6

**regular** [1]  121/12

**Rehaif** [1]  10/23

**relation** [2]
196/17 203/18

**relatives** [2]
32/13 32/15

**released** [1]
155/22

**relevance** [1]
201/24

**rely** [1]  86/15

**relying** [1]  9/24

**remain** [8]  67/21
108/21 127/6
137/19 137/20
156/5 179/2
233/23

**remainder** [1]
155/15

**remaining** [1]
178/2

**remarked** [2]
100/14 100/20

**remind** [2]  10/6
233/25

**removal** [13]  8/4
33/18 41/20 41/24
42/22 156/19
161/3 167/2 167/6
168/4 168/9
168/14 170/18

**remove** [5]  6/24
100/16 100/18
100/21 185/17

**removed** [24]
5/10 7/15 8/10
42/22 43/17 126/9
136/21 145/15
153/1 157/18
158/3 158/5

160/10 161/6
164/24 165/19
167/1 168/5 168/8
170/9 170/12
170/15 207/18
221/14

**removing** [3]  5/5
98/5 138/19

**rendered** [1]
166/22

**renew** [4]  28/14
28/16 28/17 49/23

**renumbering** [1]
7/13

**repatriate** [1]
188/12

**repatriation** [1]
185/15

**rephrase** [2]
209/23 215/14

**replicate** [1]  96/4

**report** [26]
139/17 139/19
141/2 142/8
142/13 142/17
142/19 142/23
144/10 145/11
145/12 145/23
146/8 146/9
146/13 146/19
146/22 147/10
147/21 147/22
148/14 154/8
154/17 154/19
202/12 207/21

**reporter** [8]  1/24
27/13 30/14 76/17
84/3 178/18 220/1
236/9

**reports** [5]  140/7
140/9 142/15
143/18 176/7

**repository** [1]
171/24

**representative** [1]
113/10

**Republic** [4]
26/12 112/16
113/10 165/20

**republish** [1]
153/7

**request** [14]  3/18
9/11 9/14 9/15

10/16 11/4 11/17
12/5 12/18 13/24
128/20 169/22
169/22 171/6

**requested** [5]
11/7 12/12 13/9
118/22 198/25

**requests** [2]
171/18 172/4

**required** [7]  15/7
74/7 100/4 103/2
103/4 200/21
234/19

**requirement** [1]
10/19

**requirements** [1]
38/23

**rescue** [4]  77/8
99/25 139/8
139/10

**research** [1]
234/9

**resident** [1]  173/3

**resolve** [3]  5/1
17/20 17/25

**respectfully** [1]
155/25

**response** [5]  77/8
81/10 83/18 84/2
84/6

**responsibilities**
[1]  180/6

**responsibility**
[16]  20/5 20/7
20/8 22/10 22/13
22/19 22/20 22/23
23/13 23/22 23/23
23/25 24/4 44/5
69/7 141/8

**rest** [2]  204/15
205/2

**resting** [1]  235/14

**restrained** [1]
135/13

**restriction** [1]
176/14

**restroom** [5]  41/8
50/1 50/7 67/9
218/11

**result** [3]  166/25
170/19 171/2

**results** [3]  172/6
172/7 172/7

**resume** [3]  108/1
177/18 218/12

**resumed** [4]  52/5
108/12 178/12
218/18

**resuming** [2]  17/9
226/8

**retain** [1]  171/16

**retains** [1]  143/3

**retire** [1]  234/4

**retired** [6]  50/5
65/19 108/3
177/20 218/15
234/24

**return** [10]  41/1
41/2 110/22
164/22 165/6
190/14 193/13
200/24 221/15
233/22

**reverse** [2]
200/16 200/17

**revert** [1]  200/2

**review** [9]  19/15
143/19 144/4
144/7 144/10
154/25 164/7
164/9 164/23

**Ricardo** [2]
122/15 122/16

**Rickey** [4]  122/14
122/15 122/16
122/17

**Rickey --l** [1]
122/14

**Rico** [1]  90/14

**ridge** [1]  133/1

**riding** [2]  81/1
85/1

**rifle** [2]  120/11
120/14

**right-hand** [3]
75/16 167/20
195/13

**rights** [8]  20/22
188/21 188/21
190/15 191/4
191/14 192/16
211/1

**Rio** [1]  69/10

**Riordan** [1]
213/21

**rip** [1]  138/13

**rise** [9]  17/5 50/4
65/18 67/18 108/2
177/19 178/20
218/14 234/23

**river** [7]  69/8
77/16 77/17 77/18
77/21 85/13
224/14

**Riverside** [1]
221/25

**Riviera** [1]  210/13

**RMR** [2]  1/23
236/9

**road** [1]  111/1

**roaming** [1]
127/22

**Robert** [3]  211/22
212/2 213/22

**rock** [4]  60/18
76/20 76/22 77/10

**rocks** [1]  110/24

**RODRIGUEZ** [75]
2/3 2/3 3/17 3/17
4/11 4/15 16/3
17/1 17/3 17/10
17/10 17/15 19/15
34/25 35/1 35/3
35/3 35/4 35/24
37/3 46/6 47/23
48/12 52/13 55/20
56/4 65/21 65/22
87/25 88/1 88/5
88/7 92/24 95/20
95/21 104/10
104/20 104/24
105/19 105/23
106/14 107/8
116/11 116/12
116/16 116/19
119/9 124/23
125/4 125/17
125/19 126/4
160/5 160/5
160/10 161/18
161/18 162/3
163/17 163/18
163/23 165/6
165/6 165/18
165/18 170/22
172/3 176/4 176/9
176/12 177/5
177/8 186/4 186/4
188/3

# R

**Rodriguez's [9]**
3/8 5/10 5/14 46/6
50/12 55/5 162/3
164/7 164/23
**RODRIGUEZ-RO**
**DRIGUEZ [8]** 2/3
17/10 35/3 160/5
161/18 165/6
165/18 186/4
**Rodriguez-Rodrig**
**uez's [2]** 46/6
162/3
**role [6]** 29/9
29/13 31/11 37/10
37/12 60/1
**roll [7]** 52/16 53/1
101/2 101/4 137/2
206/18 207/11
**rolling [2]** 144/24
144/25
**Ron [1]** 156/1
**RONALD [4]** 2/17
156/6 156/9
213/24
**room [1]** 234/4
**rooms [1]** 116/6
**rope [7]** 52/25
53/1 53/1 53/2
53/4 106/20 107/9
**Rosco [1]** 145/22
**Rosmon [1]**
10/18
**ROTH [52]** 1/17
1/17 2/4 2/8 2/12
2/15 2/19 3/13 5/2
6/4 6/17 7/1 7/6
8/4 8/19 8/23 10/6
11/6 12/11 13/17
14/17 16/6 16/13
17/11 21/10 21/15
22/4 34/15 35/11
48/10 50/11 50/24
51/8 51/11 51/16
52/10 54/23 55/10
60/5 60/10 102/13
108/7 124/9
141/15 175/8
178/4 194/10
214/4 216/20
230/21 235/5
235/17

# S

**S-O-U-N-D-E-X [1]**
163/11
**safe [6]** 90/23
91/4 91/11 91/14
94/5 104/5
**safety [7]** 41/11
91/17 91/20
103/21 115/11
120/12 123/21
**sail [2]** 25/18
25/19
**Sailfish [1]** 208/1
**salon [1]** 89/18
**sandbag [1]** 4/14
**Sanders [1]** 63/13
**Santa [1]** 33/11
**Santiago [1]**
102/7
**SAUNDERS [120]**
1/6 3/5 5/7 27/23
29/15 31/1 31/2
38/2 39/3 50/18
53/14 53/17 53/19
53/20 54/2 59/13
59/23 61/17 66/12
98/7 98/9 98/15
98/18 99/15 100/4
101/7 101/24
119/17 119/20
120/5 120/8
120/15 120/16
120/20 121/19
125/1 126/6 126/9
133/24 133/24
136/10 136/22
140/21 144/23
145/3 153/1 154/1
158/15 166/1
166/3 166/15
166/23 167/17
169/9 170/22

172/7 176/10
176/25 177/5
177/5 181/16
182/5 182/7
182/14 186/9
188/3 188/9
188/15 188/18
189/9 189/20
190/16 192/6
192/13 192/16
192/20 193/24
195/17 198/8
199/11 199/13
200/19 200/25
201/20 202/9
202/10 202/16
203/18 204/4
205/17 208/9
208/12 208/15
209/10 209/13
209/15 209/20
210/19 210/23
211/1 211/9
211/22 211/24
211/25 213/12
213/14 213/20
215/21 216/1
216/14 220/5
223/19 223/22
226/24 227/24
228/5 229/1
231/14 232/4
233/2
**Saunders' [17]**
5/4 6/9 15/14
121/2 121/17
138/20 144/13
154/4 158/18
168/17 200/7
200/10 208/24
215/20 217/25
221/14 232/2
**say to [1]** 63/25
**scanner [1]**
185/11
**scars [1]** 120/24
**scenario [2]**
86/17 136/6
**scene [10]** 78/14
88/13 89/22 90/6
92/11 93/23 95/18
97/12 105/16
106/6

**Schmidt [3]** 192/7
195/17 199/11
**school [2]** 61/6
183/12
**scope [3]** 134/21
202/23 203/17
**scratching [1]**
192/10
**screaming [2]**
132/22 132/22
**screen [5]** 82/25
92/22 114/16
129/23 161/1
**screens [1]** 56/1
**screenshots [1]**
233/13
**scroll [1]** 233/4
**sea [2]** 74/24
185/14
**seal [1]** 72/11
**seamlessly [1]**
235/12
**search [13]** 4/2
5/13 97/13 123/13
159/25 163/11
171/2 172/2
199/10 199/16
200/7 229/20
229/22
**searched [2]**
85/22 171/5
**searches [1]**
158/10
**searching [3]**
96/13 131/18
132/17
**seas [4]** 71/2
71/12 71/15 71/21
**seat [1]** 94/19
**seating [2]** 94/1
94/7
**second [14]** 35/6
82/23 94/11 95/1
95/22 101/15
117/11 151/17
184/3 193/12
212/16 214/9
220/11 223/18
**secondary [1]**
196/6
**seconds [2]** 79/6
197/8
**secretary [3]**

170/17 170/24
177/7
**section [4]** 43/15
58/13 169/16
170/14
**secure [2]** 85/3
90/6
**secured [6]** 87/9
88/13 94/21 95/22
95/25 120/9
**security [24]** 33/9
34/3 37/2 68/10
68/18 72/11
103/13 157/8
157/23 158/10
162/7 162/19
166/22 170/25
171/11 172/10
174/6 177/6
179/14 179/15
179/22 183/4
187/7 213/22
**Security's [3]**
157/11 165/25
170/17
**seek [1]** 170/23
**seeking [1]**
185/17
**seeks [1]** 11/13
**seized [1]** 85/22
**selection [2]**
146/15 147/11
**sender [1]** 228/23
**sense [6]** 66/25
222/5 222/7 222/9
222/11 230/1
**sentence [10]**
24/13 24/17 28/23
33/4 33/7 33/11
39/14 44/13 51/9
58/12
**September 23rd**
**[1]** 35/17
**sergeant [1]**
144/17
**series [3]** 70/1
180/1 180/4
**served [2]** 41/19
41/23
**serves [1]** 171/23
**service [1]** 68/20
**services [3]** 4/5
162/4 187/6

**S**

**settings [1]** 233/7

**settles [1]** 184/24

**seven [3]** 128/1
203/20 228/4

**shadow [2]** 82/15
83/10

**shakes [1]** 41/18

**shape [1]** 81/6

**shaped [1]**
200/17

**shapes [1]** 83/1

**shaved [1]** 95/7

**sheers [2]** 136/2
136/7

**sheriff [2]** 102/2
135/22

**Sheriff's [17]** 67/4
88/16 88/19 88/20
93/16 93/22
118/24 122/11
126/23 127/16
127/18 127/24
135/21 143/7
150/25 215/23
217/2

**ship [14]** 31/17
41/3 41/6 41/10
87/19 130/14
130/14 130/21
131/7 175/24
186/16 187/14
224/9 224/11

**shipped [2]** 161/7
167/8

**ships [2]** 69/19
187/5

**shirt [7]** 98/13
119/24 120/1
120/2 169/7
182/12 220/13

**shocked [1]**
98/25

**shocking [1]**
96/18

**shoes [12]** 215/9
215/15 215/20
215/22 216/3
216/3 216/4 217/6
217/7 217/8 218/4
221/14

**shoot [1]** 121/15

**shore [1]** 187/13

**short [2]** 80/22
95/7

**shorter [2]** 12/16
218/12

**shot [4]** 90/15
90/17 97/10 205/6

**shoulder [1]**
213/1

**shown [5]** 45/4
133/5 150/14
193/16 200/4

**shrugged [1]**
112/10

**shrugging [4]**
82/21 83/19 84/8
112/12

**shut [1]** 117/24

**sic [4]** 29/9 29/11
205/6 220/2

**side [38]** 5/21
41/18 41/18 68/24
69/3 70/14 77/11
79/17 82/12 82/16
83/16 83/16
104/12 110/22
110/23 110/24
111/1 111/5
111/23 113/14
113/20 117/15
117/19 120/17
126/3 130/4
130/10 130/11
130/13 130/15
130/17 131/11
132/1 179/22
183/11 191/12
207/9 219/13

**sidebar [1]** 46/2

**sides [4]** 5/8 15/5
50/23 179/21

**sign [20]** 42/25
43/4 43/7 43/18
43/19 43/20 43/21
43/22 44/3 44/4
44/5 44/10 44/23
57/8 191/5 199/11
211/9 215/21
216/14 217/10

**signaling [1]**
79/21

**signature [4]**
189/8 200/10

217/17 217/23

**signed [6]** 20/12
20/13 46/8 199/12
215/25 217/11

**signs [3]** 121/19
185/3 191/16

**silver [2]** 117/18
131/25

**SIM [1]** 207/25

**simple [4]** 38/8
47/14 47/24 185/1

**simplest [1]**
151/23

**simultaneously
[1]** 105/9

**single [2]** 147/22
163/18

**sink [1]** 64/20

**siren [3]** 72/17
79/12 111/11

**sirens [3]** 78/13
79/20 80/11

**sissy [1]** 229/18

**sister [1]** 68/20

**situated [3]** 83/4
92/22 203/21

**situation [6]**
54/17 90/12
100/20 104/21
106/5 137/14

**sixth [1]** 206/5

**size [2]** 151/10
151/11

**sized [1]** 74/24

**skill [6]** 25/6
25/23 26/25 28/15
60/5 60/8

**skills [1]** 26/1
26/5

**slapped [1]** 229/4

**slapping [1]**
229/17

**sleeved [1]** 120/2

**slightly [1]**
105/15

**slow [2]** 76/17
84/24

**slower [1]** 80/14

**slowing [1]** 80/12

**smaller [3]**
129/20 129/20
207/9

**smuggle [11]**

20/17 24/12 25/4
25/12 25/21 25/24
28/15 29/17 30/1
30/11 32/7

**smuggled [13]**
18/24 22/17 25/1
25/10 25/11 26/12
36/4 40/10 40/24
118/13 125/7
125/9 175/21

**smuggler [2]**
53/15 53/18

**smugglers [2]**
81/18 188/7

**smuggling [40]**
11/24 17/17 18/8
18/18 20/3 20/13
20/25 21/1 22/9
22/11 23/17 24/3
24/16 27/19 28/18
29/5 29/6 29/8
30/5 31/20 33/5
33/7 35/18 35/21
36/15 39/5 48/1
54/19 92/5 118/11
130/7 141/22
164/11 175/24
180/12 180/19
185/3 185/3
207/21 219/18

**socks [1]** 220/14

**solve [1]** 29/4

**someplace [1]**
101/3

**soon [4]** 67/9
79/8 111/21 139/6

**sorts [1]** 187/8

**sought [1]** 177/11

**souls [1]** 186/2

**sound [2]** 57/6
110/3

**Soundex [4]**
62/14 163/10
163/15 163/17

**sounds [4]** 4/22
93/11 94/10 96/10

**south [10]** 76/11
76/12 76/15 76/22
77/11 77/22 77/23
110/2 183/24
236/10

**southbound [1]**
111/6

**SOUTHERN [6]**
1/1 70/23 110/5
128/9 181/18
181/19

**space [2]** 87/12
118/7

**Spanish [26]**
83/25 84/1 84/5
105/25 107/12
111/22 112/3
112/11 112/13
112/18 113/1
116/13 116/17
116/18 116/21
116/22 116/23
116/25 126/4
126/5 126/5 132/5
132/10 132/11
132/12 187/9

**speaker [3]** 106/7
107/13 187/12

**speakers [2]**
196/13 196/15

**special [36]**
127/20 153/11
172/9 172/16
173/13 179/1
179/12 179/25
180/4 183/14
189/2 189/19
193/7 193/16
194/23 197/7
197/22 198/20
199/5 200/4
209/19 211/21
212/13 213/20
213/21 213/23
215/8 219/2
220/19 221/12
222/24 223/17
224/7 226/17
227/17 231/8

**specialized [1]**
183/11

**specific [8]** 5/15
10/19 10/21 39/22
116/7 161/9
163/16 212/18

**specs [1]** 116/1

**speculate [2]**
194/18 214/16

**speculation [2]**
54/4 65/3

**S**

speed [2] 38/20
81/9
speeding [3]
80/12 84/22 84/24
spelled [1]
213/21
spelling [6] 67/25
109/2 127/10
129/13 156/8
179/6
splits [1] 77/21
spoke [10] 84/1
106/5 116/20
116/21 116/22
120/9 126/4 126/5
182/22 188/2
spoken [2] 92/9
176/4
sport [2] 74/21
129/20
sport-fish [1]
74/21
spot [1] 187/3
spotted [1] 86/19
spread [1] 221/1
spreader [1]
78/13
square [1] 131/20
St [15] 61/21
66/15 70/20 70/22
73/19 73/24 74/2
77/17 77/18
109/22 110/2
128/6 128/15
129/19 172/18
St. [2] 77/21
129/5
St. Lucie [2]
77/21 129/5
stack [1] 34/16
staged [1] 202/16
staircase [2]
117/18 117/19
Stairwell [1]
204/4
stamped [1] 44/4
stand [8] 57/3
66/12 67/15
108/16 108/17
127/4 156/4 179/1
standard [3] 11/8

190/18 192/7
standing [17]
15/2 67/21 83/11
83/13 83/17 86/7
89/16 94/4 94/17
104/14 105/4
108/21 117/15
125/6 127/6 156/5
179/3
starboard [2]
120/17 131/11
staring [1] 82/22
starting [1] 8/25
starts [3] 94/9
209/7 232/18
state [9] 12/8
39/9 67/24 68/7
105/11 105/21
109/1 143/3
152/10
stated [6] 9/10
10/13 99/6 99/10
99/12 209/10
statement [11]
15/3 15/14 96/19
140/1 188/21
206/1 208/6 208/9
208/21 208/25
223/19
statements [7]
176/7 195/16
203/4 209/21
209/23 209/25
210/1
STATES [137] 1/1
1/3 1/11 1/24 3/5
17/24 18/13 18/19
18/24 20/23 22/14
22/18 25/2 25/4
25/8 25/11 25/14
25/15 25/21 25/24
26/8 26/20 26/21
27/1 27/9 27/22
29/17 30/6 30/12
33/1 33/8 34/8
35/16 36/3 36/7
36/8 36/9 36/10
36/16 37/11 40/11
40/22 41/1 42/3
42/16 42/23 43/17
44/8 48/2 57/17
59/12 63/3 63/8
69/5 69/11 69/14

69/25 69/20 71/5
71/12 71/16 71/18
71/20 85/11
102/10 109/12
109/14 141/24
142/5 142/6 144/1
155/25 156/17
157/1 157/2 157/5
157/21 158/3
158/24 159/16
159/20 159/20
160/11 161/6
161/7 163/19
163/20 164/14
164/15 164/24
165/7 165/13
165/19 166/4
166/6 167/9
169/15 169/18
169/21 170/9
170/14 170/15
170/16 170/24
171/16 171/18
172/4 172/24
173/3 173/4 175/5
176/10 177/1
177/8 177/12
179/1 180/20
180/23 181/1
181/6 181/9
181/17 181/19
184/20 185/13
185/17 185/21
186/18 187/4
203/15 203/16
203/22 208/24
213/23 219/15
224/11 236/10
static [1] 137/14
station [2] 210/13
220/12
status [2] 28/21
158/25
statutes [1] 69/24
statutory [2]
50/17 69/22
stay [3] 86/23
110/22 226/5
stayed [1] 27/7
steel [1] 64/17
steer [2] 37/23
61/19
steerer [1] 37/15

steering [2] 63/20
132/6
step [1] 193/12
stick [1] 161/17
stipulation [2]
46/21 47/18
stood [2] 87/9
135/7
stopped [8] 75/12
111/21 141/22
197/16 199/1
215/5 218/8
222/24
store [1] 120/12
story [4] 185/23
191/12 204/8
206/12
STR8 [1] 229/10
straight [3] 49/13
138/10 229/10
strain [1] 183/10
street [1] 155/5
strength [1]
205/23
stretch [1] 218/11
stretches [1]
10/22
stretching [1]
213/3
strong [2] 106/7
107/15
stronger [2]
14/14 206/2
struck [2] 99/11
137/17
structure [2] 89/7
131/1
Stuart [1] 110/6
style [1] 74/21
subcomponent
[1] 162/6
submission [2]
13/1 47/19
submit [2] 6/8
171/15
submitted [2]
16/12 172/3
subpoena [2]
155/22 208/5
subscriber [1]
231/25
substance [1]
235/1

substantial [1]
44/14
substantive [1]
47/3
substation [1]
88/24
successful [1]
54/19
sufficient [3]
15/19 16/1 121/1
suggesting [1]
47/2
suit [4] 205/3
219/20 220/8
220/10
Suite [2] 1/14
1/18
superstructure
[1] 132/24
supervisor [4]
145/22 154/19
154/22 154/23
supervisors [1]
155/8
supplement [1]
141/5
Supreme [1] 9/24
surely [1] 115/24
surgery [1] 213/1
surprise [1] 96/15
surprised [1]
34/2
surprises [1]
178/6
surroundings [1]
91/10
suspect [2] 70/2
124/19
suspected [1]
130/6
suspicion [1]
92/10
suspicious [5]
81/24 202/13
202/14 202/14
202/16
sustained [3]
54/5 138/21
223/13
swapped [1]
220/11
sweater [1] 64/10
sweatpants [1]

**S**

sweatpants... [1] 220/14
sweatshirt [1] 220/13
sweep [2] 94/9 94/22
sweet [1] 57/6
swelling [2] 204/22 204/25
swift [1] 113/15
swim [2] 64/22 64/22
swimmers [2] 64/24 65/11
switch [1] 12/17
sworn [11] 67/21 67/23 108/21 108/25 127/6 127/8 156/4 156/5 156/6 179/3 179/4
system [24] 24/24 33/13 142/16 143/3 143/4 143/8 143/12 143/15 144/15 144/20 150/18 150/21 150/25 151/19 151/20 156/24 163/11 166/1 171/10 171/12 171/14 171/17 185/12 227/18
systems [2] 151/2 171/8

**T**

T file [1] 162/20
T-shirt [3] 119/24 120/1 220/13
T-Y-V-E-K [1] 220/1
T-Y-V-E-X [1] 220/2
table [3] 119/24 139/6 233/22
tactical [6] 72/22 73/12 73/13 79/15 135/18 136/2
tail [1] 224/7
taller [1] 12/16
tape [85] 52/14 52/16 52/22 53/2

53/4 53/7 53/12 64/9 98/5 98/19 98/21 98/21 98/22 98/24 99/2 99/2 100/11 100/15 100/16 100/18 100/21 101/3 101/4 101/6 106/11 106/12 106/13 106/21 107/8 107/16 126/6 126/8 135/8 135/13 135/14 136/3 136/9 136/21 136/24 137/2 137/4 137/6 137/15 137/24 138/9 138/11 138/13 138/14 141/9 145/15 146/11 146/22 148/12 148/22 154/6 154/9 196/8 196/12 196/18 202/13 205/9 205/11 205/20 205/21 205/24 205/24 205/25 205/25 206/2 206/3 206/5 206/8 206/14 206/15 206/16 206/19 206/19 206/21 207/12 207/16 207/18 207/19 215/3 222/21 223/8
taped [14] 52/25 122/5 135/7 135/7 135/10 135/11 135/12 137/20 137/20 139/25 205/18 206/24 209/17 209/19
TBO [1] 79/15
tears [1] 224/24
technicalities [1] 11/3
technically [2] 93/4 157/24
telephone [2] 128/24 232/7
telltale [1] 185/3

temporary [4] 4/3 162/23 162/24 183/24
tend [2] 28/10 28/12
tender [3] 123/5 124/8 141/13
tenders [2] 102/10 175/5
term [6] 42/5 117/7 157/18 157/22 158/4 184/23
termination [1] 42/12
terms [15] 3/12 61/18 65/5 71/1 93/4 110/8 130/8 140/21 151/9 157/23 162/10 173/21 181/7 185/25 210/7
terrible [1] 21/17
territorial [5] 69/15 71/2 71/12 71/15 71/21
territory [4] 47/4 69/20 71/1 180/23
testimony [12] 16/3 29/13 66/18 124/21 147/4 178/5 196/16 223/10 233/24 234/11 235/1 235/15
Texas [1] 168/9
text [8] 11/10 11/12 229/25 232/17 232/24 232/25 233/3 233/14
texting [2] 144/18 232/6
TextNow [6] 230/7 230/8 232/16 232/16 233/10 233/14
thank [68] 8/7 8/13 12/10 17/8 17/12 21/8 21/9 30/21 52/11 54/22 54/23 55/10 55/16 65/12 65/21 65/22

65/25 66/23 67/5 67/24 68/1 102/12 107/2 107/17 107/20 107/22 108/10 108/13 123/6 124/7 124/11 124/17 126/14 126/17 126/18 126/20 141/12 141/14 141/16 142/20 147/10 149/3 155/18 155/20 156/7 175/7 176/22 177/14 177/16 177/21 178/10 178/17 178/25 179/5 184/6 189/15 193/14 194/10 194/21 195/9 196/23 214/19 216/20 218/24 222/19 224/3 233/17 235/24
theatrical [2] 138/15 138/18
theory [1] 230/4
thereafter [1] 111/9
thigh [1] 209/24
thighs [2] 209/15 209/16
thinking [6] 40/10 84/6 85/3 91/21 93/12 96/8
thirds [1] 209/11
thorough [1] 210/4
thought [11] 6/18 57/8 64/5 76/23 77/7 83/25 93/8 96/6 107/12 207/2 232/24
threatened [1] 15/16
threatening [7] 225/5 225/12 225/14 225/17 225/20 226/23 227/1
threats [6] 87/14 88/23 90/11 90/21

203/3 225/7
throttle [12] 38/2 38/3 38/14 38/21 63/19 64/8 80/19 86/6 105/1 105/6 105/7 113/20
throttles [2] 105/8 105/13
throw [1] 118/14
throwing [1] 68/14
thrown [1] 217/21
thus [1] 235/13
tidal [1] 85/14
tide [1] 85/16
tie [4] 119/25 169/7 182/12 206/21
tied [7] 183/9 203/19 206/13 208/13 208/17 208/18 209/12
tight [1] 138/4
time [100] 19/14 24/2 25/1 31/2 36/16 44/7 45/25 47/23 56/13 61/7 63/12 65/17 73/22 74/4 74/6 78/22 79/3 79/4 79/5 79/14 79/25 80/22 81/22 83/20 84/21 85/5 85/7 85/14 87/5 88/9 89/5 89/15 90/20 90/24 91/25 92/7 101/15 110/8 110/16 115/9 116/10 116/19 119/6 119/16 120/8 120/15 122/18 128/18 128/20 129/7 129/8 137/6 139/4 139/20 140/24 144/14 144/21 144/23 152/7 154/9 159/8 161/20 165/11 168/5 168/7 177/18 183/23 187/15 187/23 188/10 191/13 191/17 195/2

**T**

**time... [27]**
195/20 199/18
201/17 202/8
203/6 203/8
203/12 205/4
207/1 207/16
207/17 210/17
210/24 210/24
211/11 212/21
216/17 217/21
220/6 221/3 226/8
227/18 227/25
228/5 229/7
230/19 233/15
**timeframe [1]**
184/11
**timely [1]** 7/21
**times [11]** 31/4
31/5 36/9 58/7
99/18 106/6 138/6
159/13 163/8
163/12 224/20
**timing [1]** 3/9
**title [4]** 13/7 13/8
68/7 156/15
**titled [1]** 13/7
**TLK [1]** 229/9
**tomorrow's [1]**
233/23
**total [6]** 4/1 54/20
56/21 56/24 57/1
164/9
**totally [2]** 57/10
226/7
**touch [3]** 53/7
82/25 114/16
**touching [2]** 79/1
234/6
**tough [2]** 187/2
187/5
**toward [4]** 78/20
85/12 85/13
113/20
**towards [4]**
113/13 113/13
180/10 208/6
**Tracey [3]** 50/6
65/25 66/14
**track [1]** 3/11
**tracked [4]** 70/7
73/25 159/5 159/8

**tracks [1]** 10/15
**traffic [2]** 110/8
110/23
**trafficking [3]**
164/10 180/16
180/19
**transcript [14]**
1/10 196/5 196/14
196/17 196/19
197/11 200/24
200/25 203/21
213/13 214/9
214/25 215/10
221/15
**transcription [2]**
212/18 236/6
**transcripts [1]**
178/15
**transfer [1]**
210/25
**transferred [3]**
123/16 185/5
217/21
**transom [2]** 75/3
75/7
**transported [1]**
139/10
**trauma [1]** 121/20
**travel [6]** 26/7
26/9 27/2 27/25
78/1 208/24
**traveled [1]** 27/24
**traveling [2]**
61/18 85/12
**trial [14]** 1/10 3/4
3/10 6/19 7/21
17/9 108/1 146/6
146/18 148/15
148/16 186/11
194/12 223/10
**tributaries [1]**
77/23
**trip [9]** 29/20
30/10 30/15 40/19
116/3 125/24
203/22 218/2
228/13
**trooper [1]** 77/2
**trouble [3]** 28/7
28/11 230/2
**truth [9]** 28/25
29/1 29/2 29/12
38/24 39/8 40/4

40/4 40/5
**truthful [1]** 37/12
**truthfully [2]** 39/1
39/5
**tucked [1]** 134/2
**Tuesday [7]**
30/13 30/15 30/17
30/19 30/19 31/8
228/1
**turning [2]**
195/11 209/11
**twice [1]** 151/20
**twine [1]** 53/5
**two-thirds [1]**
209/11
**Tyler [1]** 142/16
**typed [4]** 147/12
147/16 147/19
148/19
**typical [1]** 74/15
**typographical
[10]** 147/13
147/15 147/17
147/18 147/20
148/1 148/18
148/19 148/21
148/23
**Tyvek [5]** 205/3
219/20 220/1
220/7 220/10

**U**

**U.S [31]** 1/14 26/3
53/3 62/10 63/2
63/11 68/9 68/20
69/15 71/1 75/5
123/17 129/21
157/12 158/12
158/18 161/20
164/2 179/19
180/7 185/7 190/7
190/13 193/20
210/12 210/16
210/19 210/20
212/17 220/12
236/10
**U.S.C [1]** 69/25
**Uh [2]** 43/6
215/11
**Uh-huh [2]** 43/6
215/11
**ultimately [3]**
93/20 106/2 122/8

**unaccompanied
[1]** 186/9
**unavailable [1]**
30/8
**uncommon [1]**
118/13
**underneath [3]**
134/2 137/18
138/3
**understanding [9]**
5/18 17/24 19/2
44/16 45/7 56/15
58/15 197/5
222/18
**underway [1]**
84/25
**uniform [3]** 73/1
135/18 135/21
**uniformed [2]**
179/22 183/1
**unintelligible [1]**
27/12
**unique [4]** 112/23
118/18 202/1
232/25
**unit [8]** 68/12
101/18 101/19
102/24 118/22
118/24 127/22
180/9
**UNITED [135]** 1/1
1/3 1/11 1/24 3/4
17/24 18/12 18/19
18/24 20/23 22/14
22/17 25/1 25/4
25/8 25/11 25/14
25/15 25/21 25/24
26/8 27/1 27/9
27/22 29/17 30/5
30/12 33/1 33/8
34/8 35/16 36/3
36/7 36/8 36/9
36/10 36/16 37/11
40/11 40/21 41/1
42/2 42/16 42/23
43/17 44/8 48/1
57/17 59/12 63/3
63/8 69/5 69/11
69/13 69/14 69/20
71/5 71/12 71/16
71/18 71/20 85/11
102/10 109/12
109/14 141/24

142/5 142/6
143/25 155/25
156/17 157/1
157/2 157/5
157/21 158/3
158/24 159/16
159/20 159/20
160/11 161/6
161/7 163/19
163/20 164/14
164/15 164/24
165/7 165/13
165/19 166/4
166/6 167/9
169/15 169/18
169/21 170/9
170/14 170/15
170/16 170/24
171/16 171/18
172/4 172/24
173/2 173/4 175/5
176/10 177/1
177/8 177/12
178/25 180/20
180/22 181/1
181/5 181/9
181/17 181/19
184/20 185/13
185/17 185/21
186/18 187/4
203/15 203/16
203/22 208/24
213/23 219/14
224/11 236/10
**units [2]** 109/17
127/20
**unknown [1]**
90/21
**unlawful [1]**
159/4
**unlawfully [1]**
184/20
**unless [7]** 66/7
78/4 121/15
176/18 177/2
177/3 178/6
**unlock [2]** 200/20
200/23
**unmistakable [1]**
72/12
**unredacted [1]**
50/23
**unreliable [1]**

## U

**unreliable...** [1]
196/20
**untwine** [1]
106/22
**unusual** [19]
73/21 91/15 98/23
98/25 100/11
110/7 110/13
115/22 115/25
132/20 133/20
137/16 137/17
163/23 201/23
202/2 202/18
222/18 230/3
**updates** [3]  3/6
3/9 235/18
**uploaded** [2]
143/1 143/23
**upper** [6]  75/16
89/6 90/25 117/12
200/13 219/14
**upstairs** [4]  85/3
93/3 93/24 131/18
**us** [37]  58/4 61/13
68/23 70/2 73/24
81/4 81/17 84/19
87/9 91/6 92/20
93/17 101/23
122/15 127/9
134/17 135/3
144/23 146/9
149/10 156/8
179/6 187/13
191/12 191/12
191/13 201/22
202/6 202/22
204/8 209/1
209/10 217/14
219/22 222/7
226/6 233/1
**usage** [3]  135/23
158/20 200/21
**user** [2]  231/9
231/22
**usual** [1]  226/8
**utilize** [4]  90/7
156/24 171/7
206/18
**Utilizing** [1]
121/16

## V

**vacated** [2]  8/12
8/15
**valid** [2]  11/25
13/25
**vantage** [3]
104/23 105/5
154/3
**variety** [2]  112/17
113/7
**Vasquez** [2]
212/3 213/22
**venture** [5]  11/24
30/6 130/7 185/4
207/21
**venue** [3]  181/8
181/11 181/13
**verbal** [4]  78/20
78/25 81/7 81/10
**verdict** [2]  16/12
234/5
**verification** [3]
167/15 168/4
168/14
**version** [1]  40/5
**versus** [2]  3/5
190/7
**vessel** [192]
14/24 26/2 26/3
32/19 37/19 37/21
38/6 38/9 38/14
52/15 64/9 71/16
72/4 72/5 72/9
72/20 73/12 73/25
74/1 74/4 74/7
74/15 74/17 74/21
74/24 75/2 75/4
75/5 75/12 75/23
76/3 76/4 76/21
77/13 78/1 78/7
78/10 78/12 78/15
78/20 78/23 79/4
79/13 79/14 79/16
79/19 79/19 80/5
80/10 80/10 80/12
81/4 81/17 82/6
82/6 82/9 83/12
83/13 83/13 83/18
84/12 84/14 84/16
84/18 84/18 84/20
85/4 85/22 87/7
88/18 89/6 89/7
89/9 89/11 90/20
91/1 91/5 91/7
91/14 91/17 91/18
91/20 92/2 92/3
92/21 92/23 93/2
93/16 93/17 93/23
94/5 95/18 96/11
97/11 97/18 99/22
100/3 100/9 101/3
101/22 102/8
103/3 103/9
103/10 103/11
103/14 103/22
104/5 104/8
104/25 105/1
105/6 105/8
105/11 105/17
105/21 106/20
110/11 110/14
111/8 111/11
111/12 111/16
111/18 111/18
111/23 112/5
112/5 113/16
114/10 114/18
115/2 115/10
115/11 116/1
116/6 116/7 117/9
117/19 118/3
119/8 120/9
120/10 120/12
122/18 122/21
123/12 123/19
123/22 124/18
124/19 125/11
126/1 128/2 128/4
129/4 129/10
129/12 129/17
129/24 130/1
130/4 130/5
130/11 130/13
130/18 130/19
131/6 131/13
131/14 131/19
132/1 132/5
132/24 133/1
137/3 139/10
144/16 147/6
150/10 150/16
172/18 182/18
184/14 184/19
184/24 185/6
185/7 197/24
**vessels** [9]  69/5
69/25 70/15 70/21
71/5 73/15 88/25
183/8 183/25
**vest** [7]  72/22
73/5 73/6 121/7
135/22 135/24
136/2
**via** [1]  180/19
**vicinity** [2]  96/11
128/15
**video** [39]  14/15
96/20 97/10 97/15
97/18 97/25
143/22 144/17
145/7 146/19
152/25 153/2
153/10 153/15
153/18 155/16
155/17 192/19
194/12 194/14
197/15 198/24
198/25 199/25
200/1 205/2 205/5
206/16 207/15
208/10 212/5
212/16 214/12
214/22 215/4
218/7 222/22
223/15 224/5
**videotape** [2]
140/16 204/18
**videotaping** [1]
151/22
**visa** [3]  159/10
159/12 159/14
**visas** [2]  173/4
185/13
**visible** [3]  99/18
99/24 104/20
**vision** [3]  74/1
74/20 76/10
**visited** [1]  181/23
**visual** [1]  73/15
**voice** [1]  86/15
**volume** [2]  145/7
145/8
**volunteered** [1]
107/11
**vs** [1]  1/5

## W

**W-O-O-D-B-U-R-Y**
[1]  179/7
**waiver** [2]  191/14
212/4
**waiving** [1]
191/14
**wake** [2]  74/22
74/22
**walk** [1]  118/7
**walked** [2]  83/16
134/21
**Wally** [1]  228/14
**warning** [3]
170/11 170/12
170/13
**warnings** [4]
189/23 190/16
210/18 212/5
**warrant** [7]  4/2
5/13 11/21 12/1
14/19 15/19
161/25
**warranted** [1]
47/20
**warrants** [4]
33/14 163/1 163/3
163/19
**was no** [1]  38/22
**Washington** [2]
207/24 207/25
**watch** [2]  153/2
216/14
**watched** [3]
73/25 74/2 77/10
**watching** [4]
76/10 82/9 144/8
194/12
**waterborne** [1]
77/1
**Waterway** [1]
77/22
**waterways** [2]
180/19 183/7
**wealthy** [1]  151/6
**weapon** [5]  87/14
115/5 115/6 115/8
115/13
**weapon's** [1]
121/9
**wear** [1]  64/3
**wearing** [12]

## W

**wearing... [12]**
72/25 98/12
119/22 119/24
135/20 142/23
169/6 182/10
217/19 219/17
220/6 220/6
**website [4]** 143/6
143/6 143/10
143/17
**Wednesday [3]**
227/20 228/1
228/3
**weekend [1]**
116/4
**welcome [2]**
55/17 126/15
**west [4]** 1/15 66/6
77/21 180/10
**westward [1]**
77/19
**wet [1]** 219/20
**wheel [7]** 37/15
37/17 37/17 37/25
38/2 63/20 63/25
**whenever [4]**
90/18 138/9
138/12 189/19
**whereas [2]**
176/10 177/8
**white [13]** 74/15
78/13 98/13
119/24 169/7
182/11 216/3
216/4 217/6 217/7
217/7 219/17
220/8
**whoops [1]** 133/3
**WHT [1]** 229/10
**wide [2]** 64/17
113/7
**Williams [3]**
73/12 111/10
111/13
**willing [2]** 88/11
192/17
**windy [1]** 187/2
**wing [1]** 70/5
**wish [1]** 234/21
**wishes [2]** 150/7
199/16

**withdrawn [1]**
8/14
**withdrew [1]** 11/9
**witness's [1]**
222/17
**witnessed [2]**
212/1 217/10
**witnesses [6]** 2/1
2/2 67/2 223/2
234/14 235/20
**wood [1]** 131/1
**WOODBURY [38]**
2/21 111/13
153/12 172/9
172/16 173/13
179/1 179/2 179/4
179/7 179/12
189/2 189/19
193/7 193/16
194/23 197/7
197/22 198/20
199/5 200/4
209/19 211/21
212/13 213/20
215/8 217/16
219/2 220/19
221/12 222/24
223/17 224/7
226/17 227/17
231/8 233/22
234/25
**Woodbury's [1]**
235/15
**wool [1]** 219/21
**world [1]** 164/1
**worn [5]** 142/23
142/24 143/7
143/19 144/18
**worth [2]** 190/12
190/13
**wrap [1]** 107/9
**wrapped [5]** 99/2
101/7 106/21
136/4 138/4
**wrists [2]** 206/19
207/12
**writer [1]** 147/21

## Y

**yacht [1]** 32/7
**yah [3]** 229/12
229/13 229/18
**yards [1]** 85/8

**yelling [8]** 81/14
83/15 83/17 91/21
92/18 96/5 100/14
100/17
**YH [1]** 229/9
**you'd [1]** 39/22
**younger [1]** 95/7

## Z

**zero [4]** 123/23
123/24 152/12
172/7
**zone [7]** 71/1 71/3
71/4 71/11 180/22
180/25 181/8
**zones [1]** 181/1